# In the Matter of:

## *Khazanie v University of North Carolina*

---

### Stephen Regan

### February 14, 2023

---



**Chaplin & Associates**
Premier Litigation Support

www.chaplinandassociates.com
transcripts@chaplinandassociates.com

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No. 1:20-cv-01096


SUPRIYA KHAZANIE,                      )
                                       )
                    Plaintiff,         )
                                       )
        vs.                            )
                                       )
UNIVERSITY OF NORTH CAROLINA           )
AT CHAPEL HILL, UNC GILLINGS           )
SCHOOL OF GLOBAL PUBLIC HEALTH,        )
KATIE THORNSVARD, in her               )
individual and official               )
capacity as Associate Dean for         )
Finance and Business,                  )
                                       )
                    Defendants.        )
                                       )
---------------------------------

_____

VIDEO CONFERENCE DEPOSITION
OF
STEPHEN REGAN
_____


TAKEN VIA VIDEO CONFERENCE AT THE OFFICES OF:
CHAPLIN AND ASSOCIATES, INC.
132 JOE KNOX AVENUE, SUITE 100-G
MOORESVILLE, NC 28117


02-14-2023
11:06 O'CLOCK A.M.
_____

Lori Gruber
Court Reporter

Chaplin & Associates
132 Joe Knox Ave, Suite 100-G
Mooresville, NC 28117
(704) 606-1434 | (336) 992-1954 | (919) 649-4444

1
                            **REMOTE APPEARANCES**

2

3       **FOR THE PLAINTIFF SUPRIYA KHAZANIE:**

4           Valerie L. Bateman, Esquire
            **NEW SOUTH LAW FIRM**
5           209 Lloyd Street, Suite 350
            Carrboro, NC 27510
6           valerie@newsouthlawfirm.com

7

8       **FOR THE DEFENDANTS THE UNIVERSITY OF**
        **NORTH CAROLINA AT CHAPEL HILL, ET AL.:**
9

10          Kari R. Johnson, Esquire
            Anne Phillips Martin, Esquire
11          **Special Deputy Attorney General**
            **NORTH CAROLINA DEPARTMENT OF JUSTICE,**
12          EDUCATION SECTION
            P.O. Box 629
13          Raleigh, NC 27602
            kjohnson@ncdoj.gov
14          ahphillips@northcarolina.edu

15

            Kristen S. Lewis, Esquire
16          **UNC - CH OFFICE OF UNIVERSITY COUNSEL**
            **123 West Franklin Street, Suite 600A**
17          **Chapel Hill, NC 27599**
            **kslewis@email.unc.edu**

18

19      **OTHER APPEARANCES**

20
        Anne Privett, UNC - CH Office of
21       University Counsel

22

23

24

25

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 3 of 150

1                           I N D E X

2

  STIPULATIONS                                                    4
3 EXAMINATION
        By Ms. Bateman                                           6
4

5 ADJOURNMENT                                                   128
  REPORTER CERTIFICATE                                          129
6 WITNESS CERTIFICATION                                         130
  WITNESS ADDENDUM                                              131
7

8

9                         E X H I B I T S

10

  Name                    Offered By           Identified
11

  Exhibit 20              Ms. Bateman                120
12  (Email)

13

14

15

16

17

18

19

20

21

22

23

24  NOTE: Quoted material has been reproduced as read or
    quoted by the speaker.
25

## STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Lori Gruber, Notary Public in and for the County of Iredell, State of North Carolina at Large.

Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

Reading and signing of the testimony was requested prior to the filing of same for use as permitted by applicable rule(s).

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 5 of 150

1              <u>PROCEEDINGS</u>

2         (11:06 o'clock a.m.)

3              THE COURT REPORTER:  We are now on the

4    record.  Today's date is February 14th, 2023.  The

5    time is 11:06 a.m.  I'll ask the attorneys to please

6    introduce yourself and who you represent, and indicate

7    for the record whether anyone else is present in the

8    room with you.  After that, I will place the witness

9    under oath.

10             MS. BATEMAN:  This is Valerie Bateman.

11   I'm the attorney for the Plaintiff, Supriya Khazanie,

12   and there's no one else in the room with me.

13             MS. JOHNSON:  Kari Johnson.  I'm an

14   attorney on behalf of the Defendants in this case, and

15   there's no one in the room with me.

16             MS. MARTIN:  Hi, I'm Anne Martin, also

17   representing Defendants in this case, and there is no

18   one else in the room with me.

19             MS. LEWIS:  Kristen Lewis with UNC

20   Chapel Hill.  No one in the room with me.  But Anne

21   Privett, my paralegal, is joining also remotely, so I

22   don't know if she also needs to confirm no one is in

23   the room with her.

24             THE COURT REPORTER:  I'll just have her

25   confirm just to be safe that no one's in the room with

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 6 of 150

1  you.

2              MS. PRIVETT:  No one else is in the

3  room with me.

4              The witness, STEPHEN REGAN, being first duly

5  affirmed by me to state the truth, the whole truth,

6  and nothing but the truth, testifies as follows:

7                        **EXAMINATION**

8  **BY MS. BATEMAN:**

9       Q.   Good morning, Mr. Regan.

10      **A.   Good morning.**

11      Q.   Thank you for being here with us today.  I

12  -- as I already said, I'm Valerie Bateman.  Have you

13  ever had your deposition taken before?

14      **A.   It's been several years.**

15      Q.   Okay.  But you remember the drill?

16      **A.   I remember it pretty well.**

17      Q.   All right.  I'm going to be asking you

18  questions.  You're going to be giving answers.  I'm

19  trying to find out information about what you know.

20  If you have any questions or you need to take a break

21  at any time, I am fine with that.  If you're in the

22  middle of a question, all I ask is that you finish

23  that question.  Is that okay with you?

24      **A.   Yes, it is.**

25      Q.   Okay.  Great.  And at some point, you may

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 7 of 150

1   get objections from the lawyers on your side to my

2   questions.  I would ask that you answer the question

3   unless they instruct you not to answer it.

4          That objection is sometimes a cue to you,

5   and it's just something lawyers do.  I'm fine with

6   that, but I just need you to go ahead and answer the

7   question without, you know, taking an undue time to

8   stop and pause.  Is that okay?

9       A.   Yes.

10      Q.   Okay.

11           MS. JOHNSON:  I'm -- just again for the

12   record, going to object to her description of what my

13   objections -- the intention for my objections might

14   be.

15      Q.   (Ms. Bateman)  Okay.  So Mr. Regan, I would

16   like to start with your history of employment at UNC.

17   Can you tell me a little bit about that?

18      A.   Yes.  I was hired on February the 24th,

19   2014, and was employed with the University of North

20   Carolina Gillings School of Global Public Health for

21   my full tenure with them until I retired on August 1st

22   of 2020.

23      Q.   Okay.  And how many years of service did you

24   have with UNC when you retired?

25      A.   Six years and five months.

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 8 of 150

1      Q.   And did you have prior state service?

2      A.   I did not.

3      Q.   Okay.  And what did you do before you came

4  to the Gillings School?

5      A.   Immediately before, or would you like a

6  overview?

7      Q.   Well, it would be great if you give me an

8  overview.  That'd be great.

9      A.   Okay.

10     Q.   How about in reverse chronological order, so

11  starting with what you did immediately prior to

12  Gillings.

13     A.   Immediately prior to Gillings, I worked as a

14  human resource manager and volunteer relations manager

15  for an organization based in Boone, North Carolina,

16  called Samaritan's Purse, which is a non -- nonprofit

17  which was focused on the assistance of people going

18  through disaster relief both domestically and

19  internationally.

20     Q.   And how long did you do that?

21     A.   Nine-and-a-half years.

22     Q.   Okay.  And then before that?

23     A.   Before that, I had worked with human

24  resources in Madison, Wisconsin for an ---

25     Q.   Okay.

1      A.    And I was the ---

2      Q.    Go ahead.

3      A.    That was a private industry called

4   Datex-Ohmeda, who specialized in medical equipment.

5   And I was a human resource manager, training manager

6   and labor relations manager for that organization.  I

7   worked for them about five years.

8      Q.    Okay.  And prior to that?

9      A.    Prior to that, I worked for a window

10  fenestration company in -- in Michigan.  And I ---

11     Q.    And were you doing ---

12     A.    --- I was there for about five years as

13  their human resource manager.

14     Q.    Okay.  And prior to that?

15     A.    Prior to that, I worked for a company called

16  Digital Equipment Corporation that specialized in

17  computer -- it was a computer hardware/software

18  company.  And I ---

19     Q.    Okay.

20     A.    And I worked for them since -- let's see.  I

21  worked for them from 1981 to 1994.  And I had worked a

22  number of human resource positions, which included

23  staffing and recruiting, compensation, employee

24  relations and human resource manager.

25     Q.    So how did you come to get the job at the

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 10 of 150

1   Gillings School?

2        A.   I was looking -- I wanted to finish my

3   career in human resource management, a higher level

4   position which I was used to.  And I didn't have that

5   at Samaritan's Purse.  I saw that the Gillings School

6   was actually looking for -- well, what they called at

7   the time "a shared services manager."

8             And the job description as outlined online

9   indicated they were looking for an individual that

10  could actually pull the team of human resource

11  professionals together to provide service for the

12  school.  I was quite interested in that.

13       Q.   And so what did you do when you saw that

14  position posted?

15       A.   I applied online.

16       Q.   Okay.  And you submitted your resume and I

17  guess a state application?  Did you submit a state

18  application for that?

19       A.   Well, I actually am trying to remember.

20       Q.   Okay.

21       A.   Because I believe that that's accurate, but

22  I believe it -- it was all online.  Yes, I did.

23       Q.   Okay.  So whatever the online process was,

24  you followed it?

25       A.   That's correct.

1          Q.    Okay.  And at some point, were you

2     interviewed for the position?

3          A.    Yes, I was.

4          Q.    And who interviewed you?

5          A.    Well, I was interviewed by a team of about

6     15 different people which consisted of -- would have

7     been the assistant dean for administration, a number

8     of the HR consultants.  It would have consisted also

9     of department chairs and also for staff members that

10    were classified as business managers.

11         Q.    And do you remember the names of any of

12    these people?

13         A.    Yes.

14         Q.    Would you -- would you please share them

15    with me?

16         A.    Yeah, Janet Scearce from the human resource

17    organization, Dr. Wolff who was the assistant vice

18    dean -- well, she was the assistant dean in charge of

19    administration.

20               I was trying to remember who the chairs

21    were.  Dr. Michael Kosorok was involved.  I'm trying

22    to remember the names of all the people that were

23    there.

24         Q.    How about -- how about Barbara Rimer?

25         A.    I -- I didn't interview with Dean Rimer.  I

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 12 of 150

1   interviewed with the assistant dean who is a direct

2   report to Dean Rimer.

3        Q.   And was that Dr. Wolff?

4        A.   Yes, it was.

5        Q.   All right.  And was Dr. Wolff the

6   highest-ranking person you interviewed with?

7        A.   I don't know about highest ranking --

8   department chairs are probably higher ranking.

9        Q.   Oh, okay.  So Dr. Kosorok was a department

10  chair?

11       A.   That's correct.

12       Q.   Okay.  And who -- do you remember any of the

13  other department chairs?

14       A.   Not offhand.

15       Q.   All right.  Well, probably from 2014, three

16  out -- four out of -- let's see.  One, two, three.

17  Okay.  Three out of 15, okay, that's not bad.  If you

18  think of anybody else while we're talking, would you

19  -- would you add them to this list for me, please?

20       A.   Yes, I will.

21       Q.   Okay.  Great.  So you were hired in -- let's

22  see, I wrote this down.  You were hired in February of

23  2014.  And what was your position title?

24       A.   I was hired as a shared services manager.

25       Q.   And what does that mean, shared services

1    manager?

2        A.    It was -- it was meant to be the human

3    resource manager for the school that would provide

4    direct supervision for all of the HR professionals

5    that worked within the school.

6            Shared services was meaning that it was

7    providing services across the school for eight

8    separate departments.  So each one of those

9    departments would be getting human resource service,

10   whether it be compensation or benefits, employee

11   relations, consultation, training consultation.

12           It was -- they would come to that particular

13   department and they would share their resources from

14   the human resource team to obtain those services.

15       Q.    Okay.  So I think I understand from my

16   deposition with Janet Scearce that she was assigned to

17   certain functions, let's say, within the Gillings

18   School.

19           And I believe that one of her -- one of her

20   functions was the finance department.  Do you recall

21   what she was assigned to off the top of your head?

22       A.    That would have been -- finance department

23   is part of a department that we called a central

24   administrative unit.

25       Q.    Okay.

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 14 of 150

1      A.   So we had eight -- eight departments that

2   were part of, well, global public health, different

3   aspects of global public health.  Then you had the

4   central administrative unit which was made up of IT,

5   finance, human resource management and student

6   services.

7            Janet would be the -- would have been

8   assigned, while I was there, as an HR consultant

9   supporting those particular parts of the central

10  administrative unit.

11     Q.   Okay.  Do you know if she supported any

12  other departments or just the central administrative

13  unit?

14     A.   (No verbal response)

15     Q.   Do you want me to ask that again, or are you

16  thinking?

17     A.   No, I'm sorry.  I'm -- I was thinking about

18  that.  I was trying to remember who -- who was doing

19  what because we had eight different departments.  And

20  we had nine people reporting to me.  So I was trying

21  to remember ---

22     Q.   Okay.  Okay.

23     A.   --- how that was divided up.  I think the

24  central administrative unit -- and I also believe that

25  she was -- let me think, nutrition, right.

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 15 of 150

1      Q.   Okay ---

2      A.   She would've also provided support to the

3  nutrition department as well.  Sorry I took so long.

4      Q.   No, that's okay.  I think she came from the

5  nutrition department, did she not?

6      A.   She had provided services to the nutrition

7  department for quite some time.

8      Q.   Okay.  So let's -- let's talk about the

9  people who reported to you if we might.

10     A.   Okay.

11     Q.   Can you -- I think I remember Linda

12  Mitchell, okay, as one person.  Do you -- do you

13  recall Linda Mitchell?

14     A.   I do.

15     Q.   Okay.  And what did she do?

16     A.   She was one of -- I had two lead

17  consultants.  Basically, what we were doing was the

18  human resource team, we were working what I would call

19  a team-based system.  And so she would have been one

20  of the HR team leaders.

21          And that way, she could provide support and

22  coaching and mentoring.  She had more experience as

23  the senior HR consultant that would provide that

24  support for part of the team.  So she was a team

25  leader.

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 16 of 150

1     Q.   Okay.  Team leader.  Who was the other team

2   leader?

3     **A.   That would be Abbey McLennan.**

4     Q.   And are they still at the Gillings School?

5     **A.   To my knowledge, yes.**

6     Q.   Okay.  And how did Linda and Abbey divide up

7   the other -- let's see, nine, two people reported to

8   you.  That's two of them.  So that leaves seven.  How

9   did they divide up the supervision of the other seven

10  people, if they did?

11    **A.   Well, in concert with me when we met, we**

12  **looked through the different consultants and simply it**

13  **was more of like a 50/50 split trying to make sure**

14  **that the work was divided evenly between them.**

15    Q.   So I take from that that some departments

16  were more needy than others.

17    **A.   Well, I'm not sure what you mean by "needy."**

18    Q.   Well, did you just split the departments in

19  half?  I mean there are eight departments.  Did you

20  just give four to Abbey and four to Linda and then let

21  them spread it out among the consultants?

22    **A.   No.  We -- we identified each department and**

23  **each consultant, and then we split them 50/50.  So**

24  **they were assigned consultants that way.**

25    Q.   Okay.  So who were the -- if you recall, who

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 17 of 150

1   were the other seven people other than Abbey and Linda

2   -- other -- and Janet?  So there's six more I'm

3   looking for.

4        A.   Well, we had a specialist called -- and her

5   name was LaSonya Whitworth.

6        Q.   Can you spell that for me?

7        A.   Lasonya is L-a-S-o-n-y-a.  Whitworth is

8   W-h-i-t-w-o-r-t-h.

9        Q.   Okay.  And why was she called a specialist?

10       A.   Her classification of her position wouldn't

11  have been as high a level.  So she would be a -- more

12  of an entry-level HR professional.

13            But she would also specialize primarily in

14  issues of international visas for the school because

15  we -- we had a number of international students that

16  would -- well, that would study with the school.  And

17  some of them would work within the school as well.

18            So we had to work with the university

19  international services to make sure that all of their

20  visas and everything was administered properly and

21  legally.  And so that was primarily LaSonya's focus.

22       Q.   Okay.  So that would be, then, let's see,

23  nine, seven, six.  So that means maybe there are six

24  consultants and the specialist, LaSonya.  Is that

25  right?

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 18 of 150

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1      A.    Six -- six consultants, the specialist and

2   two lead consultants.

3      Q.    Got it.   And the two lead consultants were

4   Abbey and Linda?

5      A.    Correct, uh-huh.

6      Q.    Okay.   So who were -- besides Janet, who

7   were the other five consultants?

8      A.    One of them would have been Melissa.   That's

9   M-e-l-i-s-s-a.   Halstead, that's H-a-l-s-t-e-a-d.

10     Q.    Okay.

11     A.    Annette Raines.   That'd be A-n-n-e-t-t-e is

12  Annette.   Raines is R-a-i-n-e-s.

13     Q.    Okay.

14     A.    Caitlin Webster would have been a

15  consultant.   It's C-a-i-t-l-y-n (sic), Caitlin.

16  Webster, W-e-b-s-t-e-r.

17     Q.    Okay.

18     A.    Karen Capps.   That would be K-a-r-e-n,

19  Karen.   Capps is C-a-p-p-s.   That's P as in Paul,

20  p-p-s.

21     Q.    Okay.

22     A.    I should mention that there was one

23  consultant that retired during my tenure as well.   Her

24  name was Vera Bennett.   That's V-e-r-a.   And then

25  Bennett is B as in Baker, e-n-n-e-t-t.   Like I said,

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 19 of 150

1    she retired.

2        Q.   Do you recall when she retired?

3        A.   A couple of years before I did.  That's why

4    we hired Caitlin Webster to replace her.

5        Q.   Okay.

6        A.   And then Sharon Sullivan.  Sharon is

7    S-h-a-r-o-n.  Sullivan, S-u-l-l-i-v-a-n.  I think I

8    covered everybody.  I'm not sure.

9        Q.   I think you did.  One, two, three, four,

10   five.  Yeah.  So Vera and Caitlin were in the same

11   position.  And Caitlin came in and replaced Vera.  So

12   were all of these individuals at -- still working when

13   you retired?

14       A.   Except for Vera.

15       Q.   Okay.  And do you know ---

16       A.   All of them, yes.  Yeah.

17       Q.   And do you know if they're still there now?

18       A.   I believe they are all there now.  As far as

19   I know, yes.

20       Q.   And do you know who replaced you?

21       A.   I should, but I don't remember her name.  I

22   did not meet her.  I was told that she came from the

23   -- the school of medicine, I believe.  I can't -- I

24   don't know what her name is.

25       Q.   Okay.  That's okay.  And you retired during

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 20 of 150

1    the pandemic.  Let's see, I believe you said in

2    August?

3        A.   Yeah.  My retirement date was August 1st.

4        Q.   Okay.  So during your tenure at the Gillings

5    School between February 2014 and August 2020, did you

6    have the occasion to conduct any HR investigations?

7        A.   I did.

8        Q.   And how many would you say you conducted?

9        A.   Well, if we define HR investigations -- how

10   are you defining HR investigations?

11       Q.   Well, somebody makes a complaint about

12   something, and it comes to HR, and -- and somebody

13   says, "You need to do an investigation so we can

14   decide what to do about this."

15       A.   Yeah.  Probably at least a half dozen times

16   I had to do that.

17       Q.   Okay.  And did you do it yourself, or did

18   you assign it to someone?

19       A.   Depending on what the matter would be.

20       Q.   Okay.

21       A.   I would ---

22       Q.   So -- go ahead.

23       A.   I'm sorry.  Depending on what the matter

24   would be, sometimes I would have lead consultants

25   involved in the investigation as well based on their

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 21 of 150

1  knowledge and based -- like I said, it depends on the

2  situation, of course.

3      Q.   Okay.  Well, of this half dozen, and I know

4  that's an estimate so I'm not going to hold you to it.

5  You know, if it turns out to be more or less, that's

6  fine.  But do you recall any that you did personally?

7      A.   Yeah.

8      Q.   Okay.  Can you tell me how many?

9      A.   At least four.

10     Q.   And so that means that of the approximately

11  six, you did, I'd say at least four of them.  And then

12  would you have assigned the others to either Linda or

13  Abbey?

14     A.   I wouldn't have assigned it directly.  I

15  still would have been involved with it, but they would

16  have been -- they would have assisted me with it.

17     Q.   Okay.  So you were personally involved in

18  all of them, but there were some that you were the

19  only person involved?

20     A.   That's true.

21     Q.   And is that the four that you were talking

22  about?

23     A.   That I was personally involved?

24     Q.   That you were the only person personally

25  involved?

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 22 of 150

1          A.    Only person as the investigator?

2          Q.    Well, here's what I'm trying to figure out.

3     You said of the four, you -- I said, "How many of them

4     did you do personally?"

5                And you said, "Well, at least four."

6                And then I was asking you, "Well, who would

7     have done the other ones?"

8                And you said -- well, you would have been

9     involved, but they would have assisted you with them.

10                So what I'm trying to figure out now is of

11     the four that you were personally involved with, were

12     you the only person involved with it?

13          A.    Are you saying -- I'm sorry.  I'm sorry that

14     I'm not clear.  But if you ask me if I'm the only

15     person involved with it, there are other persons

16     involved in investigations besides myself.

17                If you're asking me as -- I guess I'm not

18     clear really what you're asking me.  And I'm not

19     trying to be difficult, believe me.

20          Q.    No.  No.  No.  And I'm not trying to be

21     unclear, so -- I'm trying to go back -- so there were

22     about a half dozen investigations that you did

23     yourself or oversaw while you were there.  Is that

24     true?

25          A.    Yes.  At least.

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 23 of 150

1     Q.   Okay.  Can you -- can you tell me how to

2  distinguish your involvement in those six

3  investigations?  Like, did you do them all yourself?

4  Did you always work on somebody else with them?  I'm

5  just trying to understand how those investigations

6  came to occur.

7     A.   Well, generally, the way an investigation

8  came -- as you said would come to occur, would be

9  through a concern or a complaint that would come

10  either through one of the consultants, or a person

11  could come directly to my office, either directly or

12  send me an email or -- or give me a phone call.

13          Depending on what that complaint or

14  depending on what that concern would be, I would then

15  make a determination of who should be involved in --

16  in following up with that concern.

17          Now, because there's different types of

18  concerns, there wouldn't always be an -- you know,

19  it's pretty hard to say that I would do it the exact

20  way every time, nor would I have the same people

21  involved every time.

22          It would depend very specifically on what --

23  what was being -- what was being reported to me.  Does

24  that make sense?

25     Q.   It does make sense.  That's -- that's very

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 24 of 150

1   helpful.

2          So I want to go back to an investigation

3   that Barbara Rimer discussed during her deposition.

4   She said at one point, some -- an employee came to her

5   and said, "Well, I don't think you're going to do

6   anything about this, but here's what happened to me."

7          And Barbara was very concerned, and she went

8   to you, and an investigation was done.  And she said

9   -- and someone was eventually terminated.  So do you

10  recall that ---

11         MS. JOHNSON:  I'm going to object.

12  Also -- I'm going to object for the record.  But also,

13  just as we did in Barbara Rimer's deposition, I'm

14  going to instruct the witness to answer, but to do so

15  without personally identifying any employees because

16  we don't have the right to that in this deposition

17  setting.  So...

18         MS. BATEMAN:  Okay.  Well, I am -- I am

19  going to -- I am going to ask the witness to

20  personally identify it because we do have a protective

21  order in place and we can seal this deposition if you

22  want.  We can refer to people by initials if you want,

23  but I want -- I want to get specific details about

24  each of these investigations.

25         So I don't know if you want to -- I mean, I

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 25 of 150

1   can hold the deposition open pending a resolution of

2   the issue by the Court, or we can come to some

3   compromise during the deposition about how Mr. Regan

4   can refer to people.  I'm open to suggestions.

5                MS. JOHNSON:  Valerie, why don't we do

6   it this way?  Why don't you let him answer without

7   personally identifying him so we can keep the

8   deposition rolling?  And then when we take our first

9   break, I will consult and see if there's anything

10  further in terms of more specific identification that

11  he can provide.

12               MS. BATEMAN:  Okay.  All right.

13               MS. JOHNSON:  And we'll just go from

14  there.

15               MS. BATEMAN:  That's fine.  That's

16  fine.

17               MS. JOHNSON:  Thank you.

18       Q.   (Ms. Bateman)  Okay.  So Mr. Regan, do you

19  recall this investigation that I just described to

20  you?

21       A.   Can you repeat it, please?

22       Q.   Yes.  Yes.  Someone went to Dean Rimer and

23  made a complaint.  And Dean Rimer was concerned enough

24  that she came to you and asked you -- or told you

25  about it, and then she either directed you to do an

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 26 of 150

1   investigation or you decided to do an investigation.

2          But the outcome of that investigation was

3   that someone was terminated.  And I think it had to do

4   with bullying.

5          MS. JOHNSON:  I'm going to object.  But

6   you can answer, Mr. Regan, to the extent -- again,

7   just don't personally identify employees -- to the

8   extent that you can answer her question.

9          **THE WITNESS:  Well, that's what I'm**

10  **struggling with.  As you described it, I cannot**

11  **remember a case where that happened like that.**

12     Q.   (Ms. Bateman)  So you don't recall anybody

13  being terminated as a result of one of your

14  investigations?

15     **A.   I didn't say that.**

16     Q.   All right.  Well, let's say -- let's start

17  there, then, and work backwards.

18     **A.   Okay.**

19     Q.   Of this half a dozen or so investigations

20  that you conducted, was the outcome of any of them

21  that someone was terminated?

22     **A.   Yes.**

23     Q.   Okay.  Can you tell me more about -- how

24  many?

25     **A.   When you say, "terminated," as in the**

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 27 of 150

1    university made the decision that they could no longer

2    work at the university, or that they resigned ---

3         Q.   Either one.

4         A.   --- voluntarily?

5         Q.   Either one.

6         A.   Either one?  Well, I can think of three.

7         Q.   And what -- what happened in the other three

8    or so investigations?  The ones ---

9              MS. JOHNSON:  Objection.  Same

10   instruction as before.

11             THE WITNESS:  I'm not sure what you're

12   asking right there.

13        Q.   (Ms. Bateman)  So -- yeah, so in -- in the

14   approximately half dozen investigations that occurred

15   while you were at the Gillings School, in about half

16   of them, three of them, you recall an employee either

17   resigned or was terminated as a result of the

18   investigation.  In the other three, what was the

19   outcome?

20        A.   If -- if they weren't -- well, I can think

21   of one where there were letters of reprimand written

22   and placed in files.

23        Q.   All right.  And then what about in the other

24   two?

25        A.   Where are we on the count?  So which two are

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 28 of 150

1  we talking about?

2      Q.   So three -- that's okay.  Three resulted in

3  either termination or resignation, one resulted in

4  letters of reprimand.  That leaves two more.

5      **A.   Yeah.  The investigations that I'm thinking**

6  **about would have been written reprimands.**

7      Q.   So in all three of those remaining ones

8  there were letters of written reprimand?

9      **A.   To my recollection, yes.**

10     Q.   Okay.  And so in the three in which the

11  employees left either by voluntary resignation or

12  termination, do you recall how many were terminated

13  and how many resigned?

14     **A.   To my recollection, I believe two were**

15  **terminated and one resigned.**

16     Q.   Okay.  And what were the -- okay.  In the

17  one -- in the two that were terminated, what level

18  position was this?

19     **A.   One was faculty and one was a business**

20  **manager.**

21     Q.   Okay.  And the resignation, what level

22  position was that?

23     **A.   Professional staff.**

24     Q.   And what does that mean if you -- if you

25  could ---

1      A.   Well, they weren't -- they weren't faculty

2   and they weren't classified as a business manager.  So

3   they would have had a particular expertise.

4   Professional staff is -- I'm trying to figure out how

5   to explain that.

6            There are certain positions with the state

7   that are subject to personnel law.  And there's

8   certain positions with the state that are exempt from

9   personnel law, which means, you know, are you going to

10  pay them overtime?  Are you not going to pay them

11  overtime?  Do they have certain benefits versus --

12  that's how they would distinguish.  And there are

13  other ways to distinguish.

14            So the person that I'm referring to in this

15  particular case would have been exempt from the

16  personnel law.  It's classified as EPA in compensation

17  and benefits at the Office of Human Resource

18  Management.

19      Q.   Okay.  And then the faculty person was also

20  exempt, correct?

21      A.   That would be true, yes.

22      Q.   Okay.  What about the business manager?

23      A.   Yeah, I'm thinking about that because some

24  of the business managers -- we have examples of both.

25  And I'm not sure.  I'm not totally sure how that

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 30 of 150

1    person was classified, whether it was exempt or

2    whether it was subject to the personnel law for North

3    Carolina.

4         Q.   Okay.  And so do you have -- like, in the

5    investigations, in the three investigations where

6    there were letters of reprimand written and placed in

7    the file, do you recall whether these were exempt or

8    subject to the human resources act?

9         A.   There would have been both.

10        Q.   Okay.

11        A.   One would -- one would be faculty.  And I

12   think the -- I think -- you know, I'm not totally sure

13   how they were classified, but I -- yeah.  I would be

14   guessing, so...

15        Q.   Okay.  So you ---

16        A.   You would have to check.

17        Q.   Okay.  And those other three investigations,

18   then, one was faculty, and they would have been

19   exempt, right?  And then you don't recall about the

20   other two.  Is that right?

21        A.   Yeah.  Because it could have been either

22   one.  Or I know that we had -- I know that I had

23   worked some where they were processed and some were

24   non-exempt, or they were SPA, I guess you would say.

25        Q.   Okay.

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 31 of 150

1      A.   I can't remember for sure every single one

2   of those because I -- I believe that at least one

3   would have been classified as EPA.

4      Q.   So without matching a position to an

5   allegation, but tell me, generally, about these six --

6   the six investigations.  What were the allegations in

7   each one?

8             MS. JOHNSON:  I'm going to object.  But

9   same instruction.  You can answer, Mr. Regan, but

10  without identifying employees.  Thank you.

11            THE WITNESS:  Yeah.  And I'm not -- I'm

12  not comfortable in answering the question without

13  having case files in front of me because I'm -- I'm

14  very concerned about -- well, I guess I'm -- I don't

15  really want to speculate and I don't want to go from

16  memory because I've -- I've been gone from the office

17  for two-and-a-half years.

18            And some of these cases date back a number

19  of years.  So to be fair, I -- I don't want to try to

20  speculate on the cases without having case notes.  And

21  I don't have the case notes.

22      Q.   (Ms. Bateman)  Okay.  So do you have any

23  recollection at all about any of the investigations

24  that you conducted, what you were looking at, what the

25  allegations were?

1          MS. JOHNSON:  I'm going to object based

2    upon his prior testimony that he would be speculating.

3    But you can answer her question if you can.

4          Q.    (Ms. Bateman)  Okay.  Do you recall any

5    allegations?  Like, were there sexual harassment?

6    Were they -- were they -- I'm assuming that they all

7    involved misconduct as opposed to performance.  Is

8    that true?

9          A.    Well, again, unless I have the case files in

10   front of me, I don't want to make a statement about

11   what people were accused of or anything like that.  As

12   I said, I don't want to go from memory and

13   speculation.

14          I'm used to having case files in front of me

15   if I'm going to talk about a case, and I don't have

16   them.  I don't have the case file.

17         Q.    Okay.  So is it your testimony you don't

18   recall for the three employees who two were terminated

19   and one resigned, you have -- you have no recollection

20   at all about what the allegations were in those cases

21   that resulted in their leaving university employment?

22                MS. JOHNSON:  Objection.

23                THE WITNESS:  And my -- I'd give the

24   same answer on those.  I -- I do recall people being

25   terminated.  But again, I'm not comfortable talking

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 33 of 150

1  about their individual cases without having case

2  notes.  And I don't have them.

3       Q.   (Ms. Bateman)  Yeah, I understand that

4  you're not comfortable talking about it.  But I guess

5  my question is -- I'm not asking you to give me any

6  specific matching it up with any particular people.

7  I'm asking you just to tell me basically the nature of

8  the investigation.

9            What generally -- this is not calling for

10 any speculation.  I'm just asking you to recall the

11 reasons people left employment.

12            MS. JOHNSON:  Objection based upon his

13 testimony that he would need to see the case files.

14 You can answer, though, if you can, Mr. Regan.

15            **THE WITNESS:  Yeah.  I would give you**

16 **-- I would give the same answer.  I'd be happy to**

17 **discuss the cases and the investigations if I could**

18 **have the case file in front of me.  I don't have them.**

19 **And so I'm not comfortable.  I'm not interested in**

20 **trying to speculate and go from memory on those case**

21 **files.  I'm just not ---**

22       Q.   (Ms. Bateman)  Yeah.  I just want to know

23 what your best recollection is of the reasons people

24 were terminated.

25            MS. JOHNSON:  Objection.  Same

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 34 of 150

1  objection.  And also, now, asked and answered is

2  another objection.

3          MS. BATEMAN:  Okay.  Well, I'm just

4  going to -- I'll have to do a Motion to Compel on

5  this.  That's okay.  So I'm going to leave this just

6  in interest of moving along.

7      Q.   (Ms. Bateman)  And I'm going to ask you if

8  you ever recall at some point in time, the Plaintiff

9  in this case, Supriya Khazanie, coming to you and

10  making a complaint about Katie Thornsvard?

11     **A.   The only time that I recall Supriya Khazanie**

12  **making a complaint about Katie Thornsvard was on her**

13  **last day of employment when we were processing her**

14  **exit from UNC.**

15     Q.   Okay.  So I am going to show you a document.

16     **A.   Okay.**

17          MS. JOHNSON:  Valerie, if you need a

18  second to get that document up, would this be a good

19  time to take a restroom break?

20          MS. BATEMAN:  Sure.  I don't really

21  need any time to get it up.  I can just share my

22  screen right now.  But if you want to take a break,

23  I'm fine with that.

24          MS. JOHNSON:  No.  No.  I can wait a --

25  I can wait a little while.  Go ahead and continue.

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 35 of 150

1          MS. BATEMAN:  Okay.  All right.  So I

2    am just going to ask if I can get control, if I can

3    share my screen.  Can I do that?

4          THE COURT REPORTER:  You should be able

5    to do that.  On the bottom of your screen ---

6          MS. BATEMAN:  Got it.

7          THE COURT REPORTER:  --- at the bottom,

8    it should say "Share Screen."  Or if it doesn't, the

9    -- there you go.

10         MS. BATEMAN:  Got it.  Great.

11     Q.   (Ms. Bateman)  Okay.  Mr. Regan, can you see

12    that screen?

13     A.   Now I can, yes.

14     Q.   Okay.  Great.  So I'm going to move down in

15    this screen.  This is a document we've marked, and I

16    can't tell you exactly what we've marked it.

17         But it's a -- it's a charge of

18    discrimination that Ms. Khazanie filed.  Have you ever

19    reviewed that document?  Does this look at all

20    familiar to you?

21     A.   It does look familiar, yeah.

22     Q.   Okay.  So do you see this paragraph that

23    says, "Around the beginning of November 2019"?

24     A.   Yes.

25     Q.   Okay.  It says, "I also talked to Steve --

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 36 of 150

1    Stephen (Steve) Regan the Dean for human resources."

2            So do you deny that you talked to Ms.

3    Khazanie around the beginning of November 2019?

4        A.    About what that paragraph says?

5        Q.    Yes, that she felt bullied by her

6    supervisor.

7        A.    Well, that's the -- okay.  When that was --

8    that's the same paragraph or a similar paragraph that

9    was shown to me when she -- when she filed an appeal

10   with employee management relations after her

11   employment was terminated.

12           And in that ---

13       Q.    Right.

14       A.    -- in that one, she said -- it didn't say

15   that.  It said November 1st because I remember -- I

16   remember this because it jumped out at me.  The

17   paragraph jumped out at me because, in her original

18   comment, she had indicated on November 1st.  It didn't

19   say, "Around the beginning of November 2019."

20           Regardless, I have no recollection of this

21   conversation ever happening.

22           But in the original document that I saw on

23   November 1st, I -- I explained to the people that were

24   asking me questions about it then, it couldn't have

25   happened because I wasn't even in the state when she

1  said that conversation happened.  So no, I have no

2  recollection of that conversation at all.

3      Q.   Okay.  And you don't recall telling her to

4  go talk to Katie about her concerns?

5      A.   No.

6      Q.   Okay.  So let's -- I'm going to -- I'm

7  looking for -- let's see.  So in the next paragraph,

8  it says, "The next week I went to Katie's office to

9  talk to her as Steve advised."

10          Do you see that paragraph?

11     A.   I see that.

12     Q.   Okay.  And it says, "I told Katie how much

13  her comments about my wearing my hair down when

14  interacting with male colleagues had bothered me and

15  how self-conscious they made me."

16          Do you see that?

17     A.   I see that.

18     Q.   Okay.  And then the next sentence says, "She

19  told me 'oh, you know I self-reported that comment to

20  Steve when I said it.'"

21          Do you recall Katie coming to you and,

22  quote, "self-reporting" that she made a comment to

23  Supriya?

24     A.   I do.

25     Q.   Okay.  Can you tell me more about that?

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 38 of 150

1      A.    Can I tell you more about?

2      Q.    Yeah.  What did -- what did Katie come to

3  you and say?

4      A.    It was in the -- okay.  Well, let me put it

5  in context.  Katie had come to my office because she

6  was concerned.  She was asking me questions of how to

7  address a situation that she was having with Supriya.

8            Because she was asking for counsel because

9  other employees had been coming to her and reporting

10  that Supriya had been making comments that they felt

11  was inappropriate and -- and were offensive.

12            Katie was concerned and trying to seek

13  counsel on this because the employees that were

14  reporting it were not giving her specifics.  So she

15  wanted to know how to sit down with an employee to

16  address a concern like that when she can't tell the

17  employee exactly what was being said.

18            So what we ended up doing during those

19  conversations -- because Katie said there was more

20  than one and, you know, there were comments that were

21  offensive.  But she was concerned that maybe Supriya

22  did not understand the impact that she was having on

23  people.

24            And that's -- that's where the thought

25  process came from around addressing an issue which we

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 39 of 150

1   -- we called "EQ and EI," emotional quotient and

2   emotional intelligence, to help employees understand

3   that -- how their words impact the working environment

4   and to try to help her along those lines so that it

5   wouldn't interfere with her career.

6           All of that happened there in -- she was

7   also trying to address issues with Supriya about time

8   management because -- what she was saying is, Supriya

9   -- you know, she's getting complaints from other

10  managers about Supriya spending too much time within

11  their departments talking to employees that they're

12  responsible for.  So they're afraid that that's going

13  to inhibit the work production that they're involved

14  in.

15          Now, one of the groups that was identified

16  in that was the IT support group that was down the

17  hall from Supriya's office.  Now, one of the HR

18  consultants I mentioned to you, Caitlin Webster, her

19  office was right across the hall from that area.

20          So what I elected to do -- Linda Mitchell

21  was the lead consultant that would be assisting

22  Caitlin.  We had a system in our HR team that I would

23  meet with the HR consultants officially in a meeting

24  with the lead one time per week, every week.

25          And so part of that meeting that happened

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 40 of 150

1  with Caitlin, I brought up the conversation saying

2  that, "It's come to my attention that you have been

3  identified" -- saying to Caitlin that she had been

4  identified as one of the people that Supriya would

5  come and spend an exorbitant amount of time talking.

6           And I asked Caitlin about that.  And Caitlin

7  advised that she does come to her office.  And I asked

8  her about -- "Does she come to the IT department?"

9           She said, "Yes, she does."

10          And during that session, I'd asked her, "Was

11 there an HR reason for the meeting?  Was there any

12 complaint or was anything said that was a concern?"

13          During that meeting, Caitlin advised me that

14 a statement had been made to her from one of her

15 colleagues in the finance department when discussing

16 diversity.

17          As -- as I recall it, the comment was along

18 the lines of Katie asking the team what they -- you

19 know, what they were working towards or what they were

20 doing towards diversity.  Because diversity and

21 inclusion was one of the main goals and focuses on the

22 school of public health.

23          And so every department would have -- want

24 to be able to make a statement of what they're doing

25 to help promote diversity and inclusion within the

1   school.

2          So one of Supriya's colleagues, according to

3   Caitlin, made a comment that they hired Supriya.  And

4   Supriya was telling Caitlin that that upset her.  And

5   Caitlin said that she -- as I recall it, Caitlin was

6   giving advice on how to address the situation.

7          She was -- which would have included going,

8   potentially, and talking to Janet Scearce, who's the

9   -- again, the consultant that was partnered with the

10  finance team.

11         And she said that she advised her -- did she

12  say anything to the colleague?  I think her colleague

13  was -- I believe it was Teri Smith that had made that

14  comment, which is one of the finance people in that

15  finance suite.

16         So I asked her how that ended up.  She said

17  that the next day she was advised that Supriya had

18  advised her that Teri had apologized and also

19  apologized in front of the rest of the team in -- in a

20  team meeting.

21         So all of that to say, as I recall the

22  original question, Katie had come to me asking counsel

23  on how to have these conversations.  And I advised her

24  that there are people that we can talk to within the

25  university that can also advise counsel on difficult

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 42 of 150

1  situations like that, which included our

2  organizational development consultant Will Frey out of

3  the office of human resources.

4        Brandon Washington who was the vice provost,

5  I believe, over at EOC at the time.  And also, there's

6  some very good people within the EOC organization.

7  Rebecca Gibson's name came up.

8        And so that -- at that point in time, I had

9  given counsel to Katie to talk to Rebecca and that I

10  would take the action either of getting a hold of

11  Brandon and Will Frey to get counsel around can we

12  provide some guidance and support for Supriya,

13  especially around potential issues of EQ and EI.

14     Q.   And tell me again what "Q" is.  An

15  emotional?

16     A.   Emotional quotient.  Basically, what that's

17  doing is helping a -- it's basically a process to go

18  through and similar to questionnaires that you would

19  take, like a Meyers-Briggs-type questionnaire, which

20  would measure a person's adequacy to help them assess

21  their own self-awareness, their own empathy.

22        You know, how are they dealing with other

23  employees, other people?  Are they dealing with

24  sensitivity with other people?  All of which would

25  assist her, and any employee, in working and helping

1    to promote a positive work environment.

2           So that was the type of support that we

3    decided to do.  None of the managers -- Katie had -- I

4    remember Katie saying to me that she didn't think any

5    of the managers thought that Supriya was saying these

6    things out of maliciousness or trying to violate

7    policies, that they thought that she just isn't aware

8    of the impact that she's having when she's making some

9    of these comments.

10          And that's where the idea of the EI and EQ

11   actually came from.

12       Q.   And so what ever came of that?

13       A.   Will Frey and I had the conversation, and

14   they were able to identify actual -- I guess you'd

15   call them courses, that were offered by the

16   university.  And I believe it was in concert with our

17   employee assistance program, the people that provide

18   employee assistance programs for the university.

19          And ---

20       Q.   And did -- go ahead.

21       A.   And I got that information basically the --

22   I think the schedule of the course -- actually, the

23   schedule of the courses -- the way the employees sign

24   up for courses like that, they can do that online.

25   University has a system that they call

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1  ConnectCarolina, and several different programs are

2  part of that ConnectCarolina where an employee can

3  actually log on and apply to schedule a course like

4  that.

5          To my recollection, Supriya did that.  And

6  to my recollection -- I know for a fact she went to

7  it.  Because when she came back afterwards, she did

8  come to my office then and talked to me about the

9  course because I was interested in how it went, too.

10      Q.   Okay.  And what was the course called?

11      A.   Not totally sure.  I -- I thought it was --

12  I -- again, I don't have that in front of me so I

13  don't know the exact name of the course.  I'm sorry.

14      Q.   So what do you recall of the conversation

15  you had with her after she went to this course?  What

16  did she tell you?

17      A.   She told me it was a total waste of her

18  time.

19      Q.   Okay.  And did she tell you any more about

20  why it was a waste of her time?

21      A.   I remember her saying that this kind of

22  stuff is for -- I don't know if she used the word

23  "stuff," by the way.  To the best of my recollection,

24  she said, "That is more geared toward entry-level

25  employees.  It's a waste of my time."

1        I remember talking to her about that, and I

2   said, "Well, one of the reasons that we don't feel

3   it's a waste of anybody's time is because it's very

4   important that all of us understand the impact that

5   we're having with people in general, but people that

6   we work with."

7        If we want -- want to be -- especially if we

8   want to perform at a higher-level position, that we

9   are thought of as people that have a lot of influence

10  on -- on employees.  And we also represent the School

11  of Global Public Health.  So in that sense, I was

12  saying it shouldn't be thought of as a waste of time.

13       That was pretty much it.

14       Q.   Okay.  And you -- and your testimony is that

15  you don't recall Supriya ever complaining to you about

16  Katie making a remark to her about wearing her hair

17  down?

18       A.   Supriya never made that comment to me until

19  her exit interview.  Katie made the comment to me.

20       Q.   Katie told you about it ahead of time?

21       A.   Katie told me that in one of the

22  conversations -- that was the original question.  I'm

23  sorry.  The original question that you had asked, when

24  I was telling you about Katie coming and talking to me

25  about that ---

1      Q.    Yeah.

2      A.    --- she said that in one of her conversation

3   -- Katie said, as I recall, in one of her

4   conversations in attempting to coach and counsel

5   Supriya around the perception that she's having,

6   which, you know, that's why we're talking about all

7   the -- the complaints or the words that are being used

8   with other employees, that she also made a comment

9   about touching her hair in -- in some of the staff --

10   in some of the meetings that she's having, I think she

11   said, with chairs, as I recall.

12            And I remember saying, "Why did you say

13   that?"  And she said she was trying to just make her

14   aware of the impact along the same context as trying

15   to help her be as professional as she can, have the

16   appropriate impact.  Again, with the EQ, EI and being

17   self-aware.

18            I said, "Well, Katie, how did that go?  Or

19   how did she respond?"

20            She said -- as I recall Katie saying that

21   she didn't agree with her, and she could tell that,

22   you know, that she wasn't accepting that kind of

23   feedback.

24            So I told her, "Well, don't make that kind

25   of comment because it's clearly not having the impact

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 47 of 150

1   that you're hoping it would. And it's clearly, you

2   know, not being helpful for what we're trying to do

3   here on behalf of Supriya."

4           And then Katie advised that she included

5   that -- when she went to see Rebecca Gibson at EOC,

6   that she had also talked to Rebecca Gibson about

7   making that comment as well. So ---

8       Q. Do you know -- go ahead.

9       A.   So she was -- so she was saying that she

10  self-reported to EOC. She made -- it's the only time

11  -- I remember telling the EOC department. I remember

12  telling Brandon, I said, "In the six-and-a-half -- you

13  know, the six years that I've been around -- actually,

14  in the 30 years that I've been around, I've never had

15  a manager come into my office and tell me that they

16  messed up, said the wrong thing or said it in a way

17  that they wished they hadn't said it."

18          I've never had anybody do that. And I never

19  had anybody then go and talk to EOC on their own

20  behalf without being somewhat compelled to do so. So

21  that's why that's very memorable. Never had that

22  happen before.

23      Q. So I thought Rebecca Gibson had been

24  identified as someone that might be a resource to

25  Supriya.

Case 1:20-cv-01096-TDS-JEP    Document 67-1    Filed 03/09/23    Page 48 of 150

1      A.    Well, she would be a resource to Supriya.

2      Q.    So do you ---

3      A.    She'd be a resource to any of the employees,

4   but she was ---

5      Q.    Right.  But your testimony is that Katie

6   went and talked to Rebecca?

7      A.    That is what I recall, yes.

8      Q.    Okay.  So do you know if Supriya was ever

9   referred to Rebecca?

10      A.    Not by me.  Supriya was referred to the EOC

11   organization.  Rebecca's not the only person that

12   works at EOC.  But Supriya had been involved in other

13   EOC cases while she was an employee at UNC, both as an

14   employee where a EOC report was filed on her behalf

15   and also an EOC employee -- an EOC report that was

16   filed where she was identified as a person violating

17   policy.

18      Q.    Okay.  Well, tell me more about that.  Tell

19   me more about the one where she was accused of

20   violating policy.

21      A.    Well, as I had indicated before, she had

22   spent an -- she -- managers had been coming --

23   managers -- you're going to ask me what managers.

24   Specifically, the IT -- the associate -- the associate

25   dean for IT and the associate dean for student

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 49 of 150

1   services had both approached Katie indicating that the

2   remarks that Supriya was making were going to be a

3   problem for her.

4            And as I said before, they were trying to

5   get Katie and trying to get assistance how to -- how

6   to coach and help Supriya understand the impact that

7   she's having by making some of the comments.

8            So in September, as I recall, it came to

9   HR's attention.  Again, that would have come to Janet

10  Scearce, I believe.  And Janet then elevated to me

11  because the -- the facilities manager Brent Wishart

12  had reported that he had witnessed and overheard a

13  meeting or a conversation that was happening in the IT

14  suite.

15           And in that conversation, one of the

16  people's -- well, the supervisor in there, I believe,

17  or at least the -- I think he's classified as

18  supervisor -- he was Joseph Love -- was having a

19  conversation.  And in that conversation, Supriya had

20  used what he described as the N-word, and that -- he

21  was upset by that.

22           And he could tell that Joseph Love was upset

23  by that.  And a conversation ensued which people in

24  the room were telling Supriya not to use that word.

25  Now, in that room was -- would have been Supriya.

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 50 of 150

1  Joseph Love is African American and Brent Wishart is

2  Caucasian.

3          So Brent, being a management level, realized

4  that he had a responsibility to do something this as a

5  responsible employee.  So he reported that to Janet

6  and to myself.  And he was advised to contact EOC

7  regarding that matter, which he did.

8      Q.   Okay.  And do you know who he contacted?

9      A.   I would only be guessing.  Well, I don't --

10 I don't know if Rebecca Gibson had anything to do with

11 that.  The name -- I'm not totally sure, but the name

12 that sticks, I thought her name was Ms. Wise (ph).

13 She was like a coordinator -- coordinator of reports

14 and everything or complaints that are coming in.

15         She -- she was an intake-type person, you

16 know, taking those type of reports.  And I believe --

17 I'm pretty sure Brent had told me that that's who he

18 talked to.  They talked on -- they talked on the phone

19 about that, I believe.

20     Q.   So that's a pretty serious allegation that

21 somebody is using the N-word, wouldn't you say?

22     A.   Yes.

23     Q.   And so what ever happened to that

24 allegation?

25     A.   My understanding, that a representative from

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 51 of 150

1  the EOC, and I don't know if it was Ms. Wise or who it

2  would have been in this particular case, followed up

3  and contacted Joseph Love, I believe.  I found out

4  this after the fact because I had called the vice

5  provost for EOC because I -- I hadn't heard any

6  follow-up on it.

7            And I wasn't directly involved in any of the

8  investigation on it.  So what Dr. Washington told me

9  was that, on the follow-up, EOC had contacted Joseph

10  Love who advised them that he didn't want to make any

11  further complaint on it, that he had talked directly

12  with Supriya about the situation and, in his opinion,

13  that the situation had been resolved.  And that no

14  further action was to be taken.

15       Q.   Okay.  And was that sufficient in your mind

16  to address the allegation?

17       A.   Was it sufficient in my mind?

18       Q.   Yeah.  Did you think you needed to do

19  anything else with it?

20       A.   No.  I didn't think there was anything.  I

21  also thought that it was consistent with what the

22  managers were telling Katie and what Katie was asking

23  me consult over in terms of comments being made.

24            Again, she's sitting there talking to people

25  that are African American.  And it just kept looking

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 52 of 150

1   like she did not understand the impact she was having

2   when she was talking and -- and making comments.

3           Again, we were trying to help her be

4   successful and also help her understanding how her --

5   what she says does have an impact on people.  And then

6   she -- and then this happened.

7       Q.   Do you know if anything was ever put in

8   writing to Supriya about this incident?

9       A.   I don't know that.

10      Q.   Okay.  And were you aware that she had

11  gotten a first quarterly evaluation from Katie?

12      A.   Yes.

13      Q.   And that that evaluation was very positive?

14      A.   Yes.

15      Q.   And do you know if she got any other

16  evaluations from Katie?

17      A.    I do know that she didn't get it on the same

18  form that she used for the first one, but she had

19  received ongoing evaluations which were shown to be

20  true through a series of emails between Supriya and

21  Katie.

22           So certainly the intent there and what we

23  tell our managers is you need to have -- whether it's

24  a probationary employee or whether it's any employee,

25  what you want to do is have ongoing feedback around

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 53 of 150

1    what a person is doing well and what a person needs to

2    improve.

3            So on the first -- the first few months, she

4    was doing extremely well.  Everybody thought so.  So

5    we did not think we had any type of issue at that

6    point in time.  We thought that she was going to --

7    actually, we thought she was going to be a star.

8    That's the word I would use.

9            And that was Katie's hope, and that was my

10   hope.  And that's why we were doing quite a lot of

11   work with her to help her understand, "Don't let these

12   other things get in your way because you have a -- you

13   have the potential here of being very, very successful

14   and have a future with UNC in the school of public

15   health or anywhere else in UNC."

16           I know that Katie had put it in writing that

17   she had committed to her a hundred percent to help her

18   be successful.  Then these problems started to come

19   up.  And then the people started to come -- managers

20   started coming forward with the discussions about

21   comments that she's making that are going to get in

22   her way.

23           And again, you know, you've already heard

24   about our approach with EQ and EI, trying to assist

25   her with that.  I know Katie had had conversations

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 54 of 150

1    with her about time management because the amount of

2    time that she was spending either down at IT or in

3    student services.  And then when I found out she was

4    spending a lot of time with one of my own staff, then

5    I was really concerned.

6             And so Katie had followed up, and I believe

7    there's an example of where she had followed up in a

8    conversation with her about time management and being

9    where she needed to be and doing work that she needed

10   to do.

11            As time went on, the expectation was that

12   for an employee at her level, or what she was leveled

13   to be, much higher level of work was expected to be

14   handed over to her from Katie, and that's why Supriya

15   was hired in the first place.

16            As Katie continued to talk about progress

17   and how things were going -- because I wanted to know

18   if any of the things we were doing were helping her or

19   not.  And Katie was showing me emails back and forth

20   where she was working, where -- she was not only

21   working with the issues of -- that we've already

22   discussed, she was also working issues of accuracy of

23   -- in her reporting or getting projects done in a

24   timely manner.

25            I had asked Katie -- my understanding, the

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 55 of 150

1  reason we leveled this position that was paying at a

2  higher level than what we probably would do for just

3  an accountant -- finance accountant, we could bring

4  somebody in at a mid-level and not pay at the rate

5  that we're paying for somebody at a senior, advanced

6  level if you're not going to get the work back that

7  you were hoping to get.

8           You know, she -- she had told me types of

9  things that she was trying to get out of that position

10 because Katie was being pressured, I believe, from the

11 dean and the vice dean about getting some of the

12 reports and projects done sooner.

13          And Katie was not going to be able to do

14 that all by herself.  And her other staff members were

15 not at the level.  That's not what they were hired to

16 do at that senior level.  So when Supriya was brought

17 in, our hope was that it's going to address that

18 particular issue.

19          So I asked Katie point-blank how the

20 progress was going, and we were having those

21 conversations, you know, right -- you know, the

22 original conversations I talked about were happening

23 in April and May.  And we -- we continued to have

24 conversations about her work output.  And it turned

25 out that the work output was not at the level.  The --

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 56 of 150

1    the work that she was providing was not accurate.

2            And when I asked Katie if she was showing

3    her what she was doing wrong and -- and how to do it

4    correctly, she said, "Yes, but Supriya was not

5    accepting the feedback."

6            I remember one -- I can remember one example

7    where they were getting ready to do reports.  I think

8    this was for -- I don't remember exactly what the

9    project was.  Had to do with reporting out to

10   department chairs, you know, finance information for

11   their individual departments.

12           Katie indicated that Supriya was bringing

13   the information back and was showing a percentage, and

14   one of the percentages came out to 105 percent, which

15   it's supposed to come out to a hundred percent.  And

16   when they had a conversation about that, Supriya would

17   not accept that, that she was insistent that what she

18   did was correct.

19           So when Katie went and, as I understand it,

20   looked at the reporting that she did, there were

21   mistakes made in the programming of the software.  And

22   I don't recall -- there's two -- I remember a couple

23   of softwares they were using.  One was Excel.  And I'm

24   trying to remember the name of the other one, which

25   I'm -- I'm not as familiar with.  I hadn't even heard

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 57 of 150

1    of it.

2              Anyway, Katie went back to review that with

3    her again to show her that the way she had created the

4    report was creating the errors.  So that was just one

5    example of a number of conversations Katie was having

6    about work output and timeliness.

7              Because I had asked Katie at one point,

8    "You're saying that she's not getting the work done in

9    a timely manner," and she's had it for several weeks

10   -- or a couple of months, maybe three months.  I said,

11   "What would be your expectation of an individual at

12   that level when you're asking for this exact same

13   work?"

14             She said "I -- if I had had that -- if that

15   work was being done," and she even gave an example.

16   There was a senior-level person when I first came on

17   board with UNC.  Her name was Gladys.

18        Q.   Her name was, I'm sorry, what?

19        A.   Gladys.

20        Q.   Okay.

21        A.   I think her name was Gladys Yam, Y-a-m, I

22   think.

23             She said had she had given that to Gladys,

24   who also would have been classified as a advanced

25   accounting person -- finance person -- I said, "How

1   long would it have taken Gladys to have it back to

2   you?"

3            She said, "She would have had it back within

4   a couple of weeks."

5            I said, "How long has Supriya had it?"

6            And she says, "She's had it for three

7   months, and it's still not done."

8       Q.   And do you recall what this project was?

9       A.   I don't recall the name of the project.  I

10  don't.  I do remember the conversation with Katie,

11  though.

12           And I also remember that it was -- I think

13  it was provided in the justification documentation

14  that Katie had provided when the decision was made

15  that Supriya was not going to continue past her

16  probation period.

17           I don't have that.  I don't have that in

18  front of me, but I'm pretty sure the example was

19  given.

20      Q.   So tell me more about this justification

21  document.

22      A.   Oh, justification when there was made a

23  determination that Supriya wouldn't continue?

24      Q.   Yes.

25      A.   Sure.  If we were going to release an

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 59 of 150

1   employee, that decision is not made just

2   autocratically by somebody like myself or anybody

3   within the school of public health.  We would have to

4   have people involved from Employee and Management

5   Relations at the offices of -- office of human

6   resources, the central office, HR office for the

7   University of North Carolina Chapel Hill.

8            Those people would have to be involved.

9   When those people are involved -- in this particular

10  case, Chenise Crump would have been the representative

11  from Employee and Management Relations that was

12  reviewing the decision.

13       Q.   Can you say that name again?  Chenise?

14       A.   Yeah.  I believe Chenise is C-h-e-n-i-s-e,

15  and I believe Crump is C-r-u-m-p.

16       Q.   Okay.  I'm sorry.  Go ahead.  Thank you.

17       A.   Yeah.  So I would -- at my level, I would go

18  through with the manager pretty much asking the same

19  questions that Chenise would ask, which would

20  basically be what's the justification?  Is there

21  ongoing feedback going on?  Does the individual

22  understand, you know, where they're falling short of

23  the position?  What is -- you know, what are the

24  actual issues of concern?  What is it that's making

25  the manager feel that they shouldn't continue?

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 60 of 150

1          And I asked Katie to provide all of those

2    answers in writing, which she did.  And then I

3    reviewed it, and then I forwarded that to Chenise.

4    And Chenise reviewed that.  And I'm pretty sure --

5    because the latter part of my tenure, I'm pretty sure

6    that even Chenise or the folks at Employee and

7    Management Relations wouldn't make that final decision

8    without talking to somebody within the legal

9    department.

10          And the legal department, more often than

11   not, the person I'm talking to or Chenise is talking

12   to, generally, was Anne Fox, F-o-x.  And there might

13   be an E on the end of that.  I'm not sure.

14          So a process of review had to happen.  That

15   process of review did happen.  And once it occurred,

16   then I would be advised Chenise said it's okay to go

17   forward.

18          However, the time frame on this made things

19   even more difficult and complicated because it was

20   falling right into the December time frame.  So

21   everything was reviewed, and complete review was done

22   by the first week or two -- probably the first week or

23   two of December.  But we had been advised by Employee

24   and Management Relations, which -- and we were also

25   being advised by the dean's office that we do not want

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 61 of 150

1  employee actions such as terminations occurring during

2  that time frame -- during that December time frame.

3  And so ---

4      Q.   And why is that?

5      A.   Primarily -- well, primarily because that

6  December time frame, being a time -- celebration,

7  holidays, everything going on at that point in time,

8  they just felt that they did not want to be doing

9  terminations during that period of time.  And so we

10  were advised that, "You need -- you need to hold off."

11           You would need to do it before that.  They

12  usually would have a date.  Usually, it's around the

13  beginning of December and then through December.  And

14  then once you get into January, you go back to

15  business as usual.  As it fell, that's exactly what

16  happened.  That's why the termination date was done

17  when it was done, in January.

18      Q.   Did you ever ask Katie if she had done

19  formal evaluations of Supriya?

20      A.   Yeah.  I did not ask a question about formal

21  evaluation.  I asked if there was ongoing evaluations.

22  So ---

23      Q.   And did you -- yeah, did you ask her if

24  there was any written documentation of the ongoing

25  evaluations?

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 62 of 150

1      A.   Yes, I did.  What was provided was the first

2   form that you had discussed, and also the series of

3   emails that indicated the meetings and conversations

4   that she had ongoing right -- month by month by month

5   during the tenure that Supriya was working in that --

6   in that team.

7      Q.   So she ---

8      A.   So the intent there is to give ongoing

9   feedback to the employee around their performance.

10  And Katie was able to provide the documentation that

11  showed that she did provide that feedback.  It also

12  showed documentation where responses were coming back

13  from Supriya regarding that feedback.

14     Q.   So how many emails would she -- would you

15  say she showed you?

16     A.   I do not recall that.

17     Q.   Okay.  But there were enough emails giving

18  her -- giving -- from Katie to Supriya giving her

19  specific feedback about her performance that you felt

20  comfortable with Katie's recommendation that she be

21  terminated?

22     A.   That's accurate.  Not only was I

23  comfortable, but Chenise Crump was comfortable, and I

24  believe the legal organization was comfortable because

25  all of that was sent as -- as part of the

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 63 of 150

1   justification for termination.

2       Q.   So I believe that your testimony previously

3   was that her performance the first quarter was

4   exceptional.  You thought she was going to be a star.

5   Is that correct?

6       A.   That's what I said, yes.  I thought -- and I

7   did.  I thought she was going to be great.

8       Q.   Okay.  And her performance evaluation

9   reflected that.  Is that right?

10      A.   She had -- yeah, she had a very good

11  performance evaluation.  It may have been indicated in

12  terms of -- I'm not looking at it.  This is going to

13  fall under speculation again.

14           But I -- I thought on that first one was the

15  first time that Katie had told her -- told Supriya

16  about the discussion around time management, that that

17  -- that did come up.

18           Other than that, I remember a discussion

19  that her Excel skills -- Excel meaning the program --

20  one of the programs they would use in finance, like

21  everybody in the world uses that.  That her Excel

22  skills were very good.

23           Tableau was the other one.  I couldn't

24  remember the name of that before.  It just came back

25  to me.  I'm sorry.  The other finance system -- and

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 64 of 150

1   this is where it started all to come to light.  It was

2   everybody's understanding that Supriya's skill set --

3   or one of the reasons that she got hired into an

4   advanced level was her skill set around a specific

5   program called Tableau.  Don't ask me how that works

6   because I have no idea.

7            But I know that that came out because

8   Supriya had indicated -- during the hiring process,

9   Katie had advised me that during the interviews and

10  everything, that Supriya had indicated that she had

11  even trained people on Tableau, that her -- that she

12  was an advanced-level user on Tableau.

13           That's where things came to light.  After

14  that first quarter, that's when Katie would've been

15  trying to have Supriya utilizing that program to do

16  projects.  And it came to light that she was not

17  operating at the level of an advanced user at all, was

18  making errors and making errors of -- well, I already

19  talked about the errors.  But that's where that came

20  from.

21       Q.   Okay.  And do you recall anyone else

22  confirming that Supriya had said that she was an

23  expert at Tableau?

24       A.   I don't recall, no.

25       Q.   Okay.  So did you ever, yourself, have any

1   individual conversations with Supriya about her

2   performance issues that Katie was identifying?

3       A.   No.  The only thing that I had discussed

4   with Supriya was the issues of being careful about the

5   phraseology that she uses when she's talking.  I

6   didn't -- I didn't get into the details of her

7   accounting and finance work.  I wouldn't have even

8   known where to start with that.

9            But I was -- I was comfortable that she was

10  getting feedback from Katie around the finance work

11  and what she had to do and, if she was making errors,

12  what she had to do to correct them, things like that.

13           My focus -- my comments to Supriya was more

14  along the interpersonal talking and saying things.  I

15  can give you an example of that.  This would have

16  been, like, in the October time frame, I think.

17           From time to time, when one of the staff

18  members or one of the managers would have a birthday,

19  the members of their department would -- would have a

20  basic -- you know, the birthday cake celebration,

21  basically.  And they would invite members from the

22  other departments.  And that happened.  That actually

23  happened with the associate dean for information

24  technology and services, Kathy Anderson.

25           So her staff called for a meeting to

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 66 of 150

1   celebrate Kathy's birthday, and people came down to

2   the IT area and kind of -- there was probably -- I bet

3   there was 15, 20 people within the area, and there

4   were people standing outside the door.  So you kind of

5   stand in a circle and you sing happy birthday and you

6   do all that, and then there's -- you know, there's

7   talking, and it was -- everything was high -- high

8   morale, I guess you'd say it was.  That's what they

9   were meant to be for.

10           Supriya was at that particular celebration.

11  During that celebration, a comment was made.  I can't

12  remember the exact comment, I apologize.  But what I

13  do remember was the impact of the comment.

14           It had to -- it went along the lines of,

15  "Such-and-such is the modern-day herpes."  And when

16  she said it, the room went quiet.  Totally out of

17  context.  Don't know what everybody was talking about.

18  But she said it, and she said it loudly.  And people

19  all around the room heard it, and everybody just, you

20  know, did one of those freeze things.  And then

21  everybody just went on after that.

22           After that session, I spoke to Supriya and I

23  asked her, "Did you see the -- did you see the

24  response that the employees had when you made that

25  comment?"

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 67 of 150

1            She said, "No."

2            I said, "Well, here's -- here's the" -- and

3    I explained it the same way I just explained to you.

4    And I said, "Do you realize that there were also

5    people standing in the hallway, and do you know who

6    those people were?"

7            And she said, "No."

8            And I said, "Well, that's one of the points

9    I was trying to help you understand when we were --

10   way back when we were talking about EQ and EI and you

11   went to that course, and you said it was a waste of

12   time.  You make that type of comment, you have an

13   impact.  And the people are looking at you as one of

14   the advanced financial people.

15            "And that's why people are going to be

16   upset.  You're not -- you're not even going to know

17   some of the people that hear what you're saying, but

18   you're having an impact on them."

19            That was the type of coaching and counseling

20   I was trying to provide Supriya.  A technical coaching

21   and everything, that would have been coming from

22   Katie.  That's my recollection.

23        Q.    Okay.  So if Supriya had her 90-day review

24   in the middle of March, then if she had -- if she was

25   going to have another review like the review she had

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 68 of 150

1    in March, when would that have occurred?

2        **A.   Well, with the assumption that you're not**

3    **just doing an ongoing all along the way and you were**

4    **going to divide it up, you would divide it up ---**

5        Q.   Yes.

6        **A.   --- you'd divide it up into quarters.**

7    **January, February, March; April, May, June; July,**

8    **August, September ---**

9        Q.   Okay.  So March -- so she would have gotten

10   -- would have gotten one in June.  Okay.  And then --

11   and then that would have been the last month of the

12   second quarter.  So then the last month of the third

13   quarter would be -- what, July, August, September?

14              MS. JOHNSON:  Objection.  You can

15   answer.

16              **THE WITNESS:  It would be 90 days.**

17       Q.   (Ms. Bateman)  Yeah, in September.

18       **A.   So you're talking about 90 days.  Yeah.  90**

19   **days.**

20       Q.   And then in December?

21       **A.   Yeah.**

22       Q.   Okay.  But your testimony is that in lieu of

23   the formal review that she'd gotten in March, she had

24   ongoing conversations with Katie, which were

25   documented in emails, all during this period of time,

1   April, May, June, July, August, September, October,

2   November, December, right?

3       **A.    That's my recollection, yes.**

4       Q.    And that you actually required Katie to show

5   you that she'd had that feedback when she wanted to

6   terminate Supriya.  Is that right?

7       **A.    That's correct.**

8       Q.    And that not only she had to provide it to

9   you, she had to provide it to central HR at UNC.  Is

10  that right?

11      **A.    Right, Employee and Management Relations.**

12  **That's correct.**

13              MS. BATEMAN:  Okay.  So I would like to

14  take a break here.  And that'll be a bathroom break or

15  whatever.  And I want to go back through my notes.

16  And -- and that would be great.  Can we go off the

17  record?

18  (Brief recess: 12:45 p.m. to 12:58 p.m.)

19      Q.    (Ms. Bateman)  Okay.  Mr. Regan, I am going

20  to follow back up with some areas that I did not go

21  into while you were testifying earlier.  I know that

22  you told me earlier about an incident involving a

23  report by Brent Wishart against Supriya.

24              But you also told me that Supriya had been

25  involved in a case that had been filed -- had had

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 70 of 150

1   experience with I think you said EOC based on a

2   complaint filed on her behalf.  Can you tell me more

3   about that?

4       A.    Yeah.  My -- yes.  My recollection -- and

5   that would have been the latter part of the year, I

6   think around October time frame.  Well, let me tell

7   you how I recall it.  Here's what I think happened to

8   the best of my recollection.

9             A manager, I believe that was Charletta Sims

10  Evans -- Charletta Sims Evans who is the associate

11  dean for student services came and told Katie

12  Thornsvard that an email or a text had been -- I guess

13  it was a text that had been sent by one of the

14  employees in the school to Supriya that offended

15  Supriya.

16            And she knew that Supriya had been offended

17  because Supriya had gone down to the student services

18  area and spoke to one of the employees in that area --

19  I think her name is Natiaya Neal -- and showed the

20  text to Natiaya who then -- then reported that to

21  Charletta.

22            Charletta then went to Katie and reported

23  that the situation had occurred.  Now, the -- when it

24  was being reported, Supriya was not on site.  She was

25  actually on vacation as I recall.  The report, as

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 71 of 150

1   made, indicated that the text said in -- I don't know

2   the exact wording.

3           To my recollection it had to do -- "If

4   you're going to wear a red dress like that, you need

5   to give me a warning before I have a heart attack,"

6   something along those lines.  And it was determined

7   that Supriya actually was upset about that and even

8   responded to the text by saying, "What would your wife

9   say about this text?"

10          So I was not able to talk to Supriya

11  immediately, but I had all that information.  So I

12  made the decision to file a report with the EOC on

13  behalf of Supriya to make sure that all of that was on

14  record, and I did.

15     Q.   Who did you file it with?

16     A.   I -- the EOC office.  Again, I couldn't tell

17  you -- well, that report -- there's basically three

18  ways to make -- make a report to the EOC office.  At

19  least there was when I was working there.

20          You could call them and do it by phone.  You

21  could do it in person, or you can also do it online.

22  Because part of the ConnectCarolina operation on the

23  computer was that the EOC has a division of that where

24  you can actually file a complaint.

25          So I filed the complaint on behalf of

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 72 of 150

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1   Supriya because she was absent, knowing that when she

2   returned that the EOC office would be in touch with

3   her about it.

4        Q.   Okay.  And when you say, "EOC," what does

5   that stand for?

6        A.   I guess what I'm thinking is equal

7   opportunity commission, but that's not how UNC says

8   it.  It's the office -- isn't that something?  It's --

9   yeah, what I'm thinking is EEOC which would be -- I

10  cannot remember the acronym at -- at the moment

11  without actually looking it up.  Do you want me to

12  look it up?

13       Q.   No, that's okay.

14       A.   It's the office that would handle

15  investigations or concerns regarding anything to do

16  with what the EEOC would normally have concerns about

17  in terms of discrimination, harassment or such matters

18  as that.

19       Q.   Okay.  So did you file it by phone, in

20  person or online?

21       A.   Online.

22       Q.   And who was the employee that sent the text?

23       A.   Can I just -- can I just ask is it -- is it

24  okay for me to name that employee?

25       Q.   Yes.

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1            MS. JOHNSON:  Valerie, I'm going to

2    object to that because it is a -- that would be --

3    that would constitute employee information of another

4    employee whose permission we don't have to give that

5    type of information.

6            However, I will consult with university

7    counsel after this deposition and see if there's a way

8    we can supply it to you outside of the deposition

9    form.

10           MS. BATEMAN:  Okay.  Are you ---

11           MS. JOHNSON:  I just need to -- I just

12   need to consult, and I don't want to stop the

13   deposition right now to see ---

14           MS. BATEMAN:  Okay.  So are you

15   instructing the witness not to answer?

16           MS. JOHNSON:  Yes -- no.  He can -- I'm

17   instructing the witness not to provide the name at

18   this time.  And I'll revisit that before the end of

19   the deposition.

20           MS. BATEMAN:  Okay.  Well, I'm going to

21   -- I'm going to have to hold the deposition open for

22   that reason, too.  We're still -- I'm still holding it

23   open because of the -- we're missing the testimony

24   about the investigations.

25           MS. JOHNSON:  That's fine.  I'm also

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 74 of 150

1  going to see if we can supply you the name.  But if

2  you just want to continue, I'll see -- I'll see if we

3  can do it in the context during the course of this

4  deposition or if we can supply it to you in another

5  way afterwards.

6          But that's fine.  So -- but you can just go

7  ahead and continue, but I will instruct him at this

8  particular time in the deposition not to give the

9  person's name.

10     Q.   (Ms. Bateman)  Okay.  So was the employee

11 male?

12     **A.   The person that wrote the text was male,**

13 **yeah.**

14     Q.   Was male.  And was this someone who was

15 above Supriya in the -- in the chain of command?

16     **A.   No.**

17     Q.   No?  It was her peer?

18     **A.   Yes.**

19     Q.   Okay.

20     **A.   Ms. Bateman, may I also answer your earlier**

21 **question?  It's the Office of Equal Opportunity and**

22 **Compliance.  I haven't had to say that in quite a**

23 **while.  I apologize for the delay on that answer.**

24     Q.   Okay.  Thank you for that.

25          And when Supriya came back from vacation,

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 75 of 150

1  did you tell her about this?

2      A.   I did.  I had received -- actually, I

3  received an email from the Office of Equal Opportunity

4  and Compliance wanting to make sure that Supriya was

5  not going to be surprised by their call.  And so they

6  asked me to contact Supriya, which I did, to let her

7  know that there would be a call coming in from them.

8           And after that, I informed the -- that

9  office that I had contacted Supriya to let her know

10  that a call was coming from them.  And at that point

11  in time is when they contacted Supriya, to the best of

12  my recollection.

13      Q.   Okay.  And what was the upshot of that

14  investigation if you know?

15      A.   Well, my -- my recollection is that after

16  being contacted by EOC, that Supriya had indicated to

17  EOC that she did not want any -- did not want to make

18  any further complaint regarding the matter.  What was

19  actually said, I don't know because -- because I

20  wasn't part of that conversation.

21      Q.   Okay.  And it is your testimony -- I just

22  want -- I'm reconfirming that in November, you deny

23  that Supriya came to you and complained about Katie --

24  about -- I'm just going back up to this date, sorry.

25           That you deny that Supriya ever came to your

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 76 of 150

1    office and complained about Katie bullying her?

2         A.   Yes.  The reason I'm -- I'm saying that is

3    during the exit interview I asked Supriya point-blank,

4    "Why didn't you come to me to talk about any of these

5    matters that you're bringing to my attention now?"

6              And she said, "I didn't bring it to your

7    attention because I thought you were too close to

8    Katie," is what she told me.

9              And that was witnessed by one of the lead HR

10   consultants, Abbey McLennan.

11        Q.   And who was that?

12        A.   Abbey McLennan is the other lead consultant

13   that I identified earlier as working within our human

14   resource department.  She sat in in the conversation

15   -- or the exit interview.  She was there, Supriya was

16   there and I was there.

17             And during that time is when Supriya made

18   the -- and I asked point blank.  You know, Supriya

19   brought up the conversation about the comment that

20   Teri Smith made about diversity.  She brought up the

21   comment about Katie making a hair comment.  And she

22   did a whole laundry list of comments of why she was

23   upset and that she did not feel that she was being

24   treated correctly.

25             And I asked her specifically, "Why didn't

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 77 of 150

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1   you come to me and talk to me about any of these

2   things?"

3           And she said -- because she was afraid to do

4   so because Katie and I were too close is what she

5   stated.

6       Q.   Okay.  Were you close to Katie?

7       A.   What do you mean by "close"?  We were

8   colleagues.  We were professional colleagues.  We

9   worked in the same building for the same organization.

10  Are we talking physically close where I was two doors

11  down from the -- the facilities -- or the finance

12  department.  I don't know what Supriya meant by

13  "close."  She -- she didn't elaborate.

14      Q.   Okay.  So when she told you about the Teri

15  Smith diversity comment, you already knew about that,

16  though, right?

17      A.   Yes.

18      Q.   Because Caitlin had told you about that.  Is

19  that right?

20      A.   Yes.

21      Q.   And Caitlin had told you about that -- let's

22  see.  When had Caitlin told you about that?

23      A.   That would be back in the May time frame.

24      Q.   May?

25      A.   Yeah.

1      Q.   Okay.

2      A.   **April, May time frame approximately.**

3      Q.   Okay.  Now, do you recall when Todd Nicolet

4   left?

5      A.   **I think it was June or July 2019.**

6      Q.   And after he left, Katie was -- had no

7   direct supervisor at that time.  Is that right?

8      A.   **No, that's not right.  She reported directly**

9   **to Dean Barbara Rimer at that time -- during that**

10   **time.**

11      Q.   Okay.  And so Dean Rimer was her supervision

12   until Todd Nicolet's replacement was hired?

13      A.   **That's correct.**

14      Q.   Is that right?

15      A.   **That's correct.**

16      Q.   Okay.  And when was that person hired?

17      A.   **I don't remember the month.  I don't**

18   **remember the month that she came in.  We had an**

19   **extensive search for that position.  Basically, it's a**

20   **vice dean for the school.  I don't recall the month**

21   **she was hired.  I don't.  Latter part of 2019.**

22      Q.   Okay.  And when -- and I think earlier when

23   we were talking about this, Supriya saying that she

24   talked to you in November 2019, you said -- and about

25   feeling bullied by Katie, and you said, "Oh just talk

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 79 of 150

1    to her and tell her how you feel."

2           You -- do you ever recall giving Supriya the

3    advice to talk directly to Katie about any concerns?

4        A.   No, I do not.

5        Q.   So it's your testimony that Supriya never

6    complained to you about Katie prior to her exit

7    interview?

8        A.   That's correct.  That's my recollection.

9    That -- that was easy to remember because she told me

10   why she didn't again.

11       Q.   At her exit interview, right?

12       A.   At her exit interview, right.

13       Q.   So when she made those allegations at her

14   exit interview, did you -- what did you decide to do,

15   if anything?

16       A.   Well, I -- I told Supriya what the process

17   is in terms of being able to file an appeal to the

18   decision if she chose to do that.  And, you know, I

19   basically told her that -- I gave her the phone number

20   even to management and employee -- Employee and

21   Management Relations.

22           I'm pretty sure it even says in the

23   documentation I give her -- I gave her, that she had

24   15 calendar days in which to file an appeal.  And she

25   did file an appeal.

1      Q.   Okay.  And you testified earlier that she

2  gave you a laundry list of things that had happened to

3  her that she thought were discriminatory.  Can you

4  tell me any more of those other than the hair comment

5  and the diversity hire comment?

6      A.   Again, I don't have the file in front of me,

7  so I don't want to do that by speculation.  But she --

8  I do recall -- all right.  I do recall a couple of

9  comments that -- well, I -- maybe I shouldn't have

10  said laundry list.

11          But she -- she stated that she felt that

12  Katie was taking credit for the work that she had

13  actually done, that somebody had to oversee Katie's

14  work because Katie was doing her work wrong and giving

15  inaccurate information.

16          Again, she talked about the diversity hair

17  comment.  She talked about the diversity and the hair

18  comment.  She said -- what did she say?  I'm trying to

19  think of the things she said about her.  Oh, she said

20  that Dr. Kosorok thought that she was outstanding.  I

21  remember her mentioning Dr. Kosorok's name.

22          And I know she indicated that she didn't

23  feel that it was appropriate for Katie to just be able

24  to make this decision.  And -- and also, she was upset

25  that it was so close to her probation date.

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 81 of 150

1     Q.   Did she tell you that she'd not gotten any

2    feedback from Katie about her performance?

3     A.   I don't recall if that was one of the

4    comments she made or not.  I don't recall that.  I

5    think ---

6     Q.   Do you recall ---

7     A.   --- what she was doing, she was looking

8    right at the letter, and the letter was spelling out

9    the reasons that she wasn't going to -- well, the

10   reason for termination.

11        I remember she pointed out the discussion

12   about low work output.  And I remember her saying

13   there is lots of work that Katie has never reviewed

14   and that -- I think she also said she wanted to go

15   talk to Charletta Sims Evans.

16    Q.   But the decision had already been made ---

17    A.   Oh ---

18    Q.   Go ahead.  I'm sorry.

19    A.   I -- and one other comment I do recall her

20   making, she said -- I'm pretty sure she said it this

21   way.  She had said that, "When I stopped in to talk to

22   you, don't you remember me hesitating in that I wanted

23   to tell you something more?"

24        And I remember saying exactly, "No, I don't

25   remember you doing that."

1          And that's, you know, right in line -- I

2     don't know which was said first.  I think that was --

3     which led into me asking her, "Why didn't you come and

4     talk to me about all these things you were concerned

5     about?"

6          And she said -- she indicated that she

7     planned to come and talk to people after her

8     probation.  But before probation, she felt that she

9     was afraid to do that.

10         I was concerned about that because our

11    conversations had always been positive.  I thought she

12    knew that everything that we were trying to do we were

13    doing and talking about how to make her successful.

14    So it did surprise me when she said she was afraid to

15    come and talk to me because I was too close to Katie.

16    But that is what she said.

17         Q.   Okay.  Did she ever say anything to you

18    about Katie treating her differently about her eating

19    habits?

20         A.   No.

21         Q.   Okay.

22         A.   I don't know if that was one of the things

23    she said during the exit interview or not.  I don't

24    remember that.

25         Q.   And did she ever say anything to you about

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 83 of 150

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    Katie putting a Post-it Note on her computer screen

2    about -- asking about her time sheet?

3         A.   No.

4         Q.   And did any other employees ever come to you

5    and complain about Katie?

6         A.   Not that I can recall, no.

7         Q.   Would you have documented them if they had?

8         A.   Well, if it was a complaint that warrant

9    documentation, I would have, sure.

10        Q.   And what kind of complaint would have

11   warranted documentation?

12        A.   Well, violation of policy, violation of

13   school policy, UNC policy, accusing her of anything

14   that would be a violation of policy or violation of

15   law.

16        Q.   Okay.  Did you ever work with Katie to

17   terminate another employee?

18        A.   Work with Katie?  I don't think we ever

19   terminated an employee within Katie's area that wasn't

20   either just a retirement or leaving the organization

21   to go for another organization, voluntary resignation.

22   I think that's all it is.

23             Those are pretty straightforward, and I

24   generally wouldn't do those.  That generally would be

25   something that Janet would have assisted with.

1      Q.   So did Katie terminate Supriya's

2  predecessor?

3      A.   No.  Terminate?

4      Q.   I'm sorry?

5      A.   Did she terminate?  No.  Her predecessor?

6      Q.   Yeah.  Who was Katie's predecessor in that

7  job?

8      A.   Supriya ---

9           MS. JOHNSON:  Katie?  Valerie, you're

10 saying Katie.

11     Q.   (Ms. Bateman)  I'm sorry, Supriya.  Who was

12 Supriya's predecessor in that job?

13     A.   Well, I guess that calls for a little bit of

14 clarification.  The job that Supriya was in was

15 classified as an advanced-level finance accountant.

16 And the person -- the only other person that was at

17 that level previously, during my tenure, would have

18 been six years prior to Supriya.  That would have been

19 Gladys Yam.

20           There were other -- there was another staff

21 member that would have been at a lower-level

22 accounting position.  Her name, I believe was Kirsten,

23 I think.  Kirsten -- I can't -- I can't remember the

24 last name.  I'm sorry.

25     Q.   And she was there ---

1      A.   Without looking at -- without looking it up

2   on the computer or something, I can't remember the

3   last name.  Her first name was -- I think it was

4   Kirsten, K-i-r-s-t-e-n.

5      Q.   Okay.  And she was there ---

6      A.   She would have been a -- she would have been

7   a lower level than what Supriya was classified as.

8   And so she would not have -- yeah.  So it's not

9   exactly the same position.  I thought that you should

10  know that.

11     Q.   Okay.  Was she terminated?

12     A.   She resigned and indicated that she was

13  going to work for a different organization.

14     Q.   Okay.  So she was not terminated?

15     A.   Not for cause.

16     Q.   Okay.  And do you know why she resigned?

17     A.   Only that she indicated that she was going

18  to work for another organization.

19     Q.   And did she have an exit interview?

20     A.   She would have -- she would have had a exit

21  with Janet Scearce.

22     Q.   And did Janet ever tell you the results of

23  that exit interview?

24     A.   I don't recall a conversation like that, no.

25     Q.   But it's not -- it's your recollection that

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 86 of 150

1   she was -- was she ever threatened with termination?

2        A.   I would have taken exception to that.  Not

3   to my knowledge.

4        Q.   And do you have any recollection about her

5   work performance?

6        A.   The only thing I remember about Kirsten in

7   work was that she was struggling to do a project with

8   someone from the IT department.  And it -- I think the

9   issue -- I don't know.  It sounded like -- well, I

10  don't even remember what they were -- there was some

11  kind of discussion that they were having.

12            Yeah.  I remember that Kathy Anderson, who,

13  you know, the person in the IT department would have

14  reported up to, had asked for me to come and assist

15  with a conversation with them.  I don't even remember

16  what the date was on that, but whomever -- trying to

17  do like a team-build discussion with them.  Because

18  that was my background.

19            And I remember the gist of that being that

20  most -- most disagreements within a work team are not

21  anything to do with people's personality or anything

22  like that.  I remember having the conversation around

23  defining, you know, what -- the project goals, what

24  each person's roles would be, what the process should

25  be, or is.  Does everybody understanding what that

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 87 of 150

1  process is?

2          Interpersonal relationship is a very small

3  percentage of the things that cause the overall

4  problem.  Usually, they get into a problem with

5  interpersonal relationship because the first three

6  problems aren't defined well enough.  They don't have

7  a understanding of what their goals and roles really

8  are, and they're -- and they're getting upset.  And so

9  they basically blame each other.

10          And I remember that conversation happening.

11  I thought things got better after that, but anyway.

12  Kirsten decided to leave, go -- and it must be she

13  found a different job that she liked better.

14      Q.   So did you have any discussions with Kathy

15  and Katie about the project they were working on?

16      A.   Yeah.  I was trying to understand myself,

17  you know, where it was having a problem.  Katie -- you

18  know, Katie and Kathy -- Katie and Kathy and I all

19  worked on the administrative unit's leadership team so

20  we would -- we would talk often around that.

21          My recollection was that Katie was trying to

22  get -- get part of a finance process automated, and

23  that's why it was between a finance person and a IT

24  person trying to do that.

25          Now, I've done that type of thing myself, so

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 88 of 150

1    -- and I remember talking to Katie and to Kathy about

2    that.  And I said, "You know, I've tried to have

3    software programs created in-house where you're not

4    taking them off the shelf.  And it's hard to do."

5            I -- in my opinion, and this is a bias -- my

6    opinion is that IT professional software developers do

7    not approach things the way the people using the

8    actual system thinks about things.  And I was

9    suggesting pretty much to Katie and to Kathy that a

10   lot of the disagreement can be right there.  They're

11   not speaking the same language.

12           And I've been there, and I know what that

13   feels like.  So taking the time to clarify.  Again, I

14   tried to break it down, at least make sure they

15   understand the ultimate goal, what their roles are in

16   the process and what process they should be using in

17   -- in working through that.

18           And then elevate the issues.  Don't sit

19   there and argue back and forth and turn it into

20   something personal.  Elevate it to both of them before

21   it gets to that level.

22           Beyond that, no.  No, I don't have anything

23   else in that.  But I remember that because I spent a

24   lot of time preparing to try to assist with that

25   situation.

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 89 of 150

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1        Q.   Okay.  So did you ever work with Charlotte

2    Nunez-Wolff?

3        A.   Yes.  That's Dr. Wolff.  That's who I was

4    talking about when we first started the conversation.

5        Q.   Okay.  Remind me what you were telling me.

6        A.   Well, she was one of the people that

7    interviewed me, and I work directly for her before she

8    left the organization.  She went to Duke.

9        Q.   And she was replaced by Todd Nicolet?

10       A.   That was right at the beginning of -- that

11   one stood out to me because I came on board, and she

12   sat down with me one day and said she was leaving.

13   You know, I thought she was kidding.  But she wasn't.

14   She had an offer from Duke that she decided to take.

15           My recollection is -- and I should remember

16   a name here.  I think there was a gentleman that was

17   not full time with UNC but was actually contracted to

18   assist Dean Rimer for a little while.  But -- and I do

19   mean a little while because they were not there long.

20           And then after that person, I think is --

21   yeah, after that person would be when Todd Nicolet was

22   hired.

23       Q.   Okay.

24       A.   I'd have -- I'd have to look up that name of

25   that contractor.

1      Q.   Okay.  Do you recall somebody by the name of

2    Robert Pitt?

3      A.   Yes.

4      Q.   And who was he?

5      A.   Robert Pitt was a systems -- I don't

6    remember his exact title, but he worked for Charlotte

7    Nunez-Wolff directly.  When Charlotte Nunez-Wolff

8    left, he left almost immediately after her.

9      Q.   And when did Katie leave?

10     A.   Well, during my tenure, Katie never left.

11     Q.   Oh, okay.  Got it.

12     A.   I -- I believe she has recently left.  And I

13   think she went to work for some -- I think she's at

14   Duke.

15     Q.   Okay.  Did you go to the finance meetings

16   they had?

17     A.   No.  What finance meeting?  I ---

18     Q.   Well, there were some finance meetings in

19   which Katie and Supriya and Todd made some reports.  I

20   didn't know if you were present at any of those

21   meetings.

22     A.   I was not.

23     Q.   Okay.  So did any of your HR staff ever talk

24   to you about Supriya?

25     A.   Well, again, Caitlin and I talked, you know,

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 91 of 150

1   in the May time frame.  And Janet and I talked in the

2   November time frame because Janet told me that Supriya

3   brought up the comment about the hair discussion.  And

4   I had let Janet know the background on that and that

5   that had already been dealt with at EOC.  There

6   wouldn't be any more action that she would need to

7   take on that.

8           But that was -- I remember that being in the

9   September time frame, Ms. Bateman, because it was very

10  close to when the complaint was made about -- when we

11  talked about the N-word.

12          So a number of months had transpired here

13  before Janet was approached by Supriya to talk about

14  the hair.  We thought that was a done deal and that

15  everybody had made things right and apologized and

16  reports made to EOC, counsel, corrected, people told

17  to cease and desist for the -- all of that had

18  transpired.

19          So Janet coming to talk to me in November

20  was a little surprising.  But she said that Supriya

21  had stopped by and told her about that.  So she was

22  making sure I was aware of it, which I was.

23      Q.   And it was only -- it was only the hair

24  comment?  Is that what you're saying?

25      A.   That's all I ---

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 92 of 150

1      Q.    I'm trying to understand.  You said you

2   talked with Caitlin in May ---

3      **A.    Yeah.**

4      Q.    --- right?

5      **A.    Right.**

6      Q.    About Supriya?

7      **A.    Right.**

8      Q.    And that was about the diversity hire

9   comments?

10     **A.    Diversity hire comments and time management**

11  **issues, was spending too much time, et cetera, et**

12  **cetera, correct.  I think ---**

13     Q.    And then in September you said the N-word

14  complaint was made by Brent Wishart?

15     **A.    That's correct.**

16     Q.    Okay.  And then you said you and Janet

17  talked in November because Supriya had stopped by her

18  office and complained about the hair comment.  Is that

19  what you said?

20     **A.    I didn't say, "complain."  I said she told**

21  **-- told Janet about the hair comment at that time, and**

22  **Janet told me about it to make sure that I was aware**

23  **of that conversation.  And I -- so I wanted Janet to**

24  **know the background on that.  I said I was aware of**

25  **that and it had been addressed.**

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 93 of 150

1           There shouldn't be -- unless Supriya wanted

2    to do something else, both Caitlin and Janet, to my

3    recollection, told me that their -- you know,

4    consultants are pretty standard about how they do

5    this.  They basically would listen carefully, find out

6    what the person wanted to do, let the person know what

7    the resources were to assist them.

8           Both Janet and Caitlin told me that that --

9    that had happened.  And both, to my -- I know Caitlin

10   did, and -- and I'm pretty sure Janet told me that no

11   action was being requested at that time that she was

12   talking to Supriya.  Supriya was not asking for a

13   report to be made other than she just wanted Janet to

14   know about that comment.  So ---

15       Q.   So do you ---

16       A.   --- Janet told me.

17       Q.   Yeah, do you recall ---

18       A.   And I was aware of that comment ---

19       Q.   Sorry.

20       A.   --- and the whole background on it.

21       Q.   Say that again, I'm sorry.  I was talking

22   over you.  I apologize.

23           I'm sorry, Mr. Regan, could you just say

24   what you said again?  I was talking over you and I

25   missed what you said.

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 94 of 150

1      A.   Don't know where we -- what was the last

2  thing you heard?

3      Q.   Yeah.

4           MS. JOHNSON:  I think you might have

5  frozen up, Mr. Regan, for a few seconds there.  So

6  Valerie, maybe you just want to repeat your question.

7  It looked to me like his frame froze up.

8      Q.   (Ms. Bateman)  Okay.  Well, you had said

9  Janet said that Supriya was not asking for any sort of

10  report to be made.

11      A.   My recollection is that Janet was telling me

12  because Supriya had just stopped into her office, made

13  the comment -- I don't even remember how she said it,

14  but was making the comment about, you know, that Katie

15  had made comment about her hair.  Janet was letting me

16  know that because there wasn't any action being

17  requested by Supriya.

18           So when Janet let me know about that

19  comment, I told Janet what the history of that comment

20  was and how I had been involved previously and -- as

21  well as EOC was aware of that.

22           All that to say that Janet, you know,

23  wouldn't have been required to do anything else with

24  that once she knew that from me.

25      Q.   Okay.  Do you -- do you recall when Barbara

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 95 of 150

1    Rimer promoted Katie?

2         A.    No.  I don't remember the date.  I don't

3    remember the -- I don't even remember the month.  That

4    took some time.  It's not easy to get promoted at UNC,

5    administratively or any other way.  But that -- that

6    took some real time.  There were -- there were a lot

7    -- well, the reason I'm saying that is UNC is trying

8    to be very, very careful about -- and be fiscally

9    responsible.

10              So they had a full process in terms of

11   review and approval that had to happen up through the

12   office of human resources at the central office.  It

13   took quite some time to get approval for Katie's

14   promotion.  But she was promoted, and I can't remember

15   the exact time of when that happened without looking

16   at the computer files or something to tell you that.

17        Q.   Okay.  Well, I'm going to -- I'm going to

18   back to Katie's -- Supriya's charge of discrimination.

19   And in her charge, she says, after she came back from

20   vacation in October, Katie was out of the office for a

21   few days.  And Supriya says she got up the courage to

22   go talk to HR, and she said she talked to Janet about

23   Katie's comments about her hair.

24              And she said she also told Janet how Katie

25   was creating a hostile work environment for her.  Did

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 96 of 150

1    Janet ever say anything to you about that?

2        A.    She did not.

3        Q.    Okay.  And I think you said, when you had

4    the conversation with Caitlin, that you, you know,

5    were talking to Caitlin about how much time she spent

6    with Supriya.  Is that right?

7        A.    Yeah.  What I was talking to Caitlin about

8    is if it's an HR matter, that's one thing.  If it's

9    not an HR matter and it's just personal conversation,

10   just talking without any business related, to keep

11   those down to like five minutes.  We don't tell people

12   they can't talk to each other, but we do tell people

13   that we are being paid to do our work.

14            And I wanted Caitlin to -- both Caitlin to

15   realize that what my expectations were of Caitlin and

16   also how to handle it if any employee were to come in

17   and just kind of sit there and start talking and take

18   up lots of her time.  Because there isn't any other

19   consultant that has any time to waste.  They have a

20   very, very complicated and difficult challenging job.

21   And they're all really good at it.

22            So I didn't want people to start thinking

23   that HR was causing the problem because they were off

24   talking, not doing work inappropriately like that.

25   But specifically, what I wanted Caitlin to know is --

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 97 of 150

1    and I was after two things in that conversation.

2              One is, you know, were there any complaints

3    being made?  Is she aware of any problems that the

4    managers were reporting to Katie about being upset

5    about things that Supriya was saying?  Was she aware

6    of anything like that?  Had she heard anything like

7    that?

8              And I knew that she sat right across from

9    the IT office where it was reported that Supriya was

10   spending and exorbitant amount of time non-work

11   related.  So I wanted to get Caitlin's perspective on

12   that as well.

13        Q.   Okay.  So other than Janet and your

14   conversations with her that you've just detailed, did

15   you have any conversations with anyone else in HR

16   about Supriya?

17        A.   Well, I considered Will Frey part of HR.

18        Q.   Okay.

19        A.   He's the organizational development

20   consultant that I talked to back in, you know, the end

21   of April, early May time frame about the EQ, EI

22   discussion.  He's part of the central HR -- or he was

23   at the time.  I think he's retired, too.  He's part of

24   the central HR organization.

25              Of course I -- I talked to Chenise Crump

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 98 of 150

1   from Employee and Management Relations.  I referred to

2   her earlier as well.

3       Q.   That was near the end when you were getting

4   guidance on terminating Supriya.  Is that right?

5       A.   Correct.

6       Q.   Okay.  And your conversations with Will Frey

7   were prompted by Katie's discussions with you about

8   her perception that Supriya lacked emotional quotient

9   and emotional intelligence.  Is that right?

10              MS. JOHNSON:  Objection.  You can

11  answer.

12              THE WITNESS:  That's not how I would

13  characterize that.  What I would say is -- and I think

14  what I said earlier that managers -- other managers

15  were coming to Katie and saying that -- that Supriya

16  was making comments that would be considered

17  inappropriate and could impact her position if

18  somebody doesn't do coaching and counseling and

19  mentorship of her.

20      Q.   (Ms. Bateman)  Okay.  And who were these ---

21      A.   Katie then ---

22      Q.   Go ahead, I'm sorry.

23      A.   I'm sorry.  Katie came to me once that

24  started to occur.  And out of those conversations,

25  that's when I contacted Will Frey.  I also contacted

1   Brandon Washington with the EOC office to talk through

2   some of that information as well.

3       Q.   Okay.  And who were the managers that

4   complained to Katie?

5       A.   To my knowledge, I know of two.  One was

6   Charletta Sims Evans, who was the -- who is, I

7   believe, the associate dean for student services for

8   the school of public health.  And Kathy Anderson,

9   who's the associate dean for information systems and

10  support for the school of public health.

11      Q.   And what were the nature of their

12  complaints?

13      A.   Well, that's where the problem was.  Katie

14  was coming to me for assistance on, "How am I supposed

15  to talk to Supriya when the people won't come -- come

16  out and say anything other than 'inappropriate," and

17  should be coaching and need to tell her the impact

18  she's having on other people?"

19           But they didn't want to say the actual words

20  that were being used until the N-word complaint

21  happened in September.  Then it was kind of clear at

22  that point in time.  When that -- when that happened,

23  -- well, yeah, when that happened, it became more

24  clear that the interventions that we were trying to

25  have and the conversations that I was trying to have,

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 100 of 150

1    so far, were not being successful.

2        Q.   Okay.  So when Katie comes to you and says,

3    "Well, Charletta came to me and Kathy came to me.  And

4    they complained that Supriya made inappropriate

5    remarks, but they won't tell me what she said.  How

6    can I help Supriya?"  Is that what happened?

7        A.   Yeah.  That's very much what happened.

8    That ---

9        Q.   And -- go ahead.

10       A.   So...

11               MS. JOHNSON:  You might have frozen.

12               THE WITNESS:  I know Katie knew that

13   there was one phrase that Supriya used that she

14   shared.  I mean, it was right off the bat.  It was

15   like right at the beginning of her starting the work.

16               Katie and her team -- well, I thought Katie

17   and her team were quite close, you know?  I didn't sit

18   very far from them so -- and the printer that I

19   oftentimes had to use was also located within their

20   suite.  So I would be in and out of there.  I thought

21   their morale and I thought their comradery was -- was

22   outstanding.

23               And I know that they had lunches together.

24   I didn't know that situations came up during the

25   lunches.  But one thing I am aware of is, like, right

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 101 of 150

1    off the bat, that Supriya made a comment in front of

2    the other team members telling a story.  I believe it

3    was about being harassed in her previous work.

4            And in the process of telling that story

5    used the phrase "bunch of white jerks."  And I believe

6    that's when Katie informed her that it was -- you

7    know, we don't talk that way -- we don't talk that way

8    about -- we don't generalize with -- about people,

9    their race and all that type of thing here.

10           So with that and the N-word complaint and

11   overhearing her at the -- at the birthday party and

12   the language that she had used there, I -- I believe

13   one of the other things -- that is coming to me as

14   we're talking through it -- but one of the things that

15   I believe also had occurred, Katie made me aware of,

16   was Teri Smith had come to her.

17           Teri -- Teri was also -- actually, everybody

18   in that finance group I thought were outstanding, but

19   Teri was one of the people that, you know, would be in

20   charge of the finance operation, make sure the office

21   is doing what they're supposed to if Katie is out.

22           So Teri had gone to Katie and -- and

23   commented that people are coming to her also talking

24   -- but what they were saying is, "She's making

25   comments about black people, and she's making comments

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 102 of 150

1  about white people.  And this is getting people

2  upset."  But they wouldn't say what the exact comments

3  were beyond that.

4          Again, that's where we came up with trying

5  to help her.  We were trying all the way through, as

6  much as we could, to help Supriya understand the

7  impact that she was having with the things that she

8  was saying and trying to prevent things from getting

9  worse.

10     Q.   (Ms. Bateman)  So when was this -- when did

11  Teri Smith go to Katie?

12     A.   I'm not sure of the date on that.  It would

13  have been, you know, one of the conversations that

14  Katie had had with me.  Katie had a lot of

15  conversations with me because, like I say, our offices

16  were -- were close.  My office door is always open

17  unless there's a meeting, and would stop in and ask

18  for advice or counsel or who to talk to or, from time

19  to time, would update me on some of the things that

20  were going on.

21          So she was trying to make it very clear,

22  "Look, I'm not just coming to you to waste your time.

23  I'm coming to you because people are coming to me, and

24  I need assistance here about how to help Supriya.  And

25  it's hard because I'm not getting a lot of exact

1    quotes from anybody."

2              So that's kind of the situation we were in

3    in trying to help Supriya.

4        Q.   Okay.  So did you -- did you ever suggest to

5    Katie that she press people to give her details?

6        A.   She did ask people for details.

7        Q.   And they refused to give them to her?

8        A.   They said they did not want to do that.

9        Q.   And how many conversations do you think you

10   had with Katie about Supriya?

11       A.   I don't know how many.  We had a number of

12   them.

13       Q.   I mean, more than -- more than five?

14       A.   Yeah.  I -- I don't exactly know how many.

15   Because, like I said, my office is two doors down from

16   the finance office, so we would have -- and Katie and

17   I would be in leadership ops -- leadership operations

18   meetings together as well.  So there was a lot of time

19   spent discussing how she could support.

20              And what we were trying to do was help

21   Supriya be successful.  There were a lot of

22   conversations about that.  But she -- Katie was --

23   Katie was asking for a lot of help.  She even went to

24   the extent to go to the EOC office, which is at the --

25   all the way at the other end of campus to OHR, you

1  know, to talk to people -- well, like Rebecca Gibson,

2  asking for coaching and counseling.  It was -- it was

3  difficult.  And when I had ---

4        Q.   And when you ---

5        A.   And when I had a conversation myself trying

6  to help Supriya, her response to me was -- well, two

7  responses I recall.  One from the training she said

8  was a complete waste of her time.  And when I brought

9  the situation, the herpes comment at the birthday

10  party, to her, she said, "I don't" -- she didn't see

11  why that was a problem at all, and she told me so.

12        Q.   So other than those two conversations you

13  had with Supriya, how many conversations did you have

14  with her?

15        A.   About what?

16        Q.   About anything.

17        A.   Well, I -- you know, like I say, my office

18  is located two doors from them and I had to go in and

19  out.  Conversations I had with Supriya on a day-to-day

20  basis were generally, what I would say, are very, very

21  congenial.  She would smile.  She would say hello.  I

22  would do the same.  But like I say, I was in and out

23  because I had my responsibilities to attend to as

24  well.

25             So talking to Supriya, we would probably

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 105 of 150

1    have discussion like that almost every day.  In terms

2    of the EQ, the EI training, in terms of me making her

3    aware of the -- excuse me, the texting complaint,

4    harassment complaint that was made on her behalf,

5    probably only maybe three, four or five, if you count

6    those up.

7              Like I said, I had asked -- I would have had

8    a lot of conversations with her had she had the

9    conversations with me that she had at the exit

10   interview.  Because she never came across like she was

11   having any type of problem with Katie.

12             And that's why I asked her, "Why didn't you

13   come and talk to me?  I'm right here.  I'm two doors

14   away."

15             And that's when she gave me the answer about

16   "Hey, you're too close to Katie.  I was afraid to do

17   that."

18        Q.   Okay.  I want to just look quickly at the

19   reasons given in her termination letter, which was

20   dated January 6th.  Now, do you recall who wrote that

21   letter?

22        A.   The letter was -- was created by -- from

23   boilerplate where most of the letter is similar to any

24   letter such as that termination letter, and that's

25   created by Employee and Management Relations.  That

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 106 of 150

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1   was sent to us by Chenise Crump.

2           The details of the letter that Katie would

3   have input -- and I believe Abbey McLennan, again, one

4   of the lead consultants, worked with me and Katie to

5   make sure that that language was appropriate.

6   Finished the letter, sent it back to Chenise Crump for

7   -- for final review.

8           I don't know who Chenise would have -- I

9   don't know if Chenise would have worked with legal to

10  review it or not.  Have no idea.  But then she sent it

11  back and said it was approved.  And that's how that

12  letter was generated.

13       Q.   Okay.  And so the part that Abbey would have

14  drafted, I'm guessing, says this, "Based upon my

15  review and evaluation of your ability to meet the

16  expectations of this position, specifically your lack

17  of competence at the advanced level, inability to work

18  independently, low work output and your ability to

19  recognize inaccuracies in your calculations and

20  reporting, I have decided to separate you from

21  employment effective January 6, 2020."

22           MS. JOHNSON:  Valerie, I just want to

23  object for the record.  You said "Abbey."  Did you

24  mean to say Katie?

25           MS. BATEMAN:  No, I meant Abbey

1  because ---

2            MS. JOHNSON:  Okay.

3            MS. BATEMAN:  --- I thought he said

4  Abbey worked with him on the letter.

5       Q.  (Ms. Bateman)  Steve, did you say Abbey

6  worked with you on the letter?

7       A.   Abbey worked with both Katie and myself.  So

8  Katie would have provided the language that you just

9  recited were the reasons for termination.  You know,

10 Abbey would have inserted all of that into the letter.

11 Katie would have reviewed it again.  I would have

12 reviewed it.  Charletta would have reviewed it.

13 Potentially, more would have reviewed it.

14            And then it was sent back to myself, and I

15 had it.  And that's what we presented -- Abbey and I

16 presented that along with Katie during the exit

17 interview to Supriya.

18      Q.   So I think you talked earlier about a

19 documentation file that Katie would have created to

20 support her recommendation?

21      A.   I don't know if I used the term

22 "documentation file."  I do -- I do know that there

23 was plenty of documentation that was provided from

24 Katie to support the termination.  And that became

25 part of the record, yes.  I guess that's a

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 108 of 150

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    documentation file.

2        Q.    Okay.  So where would that documentation be?

3        A.    Now?

4        Q.    Yes.  Well, where was it then?  Where was it

5    kept?

6        A.    A copy would have been sent to Employee and

7    Management Relations, and then I would have had a copy

8    as well.  My copy would have been forwarded to the EOC

9    office when an appeal report came -- or, you know, a

10   request for appeal was submitted by Supriya to

11   employee management relations.

12            I believe the way that happened is the

13   office of legal counsel then contacted my office.  I

14   know -- well, and this is even during the pandemic, so

15   I had to go into the office to get it and have it all

16   sent to the office of legal counsel.

17            So I believe, and totally speculation on my

18   part, I believe the office of legal counsel has that

19   record.

20       Q.    So there's -- would you agree there's

21   nothing in this letter, though, about lack of

22   emotional intelligence or lack of emotional quotient?

23       A.    Yeah.  I would agree with that.  That wasn't

24   why she was terminated.

25       Q.    So she was terminated for the reasons stated

1  in this letter.  Is that right?

2      A.   Yes.

3      Q.   And you said that Katie provided plenty of

4  documentation to support those reasons?

5      A.   Yes.

6      Q.   Well, did you ever discuss any of -- did you

7  -- let me stop and say that again.

8           Did you ever discuss Supriya with any of the

9  department chairs?

10     A.   Not while she was still an employee.

11     Q.   How about after she was employed?

12     A.   Yes.

13     Q.   And what were those discussions?

14     A.   I was contacted by one department chair, by

15  way of an email, indicating that Supriya had contacted

16  him and sent an email whereby a lot of comments were

17  made about Katie Thornsvard.  And that chair wanted to

18  know what to do about that.

19     Q.   And who was that chair?

20     A.   Kurt Ribisl -- Kurt Ribisl -- Kurt Ribisl,

21  R-u-b-i-s-i-l (sic).  His first name is ---

22     Q.   And what did you tell him?

23     A.   I told him that it was a personnel

24  confidential matter, that any conversation in

25  reference to Supriya should be submitted to my office

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 110 of 150

1  or forwarded to Employee and Management Relations

2  office as outlined on the termination letter that

3  Supriya had received.  I didn't -- I told -- I did not

4  recommend discussing the matter with anyone else.

5      Q.  Did he forward you the email she sent to

6  him?

7      A.  He did.  Did -- I don't know.  Did that come

8  through?  I was saying yes, Valerie.

9      Q.  Yes, I heard you.  I heard you.

10     A.  Okay.

11     Q.  I want to -- I want to share my screen

12  again, so let's -- I have to do several things to do

13  that.  So can you see my screen now?

14     A.  Yes.

15     Q.  So is this the email that Kurt forwarded to

16  you?

17     A.  Yeah.  Could you hold right there?

18     Q.  Yeah.  Right there?

19     A.  Yeah.  It's -- it's scrolling so I can't

20  really read it.

21     Q.  Okay.

22  (Witness examines document)

23     A.  This seems to be more than what I -- I

24  recall.  Can we go back up?

25     Q.  Yes.

1      A.    Yeah.  The responses from Kurt, I did not

2   see.

3      Q.    Okay.  So ---

4      A.    The only thing I saw was an email that came

5   from Supriya to Kurt informing him that she had been

6   terminated.

7      Q.    So would that be ---

8      A.    None of these emails look the same.

9      Q.    Would that be this end email down here?

10  (Witness examines document)

11     A.    I don't -- I don't think so.  My

12  recollection was that there was an email -- it had

13  more to do with Katie than it had to do with prepping

14  work or anything else.  This -- this -- I'm not -- I

15  can't be absolutely certain, but I don't think that's

16  the email that Kurt sent me.

17     Q.    Okay.  Was it -- was it this one, perhaps?

18  (Witness examines document)

19     A.    I don't -- I don't think so because the

20  email that Kurt would have forwarded to me, you know,

21  would have had a preface on it about asking what to do

22  or what to say or how to handle.  Actually, he was

23  asking for a meeting with me to discuss Supriya.

24     Q.    And you told him that you could not discuss

25  it with him?

1       A.   No, that's not what I told him.  I actually

2  did meet with him.

3       Q.   Oh, okay.  And you met with him, and what

4  was the discussion?

5       A.   That's when I told him that it was a

6  personnel confidential matter, that any -- any future

7  conversation I would recommend either be forwarded to

8  my office or be forwarded to Employee and Management

9  Relations, but we shouldn't be discussing -- we

10 shouldn't be discussing personnel confidential

11 matters.

12           And my recommendation was not to discuss the

13 personnel confidential situation even with Supriya, to

14 forward her to where she has been given guidance to

15 contact if she wants to discuss the matter in further

16 detail.  That was the comment -- that was the process

17 I had with Kurt.  I also told Dean Rimer the same

18 thing.

19      Q.   Say that again.

20      A.   I told Dean Rimer the exact same thing, what

21 I just said ---

22      Q.   You told Dean Rimer the same thing?

23      A.   Yeah.  That -- I let Dean Rimer know that

24 Supriya had contacted Kurt and that Kurt had asked for

25 a meeting to discuss that.  And then I followed up

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 113 of 150

1   with Dean Rimer to tell her, "This is the

2   recommendation I'm making about that."  I probably

3   said that wrong.  I don't tell Dean Rimer what to do.

4   I made a recommendation to her what I thought should

5   be done.

6       Q.   So looking at this email here, it's clear

7   that Supriya is telling Kurt that she had no warning

8   whatsoever that her -- that her performance was not

9   strong.  Do you see that?

10      A.   Yes.

11      Q.   But your testimony is that's completely

12  inconsistent with your understanding?

13      A.   Yes.

14      Q.   And that she'd never once gotten any

15  warning.  Is that correct?  That's what she says.

16      A.   I don't know what she's talking about in

17  terms of "warning."  Was she talking about the ---

18      Q.   When she says, "HR" ---

19      A.   She'd never once given me a warning?

20      Q.   About her work.

21      A.   She was given feedback about her work.

22      Q.   From whom?

23      A.   From Katie.

24      Q.   Were you there when Katie gave it to her?

25      A.   No.  I read the documentation, and I read

1    documentation where she wrote back to Katie in

2    response to what Katie had given to her.  So, you

3    know, that's pretty good documentation when it's on

4    the email.

5         Q.    Yeah.  So this says, "I have over 35 emails

6    documented of her praising me, or blowing me off for a

7    meeting."

8         A.    Don't know anything about that.  I do know

9    that there are emails that I saw that Katie did give

10   her positive feedback on some of the things that she

11   was doing, especially in the early part of her tenure.

12           She started out really good.  She did start

13   out really well.  So there were emails even back --

14   you know, I know there are emails back then.  I think

15   one of them even talked about Katie telling Dean Rimer

16   that she was doing well.  And I think she shared that.

17           But that did not -- it didn't stay that way.

18   That's the problem.  That's -- that's what jumped out

19   at us because we -- here we had January, February,

20   March, everything is going well.  It seems to be

21   pretty good.  Now managers are coming and, you know,

22   not to tell the whole story because we've already done

23   that.

24           But you see what I mean.  You had three

25   months where other than that one meeting starting out

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    where Katie told her not to use phrases like "white

2    jerks," I didn't have any information coming to me

3    that there was ever a problem.  And I thought

4    everything was going great.  And then we started into

5    April, things started to go downhill at that point in

6    time.

7         Q.   And when you say, "starting to go downhill,"

8    are you talking about her performance or the emotional

9    intelligence things?

10        A.   Both.

11        Q.   Okay.  But you said she was only terminated

12   for her lack of performance.  Is that right?

13        A.   Correct.

14        Q.   And she says in this email to Kurt that

15   Katie hadn't reviewed a single piece of work for her

16   in months.

17        A.   Yeah.  The documentation from Katie would

18   not support that comment.

19        Q.   Okay.  And then she says she got "all good

20   verbal feedback," and that she had "done interactive

21   models" and "over 25 Tableau workbooks" and "dozens of

22   presentations that show your break even points and

23   projections."  And then she says, "It's my word

24   against hers."

25             But you're saying that Katie provided emails

1  showing that she had given her negative feedback?

2      A.   She had given her feedback on what to

3  correct, which in my mind is not negative.  She was

4  trying to help her be successful and -- and learn.

5          Katie, from my estimation, is quite a good

6  teacher when it comes to teaching finance.  She's

7  given outstanding presentations in front of high-level

8  people including provosts.  And she -- what she could

9  teach me in finance, I was impressed as well because

10 I'm not a particularly good student in finance.  But I

11 know what her skills are.

12          And that's how -- you know, she was training

13 all the business manager -- when I first came, there

14 was a big problem with business managers in terms of

15 their competence level.  But over time, those people

16 began to leave, and they were replaced with pretty

17 outstanding people.

18          And Katie helped that happen.  Because when

19 they came on board, she gave one-on-one training to

20 people to make sure they understood, answered

21 questions.  She was -- she was mentoring.

22          I thought she was doing the same thing with

23 Supriya.  I -- you know, everything I knew about Katie

24 from the time that I had worked with her, she wants

25 everybody in that finance organization to be

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 117 of 150

1  successful.

2          But she is not going to -- she's not going

3  to accept performance that is not indicative of a

4  high-performance finance organization.  She's not

5  going to allow that to happen.  And she didn't.

6      Q.   So your testimony is that all of these

7  emails that Katie provided you supported her

8  allegations or her -- her argument to you that she had

9  a lack of -- that Supriya had a lack of confidence at

10  an advanced level, was unable to work independently,

11  had low work output and was unable to recognize

12  inaccuracies in her calculations and reporting.  Is

13  that right?

14      A.   That's -- that's correct.

15      Q.   And if I reviewed all those emails that

16  Katie provided you, I would see the support for these

17  reasons for her termination?

18      A.   That's correct.

19      Q.   Okay.  Did any other department chairs,

20  other than Kurt Ribisl, ever come to you and talk

21  about Supriya?

22      A.   No.  Kurt advised that other department

23  chairs had talked to him after Supriya was terminated.

24      Q.   And what ---

25      A.   None of that came -- Kurt was speaking on

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 118 of 150

1    behalf of whoever spoke it.  And she -- he didn't give

2    me any details on that.

3              I do believe -- let me think about that.

4    Let me think about that.  Oh boy.  I can't be certain,

5    but I thought there were emails sent into the

6    organization to both department chairs and to

7    individual employees, both.

8              And when following up on that, I thought

9    that -- yeah, and I think I had talked to Kurt because

10   I think one of the chairs would have been Beth

11   Mayer-Davis, who is the department chair for the

12   nutrition organization at the time -- or, yeah,

13   nutrition department at the time.

14             And there are a number of emails and texts

15   that went out to other employees as well.

16        Q.   And you're saying these were all from

17   Supriya?

18        A.   Correct.

19        Q.   Okay.  And they came to you or they came to

20   Kurt?

21        A.   I'm only -- well, like I said, the only

22   thing that Kurt showed me was one email.  I don't know

23   how -- you're showing me a lot more than what I saw.

24   So evidently, there were more emails.

25             I don't know what emails went to Beth.  I

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 119 of 150

1   was -- I was basically told by at least one employee

2   that she was continuing -- actually, a couple of

3   employees -- continuing to get texts from Supriya

4   basically making comments about Katie being a racist,

5   being a bully, that type of comment.

6        Q.   And who was that employee that told you

7   that?

8        A.   One was Natiaya Neal.  She was the

9   individual that worked down in student services under

10  the guidance of Charletta Sims Evans.  Kurt -- let me

11  see.  Brent Wishart had indicated that he was

12  continuing to get texts.  And I'm -- and I'm certain

13  that people had walked up to Katie to tell her that

14  they were still getting texts.

15            Katie actually came and talked to me about

16  that because she was concerned.  Actually, she voiced

17  her concern in the context of her personal safety.

18  And when she did that, we contacted the university

19  police department.

20            MS. BATEMAN:  Okay.  Can you -- I'm

21  sorry, I need to take just a quick break.

22  (Brief recess: 2:22 p.m. to 2:29 p.m.)

23            MS. BATEMAN:  Okay.  I am going to show

24  you what I don't think has been marked an exhibit.  So

25  I think we will be marking it -- I'm going to look at

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 120 of 150

1    this folder.

2                    THE COURT REPORTER:  The next one will

3    be 20.

4                    MS. BATEMAN:  Yeah.  What is the next

5    number?

6                    THE COURT REPORTER:  20.  The last one

7    you marked was 19.

8                    MS. BATEMAN:  Okay.

9                    THE COURT REPORTER:  This one should be

10   Exhibit 20.

11                   MS. BATEMAN:  Okay.  Just give me one

12   sec.  Okay.  Here we go.  I'm going to share my

13   screen.

14                       (DEPOSITION EXHIBIT

15                        NUMBER 20 WAS MARKED

16                        FOR IDENTIFICATION)

17        Q.   (Ms. Bateman)  So here -- do you see that

18   document, Mr. Regan?

19        **A.   I do.**

20        Q.   Okay.  It purports to be an email from Beth

21   Mayer-Davis to Supriya.  Do you see that?

22        **A.   I do see it.**

23        Q.   Okay.  "My only suggestion is to talk to

24   Steve Regan although I am assuming you have already."

25                   And then I think we're going to go down here

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 121 of 150

1    to this email.  And that's the heading right there.

2    Let me see if I can make this somewhat smaller.  I

3    don't want to make it so small you can't read it.

4         A.    I can read it.

5         Q.    But I'm trying to get more on the screen.

6         A.    I see.

7         Q.    Okay.  So is this the email that you

8    referred to earlier?

9         A.    No.

10        Q.    No?

11        A.    I -- that's to Beth Mayer-Davis.  I was

12   referring to an email that Kurt Ribisl sent to me.

13        Q.    Oh.  I thought you said that there was also

14   an email to Beth.

15        A.    Well, I think there was.  I think -- you

16   know, you remember I met with Kurt, and Kurt had

17   indicated that emails had gone to other people.  And I

18   -- to the best of my recollection was that he had

19   mentioned Beth Mayer-Davis.  I didn't see the email.

20        Q.    Oh, okay.  Okay.

21        A.    This must be it though.

22        Q.    So Beth never sent you this email?

23        A.    No, I don't -- I think the only email I ever

24   got from the business -- or excuse me, from the

25   chairs, from my recollection -- I guess I could be

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 122 of 150

1  wrong, but I -- I think the only one I got was from

2  Kurt Ribisl.  And I haven't seen one yet that looks

3  like the one that he sent me.

4       Q.   Okay.  So when -- go down to the -- this

5  says, "Hi Michael, Beth," et cetera.  Do you see that?

6       A.   I do.

7       Q.   And then there's a first paragraph, a second

8  paragraph, and if you go down to the third, and it

9  says "I begged HR."  Do you see that paragraph?  I

10  want you to take a minute and review that paragraph.

11  (Witness examines document)

12       A.   Okay.

13       Q.   So when she says, "I begged HR to allow

14  Michael, Beth, Morris, or any of the department chairs

15  to please look over my look and have a more objective

16  review of what I did," did she -- are you the HR

17  person she's referring to?

18       A.   I don't believe so.

19       Q.   Okay.  Who else would that be?  Would --

20  could that have been Abbey?

21       A.   It could be Employee and Management

22  Relations.  It -- it could -- you know, at the time of

23  this email, she would have had the termination letter

24  in her hand.  And at the bottom of that letter, it

25  says who to contact if you have further issues or

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 123 of 150

1    concerns.

2         Q.   Right.  But what I guess she's saying in

3    this letter is that she was asking for the decision to

4    terminate her be reconsidered.

5         **A.   Yeah, that would be the appeal process.**

6         Q.   Okay.  So the -- no one in the department

7    would internally review it and say, "Wait, we made a

8    mistake"?

9         **A.   What department?**

10        Q.   Your department.  The Gillings School.

11        **A.   No one -- no.  If you're saying did anybody**

12   **make a review of the case other than myself and**

13   **Employee and Management Relations, we also let Dean**

14   **Rimer know what was going on so that she would not be**

15   **surprised.**

16             **All -- all of those people, Dean Rimer,**

17   **Katie, myself, Abbey and then central HR would have**

18   **been -- would have been the people involved.**

19             **But no, there wouldn't be anybody to turn**

20   **around and say, "Oh, this is a mistake.  We're not**

21   **going to do this."  No one did that.  You know, we --**

22   **to my knowledge, I can't think of any reason why they**

23   **would.**

24        Q.   Okay.  So Katie is talking in this paragraph

25   about her transition from being a -- not a career

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 124 of 150

1   employee to a -- to a career employee.  Is that right?

2              MS. JOHNSON:  I'm going to object

3   because you just said, "Katie was talking about."

4              MS. BATEMAN:  Sorry.  Sorry.  Thank

5   you.

6       Q.   (Ms. Bateman)  Supriya.  Supriya is talking

7   about she had -- was a week shy of being made

8   permanent.  Do you see that in this paragraph?

9       **A.   Yes.**

10      Q.   Okay.  So she was fired for performance

11  reasons, was she not?

12      **A.   Correct.**

13      Q.   And if she had been permanent, she would

14  have been required to have gotten two written

15  warnings.  Is that correct?

16      **A.   It's a different process when you are no**

17  **longer on probation.  And it ---**

18      Q.   So ---

19      **A.   You know, and it depends on the level of --**

20  **type of position.  Remember we talked about EPA, SPA,**

21  **et cetera, et cetera.  It would -- it would be a**

22  **different process at that point in time, yes.**

23      Q.   Okay.  So if you're a permanent state

24  employee, you can't be terminated for performance

25  reasons unless you've gotten a written warning or two,

Case 1:20-cv-01096-TDS-JEP  Document 67-1  Filed 03/09/23  Page 125 of 150

1    right?

2         A.    Right.   There's a step process through the

3    verbal, written and final termination.   That's

4    correct.

5         Q.    Okay.   But -- but Supriya wasn't entitled to

6    that because she wasn't a permanent employee.   Is that

7    correct?

8         A.    That's correct.

9         Q.    So she didn't get any written warnings about

10   her performance deficiencies.   Is that right?

11        A.    She didn't get any written warnings from HR

12   or part of HR to do that.   She just -- she was just

13   getting feedback on her deficiencies that were

14   documented in the emails from Katie.

15        Q.    So you would agree that she never got any

16   written warnings from anyone?

17                   MS. JOHNSON:   Objection.   You can

18   answer.

19        Q.    (Ms. Bateman)   Would you agree with that,

20   Mr. Regan, that she never got any written warnings

21   about her performance from anyone?

22        A.    I think she had written documentation given

23   to her about her performance, yes.   She got that

24   from ---

25        Q.    From Katie?

1      A.    --- from Katie, yes.

2      Q.    Okay.

3      A.    I think that's ---

4      Q.    Okay.  All righty.

5             MS. BATEMAN:  Thank you.  That's all

6      the questions I have.

7             MS. JOHNSON:  All right.  Valerie, just

8      we will allow him to give the name of the employee

9      involved in the inappropriate text matter if we can

10     all agree pursuant to the protective order in this

11     case that if this deposition is filed with the court,

12     that name will be redacted or simplified in such a way

13     that he is not personally -- his name is not

14     personally identifiable.

15            MS. BATEMAN:  Yeah.  I am -- I am fine

16     with that for the purposes of that one individual.

17     But I had a lot of questions about the investigations

18     that went on and who they involved, and the witness

19     was not willing to speculate or provide me with his

20     recollection of them because it was based on

21     speculation.  So I want to hold the deposition open to

22     pursue that.

23            MS. JOHNSON:  That's fine.  Do you want

24     -- and we'll address that with the Court.  But do you

25     want him to give you the name of that employee?

```
 1                    MS. BATEMAN:  Yeah, that'd be great.
 2                    MS. JOHNSON:  If he knows.  I don't
 3   even know if he remembers it.
 4        Q.   (Ms. Bateman)  Yes.  Do you remember it?
 5        A.   The employee that sent the text ---
 6        Q.   Yes.
 7        A.   --- that was offending?  His name is Blair
 8   Mason.
 9        Q.   Okay.  And who was he?
10        A.   He was one of the IT technicians.
11        Q.   Okay.  And was he one who was present the
12   day that Supriya used the N-word?
13        A.   I do not believe that's true, no.
14        Q.   You don't believe he was there?
15        A.   I do not believe he was there.
16        Q.   Okay.  And was an investigation done into
17   whether he sent the text message?
18                    MS. JOHNSON:  Objection.  Already asked
19   and answered.
20                    MS. BATEMAN:  Well, I'm asking it again
21   because I don't recall that I did ask it and answer --
22   and he answered it.
23                    MS. JOHNSON:  You can answer, Mr.
24   Regan.
25        Q.   (Ms. Bateman)  Was an investigation done
```

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 128 of 150

1  into whether he sent that text message to Supriya?

2      A.   A report was made to the EOC office.  The

3  EOC office followed up with Supriya about the matter.

4  Supriya would have confirmed that, you know, that it

5  did occur.  And then she also confirmed that she did

6  not want to have any other action taken.

7              MS. BATEMAN:  Okay.  All right.  Thank

8  you.

9              MS. JOHNSON:  I have no further

10 questions.

11

12             WHEREUPON, at 02:40 o'clock p.m., the

13 deposition was adjourned.

14

15

16

17

18

19

20

21

22

23

24

25

1
## CERTIFICATION
2
    Lori Gruber, Notary Public in and for the County of
3
Iredell, State of North Carolina at Large, do hereby
4
certify:
5
    That said witness was affirmed by me to state the
6
truth, the whole truth, and nothing but the truth, in
7
said cause and appeared before me, via video conference,
8
at the time and place herein aforementioned and the
9
foregoing consecutively numbered pages are a complete and
10
accurate record of all the testimony given by said
11
witness;
12
    That the undersigned is not of kin, nor in anywise
13
associated with any of the parties to said cause of
14
action, nor their counsel, and not interested in the
15
event(s) thereof.
16
    Reading and signing of the testimony was requested.
17
    IN WITNESS WHEREOF, I have hereunto set my
18
hand this 23rd day of February, 2023.
19

20
*Lori Gruber*
    CHAPLIN & ASSOCIATES
21
    Notary No. 201919100031
22

23

24

25

## WITNESS CERTIFICATION

I, STEPHEN REGAN, do hereby certify,

That I have read and examined the contents of the foregoing pages of record of testimony as given by me at the times and place herein aforementioned;

And that to the best of my knowledge and belief, the foregoing pages are a complete and accurate record of all the testimony given by me at said time, except as noted on the attached here (Addendum A). I have _____ / have not _____ made changes/corrections to be attached.

_____
(WITNESS SIGNATURE)

I, _____, Notary Public for the County of _____, State of _____, do hereby certify:

That the herein-above named personally appeared before me this the _____ day of _____, 20____;

And that I personally witnessed the execution of this document for the intents and purposes herein above described.

_____
NOTARY PUBLIC

My Commission Expires:                    (SEAL)

1
## ADDENDUM A

2

3       Upon the reading and examination of my

4   testimony as herein transcribed, I note the following

5   changes and/or corrections with accompanying reason(s)

6   for said change/correction:

7

8   Page        Line                    Is Amended to Read

9

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 132 of 150

| **Exhibits** |

**10174 Stephen Regan 02-14-2023 - Exhibit 20**  3:11 120:10,14,15

| **0** |

**02:40**  128:12

| **1** |

**105**  56:14
**11:06**  5:2,5
**12:45**  69:18
**12:58**  69:18
**14th**  5:4
**15**  11:6 12:17 66:3 79:24
**19**  120:7
**1981**  9:21
**1994**  9:21
**1st**  7:21 20:3 36:15,18,23

| **2** |

**20**  66:3 120:3,6,10,15 130:19
**2014**  7:19 12:15,23 20:5
**2019**  35:23 36:3,19 78:5,21,24
**201919100031**  129:21
**2020**  7:22 20:5 106:21
**2023**  5:4 129:18
**23rd**  129:18
**24th**  7:18
**25**  115:21
**2:22**  119:22
**2:29**  119:22

| **3** |

**30**  47:14
**35**  114:5

| **5** |

**50/50**  16:13,23

| **6** |

**6**  106:21
**6th**  105:20

| **9** |

**90**  68:16,18
**90-day**  67:23

| **A** |

**A-N-N-E-T-T-E**  18:11
**a.m.**  5:2,5
**Abbey**  16:3,6,20 17:1 18:4 21:13 76:10,12 106:3,13,23,25 107:4,5,7, 10,15 122:20 123:17
**ability**  106:15,18
**absent**  72:1
**absolutely**  111:15
**accept**  56:17 117:3
**accepting**  46:22 56:5
**accompanying**  131:5
**accountant**  55:3 84:15
**accounting**  57:25 65:7 84:22
**accuracy**  54:22
**accurate**  10:21 56:1 62:22 129:10 130:8
**accused**  32:11 48:19
**accusing**  83:13

**acronym**  72:10
**act**  30:8
**action**  42:10 51:14 91:6 93:11 94:16 128:6 129:14
**actions**  61:1
**actual**  43:14 59:24 88:8 99:19
**add**  12:19
**addendum**  130:10 131:1
**address**  38:7,16 39:7 41:6 51:16 55:17 126:24
**addressed**  92:25
**addressing**  38:25
**adequacy**  42:20
**adjourned**  128:13
**administered**  17:20
**administration**  11:7,19
**administrative**  13:24 14:4,10, 12,24 87:19
**administratively**  95:5
**advanced**  55:5 57:24 64:4,17 67:14 106:17 117:10
**advanced-level**  64:12 84:15
**advice**  41:6 79:3 102:18
**advise**  41:25
**advised**  37:9 40:7,13 41:11,17,18, 23 47:4 50:6 51:10 60:16,23,25 61:10 64:9 117:22
**affirmed**  6:5 129:5
**aforementioned**  129:8 130:6
**afraid**  39:12 77:3 82:9,14 105:16
**African**  50:1 51:25
**agree**  46:21 108:20,23 125:15,19 126:10
**ahead**  7:6 9:2 20:22 34:25 43:20 45:20 47:8 59:16 74:7 81:18 98:22 100:9
**allegation**  31:5 50:20,24 51:16
**allegations**  31:6,25 32:5,20 79:13 117:8
**Amended**  131:8

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 133 of 150

**American** 50:1 51:25

**amount** 40:5 54:1 97:10

**and/or** 131:5

**Anderson** 65:24 86:12 99:8

**Anne** 5:16,20 60:12

**Annette** 18:11,12

**answering** 31:12

**answers** 6:18 60:2

**anybody's** 45:3

**anywise** 129:12

**apologize** 66:12 74:23 93:22

**apologized** 41:18,19 91:15

**appeal** 36:9 79:17,24,25 108:9,10
123:5

**appeared** 129:7 130:18

**application** 10:17,18

**applied** 10:15

**apply** 44:3

**approach** 53:24 88:7

**approached** 49:1 91:13

**approval** 95:11,13

**approved** 106:11

**approximately** 21:10 27:14
78:2

**April** 55:23 68:7 69:1 78:2 97:21
115:5

**area** 39:19 66:2,3 70:18 83:19

**areas** 69:20

**argue** 88:19

**argument** 117:8

**aspects** 14:3

**assess** 42:20

**assign** 20:18

**assigned** 13:16,21 14:8 16:24
21:12,14

**assist** 42:25 53:24 86:14 88:24
89:18 93:7

**assistance** 8:17 43:17,18 49:5
99:14 102:24

**assistant** 11:7,17,18 12:1

**assisted** 21:16 22:9 83:25

**assisting** 39:21

**associate** 48:24,25 65:23 70:10
99:7,9

**ASSOCIATES** 129:20

**assuming** 32:6 120:24

**assumption** 68:2

**attached** 130:10,12

**attack** 71:5

**attempting** 46:4

**attend** 104:23

**attention** 40:2 49:9 76:5,7

**attorney** 5:11,14

**attorneys** 5:5

**August** 7:21 20:2,3,5 68:8,13 69:1

**autocratically** 59:2

**automated** 87:22

**aware** 43:7 46:14 52:10 91:22
92:22,24 93:18 94:21 97:3,5 100:25
101:15 105:3

## B

**back** 22:21 24:2 31:18 44:7 54:19
55:6 56:13 57:2 58:1,3 61:14 62:12
63:24 67:10 69:15,20 74:25 75:24
77:23 88:19 95:18,19 97:20 106:6,11
107:14 110:24 114:1,13,14

**background** 86:18 91:4 92:24
93:20

**backwards** 26:17

**bad** 12:17

**Baker** 18:25

**Barbara** 11:24 24:3,7,13 78:9
94:25

**based** 8:15 20:25 21:1 32:1 33:12
70:1 106:14 126:20

**basic** 65:20

**basically** 15:17 33:7 42:16,17
43:21 59:20 65:21 71:17 78:19 79:19
87:9 93:5 119:1,4

**basis** 104:20

**bat** 100:14 101:1

**Bateman** 5:10 6:8,12 7:15 24:18
25:12,15,18 26:12 27:13 31:22 32:4
33:3,22 34:3,7,20 35:1,6,10,11 68:17
69:13,19 73:10,14,20 74:10,20 84:11
91:9 94:8 98:20 102:10 106:25
107:3,5 119:20,23 120:4,8,11,17
124:4,6 125:19 126:5,15 127:1,4,20,
25 128:7

**bathroom** 69:14

**began** 116:16

**begged** 122:9,13

**beginning** 35:23 36:3,19 61:13
89:10 100:15

**behalf** 5:14 47:3,20 48:14 70:2
71:13,25 105:4 118:1

**belief** 130:7

**benefits** 13:10 29:11,17

**Bennett** 18:24,25

**bet** 66:2

**Beth** 118:10,25 120:20 121:11,14,
19,22 122:5,14

**bias** 88:5

**big** 116:14

**birthday** 65:18,20 66:1,5 101:11
104:9

**bit** 7:17 84:13

**black** 101:25

**Blair** 127:7

**blame** 87:9

**blank** 76:18

**blowing** 114:6

**board** 57:17 89:11 116:19

**boilerplate** 105:23

**Boone** 8:15

**bothered** 37:14

**bottom** 35:5,7 122:24

**boy** 118:4

**Brandon** 42:4,11 47:12 99:1

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 134 of 150

Stephen Regan

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444   ex: break..complaint

**break** 6:20 25:9 34:19,22 69:14 88:14 115:22 119:21

**Brent** 49:11 50:1,3,17 69:23 92:14 119:11

**bring** 55:3 76:6

**bringing** 56:12 76:5

**brought** 40:1 55:16 76:19,20 91:3 104:8

**building** 77:9

**bullied** 36:5 78:25

**bully** 119:5

**bullying** 26:4 76:1

**bunch** 101:5

**business** 11:10 28:19 29:2,22,24 61:15 96:10 116:13,14 121:24

**C**

**C-A-I-T-L-Y-N** 18:15

**C-A-P-P-S** 18:19

**C-H-E-N-I-S-E** 59:14

**C-R-U-M-P** 59:15

**Caitlin** 18:14,15 19:4,10,11 39:18, 22 40:1,3,6,13 41:3,4,5 77:18,21,22 90:25 92:2 93:2,8,9 96:4,5,7,14,15, 25

**Caitlin's** 97:11

**cake** 65:20

**calculations** 106:19 117:12

**calendar** 79:24

**call** 15:18 23:12 43:15,25 71:20 75:5,7,10

**called** 8:16 9:3,15 10:6 13:23 17:4, 9 39:1 44:10 51:4 64:5 65:25

**calling** 33:9

**calls** 84:13

**campus** 103:25

**Capps** 18:18,19

**career** 10:3 39:5 123:25 124:1

**careful** 65:4 95:8

**carefully** 93:5

**Carolina** 7:20 8:15 30:3 59:7 129:3

**case** 5:14,17 26:11 29:15 31:13,20, 21 32:9,14,15,16 33:1,13,18,20 34:9 51:2 59:10 69:25 123:12 126:11

**cases** 31:18,20 32:20 33:1,17 48:13

**Caucasian** 50:2

**causing** 96:23

**cease** 91:17

**celebrate** 66:1

**celebration** 61:6 65:20 66:10,11

**central** 13:23 14:4,9,12,24 59:6 69:9 95:12 97:22,24 123:17

**CERTIFICATION** 129:1 130:1

**certify** 129:4 130:3,17

**cetera** 92:11,12 122:5 124:21

**chain** 74:15

**chair** 12:10 109:14,17,19 118:11

**chairs** 11:9,20 12:8,13 46:11 56:10 109:9 117:19,23 118:6,10 121:25 122:14

**challenging** 96:20

**change/correction** 131:6

**changes/corrections** 130:11

**Chapel** 5:20 59:7

**CHAPLIN** 129:20

**characterize** 98:13

**charge** 11:18 35:17 95:18,19 101:20

**Charletta** 70:9,10,21,22 81:15 99:6 100:3 107:12 119:10

**Charlotte** 89:1 90:6,7

**check** 30:16

**Chenise** 59:10,13,14,19 60:3,4,6, 11,16 62:23 97:25 106:1,6,8,9

**chose** 79:18

**chronological** 8:10

**circle** 66:5

**clarification** 84:14

**clarify** 88:13

**classification** 17:10

**classified** 11:10 29:2,16 30:1,13 31:3 49:17 57:24 84:15 85:7

**clear** 22:14,18 99:21,24 102:21 113:6

**close** 76:7 77:4,6,7,10,13 80:25 82:15 91:10 100:17 102:16 105:16

**coach** 46:4 49:6

**coaching** 15:22 67:19,20 98:18 99:17 104:2

**colleague** 41:12

**colleagues** 37:14 40:15 41:2 77:8

**comfortable** 31:12 32:25 33:4,19 62:20,23,24 65:9

**command** 74:15

**comment** 36:18 37:19,22 40:17 41:3,14 45:18,19 46:8,25 47:7 66:11, 12,13,25 67:12 76:19,21 77:15 80:4, 5,17,18 81:19 91:3,24 92:18,21 93:14,18 94:13,14,15,19 101:1 104:9 112:16 115:18 119:5

**commented** 101:23

**comments** 37:13 38:10,20 43:9 49:7 51:23 52:2 53:21 65:13 76:22 80:9 81:4 92:9,10 95:23 98:16 101:25 102:2 109:16 119:4

**commission** 72:7 130:25

**committed** 53:17

**company** 9:10,15,18

**Compel** 34:4

**compelled** 47:20

**compensation** 9:23 13:10 29:16

**competence** 106:17 116:15

**complain** 83:5 92:20

**complained** 75:23 76:1 79:6 92:18 99:4 100:4

**complaining** 45:15

**complaint** 20:11 23:9,13 25:23 34:10,12 40:12 51:11 70:2 71:24,25 75:18 83:8,10 91:10 92:14 99:20 101:10 105:3,4

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 135 of 150

**complaints** 39:9 46:7 50:14 97:2
99:12

**complete** 60:21 104:8 129:9 130:8

**completely** 113:11

**Compliance** 74:22 75:4

**complicated** 60:19 96:20

**compromise** 25:3

**computer** 9:17 71:23 83:1 85:2
95:16

**comradery** 100:21

**concern** 23:9,14,16 38:16 40:12
59:24 119:17

**concerned** 24:7 25:23 31:14 38:6,
12,21 54:5 82:4,10 119:16

**concerns** 23:18 37:4 72:15,16
79:3 123:1

**concert** 16:11 43:16

**conduct** 20:6

**conducted** 20:8 26:20 31:24

**conference** 129:7

**confidence** 117:9

**confidential** 109:24 112:6,10,13

**confirm** 5:22,25

**confirmed** 128:4,5

**confirming** 64:22

**congenial** 104:21

**Connectcarolina** 44:1,2 71:22

**consecutively** 129:9

**considered** 97:17 98:16

**consisted** 11:6,8

**consistent** 51:21

**constitute** 73:3

**consult** 25:9 51:23 73:6,12

**consultant** 14:8 15:23 16:23
18:15,23 39:21 41:9 42:2 76:12
96:19 97:20

**consultants** 11:8 15:17 16:12,21,
24 17:24 18:1,2,3,7 20:24 23:10
39:18,23 76:10 93:4 106:4

**consultation** 13:11

**contact** 50:6 75:6 112:15 122:25

**contacted** 50:8 51:3,9 75:9,11,16
98:25 108:13 109:14,15 112:24
119:18

**contents** 130:4

**context** 38:5 46:14 66:17 74:3
119:17

**continue** 34:25 58:15,23 59:25
74:2,7

**continued** 54:16 55:23

**continuing** 119:2,3,12

**contracted** 89:17

**contractor** 89:25

**control** 35:2

**conversation** 36:21 37:1,2 40:1
43:13 44:14 46:2 49:13,15,19,23
54:8 56:16 58:10 75:20 76:14,19
85:24 86:15,22 87:10 89:4 92:23
96:4,9 97:1 104:5 109:24 112:7

**conversations** 38:19 41:23
45:22 46:4 53:25 55:21,22,24 57:5
62:3 65:1 68:24 82:11 97:14,15 98:6,
24 99:25 102:13,15 103:9,22 104:12,
13,19 105:8,9

**coordinator** 50:13

**copy** 108:6,7,8

**Corporation** 9:16

**correct** 10:25 12:11 18:5 29:20
56:18 63:5 65:12 69:7,12 78:13,15
79:8 92:12,15 98:5 113:15 115:13
116:3 117:14,18 118:18 124:12,15
125:4,7,8

**corrected** 91:16

**corrections** 131:5

**correctly** 56:4 76:24

**counsel** 38:8,13 41:22,25 42:9,11
46:4 73:7 91:16 102:18 108:13,16,18
129:14

**counseling** 67:19 98:18 104:2

**count** 27:25 105:5

**County** 129:2 130:16

**couple** 19:3 56:22 57:10 58:4 80:8
119:2

**courage** 95:21

**courses** 43:15,23,24

**court** 5:3,24 25:2 35:4,7 120:2,6,9
126:11,24

**covered** 19:8

**created** 57:3 88:3 105:22,25
107:19

**creating** 57:4 95:25

**credit** 80:12

**Crump** 59:10,15 62:23 97:25
106:1,6

**cue** 7:4

## D

**date** 5:4 20:3 31:18 61:12,16 75:24
80:25 86:16 95:2 102:12

**dated** 105:20

**Datex-ohmeda** 9:4

**day** 34:13 41:17 89:12 105:1 127:12
129:18 130:19

**day-to-day** 104:19

**days** 68:16,18,19 79:24 95:21

**deal** 91:14

**dealing** 42:22,23

**dealt** 91:5

**dean** 11:7,18,25 12:1,2 25:22,23
36:1 48:25 55:11 65:23 70:11 78:9,
11,20 89:18 99:7,9 112:17,20,22,23
113:1,3 114:15 123:13,16

**dean's** 60:25

**December** 60:20,23 61:2,6,13
68:20 69:2

**decide** 20:14 79:14

**decided** 26:1 43:3 87:12 89:14
106:20

**decision** 27:1 58:14 59:1,12 60:7
71:12 79:18 80:24 81:16 123:3

**Defendants** 5:14,17

**deficiencies** 125:10,13

**define** 20:9

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 136 of 150

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444 **<: defined..entitled**

**defined** 87:6

**defining** 20:10 86:23

**delay** 74:23

**deny** 36:2 75:22,25

**department** 11:9 12:8,9,13
13:13,20,22,23 15:3,5,7 16:22 40:8,
15,23 47:11 56:10 60:9,10 65:19
76:14 77:12 86:8,13 109:9,14
117:19,22 118:6,11,13 119:19
122:14 123:6,9,10

**departments** 13:8,9 14:1,12,19
16:15,18,19 39:11 56:11 65:22

**depend** 23:22

**depending** 20:19,23 23:13,14

**depends** 21:1 124:19

**deposition** 6:13 13:16 24:3,13,16,
21 25:1,3,8 73:7,8,13,19,21 74:4,8
120:14 126:11,21 128:13

**description** 7:12 10:8

**desist** 91:17

**detail** 112:16

**detailed** 97:14

**details** 24:23 65:6 103:5,6 106:2
118:2

**determination** 23:15 58:23

**determined** 71:6

**developers** 88:6

**development** 42:2 97:19

**differently** 82:18

**difficult** 22:19 41:25 60:19 96:20
104:3

**Digital** 9:16

**direct** 12:1 13:4 78:7

**directed** 25:25

**directly** 21:14 23:11 51:7,11 78:8
79:3 89:7 90:7

**disagreement** 88:10

**disagreements** 86:20

**disaster** 8:18

**discrimination** 35:18 72:17
95:18

**discriminatory** 80:3

**discuss** 33:17 109:6,8 111:23,24
112:12,15,25

**discussed** 24:3 54:22 62:2 65:3

**discussing** 40:15 103:19 110:4
112:9,10

**discussion** 63:16,18 81:11 86:11,
17 91:3 97:22 105:1 112:4

**discussions** 53:20 87:14 98:7
109:13

**distinguish** 23:2 29:12,13

**diversity** 40:16,20,25 76:20 77:15
80:5,16,17 92:8,10

**divide** 16:6,9 68:4,6

**divided** 14:23 16:14

**division** 71:23

**document** 34:15,18 35:15,19
36:22 58:21 110:22 111:10,18
120:18 122:11 130:21

**documentation** 58:13 61:24
62:10,12 79:23 83:9,11 107:19,22,23
108:1,2 109:4 113:25 114:1,3 115:17
125:22

**documented** 68:25 83:7 114:6
125:14

**domestically** 8:18

**door** 66:4 102:16

**doors** 77:10 103:15 104:18 105:13

**downhill** 115:5,7

**dozen** 20:15 21:3 22:22 26:19
27:14

**dozens** 115:21

**drafted** 106:14

**dress** 71:4

**drill** 6:15

**Duke** 89:8,14 90:14

**duly** 6:4

**E**

**e-n-n-e-t-t** 18:25

**earlier** 69:21,22 74:20 76:13 78:22
80:1 98:2,14 107:18 121:8

**early** 97:21 114:11

**easy** 79:9 95:4

**eating** 82:18

**EEOC** 72:9,16

**effective** 106:21

**EI** 39:1 42:13 43:10 46:16 53:24
67:10 97:21 105:2

**elaborate** 77:13

**elected** 39:20

**elevate** 88:18,20

**elevated** 49:10

**email** 23:12 70:12 75:3 109:15,16
110:5,15 111:4,9,12,16,20 113:6
114:4 115:14 118:22 120:20 121:1,7,
12,14,19,22,23 122:23

**emails** 52:20 54:19 62:3,14,17
68:25 111:8 114:5,9,13,14 115:25
117:7,15 118:5,14,24,25 121:17
125:14

**emotional** 39:1,2 42:15,16 98:8,9
108:22 115:8

**empathy** 42:21

**employed** 7:19 109:11

**employee** 9:23 13:10 24:4 27:16
36:10 38:15,17 42:25 43:17,18 44:2
48:13,14,15 50:5 52:24 54:12 59:1,4,
11 60:6,23 61:1 62:9 69:11 72:22,24
73:3,4 74:10 79:20 83:17,19 96:16
98:1 105:25 108:6,11 109:10 110:1
112:8 119:1,6 122:21 123:13 124:1,
24 125:6 126:8,25 127:5

**employees** 24:15 26:7 28:11
31:10 32:18 38:9,13 39:2,11 42:23
43:23 44:25 45:10 46:8 48:3 66:24
70:14,18 83:4 118:7,15 119:3

**employment** 7:16 32:21 33:11
34:13 36:11 106:21

**end** 60:13 73:18 97:20 98:3 103:25
111:9

**ended** 38:18 41:16

**ensued** 49:23

**entitled** 125:5

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 137 of 150


**entry-level** 17:12 44:24

**environment** 39:3 43:1 95:25

**EOC** 42:5,6 47:5,10,11,19 48:10, 12,13,14,15 50:6 51:1,5,9 70:1 71:12,16,18,23 72:2,4 75:16,17 91:5, 16 94:21 99:1 103:24 108:8 128:2,3

**EPA** 29:16 31:3 124:20

**EQ** 39:1 42:13 43:10 46:16 53:24 67:10 97:21 105:2

**equal** 72:6 74:21 75:3

**equipment** 9:4,16

**errors** 57:4 64:18,19 65:11

**estimate** 21:4

**estimation** 116:5

**evaluation** 52:11,13 61:21 63:8, 11 106:15

**evaluations** 52:16,19 61:19,21,25

**Evans** 70:10 81:15 99:6 119:10

**evenly** 16:14

**event(s)** 129:15

**eventually** 24:9

**everybody's** 64:2

**evidently** 118:24

**exact** 23:19 44:13 57:12 66:12 71:2 90:6 95:15 102:2,25 112:20

**examination** 6:7 131:3

**examined** 130:4

**examines** 110:22 111:10,18 122:11

**examples** 29:24

**Excel** 56:23 63:19,21

**exception** 86:2

**exceptional** 63:4

**excuse** 105:3 121:24

**execution** 130:20

**exempt** 29:8,15,20 30:1,7,19

**exhibit** 119:24 120:10,14

**exit** 34:14 45:19 76:3,15 79:6,11,12, 14 82:23 85:19,20,23 105:9 107:16

**exorbitant** 40:5 97:10

**expectation** 54:11 57:11

**expectations** 96:15 106:16

**expected** 54:13

**experience** 15:22 70:1

**expert** 64:23

**expertise** 29:3

**Expires** 130:25

**explain** 29:5

**explained** 36:23 67:3

**extensive** 78:19

**extent** 26:6,8 103:24

**extremely** 53:4

## F

**F-O-X** 60:12

**facilities** 49:11 77:11

**fact** 44:6 51:4

**faculty** 28:19 29:1,19 30:11,18

**fair** 31:19

**fall** 63:13

**falling** 59:22 60:20

**familiar** 35:20,21 56:25

**February** 5:4 7:18 12:22 20:5 68:7 114:19 129:18

**feedback** 46:23 52:25 56:5 59:21 62:9,11,13,19 65:10 69:5 81:2 113:21 114:10 115:20 116:1,2 125:13

**feel** 45:2 59:25 76:23 79:1 80:23

**feeling** 78:25

**feels** 88:13

**fell** 61:15

**felt** 36:5 38:10 61:8 62:19 80:11 82:8

**fenestration** 9:10

**figure** 22:2,10 29:4

**file** 30:7 32:16 33:18 71:12,15,24 72:19 79:17,24,25 80:6 107:19,22

108:1

**filed** 35:18 36:9 48:14,16 69:25 70:2 71:25 126:11

**files** 27:22 31:13 32:9,14 33:13,21 95:16

**final** 60:7 106:7 125:3

**finance** 13:20,22 14:5 40:15 41:10, 14,15 55:3 56:10 57:25 63:20,25 65:7,10 77:11 84:15 87:22,23 90:15, 17,18 101:18,20 103:16 116:6,9,10, 25 117:4

**financial** 67:14

**find** 6:19 93:5

**fine** 6:21 7:5 21:6 25:15,16 34:23 73:25 74:6 126:15,23

**finish** 6:22 10:2

**Finished** 106:6

**fired** 124:10

**fiscally** 95:8

**focus** 17:21 65:13

**focused** 8:17

**focuses** 40:21

**folder** 120:1

**folks** 60:6

**follow** 69:20

**follow-up** 51:6,9

**foregoing** 129:9 130:5,8

**form** 52:18 62:2 73:9

**formal** 61:19,20 68:23

**forward** 53:20 60:17 110:5 112:14

**forwarded** 60:3 108:8 110:1,15 111:20 112:7,8

**found** 51:3 54:3 87:13

**Fox** 60:12

**frame** 60:18,20 61:2,6 65:16 70:6 77:23 78:2 91:1,2,9 94:7 97:21

**freeze** 66:20

**Frey** 42:2,11 43:13 97:17 98:6,25

**front** 31:13 32:10,14 33:18 41:19 44:12 58:18 80:6 101:1 116:7

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 138 of 150

**froze** 94:7

**frozen** 94:5 100:11

**full** 7:21 89:17 95:10

**functions** 13:17,20

**future** 53:14 112:6

### G

**gave** 57:15 79:19,23 80:2 105:15 113:24 116:19

**geared** 44:24

**general** 45:5

**generalize** 101:8

**generally** 23:7 31:5 33:9 60:12 83:24 104:20

**generated** 106:12

**gentleman** 89:16

**Gibson** 47:5,6,23 50:10 104:1

**Gibson's** 42:7

**Gillings** 7:20 8:4,12,13 10:1,5 13:17 16:4 20:4 27:15 123:10

**gist** 86:19

**give** 8:7 16:20 23:12 32:23 33:5,15, 16 62:8 65:15 71:5 73:4 74:8 79:23 103:5,7 114:9 118:1 120:11 126:8,25

**giving** 6:18 38:14 41:6 62:17,18 79:2 80:14

**Gladys** 57:17,19,21,23 58:1 84:19

**global** 7:20 14:2,3 45:11

**goal** 88:15

**goals** 40:21 86:23 87:7

**good** 6:9,10 34:18 42:6 63:10,22 96:21 114:3,12,21 115:19 116:5,10

**great** 6:25 8:7,8 12:21 35:10,14 63:7 69:16 115:4 127:1

**group** 39:16 101:18

**groups** 39:15

**Gruber** 129:2

**guess** 10:17 22:17 30:24 31:14 33:4 43:14 66:8 70:12 72:6 84:13 107:25 121:25 123:2

**guessing** 30:14 50:9 106:14

**guidance** 42:12 98:4 112:14 119:10

### H

**H-A-L-S-T-E-A-D** 18:9

**habits** 82:19

**hair** 37:13 45:16 46:9 76:21 80:4, 16,17 91:3,14,23 92:18,21 94:15 95:23

**half** 16:19 20:15 21:3 22:22 26:19 27:14,15

**hall** 39:17,19

**hallway** 67:5

**Halstead** 18:9

**hand** 122:24 129:18

**handed** 54:14

**handle** 72:14 96:16 111:22

**happen** 47:22 60:14,15 95:11 116:18 117:5

**happened** 24:6 26:11 27:7 36:25 37:1 39:6,25 50:23 52:6 61:16 65:22, 23 70:7 80:2 93:9 95:15 99:21,22,23 100:6,7 108:12

**happening** 36:21 49:13 55:22 87:10

**happy** 33:16 66:5

**harassed** 101:3

**harassment** 32:5 72:17 105:4

**hard** 23:19 88:4 102:25

**hardware/software** 9:17

**head** 13:21

**heading** 121:1

**health** 7:20 14:2,3 40:22 45:11 53:15 59:3 99:8,10

**hear** 67:17

**heard** 51:5 53:23 56:25 66:19 94:2 97:6 110:9

**heart** 71:5

**helped** 116:18

**helpful** 24:1 47:2

**helping** 42:17,25 54:18

**herein-above** 130:18

**hereunto** 129:17

**herpes** 66:15 104:9

**hesitating** 81:22

**Hey** 105:16

**high** 17:11 66:7

**high-level** 116:7

**high-performance** 117:4

**higher** 10:3 12:8 54:13 55:2

**higher-level** 45:8

**highest** 12:7

**highest-ranking** 12:6

**Hill** 5:20 59:7

**hire** 80:5 92:8,10

**hired** 7:18 12:21,22,24 19:4 41:3 54:15 55:15 64:3 78:12,16,21 89:22

**hiring** 64:8

**history** 7:16 94:19

**hold** 21:4 25:1 42:10 61:10 73:21 110:17 126:21

**holding** 73:22

**holidays** 61:7

**hope** 53:9,10 55:17

**hoping** 47:1 55:7

**hostile** 95:25

**HR** 11:8 13:4 14:8 15:20,23 17:12 20:6,9,10,12 39:17,22,23 40:11 59:6 69:9 76:9 90:23 95:22 96:8,9,23 97:15,17,22,24 113:18 122:9,13,16 123:17 125:11,12

**HR's** 49:9

**human** 8:14,23 9:5,13,22,24 10:3, 10 11:16 13:2,9,14 14:5 15:18 29:17 30:8 36:1 42:3 59:5 76:13 95:12

**hundred** 53:17 56:15

## I

**idea** 43:10 64:6 106:10

**identifiable** 126:14

**identification** 25:10 120:16

**identified** 16:22 39:15 40:3,4
47:24 48:16 76:13

**identify** 24:20 26:7 43:14

**identifying** 24:15 25:7 31:10 65:2

**immediately** 8:5,11,13 71:11
90:8

**impact** 38:22 39:3 43:8 45:4
46:14,16,25 49:6 52:1,5 66:13 67:13,
18 98:17 99:17 102:7

**important** 45:4

**impressed** 116:9

**improve** 53:2

**in-house** 88:3

**inability** 106:17

**inaccuracies** 106:19 117:12

**inaccurate** 80:15

**inappropriate** 38:11 98:17
99:16 100:4 126:9

**inappropriately** 96:24

**incident** 52:8 69:22

**included** 9:22 41:7 42:1 47:4

**including** 116:8

**inclusion** 40:21,25

**inconsistent** 113:12

**independently** 106:18 117:10

**indicating** 49:1 109:15

**indicative** 117:3

**individual** 10:9 33:1 56:11 57:11
59:21 65:1 118:7 119:9 126:16

**individuals** 19:12

**industry** 9:3

**influence** 45:9

**information** 6:19 43:21 56:10,13
65:23 71:11 73:3,5 80:15 99:2,9

115:2

**informed** 75:8 101:6

**informing** 111:5

**inhibit** 39:13

**initials** 24:22

**input** 106:3

**inserted** 107:10

**insistent** 56:17

**instruct** 7:3 24:14 74:7

**instructing** 73:15,17

**instruction** 27:10 31:9

**intake-type** 50:15

**intelligence** 39:2 98:9 108:22
115:9

**intent** 52:22 62:8

**intention** 7:13

**intents** 130:21

**interacting** 37:14

**interactive** 115:20

**interest** 34:6

**interested** 10:12 33:19 44:9
129:14

**interfere** 39:5

**internally** 123:7

**international** 17:14,15,19

**internationally** 8:19

**interpersonal** 65:14 87:2,5

**interventions** 99:24

**interview** 11:25 45:19 76:3,15
79:7,11,12,14 82:23 85:19,23 105:10
107:17

**interviewed** 11:2,4,5 12:1,6 89:7

**interviews** 64:9

**introduce** 5:6

**investigation** 20:13,25 23:7
24:2,8 25:19 26:1,2 27:18 33:8 51:8
75:14 127:16,25

**investigations** 20:6,9,10 22:16,
22 23:3,5 24:24 26:14,19 27:8,14
28:5 30:5,17 31:6,23 33:17 72:15

73:24 126:17

**investigator** 22:1

**invite** 65:21

**involved** 11:21 20:25 21:15,17,19,
23,25 22:9,11,12,15,16 23:15,21
32:7 39:13 48:12 51:7 59:4,8,9 69:25
94:20 123:18 126:9,18

**involvement** 23:2

**involving** 69:22

**Iredell** 129:3

**issue** 25:2 38:25 53:5 55:18 86:9

**issues** 17:14 39:7 42:13 54:21,22
59:24 65:2,4 88:18 92:11 122:25

**it.'** 37:20

## J

**Janet** 11:16 13:16 14:7 17:2 18:6
41:8 49:9,10 50:5 83:25 85:21,22
91:1,2,4,13,19 92:16,21,22,23 93:2,
8,10,13,16 94:9,11,15,18,19,22
95:22,24 96:1 97:13

**January** 61:14,17 68:7 105:20
106:21 114:19

**jerks** 101:5 115:2

**job** 9:25 10:8 84:7,12,14 87:13
96:20

**Johnson** 5:13 7:11 24:11 25:5,13,
17 26:5 27:9 31:8 32:1,22 33:12,25
34:17,24 68:14 73:1,11,16,25 84:9
94:4 98:10 100:11 106:22 107:2
124:2 125:17 126:7,23 127:2,18,23
128:9

**joining** 5:21

**Joseph** 49:18,22 50:1 51:3,9

**July** 68:7,13 69:1 78:5

**jumped** 36:16,17 114:18

**June** 68:7,10 69:1 78:5

**justification** 58:13,20,22 59:20
63:1

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 140 of 150

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444 : K-A-R-E-N..Madison

## K

**K-A-R-E-N** 18:18

**K-I-R-S-T-E-N** 85:4

**Karen** 18:18,19

**Kari** 5:13

**Kathy** 65:24 86:12 87:14,18 88:1,9 99:1 100:3

**Kathy's** 66:1

**Katie** 34:10,12 37:4,12,21 38:2,5, 12,19 40:18 41:22 42:9 43:3,4 45:16, 19,20,21,24 46:3,18,20 47:4 48:5 49:1,5 51:22 52:11,16,21 53:16,25 54:6,14,16,19,25 55:10,13,19 56:2, 12,19 57:2,5,7 58:10,14 60:1 61:18 62:10,18 63:15 64:9,14 65:2,10 67:22 68:24 69:4 70:11,22 75:23 76:1,8,21 77:4,6 78:6,25 79:3,6 80:12,14,23 81:2,13 82:15,18 83:1,5, 16,18 84:1,9,10 87:15,17,18,21 88:1, 9 90:9,10,19 94:14 95:1,20,24 97:4 98:15,21,23 99:4,13 100:2,12,16 101:6,15,21,22 102:11,14 103:5,10, 16,22,23 105:11,16 106:2,4,24 107:7,8,11,16,19,24 109:3,17 111:13 113:23,24 114:1,2,9,15 115:1,15,17, 25 116:5,18,23 117:7,16 119:4,13,15 123:17,24 124:3 125:14,25 126:1

**Katie's** 37:8 53:9 62:20 80:13 83:19 84:6 95:13,18,23 98:7

**Khazanie** 5:11 34:9,11 35:18 36:3

**kidding** 89:13

**kin** 129:12

**kind** 44:21 46:22,24 66:2,4 83:10 86:11 96:17 99:21 103:2

**Kirsten** 84:22,23 85:4 86:6 87:12

**knew** 70:16 77:15 82:12 94:24 97:8 100:12 116:23

**knowing** 72:1

**knowledge** 16:5 21:1 86:3 99:5 123:22 130:7

**Kosorok** 11:21 12:9 80:20

**Kosorok's** 80:21

**Kristen** 5:19

**Kurt** 109:20 110:15 111:1,5,16,20 112:17,24 113:7 115:14 117:20,22, 25 118:9,20,22 119:10 121:12,16 122:2

## L

**L-A-S-O-N-Y-A** 17:7

**labor** 9:6

**lack** 106:16 108:21,22 115:12 117:9

**lacked** 98:8

**language** 88:11 101:12 106:5 107:8

**Large** 129:3

**Lasonya** 17:5,7,24

**Lasonya's** 17:21

**laundry** 76:22 80:2,10

**law** 29:7,9,16 30:2 83:15

**lawyers** 7:1,5

**lead** 15:16 18:2,3 20:24 39:21,24 76:9,12 106:4

**leader** 15:25 16:1,2

**leaders** 15:20

**leadership** 87:19 103:17

**learn** 116:4

**leave** 34:5 87:12 90:9 116:16

**leaves** 16:8 28:4

**leaving** 32:21 83:20 89:12

**led** 82:3

**left** 28:11 33:11 78:4,6 89:8 90:8,10, 12

**legal** 60:8,10 62:24 106:9 108:13, 16,18

**legally** 17:21

**letter** 81:8 105:19,21,22,23,24 106:2,6,12 107:4,6,10 108:21 109:1 110:2 122:23,24 123:3

**letters** 27:21 28:4,8 30:6

**letting** 94:15

**level** 10:3 17:11 28:17,21 50:3 54:12,13 55:2,6,15,16,25 57:12 59:17 64:4,17 84:17 85:7 88:21 106:17 116:15 117:10 124:19

**leveled** 54:12 55:1

**Lewis** 5:19

**lieu** 68:22

**light** 64:1,13,16

**Linda** 15:11,13 16:6,20 17:1 18:4 21:12 39:20

**lines** 39:4 40:18 66:14 71:6

**list** 12:19 76:22 80:2,10

**listen** 93:5

**located** 100:19 104:18

**log** 44:3

**long** 8:20 15:3 58:1,5 89:19

**longer** 27:1 124:17

**looked** 16:12 56:20 94:7

**Lori** 129:2

**lot** 45:9 53:10 54:4 88:10,24 95:6 102:14,25 103:18,21,23 105:8 109:16 118:23 126:17

**lots** 81:13 96:18

**loudly** 66:18

**Love** 49:18,22 50:1 51:3,10

**low** 81:12 106:18 117:11

**lower** 85:7

**lower-level** 84:21

**lunches** 100:23,25

## M

**M-E-L-I-S-S-A** 18:9

**made** 14:4 25:23 27:1 37:15,22 40:14 41:3,13 45:18,19 46:8 47:10 51:23 56:21 58:14,22 59:1 60:18 66:11,24 71:1,12 76:17,20 79:13 81:4,16 90:19 91:10,15,16 92:14 93:13 94:10,12,15 97:3 100:4 101:1, 15 105:4 109:17 113:4 123:7 124:7 128:2 130:11

**Madison** 8:24

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 141 of 150

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

**main** 40:21

**make** 16:13 17:19 23:15,24,25 32:10 40:24 46:13,24 51:10 60:7 67:12 71:13,18 75:4,17 80:24 82:13 88:14 92:22 101:20 102:21 106:5 116:20 121:2,3 123:12

**makes** 20:11

**making** 34:10,12 38:10 43:8 45:16 47:7 49:2,7 52:2 53:21 59:24 64:18 65:11 76:21 81:20 91:22 94:14 98:16 101:24,25 105:2 113:2 119:4

**male** 37:14 74:11,12,14

**maliciousness** 43:6

**management** 10:3 14:5 29:18 36:10 39:8 50:3 54:1,8 59:4,11 60:7, 24 63:16 69:11 79:20,21 92:10 98:1 105:25 108:7,11 110:1 112:8 122:21 123:13

**manager** 8:14 9:5,6,13,24 10:7 12:24 13:1,3 28:20 29:2,22 47:15 49:11 59:18,25 70:9 116:13

**managers** 11:10 29:24 39:10 43:3,5 48:22,23 51:22 52:23 53:19 65:18 97:4 98:14 99:3 114:21 116:14

**manner** 54:24 57:9

**March** 67:24 68:1,7,9,23 114:20

**marked** 35:15,16 119:24 120:7,15

**marking** 119:25

**Martin** 5:16

**Mason** 127:8

**matching** 31:4 33:6

**matter** 20:19,23 50:7 75:18 96:8,9 109:24 110:4 112:6,15 126:9 128:3

**matters** 72:17 76:5 112:11

**Mayer-davis** 118:11 120:21 121:11,19

**Mclennan** 16:3 76:10,12 106:3

**meaning** 13:6 63:19

**means** 17:23 21:10 29:9

**meant** 13:2 66:9 77:12 106:25

**measure** 42:20

**medical** 9:4

**medicine** 19:23

**meet** 19:22 39:23 106:15 112:2

**meeting** 39:23,25 40:11,13 41:20 49:13 65:25 90:17 102:17 111:23 112:25 114:7,25

**meetings** 46:10 62:3 90:15,18,21 103:18

**Melissa** 18:8

**member** 84:21

**members** 11:9 55:14 65:18,19,21 101:2

**memorable** 47:21

**memory** 31:16 32:12 33:20

**mention** 18:22

**mentioned** 39:18 121:19

**mentioning** 80:21

**mentoring** 15:22 116:21

**mentorship** 98:19

**message** 127:17 128:1

**messed** 47:16

**met** 16:11 112:3 121:16

**Meyers-briggs-type** 42:19

**Michael** 11:21 122:5,14

**Michigan** 9:10

**mid-level** 55:4

**middle** 6:22 67:24

**mind** 51:15,17 116:3

**minute** 122:10

**minutes** 96:11

**misconduct** 32:7

**missed** 93:25

**missing** 73:23

**mistake** 123:8,20

**mistakes** 56:21

**Mitchell** 15:12,13 39:20

**models** 115:21

**modern-day** 66:15

**moment** 72:10

**month** 62:4 68:11,12 78:17,18,20 95:3

**months** 7:25 53:3 57:10 58:7 91:12 114:25 115:16

**morale** 66:8 100:21

**morning** 6:9,10

**Morris** 122:14

**Motion** 34:4

**move** 35:14

**moving** 34:6

## N

**N-WORD** 49:20 50:21 91:11 92:13 99:20 101:10 127:12

**named** 130:18

**names** 11:11,22

**Natiaya** 70:19,20 119:8

**nature** 33:7 99:11

**Neal** 70:19 119:8

**needed** 51:18 54:9

**needy** 16:16,17

**negative** 116:1,3

**Nicolet** 78:3 89:9,21

**Nicolet's** 78:12

**Nine-and-a-half** 8:21

**non-exempt** 30:24

**non-work** 97:10

**nonprofit** 8:16

**North** 7:19 8:15 30:2 59:7 129:3

**Notary** 129:2,21 130:15,23

**note** 83:1 131:4

**noted** 130:10

**notes** 31:20,21 33:2 69:15

**November** 35:23 36:3,15,18,19, 23 69:2 75:22 78:24 91:2,19 92:17

**number** 9:22 11:7 17:15 31:18 57:5 79:19 91:12 103:11 118:14 120:5,15

**Khazanie v University of North Carolina**

COPY

**numbered** 129:9

**Nunez-wolff** 89:2 90:7

**nutrition** 14:25 15:3,5,6 118:12, 13

---

### O

**oath** 5:9

**object** 7:12 24:11,12 26:5 31:8 32:1 73:2 106:23 124:2

**objection** 7:4 27:9 32:22 33:12,25 34:1,2 68:14 98:10 125:17 127:18

**objections** 7:1,13

**objective** 122:15

**obtain** 13:14

**occasion** 20:6

**occur** 23:6,8 98:24 128:5

**occurred** 27:14 60:15 68:1 70:23 101:15

**occurring** 61:1

**October** 65:16 69:1 70:6 95:20

**offended** 70:14,16

**offending** 127:7

**offensive** 38:11,21

**offer** 89:14

**offered** 43:15

**offhand** 12:14

**office** 23:11 29:17 31:16 37:8 38:5 39:17,19 40:7 42:3 44:8 47:15 59:5,6 60:25 71:16,18 72:2,8,14 74:21 75:3, 9 76:1 92:18 94:12 95:12,20 97:9 99:1 101:20 102:16 103:15,16,24 104:17 108:9,13,15,16,18 109:25 110:2 112:8 128:2,3

**offices** 59:5 102:15

**officially** 39:23

**oftentimes** 100:19

**OHR** 103:25

**one's** 5:25

**one-on-one** 116:19

**ongoing** 52:19,25 59:21 61:21,24 62:4,8 68:3,24

**online** 10:8,15,22,23 43:24 71:21 72:20,21

**open** 25:1,4 73:21,23 102:16 126:21

**operating** 64:17

**operation** 71:22 101:20

**operations** 103:17

**opinion** 51:12 88:5,6

**opportunity** 72:7 74:21 75:3

**opposed** 32:7

**ops** 103:17

**order** 8:10 24:21 126:10

**organization** 8:15 9:6 11:17 42:6 48:11 62:24 77:9 83:20,21 85:13,18 89:8 97:24 116:25 117:4 118:6,12

**organizational** 42:2 97:19

**original** 36:17,22 41:22 45:22,23 55:22

**outcome** 26:2,20 27:19

**outlined** 10:8 110:2

**output** 55:24,25 57:6 81:12 106:18 117:11

**outstanding** 80:20 100:22 101:18 116:7,17

**overheard** 49:12

**overhearing** 101:11

**oversaw** 22:23

**oversee** 80:13

**overtime** 29:10,11

**overview** 8:6,8

---

### P

**p-p-s** 18:20

**p.m.** 69:18 119:22 128:12

**pages** 129:9 130:5,8

**paid** 96:13

**pandemic** 20:1 108:14

**paragraph** 35:22 36:4,8,17 37:7, 10 122:7,8,9,10 123:24 124:8

**paralegal** 5:21

**part** 13:23 14:2 15:24 39:25 44:2 60:5 62:25 70:5 71:22 75:20 78:21 87:22 97:17,22,23 106:13 107:25 108:18 114:11 125:12

**parties** 129:13

**partnered** 41:9

**parts** 14:9

**party** 101:11 104:10

**past** 58:15

**Paul** 18:19

**pause** 7:8

**pay** 29:10 55:4

**paying** 55:1,5

**peer** 74:17

**pending** 25:1

**people** 8:17 11:6,12,22 14:20 15:9 16:7,10 17:1 23:20 24:22 25:4 32:11, 24 33:6,11,23 36:23 38:23 40:4 41:14,24 42:6,23,24 43:17 45:5,9 49:23 51:24 52:5 53:19 59:4,8,9 64:11 66:1,3,4,18 67:5,6,13,14,15,17 82:7 88:7 89:6 91:16 96:11,12,22 99:15,18 101:8,19,23,25 102:1,23 103:5,6 104:1 116:8,15,17,20 119:13 121:17 123:16,18

**people's** 49:16 86:21

**percent** 53:17 56:14,15

**percentage** 56:13 87:3

**percentages** 56:14

**perception** 46:5 98:8

**perform** 45:8

**performance** 32:7 62:9,19 63:3, 8,11 65:2 81:2 86:5 113:8 115:8,12 117:3 124:10,24 125:10,21,23

**period** 58:16 61:9 68:25

**permanent** 124:8,13,23 125:6

**permission** 73:4

**person** 12:6 15:12 21:19,24 22:1, 12,15 23:10 29:14,19 30:1 48:11,16

50:15 53:1 57:16,25 60:11 71:21 72:20 74:12 78:16 84:16 86:13 87:23,24 89:20,21 93:6 122:17

**person's** 42:20 74:9 86:24

**personal** 88:20 96:9 119:17

**personality** 86:21

**personally** 21:6,17,23,24 22:4,11 24:15,20 25:7 26:7 126:13,14 130:18,20

**personnel** 29:7,9,16 30:2 109:23 112:6,10,13

**persons** 22:15

**perspective** 97:11

**ph** 50:12

**phone** 23:12 50:18 71:20 72:19 79:19

**phrase** 100:13 101:5

**phraseology** 65:5

**phrases** 115:1

**physically** 77:10

**piece** 115:15

**Pitt** 90:2,5

**place** 5:8 24:21 54:15 129:8 130:6

**Plaintiff** 5:11 34:8

**planned** 82:7

**plenty** 107:23 109:3

**point** 6:25 11:1 24:4 34:8 42:8 53:6 57:7 61:7 75:10 76:18 99:22 115:5 124:22

**point-blank** 55:19 76:3

**pointed** 81:11

**points** 67:8 115:22

**police** 119:19

**policies** 43:7

**policy** 48:17,20 83:12,13,14

**position** 10:4,14 11:2 12:23 17:10 19:11 28:18,22 31:4 45:8 55:1,9 59:23 78:19 84:22 85:9 98:17 106:16 124:20

**positions** 9:22 29:6,8

**positive** 43:1 52:13 82:11 114:10

**Post-it** 83:1

**posted** 10:14

**potential** 42:13 53:13

**potentially** 41:8 107:13

**praising** 114:6

**predecessor** 84:2,5,6,12

**preface** 111:21

**preparing** 88:24

**prepping** 111:13

**present** 5:7 90:20 127:11

**presentations** 115:22 116:7

**presented** 107:15,16

**press** 103:5

**pressured** 55:10

**pretty** 6:16 23:19 45:13 50:17,20 58:18 59:18 60:4,5 79:22 81:20 83:23 88:9 93:4,10 114:3,21 116:16

**prevent** 102:8

**previous** 101:3

**previously** 63:2 84:17 94:20

**primarily** 17:13,21 61:5

**printer** 100:18

**prior** 8:1,11,13 9:8,9,14,15 32:2 79:6 84:18

**private** 9:3

**Privett** 5:21 6:2

**probation** 58:16 80:25 82:8 124:17

**probationary** 52:24

**problem** 49:3 87:4,17 96:23 99:13 104:11 105:11 114:18 115:3 116:14

**problems** 53:18 87:6 97:3

**PROCEEDINGS** 5:1

**process** 10:23 38:25 42:17 60:14, 15 64:8 79:16 86:24 87:1,22 88:16 95:10 101:4 112:16 123:5 124:16,22 125:2

**processed** 30:23

**processing** 34:13

**production** 39:13

**professional** 17:12 28:23 29:4 46:15 77:8 88:6

**professionals** 10:11 13:4

**program** 43:17 63:19 64:5,15

**programming** 56:21

**programs** 43:18 44:1 63:20 88:3

**progress** 54:16 55:20

**project** 56:9 58:8,9 86:7,23 87:15

**projections** 115:23

**projects** 54:23 55:12 64:16

**promote** 40:25 43:1

**promoted** 95:1,4,14

**promotion** 95:14

**prompted** 98:7

**properly** 17:20

**protective** 24:20 126:10

**provide** 10:11 13:3 15:21,23 25:11 42:12 43:17 60:1 62:10,11 67:20 69:8,9 73:17 126:19

**provided** 15:2,6 58:13,14 62:1 107:8,23 109:3 115:25 117:7,16

**providing** 13:7 56:1

**provost** 42:4 51:5

**provosts** 116:8

**public** 7:20 14:2,3 40:22 45:11 53:14 59:3 99:8,10 129:2 130:15,23

**pull** 10:10

**purports** 120:20

**purposes** 126:16 130:21

**Purse** 8:16 10:5

**pursuant** 126:10

**pursue** 126:22

**put** 38:4 52:7 53:16

**putting** 83:1

Case 1:20-cv-01096-TDS-JEP Document 67-1 Filed 03/09/23 Page 144 of 150

Stephen Regan

**Chaplin & Associates**
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444 : quarter..reprimand

## Q

**quarter** 63:3 64:14 68:12,13

**quarterly** 52:11

**quarters** 68:6

**question** 6:22,23 7:2,7 26:8 31:12 32:3 33:5 41:22 45:22,23 61:20 74:21 94:6

**questionnaire** 42:19

**questionnaires** 42:18

**questions** 6:18,20 7:2 36:24 38:6 59:19 116:21 126:6,17 128:10

**quick** 119:21

**quickly** 105:18

**quiet** 66:16

**quote** 37:22

**quotes** 103:1

**quotient** 39:1 42:16 98:8 108:22

## R

**R–A–I–N–E–S** 18:12

**R–U–B–I–S–I–L** 109:21

**race** 101:9

**racist** 119:4

**Raines** 18:11,12

**ranking** 12:7,8

**rate** 55:4

**read** 110:20 113:25 121:3,4 130:4 131:8

**reading** 129:16 131:3

**ready** 56:7

**real** 95:6

**realize** 67:4 96:15

**realized** 50:3

**reason** 40:11 55:1 73:22 76:2 81:10 95:7 123:22

**reason(s)** 131:5

**reasons** 33:11,23 45:2 64:3 81:9 105:19 107:9 108:25 109:4 117:17 124:11,25

**Rebecca** 42:7,9 47:5,6,23 48:6,9 50:10 104:1

**Rebecca's** 48:11

**recall** 13:20 15:13 16:25 19:2 21:6 24:10 25:19 26:12 27:16 28:12 30:7, 19 32:4,18,24 33:10 34:8,11 37:3,21 40:17 41:5,21 44:14 45:15 46:3,11, 20 48:7 49:8 56:22 58:8,9 62:16 64:21,24 70:7,25 78:3,20 79:2 80:8 81:3,4,6,19 83:6 85:24 90:1 93:17 94:25 104:7 105:20 110:24 127:21

**received** 52:19 75:2,3 110:3

**recently** 90:12

**recess** 69:18 119:22

**recited** 107:9

**recognize** 106:19 117:11

**recollection** 28:9,14 31:23 32:19 33:23 36:20 37:2 44:5,6,23 67:22 69:3 70:4,8 71:3 75:12,15 79:8 85:25 86:4 87:21 89:15 93:3 94:11 111:12 121:18,25 126:20

**recommend** 110:4 112:7

**recommendation** 62:20 107:20 112:12 113:2,4

**reconfirming** 75:22

**reconsidered** 123:4

**record** 5:4,7 7:12 24:12 69:17 71:14 106:23 107:25 108:19 129:10 130:5,8

**recruiting** 9:23

**red** 71:4

**redacted** 126:12

**refer** 24:22 25:4

**reference** 109:25

**referred** 48:9,10 98:1 121:8

**referring** 29:14 121:12 122:17

**reflected** 63:9

**refused** 103:7

**Regan** 6:4,9 7:15 25:3,18 26:6 31:9 33:14 35:11 36:1 69:19 93:23 94:5 120:18,24 125:20 127:24 130:3

**related** 96:10 97:11

**relations** 8:14 9:6,24 13:11 36:10 59:5,11 60:7,24 69:11 79:21 98:1 105:25 108:7,11 110:1 112:9 122:22 123:13

**relationship** 87:2,5

**release** 58:25

**relief** 8:18

**remaining** 28:7

**remark** 45:16

**remarks** 49:2 100:5

**remember** 6:15,16 10:19 11:11, 20,22 12:12 14:18,21 15:11 19:21 26:11 31:1 36:15,16 43:4 44:21 45:1 46:12 47:11 56:6,8,22,24 58:10,12 63:18,24 66:12,13 72:10 78:17,18 79:9 80:21 81:11,12,22,24,25 82:24 84:23 85:2 86:6,10,12,15,19,22 87:10 88:1,23 89:15 90:6 91:8 94:13 95:2,3,14 121:16 124:20 127:4

**remembers** 127:3

**Remind** 89:5

**remotely** 5:21

**repeat** 25:21 94:6

**replace** 19:4

**replaced** 19:11,20 89:9 116:16

**replacement** 78:12

**report** 12:2 48:14,15 57:4 69:23 70:25 71:12,17,18 93:13 94:10 108:9 128:2

**reported** 15:9 16:7 23:23 49:12 50:5 70:20,22,24 78:8 86:14 97:9

**REPORTER** 5:3,24 35:4,7 120:2,6,9

**reporting** 14:20 38:9,14 54:23 56:9,20 97:4 106:20 117:12

**reports** 50:13,16 55:12 56:7 90:19 91:16

**represent** 5:6 45:10

**representative** 50:25 59:10

**representing** 5:17

**reprimand** 27:21 28:4,8 30:6

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 145 of 150

reprimands 28:6

request 108:10

requested 93:11 94:17 129:16

required 69:4 94:23 124:14

resignation 28:3,11,21 83:21

resigned 27:2,17 28:13,15 32:19 85:12,16

resolution 25:1

resolved 51:13

resource 8:14 9:5,13,22,24 10:3, 10 11:16 13:3,9,14 14:5 15:18 29:17 47:24 48:1,3 76:14

resources 8:24 13:13 30:8 36:1 42:3 59:6 93:7 95:12

respond 46:19

responded 71:8

response 14:14 66:24 104:6 114:2

responses 62:12 104:7 111:1

responsibilities 104:23

responsibility 50:4

responsible 39:12 50:5 95:9

rest 41:19

restroom 34:19

result 26:13 27:17

resulted 28:2,3 32:21

results 85:22

resume 10:16

retired 7:21,24 18:23 19:1,2,13,25 97:23

retirement 20:3 83:20

returned 72:2

reverse 8:10

review 57:2 60:14,15,21 67:23,25 68:23 95:11 106:7,10,15 122:10,16 123:7,12

reviewed 35:19 60:3,4,21 81:13 107:11,12,13 115:15 117:15

reviewing 59:12

revisit 73:18

Ribisl 109:20 117:20 121:12 122:2

righty 126:4

Rimer 11:24,25 12:2 24:3 25:22,23 78:9,11 89:18 95:1 112:17,20,22,23 113:1,3 114:15 123:14,16

Rimer's 24:13

Robert 90:2,5

roles 86:24 87:7 88:15

rolling 25:8

room 5:8,12,15,18,20,23,25 6:3 49:24,25 66:16,19

## S

S-H-A-R-O-N 19:7

S-U-L-L-I-V-A-N 19:7

safe 5:25

safety 119:17

Samaritan's 8:16 10:5

sat 76:14 89:12 97:8

Scearce 11:16 13:16 41:8 49:10 85:21

schedule 43:22,23 44:3

school 7:20 8:4 10:1,5,12 13:3,5,7, 18 16:4 17:14,16,17 19:23 20:5 27:15 40:22 41:1 45:10 53:14 59:3 70:14 78:20 83:13 99:8,10 123:10

screen 34:22 35:3,5,8,12,15 83:1 110:11,13 120:13 121:5

scrolling 110:19

seal 24:21 130:25

search 78:19

sec 120:12

seconds 94:5

seek 38:12

self-aware 46:17

self-awareness 42:21

self-conscious 37:15

self-reported 37:19 47:10

self-reporting 37:22

send 23:12

senior 15:23 55:5,16

senior-level 57:16

sense 23:24,25 45:11

sensitivity 42:24

sentence 37:18

separate 13:8 106:20

September 49:8 68:8,13,17 69:1 91:9 92:13 99:21

series 52:20 62:2

service 7:23 8:1 10:11 13:9

services 10:7 12:24,25 13:6,7,14 14:6 15:6 17:19 49:1 54:3 65:24 70:11,17 99:7 119:9

session 40:10 66:22

set 64:2,4 129:17

setting 24:17

sexual 32:5

share 11:14 13:13 34:21 35:3,8 110:11 120:12

shared 10:7 12:24,25 13:6 100:14 114:16

Sharon 19:6

she'd 48:3 68:23 69:5 81:1 113:14, 19

sheet 83:2

shelf 88:4

short 59:22

show 34:15 57:3 69:4 115:22 119:23

showed 62:11,12,15 70:19 118:22

showing 54:19 56:2,13 116:1 118:23

shown 36:9 52:19

shy 124:7

sic 18:15 109:21

side 7:1

sign 43:23

SIGNATURE 130:13

**signing** 129:16

**similar** 36:8 42:18 105:23

**simplified** 126:12

**simply** 16:12

**Sims** 70:9,10 81:15 99:6 119:10

**sing** 66:5

**single** 31:1 115:15

**sit** 38:15 88:18 96:17 100:17

**site** 70:24

**sitting** 51:24

**situation** 21:2 38:7 41:6 51:12,13
70:23 88:25 103:2 104:9 112:13

**situations** 42:1 100:24

**six-and-a-half** 47:12

**skill** 64:2,4

**skills** 63:19,22 116:11

**small** 87:2 121:3

**smaller** 121:2

**smile** 104:21

**Smith** 41:13 76:20 77:15 101:16
102:11

**software** 56:21 88:3,6

**softwares** 56:23

**sooner** 55:12

**sort** 94:9

**sounded** 86:9

**SPA** 30:24 124:20

**speaking** 88:11 117:25

**specialist** 17:4,9,24 18:1

**specialize** 17:13

**specialized** 9:4,16

**specific** 24:23 25:10 33:6 62:19
64:4

**specifically** 23:22 48:24 76:25
96:25 106:16

**specifics** 38:14

**speculate** 31:15,20 33:20 126:19

**speculating** 32:2

**speculation** 32:13 33:10 63:13
80:7 108:17 126:21

**spell** 17:6

**spelling** 81:8

**spend** 40:5

**spending** 39:10 54:2,4 92:11
97:10

**spent** 48:22 88:23 96:5 103:19

**split** 16:13,18,23

**spoke** 66:22 70:18 118:1

**spread** 16:21

**staff** 11:9 28:23 29:4 46:9 54:4
55:14 65:17,25 84:20 90:23

**staffing** 9:23

**stand** 66:5 72:5

**standard** 93:4

**standing** 66:4 67:5

**star** 53:7 63:4

**start** 7:16 26:16 65:8 96:17,22
114:12

**started** 53:18,19,20 64:1 89:4
98:24 114:12 115:4,5

**starting** 8:11 100:15 114:25 115:7

**state** 6:5 8:1 10:17 29:6,8 36:25
124:23 129:3,5 130:16

**stated** 77:5 80:11 108:25

**statement** 32:10 40:14,24

**stay** 114:17

**step** 125:2

**Stephen** 6:4 36:1 130:3

**Steve** 35:25 36:1 37:9,20 107:5
120:24

**sticks** 50:12

**stood** 89:11

**stop** 7:8 73:12 102:17 109:7

**stopped** 81:21 91:21 92:17 94:12

**story** 101:2,4 114:22

**straightforward** 83:23

**strong** 113:9

**struggling** 26:10 86:7

**student** 14:5 48:25 54:3 70:11,17
99:7 116:10 119:9

**students** 17:15

**study** 17:16

**stuff** 44:22,23

**subject** 29:7 30:2,8

**submit** 10:17

**submitted** 10:16 108:10 109:25

**successful** 52:4 53:13,18 82:13
100:1 103:21 116:4 117:1

**Such-and-such** 66:15

**sufficient** 51:15,17

**suggest** 103:4

**suggesting** 88:9

**suggestion** 120:23

**suggestions** 25:4

**suite** 41:15 49:14 100:20

**Sullivan** 19:6,7

**supervision** 13:4 16:9 78:11

**supervisor** 36:6 49:16,18 78:7

**supply** 73:8 74:1,4

**support** 15:2,21,24 39:16 42:12
43:2 99:10 103:19 107:20,24 109:4
115:18 117:16

**supported** 14:11 117:7

**supporting** 14:9

**supposed** 56:15 99:14 101:21

**Supriya** 5:11 34:9,11 37:23 38:7,
10,21 39:7,8,10 40:4 41:3,4,17 42:12
43:5 44:5 45:15,18 46:5 47:3,25
48:1,8,10,12 49:2,6,19,24,25 51:12
52:8,20 54:14 55:16 56:4,12,16 58:5,
15,23 61:19 62:5,13,18 63:15 64:8,
10,15,22 65:1,4,13 66:10,22 67:20,
23 69:6,23,24 70:14,15,16,17,24
71:7,10,13 72:1 74:15,25 75:4,6,9,
11,16,23,25 76:3,15,17,18 77:12
78:23 79:2,5,16 84:8,11,14,18 85:7
90:19,24 91:2,13,20 92:6,17 93:1,12
94:9,12,17 95:21 96:6 97:5,9,16
98:4,8,15 99:15 100:4,6,13 101:1
102:6,24 103:3,10,21 104:6,13,19,25
107:17 108:10 109:8,15,25 110:3

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 147 of 150

**Stephen Regan**

**Chaplin & Associates**
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444 : **Supriya's..trained**

111:5,23 112:13,24 113:7 116:23
117:9,21,23 118:17 119:3 120:21
124:6 125:5 127:12 128:1,3,4

**Supriya's** 39:17 41:2 64:2 84:1,
12 95:18

**surprise** 82:14

**surprised** 75:5 123:15

**surprising** 91:20

**system** 15:19 39:22 43:25 63:25
88:8

**systems** 90:5 99:9

---

**T**

**Tableau** 63:23 64:5,11,12,23
115:21

**taking** 7:7 50:16 80:12 88:4,13

**talk** 15:8 32:15 37:4,9 41:24 42:9
47:19 54:16 71:10 76:4 77:1 78:25
79:3 81:15,21 82:4,7,15 87:20 90:23
91:13,19 95:22 96:12 99:1,15 101:7
102:18 104:1 105:13 117:20 120:23

**talked** 35:25 36:2 44:8 47:6 48:6
50:18 51:11 55:22 64:19 78:24
80:16,17 90:25 91:1,11 92:2,17
95:22 97:20,25 107:18 114:15
117:23 118:9 119:15 124:20

**talking** 12:18 21:21 28:1 32:25
33:4 39:11 40:5 41:8 45:1,24 46:6
51:24 52:2 60:8,11 65:5,14 66:7,17
67:10 68:18 77:10 78:23 82:13 88:1
89:4 93:12,21,24 96:5,7,10,17,24
101:14,23 104:25 113:16,17 115:8
123:24 124:3,6

**teach** 116:9

**teacher** 116:6

**teaching** 116:6

**team** 10:10 11:5 13:14 15:18,20,24
16:1 39:22 40:18 41:10,19,20 62:6
86:20 87:19 100:16,17 101:2

**team-based** 15:19

**team-build** 86:17

**technical** 67:20

**technicians** 127:10

**technology** 65:24

**telling** 37:3 41:4 45:24 47:11,12
49:24 51:22 89:5 94:11 101:2,4
113:7 114:15

**tenure** 7:21 18:23 20:4 60:5 62:5
84:17 90:10 114:11

**Teri** 41:13,18 76:20 77:14 101:16,
17,19,22 102:11

**term** 107:21

**terminate** 69:6 83:17 84:1,3,5
123:4

**terminated** 24:9 26:3,13,21,25
27:17 28:12,15,17 32:18,25 33:24
36:11 62:21 83:19 85:11,14 108:24,
25 111:6 115:11 117:23 124:24

**terminating** 98:4

**termination** 28:3,12 61:16 63:1
81:10 86:1 105:19,24 107:9,24 110:2
117:17 122:23 125:3

**terminations** 61:1,9

**terms** 25:10 51:23 63:12 72:17
79:17 95:10 105:1,2 113:17 116:14

**testified** 80:1

**testifies** 6:6

**testifying** 69:21

**testimony** 32:2,17 33:13 45:14
48:5 63:2 68:22 73:23 75:21 79:5
113:11 117:6 129:10,16 130:5,9
131:4

**text** 70:12,13,20 71:1,8,9 72:22
74:12 126:9 127:5,17 128:1

**texting** 105:3

**texts** 118:14 119:3,12,14

**that'd** 8:8 18:11 127:1

**that'll** 69:14

**thereof** 129:15

**thing** 47:16 65:3 86:6 87:25 94:2
96:8 100:25 101:9 111:4 112:18,20,
22 116:22 118:22

**things** 43:6 53:12 54:17,18 55:9
60:18 64:13 65:12,14 66:20 77:2
80:2,19 82:4,22 87:3,11 88:7,8 91:15
97:1,5 101:13,14 102:7,8,19 110:12
114:10 115:5,9

**thinking** 14:16,17 28:5 29:23
72:6,9 96:22

**thinks** 88:8

**Thornsvard** 34:10,12 70:12
109:17

**thought** 38:24 43:5,7 44:11 45:9,
12 47:23 50:12 51:21 53:4,6,7 63:4,
6,7,14 76:7 80:3,20 82:11 85:9 87:11
89:13 91:14 100:16,20,21 101:18
107:3 113:4 115:3 116:22 118:5,8
121:13

**threatened** 86:1

**time** 5:5 6:21 7:7 10:7 15:7 23:20,
21 34:8,11,19,21 39:7,10,24 40:5
42:5,8 44:18,20,25 45:3,12,20 47:10
53:6 54:1,2,4,8,11 60:18,20 61:2,6,7,
9 63:15,16 65:16,17 67:12 68:25
70:6 73:18 74:8 75:11 76:17 77:23
78:2,7,9,10 83:2 88:13,24 89:17
91:1,2,9 92:10,11,21 93:11 95:4,6,
13,15 96:5,18,19 97:10,21,23 99:22
102:18,19,22 103:18 104:8 115:6
116:15,24 118:12,13 122:22 124:22
129:8 130:9

**timeliness** 57:6

**timely** 54:24 57:9

**times** 20:15 130:6

**title** 12:23 90:6

**today** 6:11

**Today's** 5:4

**Todd** 78:3,12 89:9,21 90:19

**told** 19:22 25:24 37:12,19 44:17
45:20,21 46:24 50:17 51:8 55:8
63:15 69:22,24 70:11 76:8 77:14,18,
21,22 79:9,16,19 91:2,16,21 92:20,
21,22 93:3,8,10,16 94:19 95:24
104:11 109:23 110:3 111:24 112:1,5,
17,20,22 115:1 119:1,6

**top** 13:21

**total** 44:17

**totally** 29:25 30:12 44:11 50:11
66:16 108:17

**touch** 72:2

**touching** 46:9

**trained** 64:11

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 148 of 150

**training** 9:5 13:11 104:7 105:2 116:12,19

**transcribed** 131:4

**transition** 123:25

**transpired** 91:12,18

**treated** 76:24

**treating** 82:18

**true** 21:20 22:24 29:21 32:8 52:20 127:13

**truth** 6:5,6 129:6

**turn** 88:19 123:19

**turned** 55:24

**turns** 21:5

**two-and-a-half** 31:17

**type** 43:2 50:16 53:5 67:12,19 73:5 87:25 101:9 105:11 119:5 124:20

**types** 23:17 55:8

## U

**uh-huh** 18:5

**ultimate** 88:15

**unable** 117:10,11

**UNC** 5:19 7:16,24 34:14 48:13 53:14,15 57:17 69:9 72:7 83:13 89:17 95:4,7

**unclear** 22:21

**undersigned** 129:12

**understand** 13:15 23:5 33:3 38:22 39:2 45:4 49:6 52:1 53:11 56:19 59:22 67:9 87:16 88:15 92:1 102:6

**understanding** 50:25 52:4 54:25 64:2 86:25 87:7 113:12

**understood** 116:20

**undue** 7:7

**unit** 13:24 14:4,10,13,24

**unit's** 87:19

**university** 7:19 17:18 27:1,2 32:21 41:25 43:16,18,25 59:7 73:6 119:18

**update** 102:19

**upset** 41:4 49:21,22 67:16 71:7 76:23 80:24 87:8 97:4 102:2

**upshot** 75:13

**user** 64:12,17

**usual** 61:15

**utilizing** 64:15

## V

**V-E-R-A** 18:24

**vacation** 70:25 74:25 95:20

**Valerie** 5:10 6:12 25:5 34:17 73:1 84:9 94:6 106:22 110:8 126:7

**Vera** 18:24 19:10,11,14

**verbal** 14:14 115:20 125:3

**versus** 29:11

**vice** 11:17 42:4 51:4 55:11 78:20

**video** 129:7

**violate** 43:6

**violating** 48:16,20

**violation** 83:12,14

**visas** 17:14,20

**voiced** 119:16

**voluntarily** 27:4

**voluntary** 28:11 83:21

**volunteer** 8:14

## W

**W-E-B-S-T-E-R** 18:16

**W-H-I-T-W-O-R-T-H** 17:8

**wait** 34:24,25 123:7

**walked** 119:13

**wanted** 10:2 38:15 54:17 69:5 81:14,22 92:23 93:1,6,13 96:14,25 97:11 109:17

**wanting** 75:4

**warning** 71:5 113:7,15,17,19 124:25

**warnings** 124:15 125:9,11,16,20

**warrant** 83:8

**warranted** 83:11

**Washington** 42:4 51:8 99:1

**waste** 44:17,20,25 45:3,12 67:11 96:19 102:22 104:8

**ways** 29:13 71:18

**wear** 71:4

**wearing** 37:13 45:16

**Webster** 18:14,16 19:4 39:18

**week** 37:8 39:24 60:22 124:7

**weeks** 57:9 58:4

**whatsoever** 113:8

**WHEREOF** 129:17

**white** 101:5 102:1 115:1

**Whitworth** 17:5,7

**whomever** 86:16

**wife** 71:8

**window** 9:9

**Wisconsin** 8:24

**Wise** 50:12 51:1

**Wishart** 49:11 50:1 69:23 92:14 119:11

**wished** 47:17

**witnessed** 49:12 76:9 130:20

**Wolff** 11:17 12:3,5 89:3

**word** 44:22 49:24 53:8 115:23

**wording** 71:2

**words** 39:3 46:7 99:19

**work** 16:14 17:17,18 23:4 26:17 27:2 39:13 43:1 45:6 53:11 54:9,13 55:6,24,25 56:1 57:6,8,13,15 65:7,10 80:12,14 81:12,13 83:16,18 85:13,18 86:5,7,20 89:1,7 90:13 95:25 96:13,24 100:15 101:3 106:17,18 111:14 113:20,21 115:15 117:10,11

**workbooks** 115:21

**worked** 8:13,23 9:7,9,15,20,21 13:5 30:23 77:9 87:19 90:6 106:4,9 107:4,6,7 116:24 119:9

Case 1:20-cv-01096-TDS-JEP   Document 67-1   Filed 03/09/23   Page 149 of 150

**Chaplin & Associates**
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

**working** 15:18 19:12 39:3 40:19
42:25 54:20,21,22 62:5 71:19 76:13
87:15 88:17

**works** 48:12 64:5

**world** 63:21

**worse** 102:9

**would've** 15:2 64:14

**writing** 52:8 53:16 60:2

**written** 27:21 28:6,8 30:6 61:24
124:14,25 125:3,9,11,16,20,22

**wrong** 47:16 56:3 80:14 113:3
122:1

**wrote** 12:22 74:12 105:20 114:1

---

### Y

**Y-A-M** 57:21

**Yam** 57:21 84:19

**year** 70:5

**years** 6:14 7:23,25 8:21 9:7,12 19:3
31:17,19 47:13,14 84:18