```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

 3     _____

 4     SUPRIYA KHAZANIE,

 5             Plaintiff,

 6         v.                          Civil Action

 7     UNIVERSITY OF NORTH CAROLINA AT      No.

 8     CHAPEL HILL, UNC GILLINGS            1:20-CV-1096

 9     SCHOOL OF GLOBAL PUBLIC HEALTH,

10     KATIE THORNSVARD, in her

11     individual and official capacity

12     as Associate Dean for Finance

13     and Business,

14             Defendants.

15     _____

16             VIDEOCONFERENCE DEPOSITION OF

17                 SUPRIYA KHAZANIE

18     DATE:          Friday, February 17, 2023

19     TIME:          10:10 a.m.

20     LOCATION:      Remote Proceeding

21                    Durham, NC 27705

22     REPORTED BY:   Joshua Seagondollar, Notary Public

23     JOB NO.:       5697605

24

25
```

```
 1              A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFF SUPRIYA KHAZANIE:

 3         VALERIE L. BATEMAN, ESQUIRE (by videoconference)

 4         New South Law Firm

 5         209 Lloyd Street, Suite 350

 6         Carrboro, NC 27510

 7         valerie@newsouthlawfirm.com

 8

 9    ON BEHALF OF DEFENDANTS UNIVERSITY OF NORTH CAROLINA

10    AT CHAPEL HILL, UNC GILLINGS SCHOOL OF GLOBAL PUBLIC

11    HEALTH, AND KATIE THORNSVARD IN HER INDIVIDUAL AND

12    OFFICIAL CAPACITY AS ASSOCIATE DEAN FOR FINANCE AND

13    BUSINESS:

14         KARI R. JOHNSON, ESQUIRE (by videoconference)

15         North Carolina Department of Justice

16         P.O. Box 629

17         Raleigh, NC 27602

18         kjohnson@ncdoj.gov

19         (919) 716-6920

20

21

22

23

24

25
```

1           A P P E A R A N C E S (Cont'd)

2    ALSO PRESENT:

3          Kristen Simonsen-Lewis, In-House Defense Counsel

4          (by videoconference)

5          Anne Martin, In-House Defense Counsel (by

6          videoconference)

7          Steve Degaetano, Paralegal (by videoconference)

8          Jeremy Lindsley, Defense Team (by

9          videoconference)

10         Mary Stewart Wilson, Law Student (by

11         videoconference)

12         Anne Privett, Paralegal (by videoconference)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1                    I N D E X

 2    EXAMINATION:                              PAGE

 3        By Ms. Johnson                        9

 4        By Ms. Bateman                        274

 5

 6                   E X H I B I T S

 7    NO.           DESCRIPTION                 PAGE

 8    Exhibit 1     Amended Complaint           15

 9    Exhibit 2     RFA Responses               15

10    Exhibit 3     Interrogatory Responses     22

11    Exhibit 4     UNC Application             31

12    Exhibit 5     LinkedIn                    31

13    Exhibit 6     Position Description        78

14    Exhibit 7     EEOC Charge                 131

15    Exhibit 8     UNC Grievance               133

16    Exhibit 10    Quarterly Review            181

17    Exhibit 11    2/6/2023 Supplemental Discovery

18                  Response                    260

19    Exhibit 12    Termination Letter          181

20    Exhibit 13    Plaintiff's CV              77

21    Exhibit 17    11/5/2019 E-mail            138

22    Exhibit 18    Pre-Start E-mails           92

23    Exhibit 19    E-mails re Lateness         186

24    Exhibit 20    E-mails re Managers         187

25    Exhibit 21    3/14/2019 Coaching          190
```

Page 5

1                 E X H I B I T S (Cont'd)

2     NO.              DESCRIPTION                    PAGE

3     Exhibit 22       E-mails re Training and Guidance,

4                      Redacted                       191

5     Exhibit 23       Meetings                       215

6     Exhibit 24       E-mails re EI                  225

7     Exhibit 25       Diversity Training E-mails     227

8     Exhibit 26       E-mails re Errors              233

9     Exhibit 27       E-mails re Lunch               238

10    Exhibit 28       E-mails re Yoga                230

11                     (Exhibits attached.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2                    THE REPORTER:  Good morning.  My name

3        is Joshua Seagondollar; I am the reporter assigned by

4        Veritext to take the record of this proceeding.  We

5        are now on the record at 10:10 a.m.

6                    This is the deposition of Supriya

7        Khazanie taken in the matter of Supriya Khazanie vs.

8        University of North Carolina at Chapel Hill, UNC

9        Gillings School of Health and Global Public Health,

10       and Katie Thornsvard, in her individual and official

11       capacity as the Associate Dean for Finance and

12       Business taken on February 17, 2023, at 536 East

13       Lenoir Street, Raleigh, North Carolina 27601.

14                    I am a notary authorized to take

15       acknowledgments and administer oaths in the state of

16       North Carolina.  Parties agree that I will swear in

17       the witness remotely outside of her presence.

18                    Additionally, absent objection on the

19       record before the witness is sworn, all parties and

20       the witness understand and agree that any certified

21       transcript produced from the recording virtually of

22       this proceeding:

23                    - is intended for all uses permitted

24                    under applicable procedural and

25                    evidentiary rules and laws in the same

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 6 of 280

Page 7

1                        manner as a deposition recorded by

2                        stenographic means; and

3                        - shall constitute written stipulation

4                        of such.

5                        At this time will everyone in

6      attendance please identify yourself for the record

7                        MS. JOHNSON:  Kari Johnson on behalf of

8      the defendants in this case.

9                        MS. BATEMAN:  Valerie Bateman on behalf

10     of the plaintiff in this case.

11                       MS. MARTIN:  Ann Martin on behalf of

12     defendant in this case.

13                       MS. LEWIS:  Kristen Lewis, an attorney

14     with the defendants, joined by Mary Stewart Wilson, a

15     law student in my office, and also Anne Privett, a

16     paralegal in the office.

17                       MS. JOHNSON:  And we are also joined at

18     DOJ with Steve Degaetano --

19                       MR. DEGAETANO:  Degaetano.

20                       MS. JOHNSON:  Degaetano.  I'm terrible

21     with names.  And also Jeremy Lindsley.

22                       MR. LINDSLEY:  Thanks, Kari.

23                       MS. JOHNSON:  Sorry.  I think I said

24     your name right.

25                       MR. LINDSLEY:  You did.  Thank you.

1          MS. JOHNSON:  Steve will get mad at me

2     later for butchering him.

3          THE REPORTER:  All right.

4     Ms. Khazanie, could you please introduce yourself for

5     the record?

6          MS. KHAZANIE:  Supriya Khazanie,

7     plaintiff.

8          THE REPORTER:  Thank you.  Hearing no

9     objection, I will now swear in the witness.

10          Ms. Khazanie, please raise your right

11     hand.

12     WHEREUPON,

13               SUPRIYA KHAZANIE,

14     called as a witness, and having been first duly sworn

15     to tell the truth, the whole truth, and nothing but

16     the truth, was examined and testified as follows:

17          THE REPORTER:  Lastly, can you please

18     state your full name spelled out including the middle

19     name, if any, and your current complete address,

20     please?

21          THE WITNESS:  Supriya Prabhaker

22     Khazanie, S-U-P-R-I-Y-A.  Prabhaker is

23     P-R-A-B-H-A-K-E-R.  And the last name's Khazanie,

24     K-H-A-Z-A-N-I-E.  Address is 536 East Lenoir Street,

25     Raleigh, North Carolina 27601.

Page 9

1          THE REPORTER:  Thank you.  One moment.

2          Counsel, you may proceed.

3                   EXAMINATION

4  BY MS. JOHNSON:

5      Q    Ms. Khazanie, we've been talking before the

6  deposition mainly just about the logistics that are

7  going on today with this remote deposition and some of

8  the issues that we're having.  But I wanted to

9  officially introduce myself and you've already heard

10 the names of the people that are here today on behalf

11 of the defendants.

12          But my name is Kari Johnson and I will be

13 the attorney asking you questions today.  Have you

14 ever been deposed before?

15     A    No.

16     Q    So basically, as you can see, I'll be asking

17 questions; you'll be answering them under

18 oath -- obligated -- truth.  The court

19 reporter -- somewhere out there in -- land and

20 he -- everything that you say down in a

21 transcript -- virtual connectivity interruption -- in

22 some format.

23          And then -- the deposition, he's going to

24 type it up into a transcript and then that will be

25 what we use for further purposes in this case.

1              And I think he's already indicated for that

2     reason you need to -- we both need to make sure that I

3     get all of my questions out before you start your

4     answers and we both need to try to be as clear as

5     possible so that the transcript can be complete.  We

6     would ask that if you don't understand any of my

7     questions -- complete and accurate.

8              If you don't understand any of my questions,

9     please just say "could you rephrase that" or "I don't

10    understand."  I know that there are going to be times

11    where I'm not asking a clear question, so please make

12    sure you understand the questions to the best of your

13    ability before you try to answer them.

14             We are going to be going for -- I've got a

15    lot of material to go over today; this is my one

16    chance to ask you questions and meet with you like

17    this.  So you know, I'll apologize in advance that

18    this is going to take several hours.

19             I typically like to take a very short break

20    at least once an hour, a restroom break.  And then if

21    at any other time you need any other breaks, please

22    just say so and we'll be happy to take a break.

23             At some point in time if we do get close to

24    a lunch hour and people -- which we probably

25    will -- and if people -- we can just discuss as we go

1     whether or not people need to take a short break for

2     lunch.

3              But I know it's a Friday and people want to

4     start their weekend, so I'm going to try to move

5     along.  I will tell you I'm not that great with the

6     remote setup and I do have numerous exhibits that I

7     would like to go over with you.  I'm not quite the pro

8     yet that Ms. Bateman is, but with the court reporter I

9     hope that we'll be able to do this in a fairly quick

10    streamlined process.

11             Having said that, let's just -- you've

12    already indicated your name for the record.  Have you

13    ever gone by any other names?

14        A    No.

15        Q    Have you recently married?

16        A    Yes, in -- two years ago almost.

17        Q    Okay.  And you didn't change your name when

18    you got married?

19        A    I did not.

20        Q    All right.  And so you got married; can you

21    state the month and the year you got married?

22        A    I'm not sure how that's pertinent, but May

23    2021.

24        Q    And what's your husband's name?

25        A    Again, not sure how this is pertinent, but

1        Dominique Bischoff.

2            Q     And when did you get engaged?

3            A     March 2021.

4            Q     And there have been some discussions about

5        your boyfriend going over to see Charletta Evans Sims

6        or Sims Evans; is that your current husband --

7            A     Correct.

8            Q     -- that went with -- that day?

9            A     Yes.

10           Q     All right.  And what does your husband do?

11           A     He is the co-founder and chief technology

12       officer for CompostNow.

13           Q     And do you two live together in Raleigh?

14           A     Yes.

15           Q     And just trying to get, you know, limited

16       background information, but where were you born?

17           A     Greenville, North Carolina.

18           Q     And are your parents still living?

19           A     They are.

20           Q     And what is your mother's name?

21           A     Rita Khazanie, R-I-T-A.

22           Q     And does she work?

23           A     She works at East Carolina University.

24           Q     And in what capacity?

25           A     She works at Joyner Library in the systems

Page 13

1    department.

2          Q    How long as she been at ECU?

3          A    Since 1998.

4          Q    And then your father; what is your father's

5    name?

6          A    Prabhaker Khazanie.

7          Q    And does he work?

8          A    He is retired.  He worked at the East

9    Carolina School of Medicine from -- at some point in

10   the 1970s until he retired, which I don't remember the

11   exact year.

12         Q    And what did he do at the school of

13   medicine?

14         A    He was a -- a director of the pathology and

15   clinical chemistry labs and he was a -- he was a

16   medical school professor.

17         Q    Was he a doctor?

18         A    He's a PhD.

19         Q    Okay.  All right.  Do you have any siblings?

20         A    I do.

21         Q    And what are their names?

22         A    My sister is Prateeti Khazanie and my

23   brother is Nirdhar Khazanie.

24         Q    And what does your -- does your

25   sister -- well, where does your sister live?

1          A     My sister lives in Denver, North -- in

2     Denver, Colorado.

3          Q     Okay.  And what does she do; does she work?

4          A     She is a advanced heart failure

5     cardiologist.

6          Q     And your brother, where does he live?

7          A     He lives in Indianapolis.

8          Q     And what does he do?

9          A     He is a senior product manager at Meta.

10         Q     All right.  And I ask this of all witnesses;

11    how old are you right now?

12         A     I'm 38.

13         Q     And how old were you when you worked for

14    UNC?

15         A     I was 34.

16         Q     Okay.  And what's the month of your

17    birthday?

18         A     January.

19         Q     Are you -- and again, I ask this of all

20    witnesses.  Are you taking any medications today that

21    will impair your ability to understand questions and

22    answer accurately and truthfully?

23         A     No.

24         Q     All right.  All right.  I'm going to try my

25    hand at introducing some exhibits that I might be

1     using during the deposition.

2                    MS. JOHNSON:  Court Reporter, could you

3     please show her Exhibit Number 2?

4                    (Exhibit 2 was marked for

5                    identification.)

6                    MS. JOHNSON:  Well, actually, show her

7     Exhibit Number 1.

8                    (Exhibit 1 was marked for

9                    identification.)

10    BY MS. JOHNSON:

11        Q    While he's pulling up those

12    exhibits -- again, just try to keep it moving,

13    Ms. Khazanie -- are you a U.S. citizen?

14        A    Yes.

15        Q    Are your parents U.S. citizens?

16        A    Yes.

17        Q    Have you ever lived permanently in another

18    country?

19        A    Not permanently, no.

20        Q    And you indicated that you were born in

21    Greenville; how long -- can you just kind of tell me,

22    like, you know, how long you stayed in Greenville and

23    the other places where you've lived?

24        A    I was born and raised in Greenville; I lived

25    there until high school.  I went to UNC Chapel Hill

1      for college.  After college, I did some volunteer work

2      in India and then I came back to America.  I lived in

3      North Carolina and then I lived in California for one

4      year after grad school and -- or eight months after

5      grad school.

6              And then I lived in DC from 2013 until the

7      end of 2017.  And then I've lived in North Carolina

8      since the end of 2017 in the Raleigh area.

9          Q     Thank you.  What's the longest period of

10     time that you've ever lived in another country

11     continuously?

12         A     One year.

13         Q     And was that after you graduated from high

14     school or college?

15         A     From college.

16         Q     Okay.  All right.  And because this case

17     involves discrimination claims, I'm going to just ask

18     you, what national origin do you identify with?

19         A     United States.  American.

20         Q     And what race do you identify with?

21         A     Indian.

22         Q     And what gender do you identify with?

23         A     Female.

24         Q     All right.  And again, I ask this of every

25     witness.  Have you ever been charged with any crimes

Page 17

1    that aren't traffic related?

2         A    No.

3         Q    Have you ever been involved in any other

4    lawsuits?

5         A    No.

6              MS. JOHNSON:  All right.  Court

7    Reporter, do we have Exhibit Number 1?

8              THE REPORTER:  I believe I can pull it

9    up.  You'll just have to bear with me one moment.

10             Are you able to see this?

11             MS. JOHNSON:  That's perfect.  Thank

12   you.

13   BY MS. JOHNSON:

14        Q    So for Exhibit Number 1 -- if we were in the

15   same room, I would be handing this to you and your

16   attorney right now.  But -- this -- is how we do

17   exhibits.  And if you could -- let's see.  Do I have

18   the ability to -- oh, yes.  This is -- see that,

19   Ms. Khazanie?  Can you see that this is your amended

20   complaint?

21        A    Yes.

22             MS. BATEMAN:  Kari, I'm just going to

23   tell -- it's Khazanie.  That second A is not long.

24   It's not an A; it's short.  It's a short A.  Short

25   vowel.  Khazanie.

Page 18

1          MS. JOHNSON:  Khazanie.  That's what

2    I've intended to say.  If I have not said that, I

3    apologize.  Khazanie.

4          MS. BATEMAN:  Just occasionally you say

5    "Khazanie."

6          MS. JOHNSON:  Okay.  Khazanie.  Okay.

7    I apologize.  That's been my intention.  Now I'm going

8    to have anxiety --

9          MS. BATEMAN:  I'm sorry.

10          MS. JOHNSON:  Okay.

11          MS. BATEMAN:  I did not mean to give

12    you anxiety.  I'm sorry.

13          MS. JOHNSON: No, no.

14    BY MS. JOHNSON:

15      Q    Ms. Khazanie, again, I apologize for that.

16    So is this not a copy of your amended complaint,

17    Exhibit 1?

18      A    I believe so.

19          MS. JOHNSON:  And, Court Reporter, are

20    you able to give me the ability to scroll?  We've been

21    able to do that in other depositions.

22          MS. BATEMAN:  I can tell you, Kari,

23    when I was able to scroll it was because I pulled it

24    up and shared my screen.  So --

25          MS. JOHNSON:  Okay.  All right.

1              MS. BATEMAN:  Yeah.  If you have it,

2      even if it's not marked -- like when I pulled it up,

3      it wasn't marked but that's how I was able to scroll.

4      So if you can get to it on your computer --

5              MS. JOHNSON:  All right.  Well 00

6              MS. BATEMAN:  -- and you can scroll.  I

7      figured that out after the second deposition.  I don't

8      want you to think that I knew that going in.

9              MS. JOHNSON:  Well, Court Reporter, are

10     you able to scroll?

11             THE REPORTER:  I can.

12             MS. JOHNSON:  If you can just kind of

13     go through and just show her -- is there any

14     way -- pull it up to where, like, entire pages can be

15     on the screen?  Would there -- that's -- if you just

16     kind of scroll -- pages to the end.

17             THE REPORTER:  All right.

18             MS. JOHNSON:  Perfect.  Yeah.  We'll

19     get this down.

20             MS. BATEMAN:  Joshua, if you hit the

21     minus button it might bring the whole page up, you

22     know, if you just try to make it a little smaller.

23             THE WITNESS:  If you just want to get

24     to page 18, you can type 18 in the page down at the

25     bottom.

Page 20

1            MS. JOHNSON:  Well, I just --

2            THE REPORTER:  You just need me to go

3    to --

4            MS. JOHNSON:  -- I'm trying to give you

5    the -- yeah.  There you go.

6    BY MS. JOHNSON:

7        Q    I'm trying to give you the ability,

8    Ms. Khazanie, if you need it, to just -- to you that

9    this -- fact -- what I've indicated Exhibit 1 is a

10   copy of your amended complaint.  But my question to

11   you, is this in fact your amended complaint?

12       A    Valerie would know better than me.

13       Q    All right.  And that's your signature at the

14   end, correct?  That he's showing you right now.

15       A    You would have to scroll up some.  I can't

16   see.

17            MS. BATEMAN:  That's actually the

18   notary's signature.  Yeah.  There we go.

19            THE WITNESS:  That's -- that's my

20   signature.

21   BY MS. JOHNSON:

22       Q    Okay.  Thank you.  And when's the last time

23   you looked at your amended complaint?

24       A    Probably on November 21 -- November 26 of --

25            MS. JOHNSON:  Okay.  Oh, wait.  Wait.

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 20 of 280

 1    Hold on one second.  Why are my e-mails showing up?

 2    Okay.

 3                    Were y'all able to just see my e-mails?

 4                    MS. BATEMAN:  No, I didn't see

 5    anything.  No.  You --

 6                    MS. JOHNSON:  Okay.  All right.

 7                    MS. BATEMAN:  You actually have to

 8    share --

 9                    MS. JOHNSON:  If you could pull up --

10                    MS. BATEMAN:  Yeah.

11                    MS. JOHNSON:  Thank you.  If you

12    guys -- and, Court Reporter, if you could now pull

13    up -- all I need with that exhibit.  If you could pull

14    up Exhibit Number 2?

15                    THE REPORTER:  Sure thing.  One moment.

16    BY MS. JOHNSON:

17        Q    And, Ms. Khazanie, Exhibit Number 2 is

18    Plaintiff's Supplemented/Amended Responses to

19    Defendants' First Requests for Admissions.  If

20    you -- would you like to see all pages of this

21    document right now?

22        A    No.

23        Q    All right.  And same question, when was the

24    last time you reviewed this document to best of your

25    memory?

1        A    It -- I'm not sure.  When -- whenever I

2    signed it.  There have been several documents, so I'm

3    not sure the exact date.

4        Q    Okay.  Thank you.

5              MS. JOHNSON:  And then, Court Reporter,

6    if you could pull up -- that's all for that exhibit

7    for now.  If you could pull up Exhibit Number 3?

8              (Exhibit 3 was marked for

9              identification.)

10             THE REPORTER:  One moment.

11             MS. JOHNSON:  Thank you.

12   BY MS. JOHNSON:

13       Q    And, Ms. Khazanie, Exhibit Number 3 is

14   Plaintiff's Responses to Defendants' First Set of

15   Interrogatories.  And sort of the same question; do

16   you want me to show you all of the pages of that?

17       A    No.  I -- I trust that Valerie sent them.

18       Q    All right.  And when was the last time that

19   you saw that document --

20       A    Whenever I signed --

21       Q    -- prior to today?  Okay.  And --

22       A    Whenever I signed --

23       Q    Thank you.  And so were you involved in

24   providing information for those interrogatories?

25       A    I was.

Page 23

1          Q     All right.  Thank you.

2                MS. JOHNSON:  So that's all for that

3     exhibit right now, Court Reporter.  Thanks.

4     BY MS. JOHNSON:

5          Q     So Ms. Khazanie, when you worked at UNC,

6     what was your address?

7          A     It was -- I forgot the number of my

8     apartment, but I lived on Spring Lake Boulevard,

9     Raleigh, North Carolina 27607, I believe.  I lived in

10    Brier Creek in an apartment complex.

11         Q     Did anybody live with you during the time

12    that you were employed at UNC?

13         A     No.

14         Q     And then since then where did you move to?

15    Because you're at a different address now.  Where have

16    you lived since where you were living at the time you

17    were employed by UNC?

18         A     I moved to the address I'm at now, 536 East

19    Lenoir Street.  While I was -- UNC, I decided to move

20    to Raleigh.

21         Q     Okay.  So when you first started at UNC, you

22    lived in the Brier Creek area, which is -- is that

23    still Raleigh?

24         A     Yes.

25         Q     And then at some point while you were

1    working at UNC, you moved to your address on Lenoir

2    Street?

3         A    Correct.

4         Q    Do you recall about when you moved?

5         A    My lease was up in November, so it's -- the

6    transition started in November.

7         Q    So for the last couple of months you were

8    living in your Lenoir Street address, correct?

9         A    Yeah.  I -- some -- I started transitioning

10   around then.  Correct.

11        Q    Okay.  Are you renting or do you own?  Or I

12   guess owning is kind of probably a --

13        A    I own my -- we -- we own it --

14        Q    Okay.  All right.  And Lenoir Street, is

15   that closer to downtown Raleigh?

16        A    Yes.

17        Q    All right.  So you moved further away from

18   UNC in November, correct?

19        A    I officially moved in January.  I gave my

20   notice of not renewing my apartment of 60 days in

21   November --

22        Q    Okay.  But --

23        A    -- it started in November, but my -- my

24   address was Brier Creek until January of 2020.

25        Q    Okay.  But where did you actually live?  I

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 24 of 280

1    mean, when did you actually physically start spending

2    time in your Lenoir house?

3         A    Summer of 2020 -- I mean, 2019.  Summer of

4    2019.

5         Q    So then were you living at the Lenoir Street

6    house most of the time then?

7         A    It -- Lenoir Street was my then-boyfriend's

8    house and I lived in Brier Creek.  And some time I

9    would spend in downtown Raleigh and sometimes I was at

10   my apartment.  We would go back --

11        Q    Okay.  Was there ever a time when you went

12   while you were employed at UNC and stayed permanently

13   at the Lenoir Street house?

14        A    I had stayed there a few days at a time,

15   yes.

16        Q    Where did you spend most of your time while

17   you were employed at UNC; the Lenoir Street house or

18   the Brier Creek apartment?

19        A    Brier Creek apartment 'cause it was closer.

20        Q    Okay.  All right.  I'd like to -- so I think

21   you've already testified to some of these questions,

22   but you went to high school -- you completed high

23   school in Greenville; is that correct?

24        A    Correct.

25        Q    And what year did you graduate from high

1    school?

2          A     2003.

3          Q     And then I believe that was from Rose High

4    School?

5          A     Correct.

6          Q     And then did you go straight to UNC after

7    high school?

8          A     I did.

9          Q     All right.  And then you graduated in 2007

10   from UNC?

11         A     I did.

12         Q     And what degree did you get at UNC?

13         A     I had a bachelor of arts in anthropology

14   with a minor in African American studies.

15         Q     All right.  And did you graduate in four

16   years?

17         A     I did.

18         Q     And did you ever fail any classes in

19   college?

20         A     I don't recall.

21         Q     Let me ask you this, did you ever have to

22   repeat any grades in high school?

23         A     No.

24         Q     All right.  And you say you can't recall if

25   you failed any classes in college?

1          A     Yeah, I do not remember.  That was 20 years

2     ago.

3          Q     But it's a possibility that you failed some

4     classes?

5          A     I did not -- I -- I was a pre-med major for

6     my first three semesters and I decided to switch

7     majors.

8          Q     And then I have that you went to ECU and

9     that you got your -- was it your master's in May of

10    2012?

11         A     I got a master's in accounting and an MBA in

12    finance.

13         Q     And how long were you -- when did you start

14    ECU?

15         A     I started at ECU in the fall of 2009.

16         Q     Did you go continuously until May of 2012?

17         A     Yes.

18         Q     Did you fail any classes in graduate school?

19         A     No.

20         Q     While you were in either UNC or ECU, did you

21    ever file any complaints or grievances with the

22    school?

23         A     Not formally.

24         Q     Okay.  Then let's go over -- while you were

25    at UNC, did you file any informal complaints?

1          A     No.

2          Q     While you were at ECU, did you file any

3    informal complaints?

4          A     I had talked to a professor -- to a

5    department chair once about --

6          Q     And what was --

7          A     -- professor -- about a professor that was

8    just not very nice.

9          Q     Can you tell me a little bit more about

10   that; what was the nature of your complaint?

11         A     I don't remember all of the details.  I just

12   remember that one of our professors was not -- not

13   providing office hours or not being very kind.  I

14   don't remember the details.

15         Q     Did you make any allegations of harassment

16   in that complaint?

17         A     I don't remember.

18         Q     Did you make any allegations of

19   discrimination in that complaint?

20         A     He -- one professor did ask me why I don't

21   wear my head scarf and I told him that I was Hindu and

22   I don't wear a head scarf.  And I did report -- report

23   that to the department chair.

24         Q     Was this the same complaint that you were

25   just talking about or was that a separate complaint?

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 28 of 280

1      A     That's -- that's the only complaint I can

2  recall.

3      Q     Okay.  And so when you made that complaint

4  to -- well, so let me just make sure I'm clear.  So a

5  second ago we were talking about a complaint that you

6  made to somebody about a professor who didn't keep

7  office hours and so on --

8      A     He was -- he was --

9      Q     -- was that --

10     A     He was the same professor; he was just -- he

11 has since deceased.  I do not remember all of the

12 details.  I don't even remember his name.  And I don't

13 really know how that's pertinent here.

14     Q     Okay.  Do you recall what class he taught?

15     A     Not a clue.

16     Q     And you reported it to the department chair;

17 what came out of that?

18     A     He talked to the professor and told him that

19 it was inappropriate.

20     Q     And what department was it?

21     A     Accounting.

22     Q     And do you recall the name of the department

23 chair?

24     A     I do not.  This was 15 years ago.

25     Q     All right.  How about at UNC; did you make

1    any informal complaints about anybody there when you

2    were in college?

3         A    No.

4         Q    All right.  And then I believe you testified

5    that after college is when you went to India for a

6    year?

7         A    Yes.

8         Q    And what did you do in India for a year?

9         A    I worked at a school for mentally

10   handicapped children.

11        Q    All right.  And then you returned to the

12   United States?

13        A    Correct.

14        Q    Was it always your intention to return to

15   the United States?

16        A    It was.

17        Q    And if I asked you this, I apologize.  I

18   have a habit of sometimes repeating questions.  Did

19   you go straight from UNC to ECU?

20        A    No.  I went to India in-between.

21        Q    Okay.  So you -- that's right.  You went

22   in-between.  That's right.  Okay.

23               MS. JOHNSON:  And, Court Reporter --

24   BY MS. JOHNSON:

25        Q    And then so you got your master's and MBA in

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 30 of 280

1    2012, correct?

2            A    Correct.

3            Q    And when you were getting your master's and

4    your MBA at ECU did you live with your family?

5            A    I did.

6            Q    Regarding that class that you took with the

7    professor in accounting that was the subject of the

8    complaint, do you recall what your grade was in that

9    class?

10           A    An A or a B.

11                MS. JOHNSON:   All right.   Court

12   Reporter, if you could please --

13   BY MS. JOHNSON:

14           Q    I'm going to show you, Ms. Khazanie,

15   Exhibit 4 and Exhibit 5.

16                (Exhibit 4 and Exhibit 5 were marked

17                for identification.)

18           And I will just tell you while he's pulling

19   them up that Exhibit 4 is your UNC application and

20   Exhibit 5 is LinkedIn materials from the internet.

21   And I will have you just take as long as you need to

22   look at those when he pulls them up.

23           And, Ms. Khazanie, while

24   he's -- pull -- those -- can -- putting on camera

25   again what -- I don't think we're able -- see right

1    now.  I just want to see -- yeah.  There you go.  If

2    we just keep that on as much as -- that would be what

3    I would --

4                    MS. JOHNSON:  So Court Reporter, if you

5    could make that a little bit bigger so Ms. Khazanie

6    can -- look at each page of that?

7    BY MS. JOHNSON:

8         Q    Yeah.  Ms. -- if you could please tell the

9    court reporter, you know, if you want to take more

10   time on each page.

11        A    Yes.

12                   MS. JOHNSON:  Is there any way we could

13   get it to -- by page, Court Reporter?

14                   THE WITNESS:  Okay.

15                   MS. JOHNSON:  Okay.  That's fine.

16   Yeah.  That's fine.

17   BY MS. JOHNSON:

18        Q    Ms. Khazanie, are you able to see that?

19        A    Yes.

20        Q    All right.  If you could just let him know

21   when you're ready for him to --

22                   THE WITNESS:  Yeah.  You can keep

23   scrolling.

24   BY MS. JOHNSON:

25        Q    And if you can, just keep telling him.

1    Yeah.  If you want to stop on any particular page, let

2    him know.

3                    THE WITNESS:  Okay.  You can

4    keep -- keep going.  Yes.  Okay.

5    BY MS. JOHNSON:

6         Q    And -- does that application have -- ability

7    to look at it, does that refresh your recollection and

8    memory as to the applications that you filled out when

9    you applied for the position at UNC of senior

10   financial analyst?

11        A    Yes.  And submitted at 3:40 a.m.  Correct.

12   After work.

13        Q    So did anybody help you fill out that

14   application?

15        A    No.

16        Q    And you don't dispute that you're the one

17   who filled it out and submitted it, correct?

18        A    Correct.

19                    MS. JOHNSON:  All right.  And then if

20   you could just show, Court Reporter, number 5?

21   Exhibit Number 5.

22   BY MS. JOHNSON:

23        Q    And I'll report to you or -- to you that

24   these are just -- when I pulled up LinkedIn for you,

25   this is what came out and I just copied it.  And you

 1    can --
 2         A    Okay.
 3         Q    I know that's kind of small, but --
 4                   THE WITNESS:  Okay.  Okay.
 5                   MS. JOHNSON:  So Ms. -- oh, sorry.
 6                   THE WITNESS:  Okay.
 7                   MS. JOHNSON:  And I think that's the
 8    last page; is that right?
 9    BY MS. JOHNSON:
10         Q    Ms. Khazanie, so regarding Exhibit Number 5,
11    is this what -- if somebody pulled up your LinkedIn
12    page, this is information that's included in your
13    LinkedIn page; is that correct?
14         A    Yes.  I have not looked at my LinkedIn page
15    in a while because I am employed happily, but yeah.
16         Q    When was the last time you looked at your
17    LinkedIn page?
18         A    I have not gone through details of it.
19    We -- we are frequently asked to post new -- new roles
20    for work since our team is growing.
21         Q    So in terms of putting in the information
22    for your LinkedIn page, do you put that in or does
23    anybody else have authority from you to enter
24    information on your LinkedIn page?
25         A    You put it in, but it's -- it's social media

1     in the end, so it's meant to look good.

2          Q    So the information, though, that -- your

3     experience and the paragraph that starts right out

4     that is "about," that would be information you put in,

5     correct?

6          A    Correct.

7          Q    And I guess just to be clear, there's nobody

8     else that worked with or on behalf of you or has your

9     authority to put in information on your LinkedIn page

10    about you, correct?

11         A    Correct.

12         Q    All right.  And the reason that I wanted to

13    show these to you is because I want to ask you some

14    questions about your employment history and I just

15    wanted to -- I know that there's information on both

16    Exhibit 4 and Exhibit 5 about your employment history.

17         A    Okay.

18              MS. JOHNSON:  Before I do that -- and I

19    apologize -- I need to take just a two-minute restroom

20    break.  I once again drank too much coffee before the

21    deposition started.  So we'll take just a two-minute

22    restroom break.

23              And, Ms. Khazanie, do you want to look

24    at those -- while I'm taking a break or --

25              THE WITNESS:  No.

1              MS. JOHNSON:  Okay.  I just want to

2     make sure that you've got -- all right.  So just two

3     minutes.  I apologize.  We'll be right back.  Thank

4     you.

5              THE REPORTER:  The time on the monitor

6     is 10:49 a.m.; we are now off the record.

7              (Off the record.)

8              THE REPORTER:  The time on the monitor

9     is 10:53 a.m.; we are now back on the record.

10             MS. JOHNSON:  All right.

11    BY MS. JOHNSON:

12        Q    Ms. Khazanie, I'm going to ask you a couple

13    questions about your employment history and I'll

14    probably go in reverse.

15             MS. JOHNSON:  And if you could -- Court

16    Reporter, if you could pull up Exhibit Number 4 again

17    just in case she wants to reference it?

18    BY MS. JOHNSON:

19        Q    When I say "in reverse," what I mean is I'd

20    like to just talk about your employment after ECU.

21    And I believe we've already talked about your job that

22    you had in India.  Did you voluntarily leave that job?

23        A    Yes.  I was only -- it was -- it wasn't a

24    job so much as a volunteer fun activity.  I -- I

25    wanted to -- I had never lived in India 'cause I lived

1    in America my whole life and my grandparents were both

2    still alive and I wanted to spend time with them.

3              And I had -- when I was a junior at UNC, I

4    had won the Mahatma Gandhi Fellowship, which is a UNC

5    scholarship that they give two people every year.  And

6    I had spent the summer after my junior year in India;

7    summer of 2006.  And I really enjoyed the work I was

8    doing and I went to continue that work.

9         Q    Do you still have extended family in India?

10        A    I do.

11        Q    And would that -- I believe you just

12   mentioned your grandparents?

13        A    They're both since deceased.

14        Q    All right.  But did both your maternal and

15   paternal grandparents live in India?

16        A    They did.

17        Q    And then -- my understanding from looking at

18   Exhibits 4 and 5 is that while you were at ECU

19   or -- you were a graduate research assistant; is that

20   correct?

21        A    I was.  Correct.

22        Q    And you indicate on Exhibit 4, which is your

23   UNC application, the different jobs and duties that

24   you performed at your various jobs, including as a

25   research assistant at ECU, correct?

1          A    I -- yes.  I believe that's --

2                    MS. BATEMAN:  Kari, we can't see that

3     on the application.  All we see is the first page.

4                    MS. JOHNSON:  No.  If you turn, Court

5     Reporter, to the 12th page of that exhibit?  And we'll

6     just kind of go in reverse from there.

7                    THE WITNESS:  Okay.

8                    MS. JOHNSON:  So if you could, Court

9     Reporter, go to the page prior to that?  Oh, actually,

10    never mind.

11    BY MS. JOHNSON:

12         Q    You see where it says employer's name, East

13    Carolina University?

14         A    Yes.

15         Q    And then you -- the times, the years, that

16    you worked as a graduate student.

17         A    Correct.

18         Q    And you indicate you were part-time.

19                    MS. JOHNSON:  And if you could go to

20    the next page, please, Court Reporter.

21    BY MS. JOHNSON:

22         Q    You list your primary job duties.

23         A    Mm-hmm.

24         Q    Is that screen full?  I'm having trouble

25    seeing the screen from this distance.

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 38 of 280

1          A     Yes.  What it --

2          Q     All right.  And it says:  conducting

3     research in statistics, primarily relating to business

4     and consumer relations; is that how that starts?

5          A     Yes.

6          Q     And you list out all the different things

7     that you did while you were working as a research

8     assistant.  And you state at the very bottom of it

9     that you were instructor for tutorials using tools

10    such as Excel, Access, and Tableau to produce more

11    succinct and interactive data for financial decision

12    making, correct?

13         A     Correct.

14         Q     And is that accurate that you

15    were -- instructor -- these tools?

16         A     I remember -- this is, again, from 2009, but

17    yes.  I -- I did work with those tools.

18         Q     Well, that's what you put down on your

19    application, correct?

20         A     Yes.  I was an instructor for those tools in

21    2009.

22         Q     Okay.  Okay.  That's what I was asking you.

23    And then so after you got your MBA and your master's

24    in accounting, was your first job with McGladrey?

25         A     Correct.

1          Q    All right.  And let me ask you this, were

2    you a research assistant the entire time you were at

3    ECU?

4          A    It was a different title.  Over the summers,

5    I did -- I -- I worked at the -- at the East Carolina

6    Foundation.  Like, each time it was kind of different

7    titles over the summer and during the schoolyear.

8    'Cause you switch professors based on which semester

9    it is.

10         Q    Did you ever get asked to leave any

11   positions with any particular professors?

12         A    No.

13         Q    Did you file any complaints against anybody

14   that you had to work with while you were -- research

15   assistant other than what you've already disclosed?

16         A    No.

17         Q    Okay.  So your next job was at McGladrey in

18   California; did you get that job right out of ECU or

19   was there any time in-between?

20         A    I signed on with them while I was

21   at -- while I was at --

22         Q    And then so what were your duties at

23   McGladrey?

24         A    I was an auditor who audited financial --

25         Q    And why did you leave that job?

1        A    I was -- I had moved to California for a guy

2    and we broke up.  And I didn't want to be in

3    California anymore.  After I -- after we broke up, I

4    had no longer -- no more reason to stay in

5    California -- and I asked my boss if she would

6    transfer me and there were no openings to transfer.

7    So at the end of busy season, I was let go 'cause I

8    wanted to leave.

9        Q    All right.  So you worked there for less

10   than a year, correct?

11       A    Correct.

12       Q    And you say you were let go.  I mean, did

13   you resign or were you let go?

14       A    At the end of busy season in accounting,

15   they often let people -- let most of the workforce go

16   in public accounting.  This is a frequent practice in

17   public accounting that the end of busy season much of

18   the workforce is let go.

19            That is not a firing, but it is also not

20   a -- it's -- it -- it -- I got unemployment, so I

21   was -- it was considered a layoff.  I was given --

22       Q    All right.  Well, did they --

23       A    -- by the state of California, I was

24   given -- I was given unemployment insurance.

25       Q    Did they keep some employees?

1          A    I assume so.  I had asked for a transfer to

2     leave anyway, so I actually was -- am not in touch

3     with anybody from my California time.

4          Q    All right.  But they kept some employees,

5     but not you, correct?

6          A    Correct.

7          Q    And you actually -- even though you wanted

8     to leave, you collected unemployment compensation

9     afterwards?

10         A    Yes.

11         Q    All right.  So you didn't have another job

12    waiting for you?

13         A    No.

14         Q    And when was the next time that -- well, let

15    me ask you this.  Were you ever disciplined while you

16    were at "McGladrey"?  McGladrey.

17         A    Not disciplined, no.

18         Q    Well, why are you laughing?  Did something

19    happen --

20         A    Because --

21         Q    -- at McGladrey?

22         A    No.  It's just public accounting.  I -- I

23    did not enjoy it and I left.

24         Q    All right.  Did you ever get negative

25    reviews?

Page 43

1          A     I do not recall the details of that time.  I
2     was -- I had just called off my wedding.  I was in a
3     abusive relationship with my -- with my significant
4     other and he and I called off the wedding and I left
5     California.  That is -- that is what I remember of
6     that time in my life.
7          Q     Is it possible you got negative reviews and
8     disciplined?
9          A     I was not disciplined.
10         Q     Okay.  Is it possible you got negative
11    reviews?
12         A     I was never given any negative -- negative
13    feedback in anything written.  I remember
14    just -- there was a constant feedback -- this is good,
15    this is bad, this is good, this is bad.  It was the
16    first job I had after grad school.
17         Q     Did you file any grievances or complaints
18    while you were there?
19         A     No.
20         Q     Did you make any allegations against anybody
21    regarding harassment or discrimination?
22         A     Not that I -- I don't remember -- some of
23    these details, Kari, I don't remember vividly
24    something that happened 10 and 15 years ago.  So
25    I'm -- to the best of my -- of my ability, I -- these

1    were jobs that I had over a decade ago and I learned

2    from them and I moved onto the next job; that's what

3    I -- that's what I remember.

4              We can spend hours combing through point by

5    point on here, but I don't think it is pertinent.

6         Q    Well, I appreciate your opinion on that.

7    But were you asked to leave McGladrey?

8         A    I was not asked to leave McGladrey.  I asked

9    for a transfer from McGladrey.  And when my boss said

10   there -- I was not going to get one, I was let go from

11   McGladrey.

12        Q    All right.  And is it possible that you made

13   a claim or allegations of harassment or discrimination

14   against people at McGladrey?

15        A    Not --

16        Q    You're saying you can't remember.  I'm

17   asking you, is it a possibility?

18        A    I do not recall.  I've had a very -- yeah.

19   I don't --

20        Q    So your next job was at Dixon Hughes

21   Goodman.

22              MS. JOHNSON:  And if we could just go

23   to Dixon Hughes Goodman?  And it's scrolling forward,

24   not -- yeah.  It kind of goes in reverse.  Do you see

25   Dixon -- yeah.  There it is.  And if you could go on

1    to --

2    BY MS. JOHNSON:

3        Q    It indicates that you worked there from

4    September 2013 to June 2014, correct?

5        A    Correct.

6        Q    Do you see that, Ms. Khazanie?

7        A    I do.

8        Q    All right.  So you left McGladrey

9    on -- 2013, so you didn't get another job until

10   September of 2013, correct?

11       A    Correct.

12       Q    I'm sorry.  I can't hear you.

13       A    I said, "Correct."

14       Q    Okay.  Thanks.  And what did you do in the

15   interim?

16       A    I studied for my CPA and I passed three of

17   the --

18       Q    Did you --

19       A    -- three of the four -- I -- I moved back to

20   North Carolina.  I was -- I had just called off my

21   wedding.  I was very emotional.

22       Q    Okay.  So did you move back in with your

23   parents?

24       A    I did.

25       Q    And then so you started with Dixon Hughes in

1    September of 2013 and you left that job in June of

2    2014.  So that was another job that was less than a

3    year in duration, correct?

4         A    Yes.  I was in busy season and I repeatedly

5    got calls from recruiters at bigger firms like

6    Deloitte and Ernst & Young and Pricewaterhouse and

7    those are Big 4 companies.  Deloitte called me several

8    times and then I interviewed with Deloitte while I was

9    still at Dixon Hughes.  And I decided to leave Dixon

10   Hughes at the end of busy season and I did.

11        Q    Okay.  So you went straight from Dixon

12   Hughes to Deloitte, right?

13        A    I did.  I signed in June with Deloitte.

14        Q    And am I saying that right, Deloitte?

15        A    Correct.

16        Q    How do you say that?  Okay.

17        A    Deloitte.

18        Q    Deloitte.  While you were at Dixon Hughes,

19   were you ever disciplined?

20        A    I was not disciplined.

21        Q    Did you ever get any negative reviews?

22        A    I did have a tough manager.  There were two

23   main senior managers and one was very

24   supportive -- that's Mike Brown that's listed

25   there -- and another one that was not so supportive.

1    And she was just not an easy person to work with.  So

2    I tried to focus on working on projects with Mike

3    Brown.

4         Q    So my question was, did you get negative

5    reviews -- I mean, did this one supervisor -- you

6    negatively?

7         A    Mike Brown gave me very positive reviews and

8    the other person did not give me positive reviews.

9    She was very difficult to work with.

10        Q    Okay.  And what made her difficult to work

11   with?

12        A    She would not give feedback.  She was -- she

13   was just not kind if you asked a question.  If

14   anything was good, she did not praise good work.  It

15   was just a difficult place to work -- or projects were

16   difficult with her, which is why I focused on working

17   with Mike Brown and why I --

18        Q    And do you recall -- sorry.

19        A    Do I recall what?

20        Q    Sorry.  I didn't mean to interrupt you.

21   Sometimes it's hard with remote.  Do you recall what

22   her name was?

23        A    No, not at all.

24        Q    You don't -- you recall Mike Brown's name,

25   but you don't recall her name?

1          A     Mike Brown's name is written right there.

2          Q     So did you file a grievance against her?

3          A     No.

4          Q     Or anybody at Dixon Hughes?

5          A     No.

6          Q     Did you make any allegations or informal

7    complaints to anybody regarding harassment or

8    discrimination while you were at Dixon Hughes?

9          A     No.

10         Q     And were you looking for a job at Deloitte

11   or did Deloitte come to you?

12         A     Deloitte -- Deloitte came to me.  Deloitte

13   reached out to me several times on LinkedIn and

14   e-mailed me, called me.  And I -- when I interviewed,

15   I was very impressed.

16         Q     All right.  And you've had a chance to --

17         A     And Deloitte was the number one -- in

18   the -- in finance of the Big 4 in the country.  So it

19   was an honor to be asked to go to -- to Deloitte.

20         Q     And I don't want to take up unnecessary time

21   going through all your primary job duties at these

22   places you've listed out on this application.  But you

23   don't dispute that you listed out your job duties on

24   this application and that you tried your best to be

25   accurate about what your job duties were, correct?

1          A    Correct.

2          Q    All right.  So your next job after Deloitte,

3    you stayed at Deloitte until -- you worked at Deloitte

4    according to your application from June 2014 to July

5    2016.  So you stayed there two years, correct?

6                    MS. BATEMAN:  Kari, I just have

7    to -- yeah.  Can you scroll up?  Because she can't see

8    that.

9                    MS. JOHNSON:  Okay.  Yeah.

10                   MS. BATEMAN:  And I can't see it.

11                   MS. JOHNSON:  Here you go.  Sorry.

12                   Court Reporter, do you mind scrolling

13   to the --

14                   MS. BATEMAN:  He did.  He did.  We're

15   there.

16                   MS. JOHNSON:  -- they're not -- all

17   right.  Thanks.

18   BY MS. JOHNSON:

19         Q    Ms. Khazanie, do you see where you state you

20   worked there from June 2014 to July 2016?

21         A    Correct.

22         Q    And you state that you left -- reduction in

23   force, worked on the 2016 election --

24                   MS. BATEMAN:  Can you --

25                   MS. JOHNSON:  Yeah.  It's down there.

 1      Oh, wait.

 2                      MS. BATEMAN:  We can't see it.

 3                      MS. JOHNSON:  Can you scroll down a

 4      little bit, Court Reporter?

 5                      Sorry.  Yeah.  There you go.

 6      BY MS. JOHNSON:

 7           Q     Do you see that, Ms. Khazanie?

 8           A     Correct.

 9           Q     And please just let me know when you can't

10      see.  I'm a little bit of a distance from -- we've got

11      this screen here.  I want you to be able to see.  But

12      you see where you state that you left because it was a

13      reduction in force and you worked on the 2016

14      election?

15           A     Yes.

16           Q     So which was it; was it reduction in force

17      or did you leave to work on an election?

18           A     There was -- I left because there was a

19      reduction in force and then I started volunteering

20      with the 2016 election.  There was a reduction in --

21           Q     Okay.  So you didn't --

22           A     It was -- there was a layoff at Deloitte,

23      which layoffs happen all the time, and I was laid off.

24           Q     So was everybody laid off?

25           A     There were -- the people I kept in touch

 1    with from Deloitte said that it was called the

 2    bloodbath.

 3         Q    But you were --

 4         A    'Cause Deloitte --

 5         Q    -- one of the ones that was --

 6         A    I -- I was one of the ones that was let go.

 7    And if you -- I mean, it's -- it's a thing that

 8    happens in business.

 9         Q    While you were at Deloitte, were you ever

10    disciplined?

11         A    No.

12         Q    Did you ever get negative reviews?

13         A    No.

14         Q    Did you have problems with any of your

15    supervisors there such as what you talked about at

16    your prior job?

17         A    No.  I enjoyed my time at Deloitte.

18         Q    Did you ever file a grievance?

19         A    No.

20         Q    Did you ever make any allegations of

21    harassment or discrimination against anybody at

22    Deloitte?

23         A    No.

24         Q    Did you collect unemployment benefits after

25    you left Dixon Hughes?

1       A    I believe I did for the period before -- I
2   don't -- I don't remember.  I don't remember.
3       Q    Okay.  Did you collect unemployment benefits
4   after Deloitte?
5       A    Yes.
6       Q    And you can't collect unemployment benefits
7   if you leave voluntarily, correct?
8       A    Yes.
9              MS. BATEMAN:  I'm going to object to
10  asking the witness a question that requires a legal
11  conclusion.
12             MS. JOHNSON:  All right.
13  BY MS. JOHNSON:
14      Q    So the next place that you worked was The
15  Washington Post, correct?
16      A    Correct.
17             MS. JOHNSON:  And, Court Reporter, if
18  you could, the part about The Washington Post starts
19  two pages over.
20  BY MS. JOHNSON:
21      Q    And your job there was financial analyst,
22  correct?
23      A    Correct.
24      Q    And then you worked there from February of
25  2017 to July of 2017, correct?

1      A    Correct.

2      Q    And so you left Deloitte in July of 2016,

3  correct?

4      A    Correct.

5      Q    And then you started at The Washington Post

6  in February of 2017?

7      A    Correct.

8      Q    Do I have that right?

9      A    Correct.

10     Q    So you were unemployed for several months at

11  least, correct?

12     A    That is correct.

13     Q    And you collected unemployment insurance

14  during that time?

15     A    I believe so.  I'll have to go back and look

16  at records.

17     Q    Okay.  Did you come back and live with your

18  family in North Carolina during those months?

19     A    No, I stayed in DC.

20     Q    And so you only worked at The Washington

21  Post for several months; is that correct?  Five months

22  approximately?

23     A    Yes.

24     Q    Right.  And it states here on your

25  application that you submitted to UNC that the reason

1    you left was because you wanted to leave Washington,

2    DC, and move back to North Carolina with -- family is,

3    correct?

4         A    Correct.

5         Q    And that's not accurate, though; is it?

6         A    I -- I do not want to get -- I did not want

7    to get into the details of The Washington Post.

8         Q    You were terminated from The Washington

9    Post, correct?

10        A    I -- I complained at The Washington Post

11   about -- to a safe -- they had -- they had phone

12   numbers in the break room; if your boss is harassing

13   you, call this number.  And I called that number,

14   talked to the helpline, and then was asked to resign.

15        Q    All right.  But let me just ask you this

16   question and then I want to talk a little bit more

17   about Washington Post.  But on your application for

18   UNC, you said that the reason you left was because you

19   wanted to leave DC; you do not indicate that you were

20   terminated, correct?

21        A    Correct.

22                  MS. BATEMAN:  Well, objection.  She

23   didn't testify she was terminated.  She testified that

24   she was asked to resign.  So that's assuming facts not

25   in evidence.

1              MS. JOHNSON:  All right.  Well, then,

2      if we could, Court Reporter, can -- pull up Exhibit

3      Number 3, the interrogatory?

4              MS. JOHNSON:  And if you could go to

5      page 21 -- actually, page 20.  I'm looking for

6      number 23, which is at the bottom of page 20.  If I

7      can read the question.

8                  There it is.  All right.

9      BY MS. JOHNSON:

10         Q    So the question on the interrogatories that

11     you completed or that were produced to me, it says:

12     have you ever filed a grievance or a discrimination or

13     harassment complaint (formal or informal) against any

14     other educational institution, employer, or fellow

15     employee, state the date of the complaint, the

16     individual or entity to whom you made the complaint,

17     the individual(s) whose conduct you reported in the

18     complaint, and a summary of the allegations against

19     the subject of the complaint.

20             MS. JOHNSON:  And that goes on to the

21     next page, Court Reporter.

22     BY MS. JOHNSON:

23         Q    And do you see your response?

24             MS. JOHNSON:  If you can scroll up a

25     little bit, Court Reporter, to show the response on

1    page 21?

2    BY MS. JOHNSON:

3         Q    Your response is:  when I was at The

4    Washington Post, myself and nine other BIPOC were

5    mysteriously terminated within a six-month period.  Do

6    you see that?

7         A    Correct.

8         Q    So you were terminated from that position,

9    correct?  According to your discovery responses.

10        A    I don't remember the -- the details of the

11   termination, but yes.

12        Q    All right.  So your application, then, that

13   you submitted to UNC was not correct on that point,

14   correct?

15        A    I -- in -- in job applications, it is

16   customary and advised to always put a -- get into

17   details if you are asked later, but you answer job

18   applications in a -- in a way that is presenting

19   your -- your best foot forward and then you give

20   details.  I can't --

21        Q    Well, how would they know --

22        A    -- I cannot put in a job application that

23   was a part of a group of people -- of people of color

24   who were terminated on a job application.  And I did

25   want to -- I did want to move back to North Carolina

1     and I did move back to North Carolina the week

2     following this event.  But I had to put my best

3     forward on a job application and that is what I did.

4         Q    So Ms. Khazanie, though, they -- opportunity

5     to -- you about the termination because they didn't

6     know about it, correct, when you interviewed at UNC?

7         A    Correct.  But that was a blip in time over

8     my career.  It was a short --

9         Q    Did you -- sorry.  I didn't mean to

10    interrupt you again.  It's this remote --

11        A    It was a very short period of time in my

12    work history and I don't think that it was at all

13    indicative of my -- my ability to work and my ability

14    to have knowledge about performing as a high level

15    financial analyst.

16        Q    So did you clarify during the interview

17    process that you had actually been terminated at The

18    Washington Post?

19        A    I was never asked about my time at The

20    Washington Post during my interview.

21             MS. JOHNSON:  Can you, Court Reporter,

22    go back to Exhibit 4?

23             Thank you, Court Reporter.  The very

24    last page of Exhibit 4.

25    //

1    BY MS. JOHNSON:

2        Q    Do you see that paragraph that says

3    "certification"?

4        A    Yes.  I hereby certify that all information

5    included is true and complete to the best of my

6    knowledge and belief.  And I signed it at 3:40 in the

7    morning.  My -- my -- I wanted to move back to North

8    Carolina.  I wanted to be closer to my family.  My

9    parents were getting older; my father was having

10   health issues.

11           And moving back to North Carolina was

12   definitely something that I was trying to do.

13   And -- as opposed to getting into the details of

14   everything that happened in Washington, DC, I was

15   focused on trying to move back -- Carolina.

16       Q    So at The Washington Post, what you state

17   in -- well, what you were just testifying to is that

18   you said you made some sort of phone call and

19   indicated that somebody was harassing you; is that

20   correct?  What were you testifying to a little while

21   ago and that you got asked to leave after you made a

22   phone call?

23       A    Yes.  That was -- that was prior to -- when

24   I was at The Washington Post, as I wrote in my

25   deposition or in my responses, that there was a group

1     of people that were just being harassed; I was in that

2     group of people.

3              And I was not protected by the union and I

4     called the helpline that says if you are having

5     issues, please call that number.  It is very similar

6     to my going to Steve Ragan in this case and saying

7     that I don't like the way that my employer is treating

8     me.

9              And I felt that I was protected by human

10    resources to make that concern known.  And as opposed

11    to being protected, I was retaliated against.

12        Q    And did -- well, let me ask you this, so

13    what type of harassment did you suffer at Washington

14    Post?

15        A    I would have to go back and read the notes

16    from then.  It has been a while.  But it was -- it was

17    not good enough to want to stay.

18        Q    Well, but you just indicated that it was

19    similar to what you experienced at UNC --

20        A    Yes.  Because the --

21        Q    -- we have a right to --

22        A    Because when you have -- when you have a

23    boss -- and in this case, this case is about Katie.

24    When you have a boss that bullies you and makes

25    comments towards you and is unkind to you and does not

1    give feedback to you, there is no recourse for people

2    to tell anyone about that.

3              And in this case specifically, I put every

4    bit of knowledge I had from past jobs towards this.  I

5    knew what I was doing.  And when I asked for feedback,

6    I was not given feedback.  When I produced work --

7         Q    Okay.  I'm talking about The

8    Washington -- oh, sorry.  I'm talking about The

9    Washington Post.  I just want to make sure the

10   record's accurate.  Are you talking right now about

11   The Washington Post?

12        A    I don't remember exactly what happened at

13   The Washington Post, but I had a very cruel boss at

14   The Washington Post.

15        Q    Well, was your boss female or male?

16        A    Female.

17        Q    Did you --

18        A    And she had --

19        Q    Go ahead.

20        A    She -- she got rid of every person of color

21   in that group.

22        Q    So how was she mean to you?

23        A    She -- she was just -- I don't know what

24   details you're trying to get out of this.

25        Q    Well, what were your allegations against

1    her?  I mean, it sounds like it --

2          A    She could not --

3          Q    -- was a big event --

4          A    She could not -- she could not find a sheet

5    of paper one day.  And as opposed to just looking in

6    her desk, she started screaming that I stole from her,

7    which there are cameras all over The Washington Post.

8    And I said, "I don't know what you're talking about.

9    I'm just sitting at my desk."  And I said --

10         Q    Do you recall anything else?

11         A    I recall --

12         Q    About --

13         A    I recall her not -- I -- I don't recall all

14   the other details, no.

15         Q    Do you recall any other details?

16         A    No.  I would have to go back and read.

17         Q    What would you read?

18         A    Notes from that time period.

19         Q    Did you file a grievance --

20         A    I filed an EEOC complaint.

21         Q    All right.  Do you have the documentation

22   for your EEOC complaint?

23         A    No, I do not.  Not --

24         Q    Did you --

25         A    Not readily --

1          Q     Sorry.  Thanks.  Did you allege

2    discrimination in that case, in your EEOC charge?

3          A     I think that is the nature of EEOC.

4          Q     Okay.  What kind of discrimination did you

5    allege in your charge?

6          A     I believe it was racial.

7          Q     All right.  And do you recall what her name

8    was?

9          A     No, I don't.

10         Q     Was her first name Sarah?

11         A     Could be, yes.

12         Q     Did you ever Google and look her -- while

13   you were on your work computer at UNC?

14         A     I don't remember.

15         Q     If you were Googling her and looking her up

16   on your UNC computer, that wouldn't have been related

17   to a work project at UNC; would it have?

18         A     No, I don't remember.

19         Q     Okay.  But you think her first name might be

20   Sarah?

21         A     That sounds possible.

22         Q     All right.  So you indicate that nine other

23   employees were also terminated at the exact same time

24   as you?

25         A     It's not the exact same time.  I said over a

 1     period of time.

 2          Q     All right.  And what was the -- and I'm

 3     trying to move this along, but this stuff -- I do have

 4     a right to ask you about these things.  What was the

 5     outcome of your EEOC charge and your EEOC complaint?

 6          A     I believe there were no findings.

 7          Q     Were you ever disciplined at Washington

 8     Post?

 9          A     Not disciplined, no.

10          Q     You were terminated, though, right?

11          A     Yes.

12          Q     Were reasons given to you as to why they

13     were terminating you?

14          A     I don't remember.

15          Q     So you don't recall?

16          A     I don't recall the exact reasons.  But

17     I -- I -- said that it was -- I -- I told -- it felt

18     like retaliation, which is exactly how I feel right

19     now.  That if you speak to -- power, if you tell

20     anybody that your boss is unkind, you get -- somebody

21     like you -- an attorney comes.

22              And they -- or some sort of legal action

23     comes that proves that you were not telling -- or

24     tries to prove that you were not telling the truth.

25     In the news, you see all these great stories about

1    people that came up and said something and spoke up

2    and whistleblowers, but if you try to blow a whistle,

3    there's a person like you that says, "That's not

4    okay."

5             And it's -- it's really -- it's really sad

6    and it makes -- it -- it's just -- it's really

7    disappointing.

8        Q    Well, Ms. Khazanie, this case is not about

9    me; this case is about the claims that you've made.

10   And you do understand that defendants have a right to

11   defend themselves against allegations, correct?

12       A    I understand that I -- I -- it's not -- it's

13   not fair that they're --

14       Q    And you --

15       A    Continue.

16       Q    You're talking about me personally.  You and

17   I have never met before today, correct?

18       A    Correct.

19       Q    So did you have a lawyer assisting

20   you -- and I don't want to know anything you and your

21   lawyer talked about.  Did you have a lawyer assisting

22   you in your EEOC complaint against The Washington

23   Post?

24       A    No.

25       Q    So your next job after The Washington Post

 1    was with Credit -- another name I have trouble with.

 2    Credit "Suisse"?  Is that how you say that?  Credit

 3    Suisse?  How do you say that, Ms. Khazanie?

 4         A    Credit Suisse.

 5         Q    Suisse.  Okay.

 6              MS. JOHNSON:  If we could go back now

 7    to Exhibit 4, Court Reporter, to the page that says

 8    Credit "Suisse"?

 9              THE WITNESS:  Suisse.

10              MS. JOHNSON:  Suisse.  Apologize.

11              THE REPORTER:  Sure thing.  One moment.

12    BY MS. JOHNSON:

13         Q    All right.  So do you see -- right.  So you

14    indicate that you started at Credit Suisse -- when did

15    you start at Credit -- oh.  You started January 8,

16    2018, correct?

17         A    Correct.

18         Q    So there was, again, several months

19    in-between the time you worked at Washington Post

20    until the time you worked at Credit Suisse, correct?

21         A    Correct.  I signed with Credit Suisse in the

22    fall.

23         Q    Okay.  And did you collect unemployment

24    benefits after Washington Post?

25         A    No.

1          Q    Did you collect unemployment benefits after

2     you left UNC?

3          A    I did.

4          Q    Okay.  So Credit Suisse, when they ask you

5     on this application if they could contact them you

6     said "no," correct?

7          A    Correct.  'Cause I was still employed.

8          Q    Right.  And you state that the reason you

9     were looking for a job is -- down there, you say:  I

10    was looking for a better work life balance.

11    Investment banking hours are very long (often hitting

12    75 hours a week); is that correct?

13         A    [No audible response.]

14         Q    Is that what you stated on there?

15         A    Correct.  Yes.

16         Q    Sorry.  We have to verbalize our responses

17    for the transcript.  On the very next page of this

18    application --

19                    MS. JOHNSON:  Court Reporter?

20    BY MS. JOHNSON:

21         Q    -- you list out job duties -- Credit Suisse?

22         A    Correct.

23         Q    Is that an accurate description of what you

24    were doing there?

25         A    Yes.

1      Q    And you stayed at Credit Suisse for about a

2   year before you started looking for another job?

3      A    Correct.

4      Q    All right.  Were you ever negatively

5   reviewed at Credit Suisse?

6      A    No.

7      Q    Were you ever disciplined?

8      A    I was not disciplined.

9      Q    Did you ever file any grievances?

10      A    I did file grievances because I had a

11   difficult situation there.

12      Q    And what was your difficult situation?

13      A    I had a new vice -- I was an assistance vice

14   president.  They brought in a new vice president from

15   India who was given company transportation for 30

16   days.  After 30 days, he did not know how to drive and

17   asked me to pick him up and drop him off every day,

18   and I did so for a week.

19           Then he asked me to continue to do it and I

20   did it for several weeks because I felt very

21   pressured.  And then one day he asked me to come up to

22   his apartment and I said, "No."  And when we were at

23   work, he would yell at me and intimidate me and say

24   disparaging things about my appearance and it was

25   harassment.

1          And I reported it to Credit Suisse, who then

2     decided that every morning -- because he was harassing

3     me in front of others -- that we had to meet with the

4     director present and watching all of our interactions.

5     And ultimately, I was given a different reporting

6     structure.  I no longer had to report -- and I had --

7          Q     Okay --

8          A     Yeah.

9          Q     Go ahead.  Sorry.

10         A     That -- that's --

11         Q     And what were --

12         A     That is what happened.

13         Q     Were you upset with the manner in which that

14    was resolved?

15         A     I was happy that I no longer had to report

16    to him.  It was very difficult to be sexually harassed

17    and that was why I started looking for different jobs.

18         Q     Did --

19         A     And I also worked 'til -- very late nights,

20    which is why I applied for this job.  And you can see

21    that the timestamp on my application was 3:40 a.m. and

22    that was after work.

23         Q     Was that a written formal investigation,

24    your sexual harassment complaint?

25         A     Yes.

1          Q    And did you allege any type of

2    discrimination in that complaint?

3          A    No.  It was -- I don't remember exactly, but

4    I did write that it was sexual harassment and that it

5    was intimidation that he had -- that I had to pick him

6    up and drop him off; that's not at all in my job

7    description.

8          Q    Who was your supervisor at Credit Suisse?

9          A    My director was Linda Wastie.

10         Q    Any other complaints or allegations that you

11   had made against any employees at Credit Suisse?

12         A    No.

13         Q    And then you worked at UNC after Credit

14   Suisse, correct?

15         A    Correct.

16         Q    And my understanding is that you started at

17   UNC on January 14, 2019; is that correct?

18         A    [No audible response.]

19         Q    I'm sorry?

20         A    Correct.

21         Q    Yeah.  You just have to -- for the court

22   reporter, just make sure we're verbalizing out loud

23   our answers.

24              And then your UNC position ended January 6,

25   2020, correct?

1          A     Correct.

2          Q     All right.  When did you -- what was your

3     very next job?

4          A     After leaving UNC?

5          Q     Correct, yes.

6          A     I was hired by Pendo.

7          Q     And what was your start date at Pendo?

8          A     January 4, I believe, 2021.

9          Q     Of what --

10          A     2021.

11          Q     All right.  And did you sign on with them

12     beforehand?

13          A     I did.  I signed on in December.

14          Q     All right.  But you didn't actually start

15     working until January 2021?

16          A     Correct.

17          Q     On your LinkedIn page -- and if you want to

18     see this --

19               MS. JOHNSON:  Actually, can we pull up

20     Exhibit Number 5?

21               THE REPORTER:  Sure thing.  One moment.

22     BY MS. JOHNSON:

23          Q     Do you see under experience --

24               MS. JOHNSON:  If you scroll down?

25     Okay.

1    BY MS. JOHNSON:

2        Q    -- where it says senior financial analyst

3    and then it has underneath that Pendo?

4        A    Mm-hmm.

5        Q    You have on there 2020 to present, three

6    years; is that not --

7        A    That's just -- that's just how the software

8    works.  I signed in December, which is when I

9    announced it at -- on LinkedIn.  And if you were to

10   put December 2020 and ending January 1, 2021, that

11   would say one year.  It is just how -- how the

12   software works.

13       Q    But you didn't actually start --

14       A    But it's --

15       Q    You didn't start working --

16       A    I don't have months there.

17       Q    Well, you have a year and it's not the year

18   you started working with them, correct?

19       A    It is the date I announced it on my

20   LinkedIn, which was when I signed in December.

21       Q    Okay.  And you're still currently employed

22   at Pendo?

23       A    I am.

24       Q    Did you tell them you resigned or were

25   terminated from UNC?

Page 72

1          A     I do not remember what happened in my

2     interview, but --

3          Q     Well, did you do a written application?

4          A     I did.

5          Q     So you don't recall whether or not you

6     discussed your situation or how you described why you

7     left UNC?

8          A     I -- most of my -- most everybody at Pendo

9     knows what happened at -- knows what happened at UNC.

10          Q     But you can't recall what you put on your

11     application?

12          A     No.  I don't recall the exact application

13     from two years ago -- over two years ago.

14          Q     Do you recall whether or not -- what you

15     told them about why you left Washington Post?

16          A     Pendo is a very forward-looking company and

17     Pendo has -- did not ask me all of these details.

18     Because I think they're -- they're very open about the

19     fact that people switch jobs.  And the important part

20     of our job is whether or not we can do the work and I

21     do the work really well.

22          Q     And so who was your supervisor at Pendo?

23          A     Currently, his name is Jason --

24          Q     Yes.

25          A     -- Jason Blaszczak.

1      Q     Have you ever been disciplined at Pendo?

2      A     No.

3      Q     Have you ever received any negative reviews?

4      A     No.  I was just promoted at Pendo.

5      Q     Have you ever filed any grievances at Pendo?

6      A     No.

7      Q     Have you made any allegations of

8   discrimination or harassment against anybody at Pendo?

9      A     No.  I've loved my time --

10     Q     And what is your salary at Pendo?

11           THE WITNESS:  Valerie, do I have to

12   answer that?

13           MS. BATEMAN:  You do.  I'm sorry.  It

14   goes to your damages.

15           THE WITNESS:  It is $126,000.00.

16   BY MS. JOHNSON:

17     Q     And has your salary been the same the whole

18   time?

19     A     No.  I --

20     Q     What did --

21     A     I --

22     Q     What'd you start with?

23     A     106.

24     Q     All right.  And then have you gone up to 126

25   or was that with your promotion that you got the bump?

1        A    I went up to 115 and then I went up to 126

2    as of this past week.

3        Q    Oh, well congratulations.  What was your

4    position when you started?

5        A    It's -- I have not changed my LinkedIn.  It

6    is now a manager position.

7        Q    Okay.  Just for the record, what was your

8    title when you first started?  I'm just trying

9    to -- what your titles have been at Pendo?

10       A    Financial analyst.

11       Q    And then when -- you were first financial

12   analyst and then did your title change at any time?

13       A    Now, it is -- I need to update my LinkedIn;

14   I haven't touched it.  But it just changed to manager.

15       Q    Just to manager or manager -- who do you

16   manage?

17       A    There are two types of manager positions.

18   You can -- I think in the system it's called senior

19   financial analyst II.  It is a manager of FP&A, of

20   financial planning and analysis.  It is a -- it is an

21   IC manager -- which means individual

22   contributor -- only we have a small team, so I do not

23   manage any people.

24       Q    All right.  I want to start talking to you

25   now about the UNC position.  We've been going about an

Page 75

1     hour, so I do think it's a good idea for everybody to

2     just stand up for two minutes every hour or so.  But I

3     think we are making some progress here, Ms. Khazanie.

4                    MS. JOHNSON:  So if we can just take a

5     two-hour -- two-hour? -- a two-minute -- obviously, I

6     need a break -- two-minute break and then we'll return

7     in two minutes, everybody?  Court Reporter?

8                    THE REPORTER:  All right.  The time is

9     11:51 a.m.; we are now off the record.

10                   (Off the record.)

11                   THE REPORTER:  The time on the monitor

12    is 11:57 a.m.; we are now back on the record.

13                   MS. JOHNSON:  All right.  If you could

14    pull up Exhibit 4 real fast one more time, Court

15    Reporter, the UNC application?

16                   THE REPORTER:  Sure thing.

17                   Pulling up now.  Just let me know what

18    page you want me to put it on.

19                   MS. JOHNSON:  If you could actually go

20    the second page?

21                   And scroll down to the bottom where it

22    says voluntary demographic data.  The very bottom.

23    Yes.  There you go.

24    BY MS. JOHNSON:

25          Q    Ms. Khazanie, do you see where it -- race

1    and it has "Asian"?  Is that just a typo on your part?

2         A    There is no -- there is no -- if you look at

3    the phrase "Asian," it -- anytime in you -- when you

4    pick on a -- on a application, Asian includes the

5    Indian subcontinent.

6         Q    Okay.  All right.  Just wanted to clarify

7    that.  And then -- back to -- and I don't think we

8    need to scroll for this.  But you indicated on your

9    application that your supervisor at Credit Suisse was

10   Linda Wastie; is that correct?

11        A    She was my director, correct.

12        Q    Did you have a good relationship with her?

13        A    Fantastic.

14        Q    All right.  All right.  And on your

15   application, you list your core -- at the very

16   end -- well, actually, hold on one second.

17             So on the second to the last page of this

18   exhibit --

19             MS. JOHNSON:  If you could scroll down

20   to that, Court Reporter?  The second to the last page.

21   BY MS. JOHNSON:

22        Q    And I'm not going to have you read that onto

23   the record to -- move this along.  But, Ms. Khazanie,

24   were those answers to the supplemental questions, were

25   they truthful and accurate descriptions of some of

1    your skills and abilities and experience?

2         A    Yes.

3              MS. JOHNSON:  All right.  And then,

4    Court Reporter, if you could pull up Exhibit

5    Number -- I believe it's 13.

6              (Exhibit 13 was marked for

7              identification.)

8              THE REPORTER:  One moment, please.

9    BY MS. JOHNSON:

10        Q    Ms. Khazanie, do you recall that when you

11   submitted your application to UNC you also -- at the

12   same or throughout the interview process submitted a

13   CV?

14        A    Yeah.

15        Q    And is Exhibit 13 the CV that submitted?

16        A    Probably.  Like I said, it was at 3:00 a.m.

17   four years ago.

18        Q    Right.

19             MS. JOHNSON:  And if you could, Court

20   Reporter, turn to the second page?  At the end there

21   where it says "core competencies."

22             THE WITNESS:  Yes.

23   BY MS. JOHNSON:

24        Q    Ms. Khazanie, could you just read the first

25   two bullet points?

1          A     Data management and budget forecasting and

2     analytics - Excel, SQL, Oracle, Hyperion/Essbase, SAP,

3     and Tableau.

4                And then accounting, audit, and finance

5     (eight years) - financial statement audit and

6     financial projections and modeling.

7          Q     And these were core competencies that you

8     had at the time you applied to UNC, correct?

9          A     Correct.

10         Q     I'm sorry?

11         A     Correct.

12         Q     Did you -- yeah.  So how did you hear about

13    the job -- UNC?

14         A     I think I just searched on LinkedIn or a job

15    posting.  I don't -- I don't remember exactly.  I know

16    I saw it somewhere online.  No one told me about it.

17                MS. JOHNSON:  We can take the exhibit

18    down for now.  And actually, can you pull up Exhibit

19    Number 6?

20                (Exhibit 6 was marked for

21                identification.)

22                THE REPORTER:  Sure thing.  One moment.

23    BY MS. JOHNSON:

24         Q     Ms. Khazanie, have you -- when you were

25    reading about the job and making the decision to apply

1    for it, do you recall reading a description of the

2    position that you were applying for?

3         A    Yes.

4         Q    And the position that you were applying for

5    was senior financial analyst, correct?

6         A    Correct.

7         Q    So you knew it was a senior position,

8    correct?

9         A    Correct.

10        Q    And do you recall if you ever saw this

11   description form of it?

12        A    I've -- I had never seen this --

13        Q    I apologize.  I'm having a little bit of

14   trouble hearing you.  What did you --

15        A    I said -- I said I had never -- I had never

16   seen this form.

17        Q    All right.  But were you aware that the

18   position was an advanced level --

19        A    Yes.

20        Q    -- required advanced level analysis and

21   modeling?

22        A    Yes.

23        Q    And were you made aware either in whatever

24   materials you reviewed or through the interview

25   process that they wanted the person who was ultimately

1    placed in the position to operate at a high level of

2    autonomy?

3         A    I assumed that's for all positions.

4         Q    But particularly for a senior position,

5    correct?

6         A    Correct.  And Katie regularly praised me

7    about how amazing my skills were and how good the work

8    was that I was doing.

9         Q    Did they tell you that one of the reasons

10   that they needed somebody to be in this spot was

11   because Katie was not able to do all of the work on

12   her own and needed somebody to work independently with

13   her to help her do these projects?

14        A    I don't remember the exact wording they

15   used, but that sounds very similar.

16        Q    And did you understand that you were going

17   to be asked to independently generate, manage, and

18   analyze financial models?

19        A    Which I did on a regular basis and I

20   produced dozens of financial models independently.

21        Q    And can you look down at -- can you just

22   actually -- you say you've never seen this particular

23   form.  But could you read on page 2 of 5 where it says

24   down there description of work duties and

25   responsibilities onto the next page?

1          A     Okay.

2          Q     Do you agree that those were what you were

3     told and what you understood your duties and

4     responsibilities to be?

5          A     I mean, this is a -- I've never seen this

6     description before, but this is what I did.

7          Q     Okay.  So I'm just asking you, is that your

8     understanding of what your duties and responsibilities

9     were while you were at UNC?

10          A     Yes.

11          Q     And would you agree that it was a senior

12     position?

13          A     Yes.

14          Q     And advanced skills were required?

15          A     Yes, which I had.

16          Q     Did they ever -- were you ever informed that

17     it -- new position that they were starting?

18          A     I asked that in my interview process.  I

19     said, "I want to know if this is a new position or if

20     you have a high turnover here."  And she said -- Katie

21     said that it was a new position.

22                And when I got to UNC, the people around the

23     floor would say things like, "Oh, that's the revolving

24     door.  Katie has gone through several people before

25     you.  That office never has the same person for a long

```
1     period of time."
2           Q    But you were told that this -- new
3     position --
4           A    From Katie.  Katie was the only person that
5     told me it was new position.
6           Q    All right.  If you could look on page 2,
7     please, under change in responsibilities?  Number 5 on
8     page 2.
9                Do you see where it says -- a couple
10    sentences in, it says:  the school does not currently
11    have any individuals working at this advanced level of
12    financial modeling and analysis, other than the
13    assistant dean for finance and business; do you see
14    that?
15          A    Yeah.  I had never seen this description
16    before, but --
17          Q    Well, would you agree that -- other than
18    Katie, was there anybody on the finance team that was
19    working at what your level was expected to be working
20    at?
21          A    No.
22          Q    Okay.  So basically, your job was very
23    unique on the finance team, correct?
24          A    Correct.  Correct.
25          Q    Yes.  Thank you.  And do you recall one of
```

1      the things that you had input in your application is

2      that you had advanced skills and experience, correct?

3           A    Correct.  Which I did.

4           Q    And you had indicated in there you had

5      "Tableau" -- am I saying that correct?  Tableau.  How

6      do you say that?  Tableau skills?

7           A    Correct.

8           Q    And in fact, I think you had it in your

9      application that you were an instructor in Tableau

10     when you were at ECU, correct?

11                    MS. BATEMAN:  I'm going to object

12     because that's not what it says.  So that assumes

13     facts not in evidence.

14                    MS. JOHNSON:  All right.  Well, I

15     believe we already read what it said.

16                    MS. BATEMAN:  Well, if we could go back

17     to what it says.

18                    THE WITNESS:  That -- I -- I --

19                    MS. JOHNSON:  Yes.

20                    THE WITNESS:  I'd like to emphasize

21     that Tableau is a presentation software; it is not a

22     software that uses -- that uses data in the way that

23     it -- you are thinking.  You have to manipulate data

24     in Excel and then import it into Tableau.  It is a

25     presentation software.

Page 84

1            And I do have Tableau skills and I

2     created Tableau reports and I would show them to

3     Katie, who admittedly did not know how to use Tableau.

4            The other thing is that in this

5     description it says here that I am going -- I'm -- my

6     description is to give data to the dean, assistant

7     dean for finance, department chairs, and other

8     levels -- senior level leaders.

9            Nobody in that list besides the dean

10    and the assistant dean for finance had a Tableau

11    license.  So Katie asked me to please maintain

12    financial models in Excel so that the chairs could

13    actually open the models and look at them.

14    BY MS. JOHNSON:

15       Q    And going back to your attorney's question

16    about what specifically you said on your application,

17    you say that -- instructor for tutorials using tools

18    such as Excel, Access, and Tableau to produce more

19    succinct and interactive data for financial decision

20    making.

21            MS. BATEMAN:  Can you show her that,

22    please?

23            THE WITNESS:  I -- I recognize it, but

24    what I'm trying to tell you is that me being able to

25    show people how to use Excel, Access, and -- and

1    Tableau ten years prior is correct and I could do that

2    when I was at UNC, as well.

3              What I'm trying to explain to you is

4    that nobody else had that access.  So I could not -- I

5    can sit around and teach you Excel and Tableau all day

6    long, but they had no ability to access the Tableau

7    workbooks.

8    BY MS. JOHNSON:

9         Q    In response to your attorney's request --

10             MS. JOHNSON:  Court Reporter, can you

11   please pull up Exhibit 4?

12             THE REPORTER:  Sure thing.  One moment.

13             What page would you like it at?

14             MS. JOHNSON:  This one's not numbered,

15   so that makes it more difficult.  I think it's the

16   13th page under the ECU part.

17             THE WITNESS:  Yes.  I see it and I --

18   BY MS. JOHNSON:

19        Q    Yes.  Can you just read it?  Your

20   attorney -- wants to be accurate.  Could you read what

21   it says there; the very last sentence?

22        A    Instructor -- tutorial -- tools such as

23   Excel, Access, and Tableau to produce more succinct

24   and interactive data for financial decision making.

25        Q    So Ms. Khazanie, you're saying that you're

1    the only person that had access to Tableau?

2         A    I'm not saying --

3         Q    Is that what you're --

4         A    -- only person.  I'm saying that the

5    department chairs did not have licenses.

6         Q    Katie did, though, right?

7         A    Katie did, I believe, as did --

8         Q    All right.

9         A    And I produced -- several -- several Tableau

10   workbooks.

11        Q    But Katie had access, as well, correct?

12        A    Yes, I believe so.  I never -- I never met

13   with Katie and -- and her logged into Tableau at the

14   same time.  I would show her Tableau on my computer.

15        Q    Okay.  You did discuss your Tableau books,

16   correct, with her?

17        A    I tried to show them to her, but she never

18   dug into them.

19        Q    Is it your testimony that she never met with

20   you to go over your Tableau books?

21        A    Specifically, she never met with me to go

22   over my Tableau books.  She would meet with me --

23        Q    All right.  And --

24        A    -- other things and -- at the beginning and

25   I would try to show her work I had done in Tableau.

1      Q    And that's your testimony here today?

2      A    Correct.

3      Q    Okay.  So again, do you recall who you

4    interviewed with for the position?

5      A    With Katie --

6      Q    For your UNC -- do you recall -- go ahead.

7      A    I remember Katie.  I remember -- I believe

8    her name was Deytia, who was a data -- who was

9    the -- now the dean of the data team.  And she did a

10   technical interview on me with technical --

11     Q    What does that mean?

12     A    They interviewed my technical skills.  She

13   asked me specific technical skills about Tableau and

14   Excel with specific -- cases and I answered all of it

15   with flying colors.

16     Q    So you did represent that you had Tableau

17   experience, correct?  That was your first bullet point

18   core competency that was listed that we had you read

19   out a few minutes ago, correct?

20     A    Correct.

21     Q    And did you indicate that in your interview

22   process, as well?

23     A    Yes.  But I would like to emphasize again

24   that Tableau is a presentation software and we

25   primarily -- 90-plus -- 99 percent functioned in

1    Excel.

2          Q     So you said Katie and then you said somebody

3    performed a technical interview; do you recall

4    interviewing with anybody else?

5          A     Teri Smith.  And I don't remember the last

6    person.

7          Q     Okay.  So there were four people?

8          A     I want -- I think there was -- yeah.  One

9    more person.  I don't remember who it was.

10         Q     All right.  And how long do you recall the

11   interview lasting?

12         A     It had snowed that day and she rescheduled

13   it a couple times.  So I don't remember how long it

14   lasted ultimately.

15         Q     And it was an in-person interview, correct?

16         A     Correct.

17         Q     And all of your time at -- so we can be

18   clear on the record.  All of your time at UNC was

19   pre-COVID, correct?

20         A     Correct.

21         Q     Okay.  And you were told during the

22   interview what was expected of you and what the duties

23   and responsibilities of the position were going to be,

24   correct?

25         A     [No audible response.]

1        Q    I'm sorry?

2        A    Correct.

3        Q    And you were able to ask questions about the

4   job and what was going to be entailed with the job,

5   correct?

6        A    Yes.

7        Q    And you and Katie -- you eventually got the

8   job, correct?

9        A    Correct.

10       Q    But there was a little bit of time before

11  you started; you didn't start -- the next week,

12  correct?

13       A    Correct.  I took a vacation before I

14  started.

15       Q    Okay.  Did they want you to start earlier

16  but you asked if you could start later because you

17  were going on a vacation or how did that work?

18       A    I don't remember the exact conversations of

19  when they wanted me to start.

20       Q    Okay.  And you understood when you accepted

21  the position that it was a probationary -- it would be

22  probationary for a period of one year, correct?

23       A    Correct.

24       Q    And you understand that if you're on

25  probation you can be terminated without cause; is that

1      correct?

2             A    I do not recall that.  I was -- even on my

3      90-day off cycle probationary review, it says that

4      probationary reviews must be completed quarterly,

5      recommended July, October, January, April.

6                    And then it says that the supervisor

7      documents at least a paragraph summarizing the

8      employee's performance so far in the cycle.  And both

9      the supervisor and employee initial the review.

10            Q    Yeah.  That's not what I asked you.  I asked

11     you, was it your understanding that an employee -- and

12     I'm just asking your understanding.  Was it your

13     understanding that an employee on probationary status

14     could be terminated without cause?

15            A    I did not understand that.  I understood

16     that if anything was a problem, they would discuss it.

17     And then we would -- then there would be action.  So I

18     was never given any -- any discussion or documenting

19     of any --

20            Q    Well, do you recall signing conditions of

21     employment?

22            A    I -- I'm sure I signed something.

23            Q    And you were aware that you were going to be

24     on probation for the first year, correct?  You've

25     asserted that in your complaint, right?

1      A     Correct.

2      Q     I'm sorry?

3      A     Correct.

4      Q     Okay.  So do you recall prior to your actual

5 start date that you and Katie actually e-mailed each

6 other about different aspects of working the job?

7      A     Yeah.  I remember we had some back and forth

8 where I asked her if she wanted me to look over

9 anything before I started just so I could get a head

10 start.

11      Q     Do you recall that you asked her about what

12 time the start time for each day was?

13      A     I don't remember.  I would have to go back

14 and see the exchange.

15      Q     Do you recall telling her that you wanted to

16 be able -- did you -- strike that.

17           Do you recall asking her if it was okay if

18 you came in at 9:00 because you were taking a yoga

19 class?

20      A     That sounds correct.

21      Q     Do you recall telling her -- do you recall

22 asking her about clothes; what you were supposed to

23 wear?

24      A     Yes, I do recall that.

25      Q     And what do you recall was said?

1        A    That I needed to dress up.

2        Q    She told you you needed to dress up?

3        A    I would have to go back and see the exact

4    e-mail, but yes.  She said that I would be in a highly

5    visible role and I would have to be business casual, I

6    think is what she said.  But I would have to go back

7    and see the exact wording.

8        Q    Were you upset with having to dress business

9    casual?

10       A    Absolutely not.  I had spent years in -- in

11   finance.  I had a closet of suits, so I was fine --

12       Q    And that's what you essentially told her,

13   too, right?

14       A    Yeah.  I was fine with that.

15               MS. JOHNSON:  All right.  I'd like to

16   pull up Exhibit Number 18, Court Reporter.

17               (Exhibit 18 was marked for

18               identification.)

19               THE REPORTER:  Sure thing.  One moment.

20               MS. JOHNSON:  Thank you.

21               THE REPORTER:  You said Exhibit

22   Number 8?

23               MS. JOHNSON:  18.  Sorry.  18.

24               THE REPORTER:  18.  Okay.

25               MS. JOHNSON:  And, Court Reporter, if

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 92 of 280

1        you can just kind of allow her however much time she

2        needs to read these e-mails.

3                        THE WITNESS:  Okay.

4                        MS. JOHNSON:  I think she -- if you

5        just want to -- yeah.  Thanks.

6                        THE WITNESS:  Okay.  Yes.  Okay.  Okay.

7        These all look familiar.  Okay.  All right.  Okay.

8        I've read it.

9        BY MS. JOHNSON:

10            Q     Ms. Khazanie, are these at least some of the

11       e-mails that you and Katie exchanged before your

12       actual start date?

13            A     Yeah.  I think -- they -- they look

14       familiar.

15            Q     Okay.  And you indicate that -- in terms of

16       start time, you say:  I was going to target by 9:00,

17       but let me know if earlier is better, correct?

18            A     Correct.

19            Q     And then you indicate:  I signed up for a

20       21-yoga immersion with my yoga teacher.  So 'til the

21       end of the month, I have yoga from 6:00 to 7:30 a.m.

22       By the time I go home, change, and battle I-40, I

23       think 9:00 is what I'm expecting.  After that yoga

24       class, I'll try to leave earlier.

25                        Is that what you say?

1          A     Correct.

2          Q     And then she says:  if it's okay, let's talk

3     about the report time on your first day.  I can be

4     somewhat flexible in January, but there are some

5     critical 8:00 a.m. meetings that you'll need to attend

6     in January, correct?

7          A     Correct.

8          Q     And you don't dispute that a supervisor has

9     the right to set dress codes and start times; do you?

10         A     Correct.  And I never once was late for any

11    of those meetings.

12         Q     Okay.  But you were late to work some;

13    weren't you?

14         A     Yes.  Because I-40 is very difficult to get

15    down.  You don't know when there's going to be an

16    accident.

17         Q     Okay.  But -- recall having to be counseled

18    about lateness at times, correct?

19         A     Yes.  And then she also wrote back to me

20    saying, "Supriya, I've seen you change your start

21    times and getting here early and I appreciate it."  So

22    as soon as she told me, I corrected it.  Immediately

23    left over an hour earlier and she congratulated me on

24    doing it well.

25         Q     So just for the record -- so in terms of the

1      school, can you state what the name of the school was

2      that your position was with?

3              A      Gillings School of Public Health.

4              Q      And am I right that it had different

5      departments in the school?

6              A      Correct.

7              Q      And do you remember -- what's your best

8      recollection on how many departments they had?

9              A      Eight -- eight academic departments.

10             Q      And did the departments each have a chair?

11     Is that what you call the head of the department, a

12     chair?

13             A      Yes.

14             Q      And did the -- each of the departments, did

15     most of them or all of them have a business manager --

16             A      Yes.

17             Q      -- as well as a chair?

18             A      Everyone had a business manager.

19             Q      All right.  And then is it true that you did

20     not work for one of the departments, correct?

21             A      Correct.

22             Q      And you were not a business manager,

23     correct?

24             A      Correct.

25             Q      You worked for what's been called the

1    finance team, correct?

2         A    Correct.

3         Q    And we've been -- a different description

4    for the finance team is that it was referred to as

5    a -- administrative unit; is that your understanding

6    of what it was?

7         A    I -- I think they were counted as part of

8    central administrative unit, correct.  They

9    were -- central administrative unit is the -- is just

10   overhead admin for the school.

11        Q    Is it your understanding that the IT

12   department was a central administrative unit?

13        A    I -- I guess they would be counted in there,

14   yes.

15        Q    And how about student affairs; were they a

16   central administrative unit?

17        A    Yeah.  They -- I mean, these were all

18   non-department --

19        Q    Okay.  All right.  All right.  And your job

20   was to work with the departments, correct?

21        A    My job was to work with everything.

22        Q    But you didn't work with student affairs;

23   did you?

24        A    Student affairs did not get a -- did not get

25   an itemized budget; they were part of the overall

1    budget.

2         Q    But you didn't have to work with them in

3    terms of presenting to them or they didn't go to your

4    finance meetings or presentations, correct?

5         A    Correct.

6         Q    All right.  And IT didn't go

7    to -- presentations or financial meetings either; did

8    they?

9         A    Sometimes the IT team did come to the

10   meetings.

11        Q    All right.  But your supervisor was Kate,

12   correct?

13        A    Katie.

14        Q    Right.  The business managers and chairs

15   were not your supervisors, correct?

16        A    Correct.

17        Q    And the IT department for personnel and

18   student affairs were not your supervisors, correct?

19        A    Correct.

20        Q    All right.  You did not report to them from

21   an employment standpoint; did you?

22        A    No.

23        Q    All right.  Can you describe -- what do you

24   recall about the finance team; who made up the finance

25   team?

1          A    There were five people.  Teri Smith.

2          Q    Do you recall what her role was?

3          A    She was senior accountant at the time.

4          Q    And I'm asking you because your case

5     involves discrimination claims, what's your -- of what

6     Teri Smith's -- what she identified as her race?

7          A    White female.

8          Q    Okay.  And then who else worked for the

9     finance team?

10         A    Kate Allison.

11         Q    And what was her position?

12         A    I -- I don't -- some sort of accountant.

13    Junior accountant or accountant.

14         Q    Okay.  And what's your understanding of what

15    race she identified with?

16         A    Female.

17         Q    And then who else worked there?

18         A    Adriana Shephard.

19         Q    And do you recall what her position was?

20         A    Some sort of accountant.  I don't remember

21    what her title was.

22         Q    And do you -- what race did she identify

23    with to your knowledge?

24         A    I'm not sure if it was white or Hispanic.

25         Q    All right.  Well, you wouldn't -- would you

1    dispute if she identified as non-white?

2         A    No.  Because she might -- I don't know if

3    she goes by Hispanic white or Hispanic non-white.

4         Q    Do you know where she was born?

5         A    I want to say possibly somewhere in South

6    America, but I'm not sure.

7         Q    Did she have an accent when you talked with

8    her?

9         A    What do you mean by "did she have an

10   accent"?

11        Q    You know, an accent.  When some people have

12   accents -- non-English speaking -- did she have a

13   non-English speaking accent?  Could you detect any

14   accent when you talked with her?  Foreign accent.

15        A    I think that's a discriminating question,

16   but yeah --

17        Q    Well, we're talking about --

18        A    Yes.

19        Q    Okay.  You could?  So was there anybody else

20   on your team besides Katie?

21        A    No.

22        Q    And the people you just indicated?  So there

23   were two women of color on your team, correct?

24        A    If Adriana --

25        Q    Adriana and you --

1          A    If she identified as --

2          Q    -- correct?

3          A    Yes.  If she identified as that.

4          Q    Okay.  So of the four people that worked for

5     Katie, two were women of color, correct?

6          A    If Adriana identifies, then yes.

7          Q    Okay.  All right.  And what was your working

8     relationship with Teri Smith?

9          A    She was one of the accountants on the team,

10    but she often would come to me for help with Excel.

11    So I --

12         Q    Did you have a good relationship?

13         A    I thought I had a really good relationship

14    with Teri and she would always come to me and ask me

15    if I could teach her new tricks.  And if I did

16    something that was helpful for her, she would come in

17    with a pen and paper and then write notes about it.

18    And she kept a file on her computer that was called

19    Excel tips and -- Supriya's Excel tips and tricks.

20         Q    Um ...

21         A    And she --

22         Q    Go ahead.  Sorry.  I apologize.

23         A    She frequently praised how -- my -- how much

24    my tricks were helping -- be more efficient --

25         Q    Your Excel tricks?

1          A      Correct.

2          Q      Now, you never did any work directly for

3     Teri, though, other --

4          A      I didn't work with -- no.  I only worked

5     with Katie on the team.  I didn't work with --

6          Q      Okay.  Okay.  So no one else on the team

7     reviewed your -- correct?

8          A      No.  But they often would ask me for help

9     with technical issues that they were having and I

10    would help them come up with quick ways of doing their

11    work.

12         Q      Did you ever refer to Teri Smith as your

13    work mom?

14         A      Possibly, yes.

15         Q      And what would you mean by "work mom"?

16         A      She was very close to me, she would ask me

17    how I'm doing, she would come in and hug me.  She

18    would -- she was just very friendly -- extremely

19    friendly.

20         Q      And what was your relationship -- how would

21    you describe your relationship with Kate Allison?

22         A      Kate and I were friends on the team and she

23    and I would walk to our cars together and she would

24    come in and tell me how things were going in her life.

25    And she -- we had a good working relationship.

1       Q     And how about with Adriana?

2       A     We did not speak as often.  She -- she

3    would -- she worked very long hours, as well.

4    And -- but we didn't speak in as much depth as I did

5    with Kate and Teri.

6       Q     Did everybody in the department -- excuse

7    me -- on the finance team work long hours?

8       A     Yes.  Katie was very -- very strict about us

9    working a lot.  She kind of -- she wanted us to be

10   there in-person all the time.  We were the only group

11   that never left early on Fridays.  We were always

12   there 'til 5:30 and later.  And Katie was known to be

13   very tough and make sure that the whole team was there

14   more than the -- 40 hours a week.

15           I believe Kate Allison was limited on how

16   many hours she was allowed to work.  So she would

17   leave after she hit 40.

18      Q     Well, as a professional, there are times

19   when you have to work more than 40 hours a week,

20   right?

21      A     And I had no problem with that.

22      Q     I mean, even if you're a state employee,

23   correct?

24      A     Correct.  And I don't think anyone was

25   disputing whether or not we would work over 40 hours

1      sometimes, but that cuts both ways.  And sometimes if

2      you have worked 'til 7 o'clock the night before or

3      8:30 the night before, it's -- would be nice to leave

4      the next day at 4:30 instead of 5:30 again.

5           Q    But that was a practice for the entire time,

6      correct?  Not just you.  In terms of being expected to

7      work a full day and try to get the work done, correct?

8           A    I -- I don't think anyone was questioning

9      whether or not we were working full days.

10          Q    Okay.  So everybody was working with the

11     same criteria in terms of the hours and times they

12     were working, right?

13          A    I -- yeah -- every -- everyone on Katie's

14     team worked more hours than other people on the floor.

15          Q    Okay.  But you're the only group that was

16     the finance team, right?

17          A    Correct.

18          Q    And you had a lot of work, correct?

19          A    That I had a lot of work?  Yes, I did.

20          Q    Yeah.  The whole team -- the finance team,

21     it was a busy place, right?

22          A    Yes.

23          Q    And there were a lot of people expecting

24     things from you guys at all times, correct?

25          A    Correct.

1          Q     And would it be fair to say that if a
2     department chair wanted something now, they wanted it
3     now; not later?
4          A     And I always provided it.
5          Q     And would it be fair to say that being on
6     the finance team and reporting about all the things
7     y'all reported about that accuracy was incredibly
8     important?
9          A     Yes.  And I was always very accurate.
10         Q     So would you agree, Ms. Khazanie, that your
11    position was a unique position on the finance team
12    itself, correct?  You had a position that none of the
13    other women on the finance team had, correct?
14         A     Correct.
15         Q     And then you would agree that everyone in
16    the finance team, including yourself, had jobs that
17    were unique from everybody else in the school,
18    correct?
19         A     They were different, yes.
20         Q     All right.  You and the business managers,
21    for example, didn't have the same responsibilities and
22    duties, correct?
23         A     Correct.
24         Q     All right.  And are you aware that you were
25    the highest paid person on the finance team but for

1    Katie?

2         A    Yes.  'Cause I had access to -- to financial

3    data --

4         Q    And because -- you were the highest paid

5    because you were a senior level employee, correct?  A

6    senior financial analyst, correct?

7         A    Correct.

8         Q    And the whole time was made up of -- I guess

9    I'll call females, correct?

10        A    Correct.

11        Q    There were no males on the team?

12        A    No.

13        Q    And I think we indicated before that as

14   of -- the team below Katie, 50 percent of them were

15   diverse, correct?

16        A    If Adriana identifies as non-white, yes.

17        Q    And do you know why she wouldn't identify as

18   a non-white?

19        A    Because I have friends that are Hispanic

20   that identify as white.

21        Q    Can you describe the layout of the floor

22   where you worked?  Well, first of all, what

23   floor -- were you in a building?  Was the school

24   self-contained in one building?

25        A    Yes.

1          Q     And then what floor were you on?

2          A     I was on the second floor.  And my

3     office -- Katie had an office and it was -- I'm

4     looking at the -- it was 207 A Rosenau Hall.

5     Two-oh -- suite 207.

6          Q     And so she had an office; did you have an

7     office?

8          A     I did.

9          Q     Was it an office or a cubicle; how did that

10    work?

11         A     I had my own office.

12         Q     And where was it located in connection with

13    Katie's office?

14         A     We shared a wall.

15         Q     So was it right next door is what you're

16    saying?

17         A     Yes.  Yes.

18         Q     Your offices were side by side?

19         A     Yes.

20         Q     Were they in a little suite together or were

21    they just down a long hall?  Does that make sense?

22         A     It was -- it was a suite.  Both Teri and

23    Adriana had cubicles.  And Kate shared an office with

24    somebody from HR and I had my own independent office.

25         Q     Okay.  And again, were you the closest

1    physically to Katie than anybody else on the finance

2    team?

3          A     No, Teri was closer.  Teri -- Teri --

4          Q     Physically closer?

5          A     Teri's cubicle was next to Katie's door.

6          Q     But you were within steps of her office,

7    correct?

8          A     Correct.  But both of our offices --

9          Q     Side by --

10         A     -- had a door.

11         Q     Okay.  All right.  And when you were working

12   in the office -- there were a lot of times when you

13   were both working in your offices at the same time,

14   correct?

15         A     Correct.

16         Q     And you were able to speak with Katie unless

17   she was otherwise occupied, correct?

18         A     At first, that is true.  After -- after July

19   or whenever Todd Nicolet left the School of Public

20   Health, Katie would often work from home for long

21   periods of time; weeks at a time.  And Katie, when she

22   was in the office, would close her door and not open

23   it for anybody.

24         Q     But my question was, you did have access to

25   her when she was there and she was not otherwise

1    occupied, correct?

2         A    Incorrect.  When she would come into the

3    office, she would often have a clear schedule, a clear

4    calendar, but have her door closed and not answer

5    anybody.  So she was not --

6         Q    And I want to talk a little bit more about

7    this later, but while you're on it right now let me

8    just make sure I understand.  You're saying that you

9    never got to talk with Katie in the office after Todd

10   Nicolet left; never?

11        A    I did not say never.  I'm saying that many

12   times she would be in the office, but keep her door

13   closed the full day and not answer anybody.

14        Q    But there were times when you were able to

15   talk to her when she was in the office, correct?

16        A    Sometimes.

17        Q    After Todd -- okay.

18        A    Sometimes; not always.

19        Q    All right.  Sometimes you had official

20   meetings with her, correct, that y'all would schedule

21   and you would meet with her officially, correct, on a

22   scheduled time?

23        A    Not frequently, but occasionally.

24        Q    But it occurred, right?

25        A    It occurred --

1          Q     And then there -- go ahead.

2          A     No, you go ahead.

3          Q     How many times do you think you guys had

4    official meetings where you scheduled them in advance

5    from July on?

6          A     There were months where I did not talk to

7    her for an entire month.  And there were months where

8    I would talk to her once a week or once every other

9    week.  But official meetings did not happen for weeks

10   at a time.

11               I did not have formal meetings with her

12   from -- I would have to give you -- I would need to

13   look at my calendar to -- to be able to tell you.  But

14   we did not have formal meetings towards the end of

15   the -- of my time there.

16         Q     And when you say towards the end, what do

17   you mean?

18         A     Towards the end of my employment at UNC.

19         Q     Well, how many formal meetings do you think

20   you had with her that were scheduled in advance from

21   July on?

22         A     Maybe six.  Six to eight.  I don't know

23   exactly.

24         Q     And you recall, do you not, that you were

25   gone on a two-week vacation in October?

1      A     Correct.

2      Q     And then she took a week vacation right

3   after you, correct?

4      A     I don't recall her vacation, but that sounds

5   possible.

6      Q     So there were three weeks during the fall

7   when y'all were both on vacation, correct?

8      A     I remember my vacation.

9      Q     All right.  Do you remember her mom being

10  sick at times during your employment?

11     A     I remember her mother getting a knee

12  replacement surgery and Teri coming to me asking if we

13  would -- if I would give $20.00 to buy her a gift and

14  I did.

15     Q     Do you recall Katie having to be out some to

16  take care of her mother?

17     A     I only recall her knee being -- her knee

18  being replaced.

19     Q     You don't recall any conversations with

20  Katie about how her mom was doing?

21     A     Her mom was not sick to my knowledge; her

22  mom had a knee replacement surgery early in the year.

23     Q     And she needed assistance from Katie, right?

24     A     At the beginning of the year; not towards

25  the end of the year.  And as I said, Teri Smith asked

1    if I would give $20.00 to buy her a gift for her

2    mother and I said, "Okay."  And I gave $20.00 and

3    they -- we sent her a gift basket of some sort.  And

4    this is not --

5          Q    And are you upset about that?

6          A    No.  I just want to say that there was

7    no -- I want to put it in the record that I was kind

8    to Katie and her mother.

9          Q    And she was kind to you; wasn't she?  At

10   times, at least?

11         A    At the beginning of the time there, she was.

12   And then she completely changed her tune.

13         Q    When according to you did she change her

14   tune, like, when in the course of your employment?

15         A    After Todd Nicolet left and she didn't have

16   any supervision.

17         Q    Can you just tell -- and I just want this to

18   be very general because obviously we're not financial

19   people or accountants.  Can you just describe to me

20   what projects you did and how they sort of changed

21   over the course of the year?  Like was there something

22   you were working on initially and so on?  Can you just

23   sort of give me an overview of your projects?

24         A    There was one -- the big project that I did

25   was an allocation model.  Prior to -- allocation

1    model, the way that Katie explained to me that

2    departments got their funding was that they would each

3    go to Barbara Rimer and lobby her for funds.

4              And they -- "they" meaning Todd Nicolet

5    and -- and Katie and others wanted to create a more

6    fact-based system of how money was going to be

7    allotted to each department.

8              So I created a model that used the inputs of

9    school-based tuition -- how many hours taught and how

10   many full-time students were enrolled and created a

11   hybrid that based on the amount of teaching and

12   students you have in your department would allocate

13   the amount of funding that would go to each

14   department.  And I created --

15       Q    So --

16       A    The other model --

17       Q    So let me just ask you about that.  Is that

18   generally referred to as the allocation model?  I'm

19   just trying to -- so we can try to speak some of the

20   same language here?

21       A    Yes, that's the allocation model.

22       Q    All right.  And Todd and Katie helped you

23   with that project, correct?  You didn't do it

24   completely alone, correct?

25       A    I would meet with Todd and Katie and they

 1    would tell me what they wanted and then I had to

 2    create it.

 3         Q    And how long did that project last?

 4         A    That project lasted most of the year that I

 5    was there.  There were over 38 versions of that model.

 6    So they -- it was an iterative process that we

 7    would -- I would make a version of it and then we

 8    would go to a meeting and present it and then they

 9    would ask for changes.

10              And then I would meet with each of the

11    department chairs and their business manager

12    separately and go through and explain things to them

13    and talk to them about it.  And Katie and Todd and

14    Barbara Rimer in those meetings would present what we

15    had done.

16              And Katie and Barbara Rimer and Todd were

17    very impressed with the model.  At the end of

18    presenting it, I received applause from all of the

19    department chairs.  And everyone was praising how

20    amazing I was doing and how helpful the model was.

21         Q    And Katie and Todd reviewed your work,

22    correct, during that project?  I mean, they would have

23    to, correct?

24         A    They did.  And that was the

25    beginning -- that -- those first few versions were at

1    the beginning of the year and even when these models

2    were sent out to department chairs, Katie would end

3    the e-mail with "many thanks to Supriya for all her

4    hard work on this."

5        Q    Giving you credit, in fact, for your work,

6    correct?  So how long -- so did that take up -- like

7    I'm trying to get an idea, again, in terms of you were

8    there for almost a year.  So how long was the

9    allocation model, the focus of your work -- was it

10   a -- focus until July?  I think we've seen --

11       A    It was -- it was a continuous focus with

12   Katie saying to me "I'm really dropping the

13   mall" -- "ball on training you."  And there was

14   another model I was supposed to make called the MPH

15   UNC model, which Todd really wanted to push on.  Katie

16   was not as keen as pushing on it.

17            And I started creating that model and wanted

18   to have meetings about it and then Katie canceled the

19   meetings for MPH at UNC.  And then there was another

20   set of meetings and that was a --

21       Q    Wait.  Let me ask you -- oh, okay.  Go

22   ahead.  Sorry.

23       A    There was another model I was working on for

24   a compensation analysis, which Katie also suspended

25   the meetings of that.  And I have the e-mails where

1     she says that she wants to put those meetings on

2     hiatus.

3          Q     Did you give those e-mails to your attorneys

4     to produce in discovery?

5          A     I did.

6          Q     Okay.  So the MPH UNC model, when did you

7     get assigned or start working on that?

8          A     I don't remember the exact dates.  I don't

9     have access to my e-mails.

10         Q     Okay.  And then would it be after the

11    allocation model?

12         A     It was during the allocation model, but my

13    emphasis was almost entirely on the -- allocation

14    model.  It was --

15         Q     And you're saying -- oh, sorry.  You and

16    Katie, you're saying y'all never met about the MPH UNC

17    model?

18         A     No.  We didn't meet on -- we didn't present

19    it formally to the group because Katie did not want to

20    keep going with it.  Katie said she was working on

21    budgets.  I don't remember exactly when this was.

22    Sometime in September -- August or September, Katie

23    spent two or three weeks working from home.

24         Q     So she as a supervisor, though, has a right

25    to decide which projects are going to get prioritized

1    when, correct?

2         A    She can decide whatever, but I was

3    producing -- even -- even though she did not want to

4    work on it anymore, I was constantly creating models

5    on the side.  I would come up with different views in

6    Tableau of what kind of drivers were causing increases

7    in tuition; what was causing attrition.

8              I created Tableau stories on the side.  I

9    was showing -- I was showing different ways of

10   presenting the data.  I have all of those models that

11   I would send her.  Like, "Hey.  I had a great idea for

12   something," and I would make a model for it and send

13   it to her.

14        Q    But you were sending her models on projects

15   that she had indicated she didn't want to work on?

16        A    No.  I was sending her more models on top of

17   the allocation model, which I thought would be another

18   way of -- like as you showed in my job description

19   that I was supposed to give advanced ways of looking

20   at data.  I was really trying to show her different

21   ways of looking at data and I would create financial

22   models that would present the data differently.

23        Q    So other than the allocation model -- here's

24   where I'm trying to get an idea.  And you've mentioned

25   an MPH UNC model, which I understand was assigned to

Page 117

1    you for a period of time but then tabled.  What other

2    projects were assigned to you while you were at UNC

3    besides those two?

4         A    I -- that's -- I think we are talking past

5    each other here because I would create models for

6    Katie, like, I created departmental explanations of

7    how -- of how funding was being used and I created

8    a -- a -- another model that shows how -- tuition was

9    being used.

10             I created -- she didn't give me other

11   objectives that she wanted me to complete.  So I

12   completed everything she gave me and then some.

13        Q    So you're saying she didn't assign specific

14   projects to you or tell you tasks to do?

15        A    Correct.  She would not give me more things

16   to do, so I would give her more information and I

17   would create more data and more projects.

18             And I would e-mail them to her and I

19   said -- I even have an e-mail where I say to her that

20   I've built out the fully allocated -- updated

21   allocation model with new census numbers.  "I finished

22   a Q1 report ahead of schedule; could you please review

23   it?"  She did not review it.

24        Q    Are you looking at e-mails right now?

25        A    I'm looking at a -- at some notes I had

1    taken -- I did a fifteen -- I did a -- a ten

2    interactive page Tableau story with four data sheets

3    each.  It's a 15 year view into the school's use of

4    school-based tuition; it had 15 years of student

5    headcounts, full-time enrollment, all calculated by

6    hand.

7           And that was because Katie would give me the

8    information I asked her for in PDF format and it

9    couldn't be calculated.  I compared revenue generated

10   by school-based tuition to headcounts, student aid

11   that was dispersed versus enrollment, how much faculty

12   salary was being paid by department and by year out of

13   the school-based tuition.  And any other --

14        Q    And were these projects she assigned to you?

15        A    She did not tell me what she wanted from

16   Tableau.  So I wanted to give her more data.  She

17   said, "All Barbara wants is data."  And I said, "Well,

18   then let me give you data."

19          And I would -- I made the story, I made the

20   Tableau -- Tableau, when you put together large

21   amounts of information, it is a page and then

22   those -- page feeds into what can be called a Tableau

23   story, which pieces together different information.

24          Each one of these stories has four -- had

25   four data inputs.  So I had to do 40 pages of data to

1    clean this up.  And I created a -- input ten-page

2    Tableau story that gave all of this data.  And

3    she -- I tried to show it to her several times in

4    December and I worked on this for weeks because she

5    was not giving me other assignments.

6              So I had completed all the work she gave me

7    and I did this Tableau story and I tried to show it to

8    her.  And one time she came into my office and she

9    said, "Oh, Barbara won't like this.  I know what

10   Barbara wants."

11   Q    So is it your position -- so my question

12   was -- and I just want to make sure we're clear on

13   this -- what projects you got assigned.  And I think

14   you --

15   A    She did not assign me more -- anything that

16   she assigned me I completed and I would give it back

17   to her.

18   Q    Well, the only projects you've actually

19   identified are the allocation project and then this

20   MPH project; what other projects do you recall that

21   she specifically assigned to you?

22   A    She wanted me to do a Q1 -- she wanted me to

23   do quarterly reports and I did the quarterly reports.

24   Q    Okay.  Any other projects that you can

25   recall that she specifically assigned you?

Page 120

1        A    She told me to -- she would go to department
2    chair meetings and promise them -- promise them
3    detailed explanations of what -- what money they were
4    getting; it was called a departmental walk.  And she
5    said, "I told them I would have it in the next two
6    weeks," she said, "but I don't plan on working" -- "I
7    don't" -- "I don't plan on giving them anything."
8            But I wasn't sure -- and I said to her, I
9    said, "Do you want me to create them?"  And she said,
10   "Yes.  But I'm not going to give it to them for a few
11   weeks."  And that happened in -- that happened in
12   November.
13           And she said -- she -- I -- she -- on
14   November 14, she promised the department crosswalks of
15   their budgets within the next two weeks.  She told me
16   after the meeting she was not even going to think
17   about the department budgets until after Thanksgiving
18   despite having promised them in two weeks.
19           So I completed all of those departmental
20   budgets and I completed the walks.  Because she had
21   promised them to the chairs and therefore I felt that
22   it was my responsibility to have those prepared for
23   her.  Whenever she -- give it to the chairs.
24       Q    When did you say -- you said there came a
25   time where she stopped giving you assignments; when

1    did that start?  When was that time?

2          A    In the fall she stopped giving me

3    specific --

4          Q    Well, what month?  What month?  Because you

5    were gone for two weeks in October and she was gone

6    for one week in October.  But what time in the fall

7    are you saying she stopped giving you assignments?

8          A    On September 18, I sent Katie 13 Excel

9    workbooks to review and I created 5 Tableau workbooks.

10   The e-mail transmitting these documents was -- was

11   sent in my evidence.  And I never received any

12   feedback from her regarding this work product.

13         Q    Well, didn't y'all meet on the 19th or 20th?

14         A    But she didn't talk to me about what I sent

15   her.

16         Q    All right.  What'd y'all talk about, then?

17         A    I don't recall the exact meeting --

18         Q    Okay.  But you met very shortly with her

19   right after that e-mail, correct?

20         A    I do not remember meeting with her in -- in

21   November.

22         Q    It was September.  You just said September.

23         A    October -- you -- you just said that

24   in -- in October we were gone --

25         Q    You just said you sent her an e-mail on

1     September 17 or 18 and that --

2          A     Yes.  I sent her --

3          Q     -- you didn't get feedback --

4          A     I sent -- yeah.  On September 18, I sent her

5     that e-mail.  And then on October 4 I said, "Hi,

6     Katie.  I'm glad you're taking a much needed day off.

7     I've been working independently for the past few

8     months, especially since the allocation model wrapped

9     up.  With Todd no longer here, I haven't had quite the

10    same structure where I was working towards delivery

11    dates.

12               "Though I know this is valuable information

13    that I'm gaining currently, I would like to have a

14    little bit more review and guidance so that I can have

15    some goals and specific product" -- "projects to work

16    towards.

17               "I understand that you have been drowning in

18    deadlines, but I would like to propose that we have

19    weekly standing meetings where we review what I'm

20    working on similar to what you're currently doing with

21    Laura [ph].

22               "I'd also like to create a roadmap of sorts

23    so that I can create personal checkpoints for myself.

24    I know I have potential to provide a lot of value with

25    models and financial information and I'm currently a

1     little stuck 'cause I don't know what's coming up.

2              "I am on vacation starting Thursday and I

3     know you're out when I get back.  If we could start

4     having meetings in November, I'd really appreciate it.

5     Best, Supriya."

6         Q    And you met with her right after that,

7     correct?

8         A    When I returned from vacation, Katie was not

9     in the office, which I was aware of before --

10        Q    So you met with her before -- did you not

11    meet with her before you left for vacation?

12        A    I sent that e-mail before I left for

13    vacation.  So no, I didn't --

14        Q    You sent that e-mail on October 4; you left

15    for vacation on October 10, right?  Or the night of

16    the 10th.

17        A    Yes.

18        Q    You worked on the 10th, correct?

19        A    On the 10th, I independently finished

20    another assignment and asked Katie for review prior to

21    leaving for -- on vacation that evening.  She did not

22    schedule any time with me on her calendar and she kept

23    her door closed and blocked off her calendar.  I left

24    for vacation with --

25        Q    So let me ask --

1          A     -- my work done -- with all of my work done

2     and my timesheets submitted.

3          Q     Is it your testimony under oath that you did

4     not meet with Katie after your September 18 e-mail,

5     that you did not -- are you saying under oath that you

6     did not meet with her on the 18th or 19th or 20th of

7     September?

8          A     I do not -- I do not remember which day I

9     spent with her -- which time I met with her, but she

10    did not go over my -- my -- those workbooks that I

11    sent her.

12         Q     Okay.  And are you saying that she did not

13    respond to your October 4 e-mail?

14         A     Correct.

15               MS. JOHNSON:  Okay.  All right.  So

16    we've been going now -- 1:11.  We've been going for

17    another hour since our last break.  So I do have a

18    couple more hours of questioning.  And so I want to be

19    fair to everybody.  I would like to take a 15-minute

20    lunch break.

21               We're all, I think, in our own homes or

22    locations.  I just need to eat a quick little bite.

23    And my preference would be to take a very short break

24    and then continue on so that we can finish up in a

25    reasonable time on a Friday afternoon.

Page 125

1          But obviously, if people need to take
2     longer than a few minutes, I'm open to whatever the
3     group suggests.
4               Valerie?  You have your head in your
5     hand.  You're on mute.  You're on mute.  There you go.
6               MS. BATEMAN:  Yeah.  Why don't we
7     discuss logistics off the record?
8               MS. JOHNSON:  Okay.  Yeah.  Let's go
9     off the record.
10               THE REPORTER:  Sure thing.  The time is
11     1:12 p.m.; we are now off the record.
12               (Off the record.)
13               THE REPORTER:  The time on the monitor
14     is 1:40 p.m.; we are now back on the record.
15               MS. JOHNSON:  Thanks, everyone, for
16     letting me take that short break.
17     BY MS. JOHNSON:
18          Q    Ms. Khazanie, I want to move on in just a
19     second to your claims in this case and get information
20     about your claims.  But I just want to follow-up on
21     one or two quick things that we discussed right before
22     our lunch break.
23               There was a period of time that you
24     said -- I think you said an entire month where Katie,
25     you said, did not come into the office; what time

1     period was that again?

2          A     She -- for a few weeks she did not come into

3     the office.  I --

4          Q     When was that?

5          A     Budget season.  I don't remember exactly

6     when it was.  Probably September.

7          Q     Okay.  So you're saying in --

8          A     In the fall sometime she was at home for

9     more than two weeks or three -- it was over two weeks

10    she did not --

11         Q     At the same time continuously is what you're

12    saying?

13         A     [No audible response.]

14         Q     Okay.  And your vacation was a two-week

15    vacation in October; was it October -- started on the

16    10th; is that right?  Or you worked the 10th, correct?

17         A     I -- I was on vacation from the

18    10th -- yeah.  I worked the 10th and I was on vacation

19    from end of the 10th through the 27th.

20         Q     And then so was that a Friday?  Did you

21    return on the 29th of October?

22         A     I -- I returned from vacation on the 28th.

23         Q     And do you know -- and you may not -- was

24    that a Saturday or -- when did you return to work,

25    like, what day did you actually return to work, the

Page 127

1     28th?
2          A     It would have to be that Monday.
3          Q     Okay.  All right.  That's what I was
4     wondering.  So when you were at work, did you have
5     your own -- did they provide a computer to you?
6          A     They provided me with a computer, yes.
7          Q     All right.  And then did you ever bring your
8     computer home?
9          A     Yes --
10         Q     What were your --
11         A     -- day.
12         Q     You would bring your computer home almost
13    every day?
14         A     Mm-hmm.
15         Q     Okay.  And did you also have access to a
16    phone, a landline?
17         A     Yes.
18         Q     Did y'all use landlines back then or --
19         A     Not very often.
20         Q     Would you also have your personal phone with
21    you during the workday?
22         A     Yes.
23         Q     Now, you denied in your discovery responses
24    that you did online shopping during the work hours; is
25    that right?

1           A     I --

2                       MS. BATEMAN:  Can you show her the

3      response, Kari?

4                       MS. JOHNSON:  It was a request for

5      admission.  If you could, Court Reporter, pull up

6      Exhibit Number twenty -- excuse me.  It's 2.

7                       THE REPORTER:  Sure thing.  One moment.

8                       MS. BATEMAN:  I mean, I'd be super

9      surprised if anybody denied doing online shopping.

10                       MS. JOHNSON:  I'm going to object if

11      you're trying to answer the question.

12                       MS. BATEMAN:  No.  I just want you to

13      show her what the question and the response were.

14                       MS. JOHNSON:  Hold on.  Let me find it.

15                       THE REPORTER:  I have it up on the

16      screen now.  What page do you need me to go to?

17                       MS. JOHNSON:  Yeah.  Hold on.  Let me

18      find -- so the first part of Exhibit 2 is the

19      supplemental responses.  Further on down, what should

20      be back there is plaintiff's responses to defendants'

21      first requests for admission.

22                       Sorry.  It's taking me a second to find

23      it.

24                       Oh, okay.  Actually, the very last

25      question.  So if you can go to the second to the last

1    page?  All right.

2    BY MS. JOHNSON:

3        Q    Question number 34 says:  admit that you

4    spent an excessive time at work engaged in non-work

5    activities, including but not limited to online

6    shopping and asking coworkers to take photos of your

7    outfits while you were employed with the university.

8    And you answered "denied," correct?

9        A    Correct.

10       Q    Is that your position that you did not spend

11   an excessive -- time at work engaged in activities

12   such as online shopping?

13       A    Correct.

14       Q    Do you recall asking Teri Smith to take

15   pictures of your work outfits, the outfit of the day,

16   to send to your mom?

17       A    It was not a daily thing.  There were a

18   handful of outfits that I wore that were my mother's

19   clothes, so I asked her to take a picture so I could

20   send my mother a picture of me wearing a dress that

21   she wore in the '80s.

22       Q    So do you recall how many times you asked

23   Teri to take pictures of what you were wearing?

24       A    I do not recall how many times, but it was

25   almost always a dress that was my mother's.

1       Q    Okay.  I mean --

2       A    And as --

3       Q    -- was it more than five times --

4       A    -- just now, it was outfits to send to my

5   mom because they were hers.

6       Q    Was it more than five times throughout the

7   year?

8       A    I -- probably about five.

9       Q    Okay.  Were there times when you would go

10  down and talk with the people in the IT department

11  about non-work matters?

12      A    They were very friendly, nice guys.  Yes.

13      Q    And -- there times when you went to student

14  affairs -- spend a lot of time in the student affairs

15  department?

16      A    I would not say a lot of time, but I did

17  confide in them that -- that Katie was bullying --

18      Q    Are you aware that people complained about

19  the amount of time you were spending in other offices

20  with their employees?

21      A    I -- that was never memorialized or said to

22  me.

23      Q    Well, you were -- in your complaint, you say

24  that Katie, you say, criticized you for socializing

25  too much.  So she did mention to you --

1          A    Yes --

2          Q    -- about socializing, correct?

3          A    -- mentioned it to me, but I did not know

4     that other people complained is what your question

5     was.

6          Q    Okay.  All right.  And you would agree that

7     a supervisor, if -- complaints of that nature, has a

8     right to address those, correct?

9          A    Correct.  But I -- I was not given that

10    feedback --

11         Q    Well, you state in your complaint that you

12    were told that you were socializing and not at your

13    desk too much, correct?

14         A    Yeah.  And then I changed that after she

15    told me.

16         Q    Okay.  So --

17              MS. JOHNSON:  I'm sorry.  Valerie, did

18    you say something?

19              MS. BATEMAN:  I did not.

20              MS. JOHNSON:  Oh, okay.  Sorry.  I

21    thought I heard you say something.

22              If we could, Court Reporter, pull up

23    Exhibit 7?

24              (Exhibit 7 was marked for

25              identification.)

1            THE REPORTER:  Sure thing.  One moment.

2    BY MS. JOHNSON:

3        Q    Ms. "Khazanie" --

4            MS. BATEMAN:  Khazanie.  Khazanie.

5            MS. JOHNSON:  Khazanie.  I just -- at

6    least I'm recognizing now when I do that.

7    BY MS. JOHNSON:

8        Q    Ms. Khazanie, I apologize for that.

9    Ms. Khazanie, Exhibit Number 7 is the charge of

10   discrimination which your attorney has used as an

11   exhibit in some of the depositions that she's taken.

12           MS. JOHNSON:  Court Reporter, if you

13   can just scroll down as much time as Ms. Khazanie

14   needs.

15           THE WITNESS:  You can go to the next

16   page.  Yes.  You can keep going.  Okay.  Okay.

17           Yes, I recognize this.

18   BY MS. JOHNSON:

19       Q    Okay.  And, Ms. Khazanie, does that EEOC

20   charge -- well, first of all, did anybody help you

21   prepare that?

22       A    Yes, Valerie.

23       Q    Okay.  And does that EEOC charge of

24   discrimination -- does that accurately summarize the

25   actions and conduct that you complain about in this

1     case -- support of your discrimination claims?

2          A     Correct.

3          Q     All right.

4                     MS. JOHNSON:  And then if you could

5     pull up, Court Reporter, Exhibit Number 8.

6                     (Exhibit 8 was marked for

7                     identification.)

8                     THE REPORTER:  Sure thing.  One moment.

9     BY MS. JOHNSON:

10         Q     And while he's doing that, I'll tell you

11    that Exhibit Number 8 is your SHRA grievance that you

12    filed with UNC.

13         A     Yes.  I recognize this, as well.

14         Q     And when was the last time you reviewed

15    that?

16         A     I looked over parts of it last night.

17         Q     Okay.  And when was the last time you looked

18    at Exhibit 7 -- EEOC charge of discrimination?

19         A     Probably a week or so ago.

20         Q     All right.  And between the two documents,

21    do they accurately describe the -- and allegations

22    that form the basis for your discrimination claim in

23    this case?

24         A     Yes.

25         Q     All right.  Is there anything you've left

1     out of these documents -- an allegation or --

2          A     I -- I'd really -- I -- I'm -- I'm really

3     upset about how much retaliation is coming here.  And

4     I -- I am frustrated that because I went to Charletta

5     and I went to Steve and I went to Janet and I told

6     them how I was feeling -- and if I get emotional, I'm

7     sorry.

8                But I told them how I was feeling.  I told

9     them what she said to me.  I told them that she made

10    comments about "oh, when a man comes to your office,

11    you take your hair down for them."  I told them how

12    she told me -- she blasted to everybody that I was

13    taking a yoga class and singled me out for coming in

14    at 9:15 instead of 9:00.

15               I told them she makes me uncomfortable and

16    makes these comments about how I eat too much and how

17    I am overly social and it was bullying.  It was -- and

18    I'm -- I'm trying not to cry here, Kari, but it was

19    bullying.  That is not how a supervisor speaks to

20    their employee.  It is not.

21               And when I came forward and told the people

22    in power, who were supposed to protect me by the State

23    Human Rights Act, their response was not to protect

24    me, but to go and tell her.  And how is that not a

25    clear cut case of retaliation?  I don't --

1      Q    Okay.  And --
2      A    I don't understand.  And I want that -- I
3   really -- the harassment that she said towards me,
4   the -- the comments she made towards me about how I
5   eat and how my hair looks and what I'm dressing
6   and -- these are not -- this is harassment.
7      Q    Okay.  And my question is -- and I don't
8   mean to make you cry.  I'm just, you know, this is my
9   one opportunity to talk to you about your claims.  But
10  I just -- my question was -- and I definitely want to
11  talk to you in a few minutes about -- interactions
12  with the HR people.
13          But in terms of what you're saying about
14  Katie Thornsvard, is the conduct that you're
15  complaining of -- is it all contained in Exhibit 7 and
16  8?
17     A    The main --
18     Q    Is there anything --
19     A    -- are.  There -- there -- I will not say
20  that there is -- that I have memorialized one year of
21  misconduct in one 18-page document.  There were
22  definitely --
23     Q    So as we --
24     A    Every -- all of the highlights are here.
25  But --

1    Q    Okay.  Sorry.  We're having that remote

2    Geico commercial over and over again.  I apologize.

3           Is there anything, though -- I mean, this is

4    my one chance to ask you questions.  Is there anything

5    that you know of as you sit here today regarding your

6    allegations against Katie Thornsvard -- and we'll talk

7    later about HR -- that are not contained in 7 and 8?

8    A    Retaliation by Katie Thornsvard.

9    Q    Okay.  All right.  And the

10   retaliation -- what are you saying was the

11   retaliation?

12   A    That -- when I went to Steve and Steve told

13   me to talk to Katie and I talked to Katie directly and

14   I said, you know, "When you said that about my hair,

15   it really upset me.  And I talked to Steve and he told

16   me to tell you directly."  And -- said, "I already

17   self-reported that."

18          And she knew that I had talked to Steve.

19   And she knew -- from what I understand, Charletta told

20   her that I also spoke to Charletta.  So she was

21   getting -- Katie was getting direct feed that I

22   confided in people and told them that she was

23   bullying.  So Katie --

24   Q    So did --

25   A    Katie knew and Katie retaliated.

1        Q    But what specific conduct are you saying was
2    retaliation?
3        A    Firing me.
4        Q    Okay.  So when you talked to Katie on
5    November-- do you remember when you -- did you and
6    Katie, was your conversation on November 4, 2019?
7        A    I don't remember which date I had the
8    conversation with her.  It was at the beginning of
9    November sometime.
10       Q    And can you tell me, was that a good
11   conversation?
12       A    I -- I wouldn't say it was a good
13   conversation considering that afterwards she became
14   more difficult to work with.
15       Q    Well, what can you tell me about the
16   conversation?  I mean --
17       A    I don't recall -- I am under oath and I
18   don't recall the exact wording she used in the
19   conversation.  But I was always -- and one of the
20   things that she criticizes me about is that I was too
21   friendly.  So I smiled and I was kind and I said to
22   her, I was like, "You know, it really upset me when
23   you did this.  It really hurt my feelings."
24            I did not get upset.  I did not show any
25   anger.  I told her -- so was it a good meeting?  I

1    only tried to have good meetings with her.  I was

2    never anything but kind.  And she would say things to

3    me like "your" -- "my Excel skills are here, but yours

4    are here" and she would hold her hand above her head

5    and say how strong I was.

6              And I would take the compliments and I was

7    nothing but nice.  So if you ask me whether the

8    conversation was good, it's not like she would be

9    hateful to my face.  The way --

10        Q    Did you feel better --

11        A    Did I feel better?  No.  I went to the

12   bathroom and cried.

13        Q    Okay.  So if we could just pull up --

14        A    Because --

15        Q    Go ahead.

16        A    Because she never said sorry.  Katie never

17   said sorry for any of the things she did.

18              MS. JOHNSON:  Can we just pull up

19   Exhibit Number 17?

20              (Exhibit 17 was marked for

21              identification.)

22              THE REPORTER:  Sure thing.  One moment.

23   BY MS. JOHNSON:

24        Q    Do you recall, Ms. Khazanie, e-mailing Katie

25   the day following your conversation?  Do you recall

1    this e-mail where you say "just wanted to say thank

2    you for talking with me yesterday.  I really

3    appreciated it"?

4        A    I don't recall this, but I might've sent it

5    just to try and smooth things over.  Notice that I

6    initiated the conversation; not her.

7        Q    That's right.  You did initiate it and you

8    thanked her, correct?

9        A    To try and keep things professional because

10   I complained about her and she knew I did.

11       Q    All right.  And then she responds:  of

12   course.  I'm here to support you and you should always

13   feel like you can come talk to me about concerns,

14   correct?

15       A    Yes.  Yes.  And then after me going to her

16   and I was trying to smooth things over and confirm

17   that I was okay telling her that I was uncomfortable,

18   this then led to me being fired.  Do you -- this is

19   clear cut discrimination that I go to her and tell her

20   how I feel.  I then send her an e-mail

21   saying -- allowing me to tell you how I feel.

22            She confirms that she's here to support me

23   and then she fires me.  I -- if --

24       Q    Ms. Khazanie --

25       A    -- and where she says:  I'm here to support

1    you and you should always feel like you can talk to me

2    about concerns -- so when I -- when I ask her -- when

3    I have established here that I have an open

4    relationship with her, that she can -- she and I can

5    talk to each other, then why over the course of my 360

6    or 50-something day employment did she not feel that

7    she could come to me directly and tell me just as

8    openly as I shared with her that "hey, you are not

9    performing and we're going to fire you"?

10              She could've had an adult conversation the

11   same way that I had an adult conversation with her and

12   she could have expressed concerns with me the way I

13   did with her.  And she could have said to me,

14   "Supriya, these are the things" -- "need to

15   improve" -- and then we -- move ahead the way I did.

16       Q    Well, let me just -- I want to talk a little

17   bit more about the --

18                   MS. JOHNSON:  But if you can, Court

19   Reporter --

20   BY MS. JOHNSON:

21       Q    I just want ask you a few more questions

22   about your charges here.

23                   MS. JOHNSON:  Exhibit Number 7.  If you

24   could pull up Exhibit Number 7?

25                   THE REPORTER:  Sure thing.  One moment.

1    BY MS. JOHNSON:

2        Q    I want to just ask you a couple specific

3    questions and I'll kind of go through the whole thing.

4            MS. JOHNSON:  But, Court Reporter, if

5    you could go to the allegations?  It's on the second

6    page.

7    BY MS. JOHNSON:

8        Q    And in the first paragraph, you say:  from

9    January to July when Nicolet was her supervisor, Katie

10   met with me regularly.  So you would agree that from

11   January to July Katie met with you regularly, correct?

12       A    Correct.

13       Q    And then you say:  I was told that Katie had

14   fired several employees; who told you that?

15       A    Multiple people in the department -- in

16   the -- in the --

17       Q    Who?

18       A    -- on the floor.

19       Q    Do you recall names?

20       A    I do not recall names.

21       Q    Do you recall any names of the people who

22   were allegedly terminated?

23       A    No, I don't.  I know there was --

24       Q    Do you know --

25       A    -- held my office before I was there.  And I

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 141 of 280

1    don't remember her name, but she -- I used to get
2    phone calls on my landline for her.  And another
3    thing.
4         Q    Do you know what race the person before you
5    identified with?
6         A    White, I believe.  I don't know.
7         Q    So in the third paragraph where you're
8    talking about training you say:  months rolled by, but
9    I never got meetings to be trained on the university
10   financial systems of how to pull data.  Is
11   that -- testimony?
12        A    She did not train me, so then I -- I found
13   training that was given by the university office and I
14   registered on my own.
15        Q    Okay.  But it -- training that was provided
16   to you when you got there, correct?
17        A    Not when I first got there; it was taken
18   later.  And Katie did not -- Katie did not find this
19   training for me; I found it myself.
20        Q    So nobody from the university helped
21   you -- training at first?
22        A    No, I found that training.  Because I went
23   to UNC, so I knew where to find it.
24        Q    Okay.  And it says:  I was completely
25   self-taught; is that correct?

Page 143

1        A     On university systems, on how to pull data,
2    on -- on how things worked, yes.  I would have to come
3    up with -- graphs on my own.  She did not train me.
4    And she even said "I'm really dropping the ball on
5    training you."
6        Q     And you also talk about a person named
7    Latasha -- say she was given no training by Katie?
8        A     Latasha started right around the same time
9    as another woman named Laura [ph].  Laura [ph] was
10   white; Latasha was black.  Laura [ph] got weekly one
11   on one meetings with Katie; Latasha did not.
12       Q     Now, did Latasha ever complain to you?
13       A     No.
14       Q     Did Latasha give you permission to complain
15   on her behalf?
16       A     No.  This is an observation I made.
17       Q     All right.  Do you know what Latasha's prior
18   history with UNC was?
19       A     I do not know Latasha's work history.
20       Q     All right.  And for the record, Latasha was
21   not par THE OFFICER: the finance team, correct?
22       A     No, she was in another department.
23       Q     She was a business manager, correct?
24       A     As was Laura [ph].
25       Q     But they were in different departments,

Page 144

1    correct?

2         A    They were different departments, but they

3    had the same role in different departments.  They were

4    both the business manager --

5         Q    Are you aware --

6         A    -- for different --

7         Q    Are you aware that -- sorry.  We're doing it

8    again.  Are you aware that Latasha had been a business

9    manager or in a comparable position in another larger

10   department before she came to the Gillings School?

11        A    I don't know Latasha's history.

12        Q    Okay.  But yet you're using her as your

13   comparator for this lawsuit, correct?

14        A    That's what is written there.  Because I was

15   not given weekly trainings the way Laura [ph] was.

16        Q    All right.  You and Laura [ph] had different

17   positions, correct?

18        A    But Laura [ph] did not report to Katie.

19   Laura [ph] was much further removed from Katie than I

20   was.  And I --

21        Q    Was Laura [ph] hired -- go ahead.

22             Was Laura [ph] hired as an advanced senior

23   analyst?

24        A    I don't know what Laura [ph] was hired as

25   besides the title of business manager.  But Laura [ph]

1    did not report to Katie; Laura [ph] was in a different

2    department.  And she took priority of training

3    Laura [ph] over her own people; me being her own

4    person.

5         Q    So what you're saying here, though, is that

6    Katie gave Latasha more training than Laura [ph],

7    correct?

8         A    I'm saying that gave Laura [ph] more

9    training than Latasha.  Vice versa of what you just

10   said.

11        Q    You're saying Katie -- I probably said it

12   wrong.  What you're saying in your suit is that Katie

13   provided Laura [ph], the white business manager, more

14   training than Latasha, a woman of color business

15   manager, correct?

16        A    Correct.

17        Q    But again, you don't know what their prior

18   histories were with UNC?

19        A    No.  But at the same -- at the same period

20   of hiring, within the few months of -- and having very

21   similar titles, Katie did -- Katie was going above and

22   beyond to train Laura [ph], who did not report into

23   her -- she had no need to take her under her wing.

24        Q    Do you know if Katie and Latasha discussed

25   or sent e-mails to each other about -- weekly meetings

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 145 of 280

1    were needed?

2        A    I -- I do not know that.  And I -- I'd also

3    like to go back to your question where you said the

4    revolving door of my office.  When -- when I first

5    started at the team in January, Katie said that it was

6    the first time she had a fully staffed -- where she

7    could depend on -- get work done.

8            She said, "I was always consumed with

9    dealing with" -- "issues with my staff that I never

10   got anything done."

11       Q    So I want to stay kind of focused on the

12   questions I'm asking you, Ms. Khazanie.  And I just

13   want to, you know, you've --

14       A    I -- I did not -- yeah.  I do not know

15   what -- what conversations Katie might have had via

16   e-mail to Latasha.  But from -- optic standpoint and

17   what all of us saw -- "us" meaning the people in our

18   office -- she took time aside to train Laura [ph]

19   regularly and did not afford me the same -- the same

20   grace.  She did not give me weekly trainings.

21           If she had time for Laura [ph] in a

22   different department that didn't report to her, she

23   should've had time for me.

24       Q    So when you say "we," who else are you

25   including in that?

1           A    Other people in finance.  No -- Kate, Teri,

2      and myself did not get weekly meetings with her.  We

3      did not have check -- on a weekly basis the way

4      Laura [ph] did.

5           Q    Did they complain to you about that,

6      Adriana, Teri, and --

7           A    Teri and -- Teri and --

8           Q    -- to you about --

9           A    -- on occasion had said, "Yeah.  She never

10     has time for us."  I don't -- they said that.  I don't

11     remember.  But they had said that "she doesn't have

12     time for us."  And she never had time for me after

13     Todd left.  "Never" meaning I did not get standing

14     once a week meetings.

15          Q    All right.  And you were not a business

16     manager, though; were you?

17          A    No.  But as you stated already, I was closer

18     to her than a business manager.  Business managers

19     weren't in our department.

20          Q    But you were hired as a senior financial

21     analyst, correct?

22          A    Correct.

23          Q    And let me just finish up this conversation

24     about Latasha.  Would it surprise you to know that

25     Latasha e-mailed her and said weekly meetings were no

Page 148

1    longer necessary?

2         A    I -- that's fine.  I don't have any -- I

3    don't know what their conversations were.

4         Q    Okay.  But you put all this in your lawsuit.

5    I'm just asking you, do you have any other information

6    about disparities that you're claiming between Latasha

7    and the other business manager that was receiving

8    training?

9         A    Yeah.  I -- not have any more information.

10        Q    Okay.  All right.  And then so -- all right.

11                  MS. JOHNSON:  And if you could go to

12   page -- let's see.  Scroll down to the next page.

13   BY MS. JOHNSON:

14        Q    And I'm not going to go through this whole

15   thing.  You say in June when -- you see that paragraph

16   that starts "in June, when Katie" --

17        A    Yes.

18        Q    -- "returned, she told me that she had heard

19   I was 'goofing off' while she was out."

20        A    Yes.

21        Q    Do you dispute that other people had

22   reported and made complaints about --

23        A    When I -- when I asked her who said that,

24   she could not give me an answer.  And when I -- when I

25   said to her, "If I were goofing off, how was I able to

1    provide you with 12 new workbooks?"  And she didn't

2    have an answer --

3         Q    But you dispute that other people complained

4    to her that it did not appear that you were working?

5         A    I do not know what other people said to her,

6    but I believe that Katie might have created this; that

7    no one really told her this and she was just

8    attempting to upset and criticize me.

9              MS. JOHNSON:  Okay.  And if you go down

10   to the -- oh, sorry.  I'm getting a little bit of

11   feedback.  That's why I think y'all are saying things.

12             If you go back down, Court Reporter, to

13   the very end, the very last sentence on this page?

14   BY MS. JOHNSON:

15        Q    It says "she even sent me to 'emotional

16   intelligence' training"?

17        A    Yes.

18        Q    And is that part of your claim here that you

19   got sent to emotional intelligence training?

20        A    Yes.  I feel that she was trying to single

21   me out for having an outgoing personality.

22        Q    Okay.  All right.  Did you actually -- she

23   recommended, in fact, during your quarterly review in

24   March that you attend this training, correct?

25        A    Correct.

Page 150

1      Q    And it was a two-day training, two separate

2    days, correct?

3      A    No, it was one training.

4      Q    Isn't it true, Ms. Khazanie, that it was two

5    days and you just didn't go to the second day?

6      A    I do not recall it being two days.  It was a

7    one-time training.

8      Q    Okay.  All right.  We will -- I'll show you

9    some documentation about that in a minute.  I want to

10   just -- well, I want to try to streamline this and

11   just go -- up on the exhibits I have up.

12          In the next sentence that starts "also in

13   July," you're talking about the diversity comment --

14     A    Yes.

15     Q    -- that Teri made?

16     A    Yeah.

17     Q    Now, Katie did not make that comment,

18   correct?

19     A    Correct.  I did not say that Katie made it.

20     Q    And it was made during a meeting that was

21   talking about diversity, right?

22     A    What have we done for diversity was the

23   question.  And she said, "We hired Supriya."

24     Q    And you state in here Katie -- later down

25   you say that Teri apologized to you, correct?

1        A    Correct.

2        Q    And you state in here that Katie walked the

3   comments back and told the group that you were the

4   most qualified applicant, correct?

5        A    Correct.

6        Q    And do you recall telling Caitlin Webster

7   that you felt like it -- that you were happy and

8   satisfied with how that matter was resolved?

9        A    I don't remember that conversation with

10  Caitlin, but I didn't want to keep a grudge

11  against -- against Teri for it.

12       Q    Okay.  And are you aware that Katie made

13  Teri go to bias training or some sort of diversity

14  training after that and because of that?

15       A    I am not aware of that.

16       Q    All right.  And would you agree that Katie

17  made y'all do -- or suggested and encouraged y'all to

18  do diversity training while you were there?

19       A    Katie -- I would not say that she suggested

20  it.  Katie -- Katie -- I asked if I could go to Safe

21  Zone training.  She said okay, but she made it

22  very -- for us to actually get these trainings.

23  It's -- it's good to -- it's good to say that we can

24  take trainings, but then not supporting your employees

25  to actually go get them is a very different story.

1      Q    So are you saying she didn't encourage her

2    team members to go to diversity training?

3      A    I do.  Because on our outside wall where you

4    put -- not you are a Safe Zone and in HAVEN

5    training -- that did that.

6      Q    Okay.  But there was other diversity

7    training, correct?

8      A    There were other diversity trainings that

9    the university provided, yes.

10     Q    And she encouraged her team members to go to

11   those, correct?

12     A    She never actually let people go.

13     Q    Okay.  All right.  Going further down, you

14   say you requested to take a vacation in September but

15   you weren't -- she didn't want you to -- in September.

16   You were allowed to take a two-week vacation in

17   October, right?

18     A    I tried to go in -- I tried to take the

19   vacation -- I asked for the vacation in September.  I

20   had accrued seventy -- you probably have the document

21   more -- than we do.  I had accrued -- how many hours

22   was it?

23          She denied me from taking vacation

24   for -- some very small, like, 41-minute difference

25   between two weeks and -- between two weeks and -- I

 1    don't have the exact hours.  You might have that

 2    there.

 3         Q    So my question was, you were able to take a

 4    two-week vacation in October, correct?

 5         A    Yes.  But I had asked if I could take it in

 6    September and I had 79 hours and change, so 79 hours

 7    and a few minutes, accrued and she would not let me

 8    take two weeks because she said I was 41 minutes short

 9    on the accrual.  So I had to wait until the next pay

10    period where I would accrue over 80 hours.  That was a

11    41-minute difference.

12         Q    Do you know of anybody else who took -- and

13    did you -- your vacation, was it two weeks back to

14    back?

15         A    Yes.

16         Q    Did anyone else while you were there take a

17    two-week back to back vacation?

18         A    Not that I know of, no.

19         Q    So then if you scroll on down, you talk

20    about the August e-mail about the yoga classes?

21         A    Correct.

22         Q    And I meant to ask you this earlier.  What

23    religion do you identify with?

24         A    I'm Hindu.

25         Q    Okay.  And you never formally made a request

1    for religious accommodations through the university's

2    official request process; did you?

3         A    I didn't know that there was a special

4    request process for religion.

5         Q    Okay.  But at one point time you asked her

6    about this coming later for the -- you wanted to go to

7    a yoga workshop that you associated with religion,

8    correct?

9         A    Correct.  It was at my temple.

10        Q    And it looks like you would be coming in

11   around 9:30, correct?

12        A    Correct.

13        Q    And you would agree that that was later than

14   other people were coming in, correct?

15        A    It was later, but then I promised to stay

16   later in the day and make up that time.  And I told

17   her that if I have any important meetings or if

18   there's anything in the morning I will skip class that

19   day.

20        Q    And then you state on the next page --

21             MS. JOHNSON:  Court Reporter, if we

22   could go to the next page?

23   BY MS. JOHNSON:

24        Q    You say:  I was upset that she shared this

25   personal information with everyone and made it

1   everyone's business, right?

2        A    Correct.

3        Q    You were mad at her for sending out the

4   e-mail where she was telling people that you'll be

5   coming in late, correct?

6        A    Yeah.  I didn't think it was necessary to

7   tell everybody that I was doing something personal.

8        Q    Did she ask your permission before she sent

9   her e-mail out?

10       A    No, she did not.

11       Q    Okay.  All right.  And then if you go down,

12  you say on September 18 you sent her the workbooks,

13  which I believe that's what you were testifying to

14  earlier about, correct?

15       A    Yes.  And I -- I'd also like to get on the

16  record that in that same paragraph where I talk about

17  how she sent out the e-mail, Kate Allison came to me

18  in confidence, "I wish Katie didn't make me tell

19  everyone that I have to go see a therapist."  So she

20  singled out people.  She was bullying people.  And

21  that's not okay -- by HIPAA standards to tell everyone

22  that somebody's going to a therapist.

23       Q    And what race is -- is it Kate; is that who

24  you're talking about?  Kate?

25       A    Yes.

1          Q     What race is Kate?

2          A     White female -- harassment.

3          Q     So if you go down to -- I believe that's

4    what you were talking about earlier about your 13

5    Excel workbooks that you talked about earlier?

6          A     Correct.

7          Q     And then you said:  I never received

8    feedback.  And then I recall asking you didn't you

9    meet on either that 19th or 20th; do you recall if

10   y'all met?

11         A     I do not recall.

12         Q     Okay.  And then the next thing you have on

13   this charge:  on October 4, I wrote an e-mail to Katie

14   asking for more guidance.  And I believe right before

15   we broke for lunch you testified that she didn't

16   respond to that e-mail, correct?

17         A     She didn't respond with meeting times.

18         Q     Okay.  She didn't respond with a meeting

19   time?

20         A     With -- I said:  I would like to have weekly

21   standing meetings where we review what I'm working on,

22   similar to what you're doing with Laura [ph].  I'd

23   also like to create a roadmap of sorts and create

24   personal checkpoints for myself.  I didn't get any of

25   that.

1        Q    All right.

2                   MS. JOHNSON:  And then if you go to the

3     next page?

4     BY MS. JOHNSON:

5        Q    And again, I'm just trying to ask you -- I'm

6     jumping, but I'm trying to just ask you -- from this

7     exhibit so that we don't have to jump back and forth

8     from exhibits.

9                   When you say -- you're talking about when

10    you went to talk -- Janet Scarce about the hair

11    comments, right?

12       A    Correct.

13       Q    And you state here:  I begged her please not

14    to make a big deal out of it if it would get me in

15    trouble, correct?

16       A    Correct.

17       Q    All right.  You --

18       A    If it would get me in trouble, which it did.

19    It -- I was retaliated against.

20       Q    And you're saying you also talked to Steve

21    Ragan at the beginning of November?

22       A    Some point in the beginning of November,

23    yes --

24       Q    -- recall putting --

25       A    What?

1        Q    Do you recall putting in one document that
2    you talked to him on November 1?
3        A    I don't remember the exact time.  I don't
4    remember if one document said that, but I do know that
5    it was around the beginning of November.  And --
6        Q    And you're saying that you talked about
7    Katie with him at that time?
8        A    Yes.  I told him that I -- he said, "Just
9    talk to her and tell her how you feel."  And we've
10   been over this that then I did tell her how I felt and
11   then I wrote her an e-mail saying "thanks for letting
12   me talk to you" and then that was held against me.  I
13   100 percent feel that she was -- that me going to
14   Steve added to her retaliating against me.
15                MS. JOHNSON:  And so if we could just
16   pull up Exhibit Number 8?
17                THE REPORTER:  Sure thing.  One moment.
18                MS. JOHNSON:  Thank you.  And then,
19   Court Reporter, when you get it up if you could just
20   again let her scroll through to where she feels
21   comfortable that she's familiar with it.
22   BY MS. JOHNSON:
23       Q    I think you may already have done this,
24   Ms. Khazanie.  It's the SHRA grievance with UNC.
25       A    Okay.

1      Q    In this particular document, Ms. Khazanie,

2   you have a part that says allegations of harassment;

3   it's on the fifth page.

4      A    Mm-hmm.

5              MS. JOHNSON:  Court Reporter, if you

6   could scroll to the fifth page?

7   BY MS. JOHNSON:

8      Q    Okay.  So for -- and this charge, isn't it

9   true, Ms. Khazanie, you list out what your sexual

10  harassment allegations are and then your allegations

11  separately of your allegations of discrimination,

12  correct?

13     A    Yes.

14     Q    And then you -- hostile work -- I believe

15  you have other grieve-able issues, hostile work

16  environment, correct?

17     A    Correct.

18     Q    All right.  And then for the sexual

19  harassment part, you've talked about the hair comment,

20  correct?

21     A    Correct.

22     Q    And then you talk about the food comments,

23  correct?

24     A    Correct.

25     Q    And then for the hair comment, I just wanted

1    to ask you about that.  What was the hair comment for

2    the record; what do you recall her saying to you?

3        A    Michael Kosorok, who was one of the

4    department chairs, came to my office and he asked me

5    if he could come in and go through the model.  I said,

6    "Sure."  He asked if he could pull up a chair next to

7    me.  I said, "Sure."  He sat next to me for two hours.

8    The door was wide open.

9            He asked me -- and once I went through it,

10   he said, "In 14 years at this school, I've never seen

11   anyone so knowledgeable and thorough.  You are the

12   best hire this department has made."  And I laughed

13   and I was like, "You should tell my boss that."  And

14   he goes, "I plan to.  This is incredible work."

15           And then later that day when Katie was

16   passing by in front of my office, I told her -- I

17   said, "The meeting with him" -- "with Dr. Kosorok went

18   really well" -- and she started giggling.  She

19   goes -- she goes, "I've noticed whenever a

20   man" -- "men come into your office you take your hair

21   down for them."

22           And I said, "Excuse me?"  I said, "That's

23   completely untrue."  And she said, "Well, I've noticed

24   it."  And then she just walked away.  And I ran to the

25   bathroom and I cried 'cause it was very mean.

1            'Cause she was insinuating that -- I -- I

2       don't even know what she was trying to -- that I was

3       wearing my hair down for -- for male colleagues?

4       Like, it was just -- it was just ridiculous.

5            Q    Was that the only time she ever made a

6       comment about your hair like that; the only one you've

7       mentioned?

8            A    That's the comment about my hair.  But she

9       made comments about my eating and how I have no

10      self-control -- lacking willpower all the time, like,

11      so many times I --

12           Q    Okay.  And I'll ask you about that --

13           A    -- that is the one --

14           Q    Do you recall when she made that comment?

15      You say June 6, but is it possible it was earlier?

16           A    It was after the meeting with Dr. Kosorok,

17      so whenever the meeting with Dr. Kosorok happened, it

18      was that day.

19           Q    Okay.  All right.  And you didn't bring it

20      up with Janet Scarce until September, correct?

21           A    Because I was terrified.  How are you --

22           Q    And you didn't --

23           A    What -- what I don't understand about this

24      whole process is that I was afraid to tell anybody

25      about what she was doing because I was afraid they

1    would retaliate.  And then finally when I got up the

2    courage to go and tell them that she was doing this,

3    they retaliated, like exactly what I feared would

4    happen is what happened.  Why wouldn't --

5         Q    Well, do you --

6         A    -- come forward --

7         A    Do you know when she self-reported it?  Do

8    you know when she self-reported it to Steve?

9         A    I do not.  'Cause I -- I'm not even truly

10   sure -- I don't know.  I don't know if she herself

11   reported it after Steve told her that I reported it or

12   if she did it on her own accord.

13        Q    Well, if -- months and months before, you're

14   saying that she somehow retaliated against you months

15   and months later?

16        A    Yes.  I feel that she was building -- if

17   my -- my question is if her accusations of me are

18   correct, that -- lack of competence, low work output,

19   unable to work independently, and inability to

20   recognize inaccuracies.

21             Up 'til the, like, July and -- and around

22   that time where I am saying this, "Supriya has amazing

23   technical skills" is what she would say.

24             I  -- and this is written in my -- my

25   review:  I'm very pleased with the work she is doing.

1    She has very advanced Excel skills and has done a

2    great job utilizing those skills to structure a model

3    that is flexible and can be modified on the fly.  She

4    is very analytical and I like the way she works

5    through issues and challenges in her work.  She is

6    extremely generous in sharing her knowledge and

7    expertise with her teammates.

8            These are the comments she was giving -- to

9    me before.  And --

10       Q    Are you reading --

11       A    -- I --

12       Q    Ms. Khazanie, for the record, are you

13   reading from your probationary review; your quarterly

14   review?

15       A    Yes.

16       Q    Does she also state in there:  she has not

17   found the right balance between work and social time

18   during the workday; she needs to cut down on

19   socializing and --

20       A    Yes.  I -- that is --

21       Q    -- make sure she --

22       A    Yes.  And that is -- that is the last thing

23   she wrote in there.  And then I went for that -- for

24   that training.  And this was written to me -- away, in

25   March.  When -- on July -- virtual connectivity

1    interruption -- on June -- July 16, Katie sent me an

2    e-mail saying:  I just wanted to let you know Barbara,

3    the dean, said you are amazing.

4          The next day, she elaborated and told me

5    that the deans are so impressed with me and the work

6    I'm doing.  And I said, "My dad, who used" -- "a

7    director at ECU thought my probation was up this week

8    'cause I hit six months."  And she said, "Well, I'm a

9    very direct person.  If you had any problems at all, I

10   would have you in my office by now.  You're doing

11   great work; tell your dad I said that."  And --

12        Q    So on --

13        A    -- then -- said, "You know, once you become

14   permanent, it doesn't mean we can't get rid of you; it

15   just makes it a little bit harder."  So she -- she was

16   upfront and honest with me or so she said that if

17   there were any problems that still existed, she would

18   let me know.  And she did not let me know.

19        Q    All right.  Ms. Khazanie, I feel like we're

20   kind of jumping -- we were talking about the hair

21   comment and then you started reading from the

22   probationary review -- I mean, excuse me -- your

23   quarterly review.

24          Isn't it true, though, that she said also in

25   your quarterly review "she has not found the

1    right -- between work and social time during the

2    workday.  She needs to cut down on socializing and

3    make sure she is putting a full day of work," correct?

4    Did she say that?

5         A    She did.

6         Q    And she also says:  she needs to develop

7    more self-awareness regarding her interactions with

8    others and how her comments and contributions to

9    conversations are being perceived, correct?

10        A    Yes.

11        Q    Then she goes on to say:  I'm very happy to

12   have Supriya on my team.  And then says:  she has

13   great potential to contribute to the school in very

14   meaningful ways, correct?

15        A    Correct.

16        Q    And then she says:  I am excited about the

17   ways she's going to help us elevate our financial data

18   delivery, especially through Tableau, correct?

19        A    Correct.

20        Q    And then if you look over at the overall

21   comments later on the review, she says:  Supriya needs

22   to work on her communication skills, correct?

23        A    Correct.  But what I would like to respond

24   to that is that that was --

25        Q    Well, I'm just asking you --

```
1        A    That happened in March -- the date on this

2    is a review from 1/14/19 to 3/31/19.

3        Q    Right.  And then if you look, she says at

4    the very bottom:  information analysis and decision

5    making -- this is what it says; does it not -- it

6    says:  Supriya is new and learning how to pull data of

7    the financial systems, how to clean the data, and how

8    to include appropriately in various analyses.

9             The more she works with the data and she

10   sees how I review and adjust her analyses she will

11   become proficient in this area.  I would expect within

12   six to nine months that she will be self-sufficient in

13   analysis and use of financial data.

14             Is that not stated in there?

15       A    I don't see that, but I can pull it up.

16             MS. JOHNSON:  I tell you what, Court

17   Reporter, can you make Exhibit Number 10 an

18   exhibit -- I mean, can you show Exhibit Number 10?

19             THE WITNESS:  I -- I see it here.  I

20   have it.

21   BY MS. JOHNSON:

22       Q    Okay.  And that's what's stated at the end

23   is that it was her hope that over the next six to nine

24   months you were going to become self-sufficient,

25   correct?
```

1        A     And I was self-sufficient.

2        Q     Well, in October you're writing her saying:

3     I need more guidance and weekly structure and more

4     structure and weekly --

5        A     -- she was not giving me projects.  She was

6     not giving me enough projects that she had delivered.

7        Q     All right.  Well, you state what you state

8     in that October 4 e-mail.  The e-mail speaks for

9     itself; would you agree?

10       A     I think that you are mixing two issues.

11    Because I wanted to have more projects like the

12    allocation model that we would take to chairs and take

13    to deans make decisions off of.  I say in that e-mail

14    that as -- now that we are, you know, we are wrapping

15    up the -- the allocation model, I don't have the same

16    structure.  I don't have --

17       Q     So going back to Exhibit 8 -- we've sort of

18    got off my exhibit here.  Going back to Exhibit 8,

19    which is your UNC SHRA charge.  I'm just going to

20    finish up with this exhibit before we move on.  So for

21    the sexual harassment, you list the hair comment,

22    which we've talked about.  And then you list that she

23    made fun of you about food.

24             And you state in there that you became so

25    self-conscious after that that you couldn't eat unless

1    you closed the door; is that correct?

2        A    Yeah.  I generally kept it a little -- I

3    didn't shut the door; I would close it a little bit so

4    I could eat without her making comments about it.

5        Q    Okay.  And you never made suggestions about

6    everyone eating together throughout -- rest of your

7    employment there?

8        A    I would ask if anyone wants to go get lunch.

9        Q    But if you were so self-conscious, why would

10   you organize team lunches that included Katie?

11       A    To keep some team camaraderie.

12       Q    Okay.  So there were times, then, where you

13   didn't eat in your office by yourself and that you

14   initiated lunches with everybody, correct?

15       A    Yeah.  Because I didn't want her to

16   completely crush my spirit.

17       Q    Okay.  And then on your charge, then you go

18   to allegations of discrimination.  And one of

19   them -- the very first thing you list is unfounded

20   criticisms for being happy and lacking emotional

21   intelligence.  And that's where we were talking about

22   before -- we've already discussed that -- where you

23   talk about she made you go to the emotional

24   intelligence training, correct?

25       A    Correct.  Yes.

1    Q    And again, were you aware that others had

2    complained?

3    A    Only from what she said.

4    Q    All right.  Did you ever -- did you refer

5    to -- during your very first lunch there, did you tell

6    everybody at lunch about your sexual harassment at

7    your prior job?

8    A    I don't remember.  I'm sure I was very happy

9    to be away from it.

10    Q    Do you remember referring to white male

11    jerks during that lunch?

12    A    I do not remember.

13    Q    Do you remember Katie telling you, "We don't

14    make generalizations like that" or we shouldn't?

15    A    I -- I don't remember that conversation.  I

16    don't recall.

17    Q    Are you denying that it occurred?

18    A    I'm not denying it.  I am -- I don't recall.

19    Q    Do you ever recall making a comment that

20    white people don't eat mangos?

21    A    I do not.

22    Q    Do you recall talking a lot about lack of

23    wokeness at UNC?

24    A    I would believe that that's something I

25    might have said, but I don't remember saying that.

1    No.  I might've said it.

2         Q    Do you know that if it got to the extent

3    where it bothered people how much you were talking

4    about it?

5         A    I wish people would have that conversation

6    with me directly.

7         Q    Do you know whether or not these

8    conversations were interrupting other peoples' ability

9    to work?

10        A    I -- again, I wish somebody would've come to

11   me directly and had a mature conversation.

12        Q    Well, did you ever -- let me ask -- this, do

13   you recall making a herpes comment at like a

14   retirement or birthday gathering at work?

15        A    That conversation I do recall.  That was

16   somebody's -- somebody had a birthday -- birthday

17   something -- birthday cake, I think, was being cut.

18   And they were talking about glitter bombs.

19             And I -- my sister -- who is an MD-MPH, with

20   a MPH from UNC no less -- had said to me that one of

21   the funniest things that they heard was that glitter

22   was the herpes of childhood and how it was considered

23   a funny public health joke.

24             And when somebody talked about

25   making -- giving -- giving glitter bombs, I said, "You

1    know, I heard this really funny joke from my sister

2    that herpes" -- "that glitter is the herpes of

3    childhood."  And I thought it was a really witty,

4    funny thing that was a public health joke.

5              And one person said, "Well, we are a public

6    health school" and he laughed, but other people did

7    not laugh.  And --

8         Q    Do you recall -- you just said you wished

9    people would've had the courage to talk to you; do you

10   recall Steve Ragan talking to you about that comment

11   afterwards?

12        A    Yes.  And then I told him I felt bad about

13   it and I will do better next time.

14        Q    And you agree that a supervisor has a right

15   to deal with complaints and concerns that other people

16   raise about their direct reports, correct?

17        A    Correct.

18        Q    Do you ever recall using the N word when you

19   were talking to people in the IT department?

20        A    Yes.  I was explaining to Joseph and Melvin

21   about how my high school had people that said the N

22   word and I used the N word in the description.  And I

23   said, "It was really shocking to me that they still

24   used it."  And Joseph replied to me and said, "You

25   know, we usually don't even say it."  And Joseph is

1    a -- is a -- an African American male.

2           He said, "We don't say it usually; we just

3    say the N word."  And I said to him -- I was like, "I

4    am so sorry.  I didn't mean to use it for anything

5    other than how shocking it was that my high school

6    teacher would still use it when explaining it and not

7    use the term 'the N word.'  But I really apologize if

8    it hurt your feelings."

9           And he said, "Oh.  It's" --

10    Q    So --

11    A    And he said to me --

12    Q    Sorry.

13    A    -- "oh, it's fine."  And he was not upset

14    with me.

15    Q    Do you recall if other people overhearing

16    that conversation found it disturbing?

17    A    I know that Brent [ph] was in the room and I

18    am aware from my attorney that he went to HR.  But

19    what is --

20    Q    And I don't want to hear anything that

21    you've learned from your attorney --

22    A    Well, what -- what I want to say is that

23    both -- both -- I talked to both Melvin and Joseph,

24    who were the two black men in the room when I said

25    this, and I apologized to them and they said, "We

1    don't mind.  It's fine."

2        Q    Do you ever recall telling Steve Ragan that

3    your emotional intelligence training was a waste of

4    time?

5        A    I -- I'm sure I did because I

6    didn't -- emotional intelligence training was about

7    having the courage to overcome shyness and talk to

8    somebody, including one of the things that they -- in

9    that training was that if you see a cute baby in a

10   grocery store, you should feel confident enough to go

11   up to the person and say, "I think your baby is cute."

12            And I found it completely counter to what

13   Katie was citing that I was too social.

14       Q    But you didn't go to the second day of the

15   training -- you?

16       A    I don't know why you keep saying "second day

17   of the training."  I was to go to a training and I

18   went to the training.  I do not know about -- second

19   day of training.  It was a -- it was not even a full

20   day of training; it was a short hour to maybe two-hour

21   short training at AOB -- administrative office

22   building.

23       Q    So for your discrimination claim, you talk

24   about unfounded -- the emotional intelligence and then

25   you talked about the diversity hire comment, which

1    we've already talked about.  And then you talk about

2    "being unavailable for me and another person of color"

3    and we've already talked about Latasha, right?

4         A    Okay.

5         Q    Correct?  And so being unavailable to you,

6    it is true -- first of all, you stated in your other

7    charge that you and Katie met regularly through July,

8    correct?

9         A    'Til July.

10        Q    And then you did have some official

11   meetings, correct, after July that were scheduled in

12   advanced?

13        A    A couple here and there, yes.

14        Q    Okay.  And then you had some training -- you

15   did get training at UNC, correct?  Some official

16   training, correct?

17        A    Correct.

18        Q    Do you remember the names of any of the

19   training you got?

20        A    No, I don't.

21        Q    And you would also have meetings where you

22   would just -- there were times where she would at

23   least talk to you in the office, correct?

24        A    I mean, our offices were next to each other,

25   so yes.  I saw her sometimes.

1      Q    And then you also e-mailed each other about

2    work a lot, correct?

3      A    I would try to catch her via e-mail, yes.

4      Q    And she reviewed your work and y'all did

5    presentations together, correct?

6      A    We did not -- she did not review much of the

7    work I gave her after August or -- July or August.  I

8    sent her countless -- countless reports and Tableau

9    stories and Excel workbooks that we never went over.

10      Q    All right.  But she did review some of your

11    work, correct?

12      A    None of the meaningful outputs.  She would

13    give --

14      Q    All right.

15      A    Yeah.  She would not --

16      Q    She would have to review your work before

17    she did a presentation, correct?

18      A    Yes.  And she would use the work for her

19    presentations.

20      Q    Yeah.  So she would have to review it.  I

21    mean, Katie's not the type of person that's just going

22    to go in and give a presentation without -- the work,

23    right?

24      A    I -- she -- she would take my work and use

25    it to present, but she did not speak to me about it.

1       Q     Okay.  All right.

2       A     The thing is that you just said that Katie

3    would use my work to present, but part of the reason

4    that I was fired was a low work output, lack of

5    competence, and inability recognize inaccuracies.  And

6    she -- you just stated "she used your work to

7    present."

8             So if my work was good enough for her to use

9    it for presentations, I don't understand how she was

10   able to say that I lacked work output.  'Cause you

11   just --

12      Q     Well, she did at --

13      A     -- my work to give presentations.  She --

14      Q     Are you saying there were never times where

15   she discussed with you the status of your projects and

16   when you were going to get them done?

17      A     Yes.  And I always had them done in time.

18   Sometimes she would tell me "I want something in by

19   the end of the week" and I would walk back to my

20   office, which was five paces away, and then she would

21   e-mail me saying, "Oh, I want" -- "I said to you end

22   of the week, but actually target Wednesday," which is

23   two less days -- and I still had it done by -- but

24   then she never talked to me about it.

25      Q     So is it your position that she never made

1    any comments to you about errors in your work after

2    July?

3         A    I will not say that I never made errors, but

4    to say that I had an inability to recognize

5    inaccuracies is false.

6         Q    So she did discuss errors with you at times,

7    correct, after July?

8         A    I do not recall what error if she did.

9    That's -- that's -- question.

10        Q    All right.  Do you recall her ever talking

11   to you about excessive socializing and looking at your

12   phone a lot after July?

13        A    I do not recall, but she might've.

14        Q    Okay.  And you --

15        A    But none of -- go ahead.

16        Q    Do you recall a meeting with her on

17   September 19 or 20 where y'all were discussing

18   progress that you were making on projects?

19        A    I do not recall the meeting.

20        Q    Okay.  Do you recall a meeting on November

21   18 to go over your Tableau stories?

22        A    November 18?  November 18, Katie finally

23   gave me a half-hour meeting but instructed me to use a

24   very difficult and inefficient method of solving a

25   certain problem.

1          Q    So what you're --

2          A    I --

3          Q    You're saying at that point that you were

4    disputing what she wanted?

5          A    I am disputing that when I asked her a

6    question about something that she wanted and I

7    said -- you -- "how would you do this?"  And the

8    method that she told me to follow was completely

9    inefficient.  I don't remember the details 'cause I

10   don't have access to my files from then.

11              But I remember wondering why she was sending

12   me on a wild goose chase as opposed to giving me a

13   more efficient way of solving a problem.

14         Q    Do you recall during your November 18

15   meeting discussing that it was taking you a long time

16   to complete projects?

17         A    No.

18         Q    Do you recall on November 18 again her

19   making comments to you about people thought you were

20   talking on the phone or looking at your phone or being

21   engaged in non-work related tasks?

22         A    No.

23         Q    Would you agree that if you're not engaged

24   in work related tasks while you're at work that that

25   has an impact on your work output?

1          A    I -- I don't understand what --

2          Q    So would you agree that the amount of time a

3     person is working at work impacts their work output?

4          A    Yes.  But I was working at work.

5          Q    Okay.  Do you recall a meeting or talking

6     with Katie on December 6 again about the status of the

7     project -- she had assigned to you in September?

8          A    On December 6, I asked --

9          Q    -- that she had --

10         A    I asked Katie if we could go over the work

11    from Wednesday, but she did not respond.  She left the

12    office early that day without getting back to me about

13    scheduling a meeting.  On Monday, December 9, I asked

14    Katie if we could go over some of the things I had

15    been working on in addition to the work that I had

16    sent her last Wednesday.

17              She told me that she was still working on

18    something else and had a conference after that so she

19    had no time for me.  And as usual, she kept her door

20    closed and blocked off the calendar.  On December 11,

21    I created a Tableau story with 10 interactive pages,

22    4 data sheets, 15-year view into the school's use of

23    school-based tuition.  It had 15 years of student --

24         Q    -- December 11?

25         A    That was --

1      Q     I'm sorry.

2      A     -- December 11.

3      Q     Okay.

4      A     December 11.  And I also -- after I sent it

5      to her, she told me that she had not had a chance to

6      look at it and her calendar remained blocked off and

7      her door closed.  On December 12, I sent her an update

8      and asked her if there was anything else she wanted me

9      to work on.  Her door continued to be closed and her

10     calendar blocked off.

11           Because she had still not -- the -- reviewed

12     the work I had sent her on Wednesday, December 4, at

13     2:00 p.m., I tried to move on and do other work.  On

14     December 17 --

15     Q     What are you reading?  What are you reading

16     from, Ms. Khazanie?

17     A     I have notes and this was in my grievance

18     form.

19     Q     Okay.  So are you reading from your

20     grievance -- reading -- we've asked you to produce

21     notes and I don't believe you've produced any.

22     A     This is from my grievance form.  This is --

23     Q     So you're reading directly from the --

24     A     Yes.  Page --

25     Q     Okay.  All right.  You've mentioned the

Page 181

1    termination letter.  I just want to, for the record,
2    get that on the record.
3                      MS. JOHNSON:  If you could, Court
4    Reporter, show Exhibit 12?
5                      (Exhibit 12 was marked for
6                      identification.)
7                      THE REPORTER:  Sure thing.  Also, you
8    did mention Exhibit 10 earlier, but it never got
9    pulled up because I don't think questioning got
10   brought up for it.  Do you want that marked on the
11   record, as well?
12                     MS. JOHNSON:  Oh, okay.  10 was the
13   quarterly review.  Yes.  If you could just -- I
14   believe she indicated she had it already.  But yeah.
15   If you could just, I guess, show it to her and let me
16   ask one quick question from that.
17                     (Exhibit 10 was marked for
18                     identification.)
19                     THE REPORTER:  All right.  You said 10
20   was the quarterly review?
21                     MS. JOHNSON:  Right.
22                     THE REPORTER:  All right.
23   One -- Exhibit 10 is on the screen now.
24                     MS. JOHNSON:  Yeah.
25   //

1      BY MS. JOHNSON:

2           Q     Ms. Khazanie, that's the review you were

3      reading from earlier, correct, and I also was reading

4      from?

5           A     Correct.

6           Q     Okay.  All right.

7                      MS. JOHNSON:  If you could pull up

8      Exhibit Number -- trying to move along here.  If you

9      could pull up Exhibit Number 12?

10                     THE REPORTER:  Sure thing.  One moment.

11     BY MS. JOHNSON:

12          Q     Ms. Khazanie, we talked about your

13     termination letter a few minutes ago.

14                     MS. JOHNSON:  And if you could show the

15     second page, Court Reporter?

16     BY MS. JOHNSON:

17          Q     Just for the record, is this

18     the -- Ms. Khazanie, is this -- termination letter you

19     were referring to before?

20          A     That -- there was a section on it where she

21     gives the reasons -- up --

22                     MS. JOHNSON:  Right.  Yes.  That's on

23     the -- yeah.  That's on the first page.  Court

24     Reporter, if you could go back to the first page?

25          //

1    BY MS. JOHNSON:

2         Q    In the second -- well, actually --

3         A    This is not --

4         Q    -- reading from the very -- yes.  Reading

5    from the first paragraph, Ms. Khazanie -- you were

6    pointed to your current position as financial analyst

7    on January 14, 2019.  Your continued employment is

8    contingent upon successful completion of your defined

9    probationary period; is that what it says?  Correct?

10        A    Correct.

11        Q    And then if you go down the second

12   paragraph, I believe this is what you were referring

13   to before.

14             It says:  based upon my review and

15   evaluation of your ability to meet the expectations of

16   this position, specifically your lack of competence at

17   the advanced level, inability to work independently,

18   low work output, and your inability to recognize

19   inaccuracies in your calculations and reporting, I

20   have decided to separate you from employment effective

21   January 6, 2020, correct?

22        A    Correct.

23        Q    That's what it says?

24        A    Yes.

25        Q    And that's what you were -- those were the

1    points you were referring to before, correct?

2         A    Correct.

3         Q    And the rest of the letter goes on to talk

4    about payout benefits and other matters about just

5    leaving the employment, correct?

6         A    Correct.

7                   MS. JOHNSON:  If you could pull up -- I

8    want to go through a couple other --

9    BY MS. JOHNSON:

10        Q    Well, going back to number 12.  So the

11   reasons that were provided to you for not continuing

12   your probationary period is lack of competence at the

13   advanced level, correct?

14        A    Correct.

15        Q    Inability to work independently, correct?

16        A    Correct.

17        Q    That's what it -- low work output, correct?

18        A    Correct.

19        Q    And inability to recognize inaccuracies in

20   your calculations and reporting, correct?

21        A    Correct.

22        Q    And an inability to recognize inaccuracies

23   in your -- and reporting, one way that that's shown

24   is -- give her a model or a work product that has

25   errors in it that you didn't catch, correct -- the

1      inability to recognize your errors, correct?

2          A     I guess so.

3          Q     Okay.  If you could -- I want to go through

4      just a couple of other documents with you.

5                      MS. JOHNSON:  And does anybody need to

6      take a break?  Maybe we can go a little bit further

7      and then at some point take another two-minute break

8      and then I'm going to try to finish up and we'll be

9      done?  But if we can just go through a couple of

10     documents, I think that will hopefully allow me to

11     just finish up quicklier afterwards.  All right.

12                     Does anybody need to take a two-minute

13     break now I guess is my long way of asking that.

14                     MS. BATEMAN:  Okay.  Let's take a

15     two-minute break now.

16                     MS. JOHNSON:  Okay.  Sounds good.

17                     Court Reporter?

18                     THE REPORTER:  Sure thing.  The time on

19     the monitor is 3:07 p.m. and we are now off the

20     record.

21                     (Off the record.)

22                     THE REPORTER:  The time on the monitor

23     is 3:14 p.m.; we are now back on the record.

24                     MS. JOHNSON:  Okay.  Thank you,

25     everybody.

Page 186

1    BY MS. JOHNSON:

2         Q    Ms. Khazanie, I want to just go through some

3    exhibits now.  And I'm going to try to make this as

4    quick as possible.

5                   MS. JOHNSON:  If you could, Mr. Court

6    Reporter, pull up Exhibit 19?

7                   (Exhibit 19 was marked for

8                   identification.)

9    BY MS. JOHNSON:

10        Q    So Ms. Khazanie, I'll give you a chance to

11   take a look at this and you'll need to see the bottom

12   part.  And it's one of those deals where I believe the

13   e-mail chain kind of starts at the bottom and then

14   goes up.

15        A    Okay.

16        Q    And would you agree that that's the e-mail

17   that on June 7, 2019, where she's reminding you

18   that -- she says: your start time has been getting

19   later and later.  I'd really like you to make an

20   effort to get here by 9:00 each day, correct?

21        A    Yes.  And then --

22        Q    And then you say:  yes, I realize that.

23   Definitely my fault.  But then she -- on June 14,

24   compliments you for coming in, getting here by 9:00;

25   she thanks you for arriving by 9:00, correct?

Page 187

1        A    Correct.  So I --

2        Q    Right.  There are times when she's, you

3    know, saying things that -- she's reviewing your work

4    behavior, correct, and whether that be acceptable or

5    unacceptable and she's telling you both ways, right?

6        A    But because she said something positive in

7    June does not mean that the harassment and -- hostile

8    work environment is not true.  You can -- you can

9    insult somebody and be mean to them and not answer

10   them and be hostile towards them and then say, "Oh,

11   but you" -- "but this is nice."  And that doesn't

12   negate all the negative things that happened.

13                  MS.  JOHNSON:  If you could pull

14   up -- again, I'm sorry for jumping around.  But I'm

15   really just trying to speed this up and go on and go

16   through.  I think the quickest way is just to go

17   through them.  If you could pull up Exhibit 20, Court

18   Reporter?

19                  (Exhibit 20 was marked for

20                  identification.)

21   BY MS. JOHNSON:

22       Q    Tell us when you're done.

23                  THE REPORTER:  Let me know if you need

24   me to scroll, Ms. Khazanie.

25                  THE WITNESS:  Okay.  Okay.

1    BY MS. JOHNSON:

2         Q    Do you remember the business managers in

3    March of 2019 getting upset with you for stupid

4    reasons?

5         A    They were upset that they were not getting

6    the amount of funding that they -- they wanted more

7    money.

8         Q    And do you recall if Katie was off that day,

9    but yet she was still communicating with you and you

10   were communicating with her?  She was home with her

11   mom, who was sick; do you recall, though, that she

12   still made herself available to you via e-mail?

13        A    She was at home 'cause her mom was not sick;

14   she had a knee replacement.  She was not ill.  And

15   I --

16        Q    Well, do --

17        A    I went to a meeting and I just gave her an

18   update.  It's up to her whether she decided to read it

19   and respond or not.

20        Q    Do you say:  hope you're doing well and your

21   mom is better?

22        A    Better as in her knee.

23        Q    Are you trying to suggest, Ms. Khazanie,

24   that because she had a knee replacement surgery that

25   she was not in need of medical care or assistance from

1    her daughter?

2          A    I am not --

3                MS. BATEMAN:  Objection.  Objection.  I

4    mean, that's --

5    BY MS. JOHNSON:

6          Q    I'm just -- let me ask you, why do you keep

7    saying that she wasn't -- I mean, she had surgery,

8    correct, to fix a --

9          A    A surgery.  But the way you are -- you are

10   asking me that when I communicated when her mother was

11   ill.  Her mother was not ill.  Ill means that somebody

12   is -- is somehow in a state that they need constant

13   care.  Her mother had a knee replacement surgery and

14   was conscious and okay.  And I simply sent her an

15   e-mail that said update for today.  And I --

16         Q    But -- go ahead.

17         A    I -- as far as the business managers getting

18   upset, the business managers were there as lobbyists

19   for their department to get more money.  And Katie

20   always made fun of the business managers and would

21   make comments about them like, "Oh, I'm not giving

22   them anything" or "oh, they can just wait."

23               They came to my office and I walked them

24   through it and I say in this e-mail I just smiled it

25   off.  I say there that I smiled it off.  Again, I gave

1    a huge smile and told her to look to the left of the

2    person, not the right, and moved on.

3              I don't see anything -- e-mail that is not

4    me just sending a status update to my boss who was out

5    of the office that day.

6              MS. JOHNSON:  If you could pull up

7    Exhibit 21?

8              (Exhibit 21 was marked for

9              identification.)

10             THE WITNESS:  And for -- for the

11   record, when I left UNC, Teri -- Teri from that

12   department was super supportive and asked me if I

13   needed any references in the future.

14             MS. JOHNSON:  So Exhibit 21?

15             THE REPORTER:  On the screen now.

16             MS. JOHNSON:  All right.

17   BY MS. JOHNSON:

18        Q    And if you could just review that,

19   Ms. Khazanie?

20        A    Okay.

21        Q    So that's an e-mail on March 14, 2019, where

22   Katie Thornsvard is wanting to provide coaching to you

23   on how to deal with chairs, correct?

24        A    Yes, in March.

25        Q    Right.  And then you said:  thanks for the

1    feedback, correct?

2         A    Correct.  And this is not about anything

3    that happened in March; this is about after.

4                   MS. JOHNSON:  If you could pull up

5    Exhibit 22?

6                   (Exhibit 22 was marked for

7                   identification.)

8    BY MS. JOHNSON:

9         Q    And we're just going to sort of take

10   Exhibit 22 -- I've grouped some e-mails together and I

11   just sort of want to take them one at a time.  It

12   should be very quick.  I don't have many questions

13   about any particular one.

14                I wanted to show you these in response to

15   your testimony regarding not getting information and

16   training when you first got to UNC.  And you started,

17   correct, on January 14, 2019?

18        A    That sounds right.

19        Q    All right.  And then this is the e-mail from

20   Katie to you on January 15 saying -- allocation model

21   spreadsheet, correct?

22        A    Okay.

23                   MS. JOHNSON:  And then if you can go to

24   the second one?

25   //

1    BY MS. JOHNSON:

2         Q    It's -- another e-mail from Katie on January

3    15:  I just did a presentation to the chairs on the

4    state allocation model; do you recall her inviting you

5    to that so that you could see what a presentation was

6    like?

7         A    That's possible.

8         Q    And then she gives you her notes about the

9    allocation model, correct?

10        A    Again, in January.

11        Q    Right.  And so you testified earlier that

12   you didn't get any training or data from UNC or Katie

13   when you first got there?

14        A    This is -- this is very high level

15   information.  This is not the level of training

16   that --

17        Q    That a senior financial analyst needs?

18        A    This is -- this is basic stuff that I could

19   learn in the first e-mail on the first day.  If your

20   colleague --

21        Q    Okay.  And --

22        A    -- training, then --

23             MS. JOHNSON:  Okay.  Well, could you go

24   to the next page?

25   //

1    BY MS. JOHNSON:

2         Q    So you don't call this training or being

3    provided information for your job?

4         A    I say -- I'm saying that this is not deep

5    training; this is very -- very high level information.

6         Q    Okay.  Well, you testified that you got no

7    training from UNC when you first got there unless you

8    initiated it.  So I just wanted to show you a couple

9    more documents.

10            The next one is January 15.  It says:

11   here's the BIOS deep dive.  I'll get you access to the

12   H drive so you can see the others; do you recall that?

13        A    I have not seen any of these e-mails in four

14   years -- over four years, so I do not recall.

15        Q    Okay.  And then on the next one, it's

16   January 17; it says:  link to last EPI projection.

17   She's giving you samples of things and models and so

18   on and data, correct?

19        A    Possibly, yes.

20        Q    And then on January 25, e-mail from you to a

21   Rhonda Leary; do you remember who Rhonda Leary is?

22        A    No.

23        Q    Do you know that she was involved in

24   training at UNC?

25        A    Oh.  That was the one I signed up for.

Page 194

1      Q    All right.  Well, if you look at the bottom,

2    it says:  we are processing your ConnectCarolina

3    access request and our records indicate that you will

4    need to complete the following computer based

5    training.

6           So she tells you what training you need to

7    complete, correct?

8      A    Correct.

9                MS. JOHNSON:  All right.  And if you

10   could look at the next page with full print on it --

11               THE WITNESS:  I see all of this, but I

12   don't feel that January -- this stuff is -- is

13   relevant.  Because what you are showing me here is all

14   things that I did independently.  She would send me a

15   link and I worked on it independently.  And part of

16   the thing that she fired me for was an inability to

17   work independently.

18   BY MS. JOHNSON:

19     Q    Well, this is -- you -- you didn't get any

20   training when you first got there.  This is training,

21   Ms. Khazanie; is it not?

22     A    This is very high level training.  This is

23   not specific to what we were trying to do.  But --

24     Q    Okay.  But you needed to figure out how UNC

25   worked and review samples of prior models and so on

1    that you would be building on or working off of,

2    correct?

3          A    Correct.

4                    MS. JOHNSON:  All right.  So please go

5    to the next page; it's a January 28 -- the next page.

6    I think that's just a -- I don't know what that is.

7                    Yeah, that one.

8    BY MS. JOHNSON:

9          Q    And that's a January 28 e-mail that says:

10   attached is the overview from this morning.  It's from

11   Katie to a bunch of people:  here's a link to the fund

12   and source ranges; is that correct?  And she's telling

13   you how to do various things in that e-mail?

14         A    I don't remember the -- the details of this.

15         Q    Okay.  All right.  And then on January 30 --

16         A    And she might've just put me on here

17   for -- for awareness because I did not work with the

18   advancement team.

19         Q    Okay.  But she's inviting you in and she's

20   sharing information with you, correct?

21         A    According to this e-mail, yes.

22                    MS. JOHNSON:  All right.  And if you go

23   to the next one, January 30?

24   BY MS. JOHNSON:

25         Q    Does this indicate you took FERPA training?

Page 196

1        A     Yes.  And I registered for it -- for it on

2     my own.

3        Q     Well, everybody has to register for

4     training; isn't that true?

5        A     Yes.  And I found the trainings, but

6     continue.

7        Q     But everybody has to register for training,

8     correct?

9        A     Yes.  But I -- many of these I found on my

10    own.  'Cause --

11       Q     So you're saying that you requested the

12    Infoporte training on your own?

13       A     I did not know how to use Infoporte in the

14    university setting.  So I don't remember what day I

15    registered for some of these things.  But Katie -- a

16    list of -- a list of people to contact or connections

17    or anything like that.  But --

18       Q     You're saying she didn't?

19       A     I don't remember how I go in touch with

20    Rhonda Leary.

21       Q     Well, somebody would have to have told you

22    on your very first or second day because you got in

23    touch with her, correct?

24       A     Yes, I did.  I don't remember how I got in

25    touch with her, but I do not remember Katie connecting

1    me.  But continue.  I'm sorry.  This is --

2          Q    All right.  So the next page is February 4,

3    2019.  It indicates you did Infoporte training,

4    correct?

5          A    Correct.

6          Q    And then the next page indicates you did

7    finance reporting training, correct?

8          A    These are official work, like, UNC -- wide

9    training.  These are not specific -- job that I was

10   performing that I was doing at the School of Public

11   Health that --

12         Q    You're saying Infoporte training wasn't --

13         A    It was not a -- the -- the financial models

14   that they wanted me to create was very loosely needing

15   information from Infoporte.  There were other --

16         Q    Is that your --

17         A    Huh?

18         Q    It's your understanding that you only

19   loosely needed information from Infoporte?

20         A    I did not log in -- Infoporte on a regular

21   basis.  Infoporte was more for -- accounting team.

22         Q    Was it something you should've been logging

23   onto more?

24         A    No.  Because I knew how to pull the

25   information I needed, but it was not -- it was -- it's

1   an accounting tool that I did not use very often.  I

2   was doing forward looking projections and analyzing

3   different data that was not on Infoporte.  But

4   continue.

5                   MS. JOHNSON:  If you can go to the next

6   page, February 12?

7   BY MS. JOHNSON:

8        Q    It's Katie asking you:  do you have enough

9   to do.  She's saying that she -- given you some

10  Tableau mockups, correct?  And you tell her you do

11  have enough stuff to do.

12       A    She says:  I want to start building

13  department dashboards in Tableau.  I have a lot of raw

14  data you can start working with.  Just need to collect

15  it all and put it one place for you.

16       Q    So you say -- if you look at the bottom

17  where she starts, she says:  until I am back in

18  tomorrow.  Is your Infoporte set up correctly now?

19  And then she says:  let me know if you don't have

20  enough and I'll scrounge up some more learning

21  exercises for you today, correct?  At the very bottom.

22       A    I don't see that.

23       Q    You don't see it at the very bottom?

24       A    I see --

25                   MS. JOHNSON:  Court Reporter, if you

1     could scroll down?

2     BY MS. JOHNSON:

3          Q     "Until I'm back."  You don't see that?

4          A     Yes.  And I did have enough to do.

5          Q     Right.  And then you say --

6          A     Again, this --

7          Q     -- the next one, you --

8          A     -- February.

9          Q     Yeah.  But we're talking -- you denied that

10    you got training when you go there.  You denied that

11    people provided you sufficient information to do your

12    job.  Ms. Khazanie, the middle e-mail when you respond

13    to her when she asks you about Infoporte, you say:

14    thanks again for the tickets this weekend.

15          She gave you tickets to a game, correct?

16          A     Correct.

17          Q     And then you say:  my Infoporte is correct

18    now and I'm able to back into all your numbers except

19    for NCIPH was a bit off, but the rest were fine.  And

20    I've held off calculating the SBT since you said I

21    need to learn the neg carryback / proper method for

22    that.  I went to training yesterday all afternoon and

23    was able to practice some there, too.

24          I've got stuff to do and I think I can stare

25    at that allocation model and department budgets 'til

1    the end of time.  If you want me to do something else,

2    let me know.

3             And then that's when she says: you're

4    welcome.  Sounds like you can stay busy today,

5    correct?

6        A    Correct.

7                 MS. JOHNSON:  All right.  And if you

8    can move down to the next e-mail, Court Reporter?  The

9    next page that has writing on it.  I think there's,

10   again, a page that's just an address.

11                THE WITNESS:  Okay.

12   BY MS. JOHNSON:

13       Q    And then on February 15, she sends you EPID

14   data for Tableau, right?

15       A    That's not for Tableau.  That is --

16       Q    What is it?

17       A    That is an Excel -- xlsx means that it is an

18   Excel file.

19                MS. JOHNSON:  All right.  So if you

20   look at the next page?

21   BY MS. JOHNSON:

22       Q    The subject is EPID three-year projection

23   review.  And she says:  I'm booking for an hour and a

24   half, but we may not need that much time.  Supriya

25   will join us so she can hear the discussion as she

1     continues to learn how the financials work here,

2     correct?

3          A     Correct.

4          Q     All right.  And then the next one is

5     February 18 -- oh, she moves a meeting.  She changes

6     the meeting to a certain date, correct?

7          A     Correct.

8          Q     And then you write her an e-mail on April 8

9     saying:  I'm very confused as to how we would give 4k

10    to some of these.  And then she responds to you that

11    you have the raw data; it's all stuff you filtered out

12    on the non-compensation tabs.  She's giving you

13    guidance in these e-mails.

14           Why don't you extract that raw data and then

15    do S-U-M-I-F-S's.

16         A     Sumifs.

17         Q     Sumifs.  Right?  She's giving you guidance,

18    right?

19         A     In April.

20         Q     And then on -- do you remember having a

21    retreat February 14, like a team retreat?

22         A     Yes.

23              MS. JOHNSON:  All right.  And if you go

24    to the next one?

25    //

 1    BY MS. JOHNSON:

 2         Q    It's April 30; reports inventory.  She sent

 3    you an attachment.  Was that an attachment of -- what

 4    do you recall about reports inventory?  Does that --

 5         A    I don't recall anything.

 6         Q    Okay.  And then on May 6 --

 7                   MS. JOHNSON:  If you can go to the next

 8    e-mail?

 9    BY MS. JOHNSON:

10         Q    And again, I'm just showing you some

11    documentation given your testimony about receiving no

12    feedback and guidance from her.  Does this one -- it's

13    a May 6 e-mail stating:  we need to start building out

14    the next iteration of the allocation model.  An she

15    says:  give me a call once you're settled in this

16    morning so we can discuss.

17         A    Correct.

18         Q    Is that correct?  And she gives you a data

19    file, correct?

20         A    Correct.

21         Q    And then the next e-mail -- and again, these

22    are just examples -- it's a July 10, 2019, e-mail

23    where write her and you say:  these are the things I'm

24    missing, correct?

25         A    Correct.

1        Q     And then she responds back to you and

2   answers them in red, correct?

3        A     People to go talk to for the --

4        Q     Yeah.  Well, what were you -- isn't that

5   what you needed, information --

6        A     Yes --

7        Q     -- about how to get the answers --

8        A     -- this is all -- this is all to do with the

9   period between January and July/August where I said

10  things were fine.

11       Q     All right.  Also --

12       A     We -- nothing that we've gone over yet has

13  been outside of that timeframe.

14                    MS. JOHNSON:  If you could look at the

15  next one?

16  BY MS. JOHNSON:

17       Q     July 12, 2019, is an e-mail from -- saying

18  the Core/FLO stuff is what we reviewed together

19  yesterday, correct?

20       A     Correct.  Again, July.

21                    MS. JOHNSON:  All right.  Next one?

22  BY MS. JOHNSON:

23       Q     E-mail from Katie to you dated September 9,

24  2019, saying she mocked up ideas for Tableau

25  workbooks.  Play with these ideas and see what you

1    come up with, right?

2         A    Yes.  And I --

3         Q    But she's giving you something --

4         A    And I created those Tableau workbooks and

5    had them available.  And as she says, I view these as

6    phase one, and I made those phase one documents.

7         Q    And I believe you testified earlier that she

8    didn't really give you any projects much after August

9    or July.

10                   MS. JOHNSON:  You can look at the

11   next --

12                   THE WITNESS:  Yeah.  A mockup is not a

13   project.

14                   MS. JOHNSON:  Can you look at the next

15   page, please, Court Reporter?

16   BY MS. JOHNSON:

17        Q    This is an e-mail October 28, 2019, and she

18   says:  there are a number of things I'd like you to

19   complete this week.  Finish your F&A analysis, create

20   a SB story in Tableau --

21        A    Which I did.

22        Q    -- finish the -- 19 sources uses analysis.

23   Please review my school financial summary; do you see

24   that?

25        A    Yes.  And I did all of these things.

1          Q    Well, this was after you asked her for more

2     guidance on projects to do, correct?

3          A    And I responded to this -- this and I did

4     all of it.

5          Q    Okay.  But I'm just saying she's giving you

6     projects, correct?

7          A    None of these projects are -- are, like,

8     what I don't understand is that these are very simple

9     projects that I made -- I did extensively.  I made a

10    detail -- where she says:  detail drilldown for

11    Tableau; I did that.  I created the SBT story.  I

12    didn't just do one story; I did a ten-page story.

13              Finish the sources and uses analysis.  I did

14    that and I did it extensively and I -- for a VLOOKUP

15    and I gave her a mapping table and I gave her things

16    that other people could use in the future.  So each of

17    these things I did and then some.

18              And she is saying that I had a low work

19    output and lack of competence and unable to work

20    independently.  This is completely contradictory to

21    that.  These are --

22         Q    So if you -- let me go back to Infoporte.

23    If you didn't pull information from Infoporte, where

24    did you pull it from?

25         A    I said I didn't pull information from

1    Infoporte on a daily basis.  Once I pulled it once, it

2    was good.  It was historical data and I -- I often

3    just got things from share drives that somebody had

4    already pulled data from.  But I -- Infoporte was not

5    some -- I didn't have to log in and make adjusting

6    entries in an accounting system or anything like that.

7         Q    And my question to you isn't whether you did

8    all these projects; my question to you is on this

9    October 28 e-mail, she's assigning you three projects,

10   correct?

11        A    Yes.  In October -- and I had

12   those -- I -- those things done.

13        Q    Okay.  That's not my question, though,

14   Ms. Khazanie.  My question just is, did she assign you

15   projects on October 28?  And she said she wanted

16   you -- them this week, correct?

17        A    Yes.  Katie e-mailed me a list of --

18        Q    And that was --

19        A    -- and I did so.  And then on October --

20        Q    And then --

21        A    -- I gave her an update of what I'm working

22   on.

23        Q    Right.  So on October 28, that was after

24   your October 4 e-mail, correct, where you asked for

25   more guidance and projects from her?

Page 207

1      A     Yes.  And the period between October 4 and
2   October 28 is a little while.
3      Q     Well, because you were on vacation for two
4   weeks of that time period, correct?
5      A     Yes.  But there's still many days that I was
6   there and she was there.
7      Q     And she was on vacation -- one week,
8   correct?
9      A     Yes.  But I sent that e-mail on October 4
10  and I was on vacation starting October 10.
11     Q     And y'all met before you left for vacation
12  after your October 4 e-mail?
13     A     I don't remember the exact date, but
14  possibly.
15                 MS. JOHNSON:  Okay.  Can you look at
16  the next e-mail?
17  BY MS. JOHNSON:
18     Q     October 31 you wrote -- excuse me.  October
19  30, again going from the bottom up.  You said you
20  wanted to give her an update, correct?
21     A     Correct.
22     Q     And you state at the end:  I've been working
23  on this nonstop, but I'm not sure I'll be able to
24  finish everything perfectly by Friday.  I might need
25  some more time if that's okay.

Page 208

```
 1              And she responded to you the next day and

 2      answered some things in red and she says:  I want you

 3      to do your best and we will see where things stand

 4      when we meet on Monday, correct?

 5         A    I don't remember this e-mail, but yes.  From

 6      what you're showing here.

 7         Q    You said you were having trouble finishing

 8      the projects by the time she wanted them done, right?

 9         A    I said I'm not sure I'll be able to finish

10      everything perfectly.  Perfectly -- that it is a

11      final, finished project with no errors.

12         Q    Is it too much for her to expect a final

13      project in a deadline that she gives to you?

14         A    When she assigned it to me on October 28 and

15      this e-mail was written on October 30 to turn around

16      three projects in two days, yes.  That's --

17         Q    So you think that was too much for you?

18         A    Three projects in two days?

19         Q    And then can you look at the second -- well,

20      actually, it was by Monday.  It was a week.  She gave

21      you a week, correct?

22         A    And thus I gave her a status update on

23      Wednesday --

24         Q    And she says see what you can get --

25         A    -- less --
```

1          Q     -- says --

2          A     -- if you want to see the timestamp --

3          Q     -- you were telling her --

4          A     If you want to see the timestamp from

5     October 28 assignment, there is at most 48 hours

6     between these two periods.

7          Q     Well, you say I'm not going to -- you wrote

8     her back on Wednesday and you said:  I'm not going to

9     be able to finish things up by Friday -- she had asked

10    you to finish them up that week.  So on Wednesday, you

11    were asking for more time, correct?

12         A     I might need some more time.

13                MS. JOHNSON:  Okay.  And then if you

14    look on the next page, if you go down to the bottom?

15    BY MS. JOHNSON:

16         Q     She had asked you to write down the purposes

17    as you look things up because I will want to drill

18    deeper and I don't want you to have to look everything

19    up a second time.  She's asking you to do a deeper

20    analysis and so that -- she wants to see what your

21    purposes are and she's going to -- she's reviewing

22    you, correct?

23         A     Yes.  And then if you see her response, "No,

24    you didn't drop the ball."  Look -- scroll up --

25         Q     Right.  But she's saying to you she -- but

1    she's giving you review -- and this is October 28:

2    the Infoporte descriptions don't have enough data,

3    which is why you are having to pull up the actual

4    journal entries and capture information about the

5    purpose.

6                    And there again, Infoporte -- you have been

7    getting more for from Infoporte?

8         A    You're asking details that I do not recall

9    and I don't want to put -- I mean, these -- this is

10   getting so deep in the weeds and none of this actually

11   has to do with any of the things that she sent.  But

12   continue.

13                   MS. JOHNSON:  And then if you look at

14   October 28 -- if you look on the next page?

15   BY MS. JOHNSON:

16        Q    You start giving her the purposes, correct?

17   Is that your writing in green?

18        A    Yes.  Correct.  But if any of this was an

19   issue beyond just normal work -- why wasn't there a

20   conversation where she sat down with me and said,

21   "Supriya, these are the issues I'm having.  I need you

22   to do this"?  As opposed to just back and forth

23   e-mails where we talk about something, she could have

24   told me, "These are the things I need you to work on."

25        Q    She's telling you in e-mail -- you would

1    agree that that's how a lot of people communicate in

2    the workforce these days, correct?

3         A    That -- people communicate via e-mail, but I

4    would say that if this was any more than normal work

5    back and forth, there would've been a review

6    where -- as -- as I had it after my first quarter.

7    'Cause you've been going -- for the last hour-plus

8    you've been going through line by line by e-mails.

9              What I was told and what I signed in

10   my -- in my first quarter probationary review was that

11   I was going to have quarterly check-ins and if there

12   was an issue I would initial it --

13        Q    Well, Ms. Khazanie, you had a lot of

14   check-ins with her, correct?  Via e-mail, via

15   meetings.  I mean, these e-mails are her reviewing

16   your work and giving you feedback on your work,

17   correct?

18        A    This is very -- very -- just back and forth

19   banter about work and I would say that this is

20   completely contradictory to her saying that I have a

21   low work output.

22        Q    Okay.  So on November -- the next one on

23   November -- excuse me.  Yeah.  November 8.  And again,

24   you say:  the walkthrough on Monday was so helpful to

25   me.  I think a lot of things clicked for me.  Moving

Page 212

1    on to Tableau now.

2              So on November 8 y'all met, correct?  You

3    had a walkthrough?

4         A    Possibly.  I don't have access to my

5    calendar to --

6         Q    All right.  Then on November 8, do you

7    recall where you sent the next one, the next pages?

8         A    Can you show me?

9         Q    Yeah.  I'm sorry.

10              MS. JOHNSON:  The next page, Court

11   Reporter.

12   BY MS. JOHNSON:

13        Q    If you start at the bottom, you tell her you

14   finished the Q1 sources and uses.  If you have some

15   time to go over it with me, I'd appreciate it.  I

16   think if I got this one right, moving forward should

17   be a lot smoother.  I felt much more confident this

18   time.

19              And then she says:  let's review Monday,

20   correct?

21        A    I -- can you scroll --

22        Q    Please work on -- yeah.  Sorry.  It's

23   remote; not perfect.  Yeah.  And she said:  let's meet

24   Monday.  And then she tells you specifically start

25   working on the next one because that's what you asked

1    her for was more guidance, right, and projects?

2         A    Okay.

3                   MS. JOHNSON:  And then the -- page,

4    Court Reporter?

5    BY MS. JOHNSON:

6         Q    Do you see where she -- giving you on

7    November 19 data questions on SBT revenue?

8         A    Okay.  You see that I asked for 2009 data

9    and we're currently in 2019.  This is 2009 data; it is

10   ten-year-old data.  FY2009.

11        Q    Do you know if you asked her for that data?

12        A    I don't remember, but I do think the

13   ten-year-old data is kind of useless.  I put it --

14        Q    Well, is that --

15        A    I put it into the model to show a deeper

16   look, but ten-year-old financial data is not going to

17   move the needle for what they are looking for.  And I

18   think that is something I really wanted to kind of

19   push.  Like, you can give me 2009 data, but that's not

20   what we're doing in 2019; that's not the outputs I

21   need to create in 2019.

22                   A lot of this stuff is -- is outdated.  I

23   needed --

24                   MS. JOHNSON:  Okay.  If you can go the

25   very last page of this exhibit?

1    BY MS. JOHNSON:

2        Q    You say:  Katie -- missing chunks of data

3    for a deep dive of sources and uses.  I have found

4    several old files, but can't pull old data in

5    Infoporte to check if it's right or the numbers are in

6    the right ballpark.

7        A    Yes.  Because the -- the university -- the

8    university migrated to Infoporte later.  And the

9    information that she wanted -- the older years, 2008

10   through 2015 -- '14, which would give me -- look into

11   the data -- should have existed in these -- this H

12   drive where they kept legacy documents.  And those

13   legacy documents did not exist and I didn't have the

14   old data.

15           So when I was trying to create a 15-year

16   view of how school-based tuition and sources and uses

17   and things were used in the university, I needed clean

18   data that we could use that would show the change over

19   time.

20           Now, if I have 2008 but I'm missing

21   2010 -- or missing 2009 but then it jumps to 2010,

22   that's not a clean data source.  And info --

23       Q    Well, you're the one who just said why is

24   2009 data relevant, so is it now relevant?

25       A    I'm telling you that 2009 through -- 2008

Page 215

1    through 2014 data, this is a wild goose chase that she

2    was sending me on  And this was not pertinent and not

3    important and I was doing this because she told me to.

4        Q    Did you tell her you thought it was a wild

5    goose chase and that it wasn't worth your time?

6        A    I would never talk that way to my boss.  I

7    tried to be respectful with her.

8                MS. JOHNSON:  Okay.  All right.  So

9    Court Reporter, if you can turn to Exhibit 23?

10               (Exhibit 23 was marked for

11               identification.)

12   BY MS. JOHNSON:

13       Q    And I'm just going to represent to you,

14   Ms. Khazanie, that they're some more e-mails

15   documenting meetings.

16       A    Okay.

17       Q    All right.  So the first one is a

18   meeting -- document that you had a meeting with Katie

19   on April 5 -- allocation model review; is that

20   correct?

21       A    Possibly.

22       Q    Okay.  And the second one -- I'm trying to

23   go through these fast -- eating up the afternoon here.

24       A    Yeah.  I --

25       Q    April 16, 2019, that was the date of your

1    workplan/performance evaluation?

2         A    Which day?  Can you scroll?

3                   MS. JOHNSON:  That second e-mail.

4    Second page.

5                   THE WITNESS:  Okay.

6                   MS. JOHNSON:  And the next page?

7    BY MS. JOHNSON:

8         Q    The meeting on April 24 for brainstorm

9    dashboard environment, correct?

10        A    Again, that period in -- while Todd Nicolet

11   was still at the school.

12        Q    The next one, review Tableau work on May 28,

13   2019; is that a meeting you recall?

14        A    That is not.

15        Q    Okay.  You don't recall or are you disputing

16   that it occurred?

17        A    Yeah.  I -- Tuesday -- I -- I don't recall

18   this.

19        Q    Any reason why you wouldn't be at work on a

20   Tuesday?

21        A    'Cause that was right around Memorial Day.

22        Q    So did you take time off in addition to your

23   two-week vacation during that one year?

24        A    I'm looking.

25                   No.  I was at work that day, so I don't

1    remember.

2         Q    Okay.  Well, did you -- if she asked you for

3    meetings, did you refuse to go to them?

4         A    I never refused a meeting with her.

5         Q    Okay.  All right.  And then on June 3, 2019,

6    do you recall a meeting on that day to go over

7    allocation model?

8         A    I -- I do not have access to my old

9    calendar.  I do not know if there are meetings here.

10   I'm -- it, like, I'm sorry, Kari, but it is 4 o'clock

11   and I took the morning off.  And if the meeting is

12   there and I accepted it as the subject says, then I

13   attended it.

14        Q    Okay.  All right.  Well, then, let me skip,

15   then, to just a couple of them, then, because, you

16   know, we've got a meeting on June 17, June 25.  We've

17   got a meeting where y'all agreed to talk on July 26.

18   We've got a meeting on August 8 called brainstorming

19   and review.

20        A    Yeah.  And -- and --

21        Q    Got a meeting on August --

22        A    -- for the first half of the year, if we had

23   a meeting her door was open and I would go to it.  It

24   was the second half of the year if I -- she sent -- if

25   one of us sent a meeting invite and oftentimes she

1    would close her door and not have the meeting.

2         Q    Do you recall --

3         A    Now, which ones of these meetings that

4    happened for and which dates and which time, I have

5    not seen my calendar since I was terminated in

6    June -- January of 2020.  So I cannot tell you exactly

7    which ones.  I'm sorry.

8         Q    Okay.  All right.  So just again, I'm going

9    to try to speed up here.  We've got a meeting on

10   August 13, review allocation model.  I have a meeting

11   on August 14, Tableau planning session.  Meeting on

12   August 13 -- I think we already went over these.

13        A    Okay.

14        Q    Meeting on September 17 -- well, that one

15   might -- oh, yeah --

16        A    That one might what?

17        Q    Meeting on September 17 that was accepted,

18   it was called catch up on projects; do you remember

19   that meeting?

20        A    I do not -- I -- I do not remember these

21   specific meeting invites.  I've never actually seen

22   this formatting of -- of appointments being e-mailed

23   to an address like this.  This is new.

24        Q    Oh.  You don't have where people do invites

25   for meetings or block off their calendars?

Page 219

1          A    Yeah.  But I don't get an e-mail like this,
2     so I don't know how the -- I never got these --
3                    MS. JOHNSON:  Court Reporter, could you
4     go down to the one that starts at the page September
5     20?
6                    THE REPORTER:  What page is that?
7                    MS. JOHNSON:  They're not numbered.  I
8     apologize.  But the very top of the page it says
9     there's an e-mail.  It's several pages down.  It's
10    religious holidays and events -- and the day is
11    September 20, 2019.
12                    THE REPORTER:  Found it.
13                    MS. JOHNSON:  Okay.
14    BY MS. JOHNSON:
15         Q    So if you go at the bottom, it's an e-mail
16    from Katie that says:  just wanted to reinforce -- we
17    discussed this morning.  And it's an e-mail dated
18    September 19, correct?
19         A    Mm-hmm.
20         Q    So that means a meeting did happen at that
21    time, correct?  And then she also says:  I'm fully
22    supportive of the need to take time for religious
23    holidays and events.  Please just make sure you put
24    them on the schedule, correct?
25         A    Yes.  That's -- that's --

1        Q    And then --

2        A    -- she says it here and then when I actually

3    take time to do something religious, it was not just

4    putting them on the -- on the schedule so we can plan

5    around them; it was singling me out and telling

6    everyone about it and making it a very public display.

7             It was not a fully supportive -- me to take

8    time and make sure you put them on the schedule.  It

9    was on the schedule.  It was also on blast to

10   everybody.

11       Q    Well, do you know whether or not for

12   purposes of morale she wanted to explain why the

13   highest paid person is coming in later than everybody

14   or not coming in?

15       A    I never --

16       Q    Do you know if that's --

17       A    I never did not -- come in.  I don't think

18   30 minutes of coming in late and then staying later in

19   the evening, of shifting the schedule just a little

20   bit -- it wasn't shifting it by hours; it was shifting

21   it by a half hour.  That is not -- that is not

22   something that would interrupt or disturb anyone's

23   morale on a team.

24             MS. JOHNSON:  Court Reporter, could you

25   go to the next page?

1    BY MS. JOHNSON:

2         Q    So Ms. Khazanie, in your charge and

3    your -- the EEOC charge, as well as the UNC SHRA

4    grievance, you make a very big deal out of your e-mail

5    on October 4 and you indicate she never followed up

6    with you.  Do you recall that October 4 was a Friday?

7         A    I do not.  I don't have a calendar --

8         Q    Well, if I told you it was a Friday, would

9    you accept that at least for now?

10        A    For now.

11        Q    All right.  For now.  That's fair.  All

12   right.  And she responds to you on October 4 and asks

13   to have -- it says she'll have a meeting with you on

14   October 7, the very next business day, correct?

15        A    Okay.

16             MS. JOHNSON:  And then, Court Reporter,

17   if you could go a couple of -- two pages?

18             THE WITNESS:  You see that it says

19   start time/end time 8:00 p.m.?

20             MS. JOHNSON:  Could you just keep on

21   going?

22             THE WITNESS:  No, no, no.  Right here

23   it says star time and end time of this check-in is

24   8:00 p.m.

25             MS. JOHNSON:  Well, keep on going.

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 221 of 280

1    BY MS. JOHNSON:

2         Q    Do you see the next page?

3         A    Yes, where it says 8:00 p.m.

4              MS. JOHNSON:  Keep on going.  These are

5    just all the different invites and times of

6    scheduling.  Keep on going.

7              Okay.  Stay there.

8    BY MS. JOHNSON:

9         Q    What do you -- you respond to --

10             MS. JOHNSON:  Wait, wait.  That one.

11   Court Reporter, go down.  Sorry.

12   BY MS. JOHNSON:

13        Q    What do you -- her when she -- well, is that

14   your response to her on October 4?

15        A    I respond, "Thank you," despite the fact

16   that it's at 8:00 p.m.

17        Q    But look at the bottom.  It says:  when,

18   Monday, October 7, 4:30 p.m.

19        A    Go up.

20        Q    On the same -- thank you e-mail.  Do you see

21   that?

22        A    Yeah.  And we saw several things just now

23   that said 8:00 p.m.

24        Q    Right.  Are you disputing that she asked to

25   meet with you on that Monday and you said "thank you"?

1        A    I do not remember this exactly, but I

2   do -- I -- I don't remember this exchange at all.

3        Q    All right.  And so if this documentation is

4   correct, she responded to your October 4 e-mail on

5   that day and asked you about setting up a meeting on

6   the very next business day, correct?

7        A    If this -- if this is correct.  I don't

8   recall this at all.

9        Q    So are you disputing that you wrote her back

10  and said "thank you"?

11       A    Yeah.  I have not seen my e-mails in, four

12  years, Kari.

13       Q    Well, so let me ask you this, why didn't you

14  mention that she responded and set up a meeting the

15  very next business day in either your EEOC charge or

16  your SHRA grievance form or your complaint?

17       A    Because she responded does not mean we

18  actually met.  And I think that's something

19  that -- not taking -- just because there is a -- there

20  is a meeting here does not mean her door was open or

21  she was in the office or she actually met with me.  A

22  meeting invite can be sent to anybody.

23       Q    So you're disputing that you met?

24       A    I do not remember the days I met to this

25  extent -- to this extent that I would have the

1      confirmation e-mail that was sent to my e-mail.  I

2      don't have that level of access to my calendar or my

3      notebooks where I kept everything written with dates

4      or my -- my e-mail.  Like, it's just -- there's a lot

5      that I don't have -- that you do.

6          Q    Okay.  It says you accepted it.  It says you

7      accepted it.

8          A    I don't know that I accepted it.  I'm

9      doubting whether or not she actually met with me.  But

10     it is 4:09 on a Friday and I would like to move this

11     along.  If this is -- if we're just going to be going

12     through calendar invites.

13         Q    Well, Ms. Khazanie, this is my chance to ask

14     you questions and I get to decide what the questions

15     are.  And we're allowed a certain amount of time to

16     take a deposition and I'm within that time, but I am

17     trying to move it along for everyone's benefit, I

18     promise you.

19              Do you know what the university hours were,

20     official hours?

21         A    I don't know that there are official hours.

22     I would say most places are 9:00 to 5:00.

23         Q    All right.  Well, so could it be 8:30 to

24     5:00 or 8:30 to 4:30?

25         A    I -- I am not sure if they have that, but I

1    would say 9:00 to 5:00 is customary.

2         Q    Okay.  And part of your job was to be

3    available to chairs and department heads, right, when

4    they were onsite?

5         A    Correct.

6                   MS. JOHNSON:  Okay.  And just finishing

7    up with this exhibit, Court Reporter, if you could go

8    to the second to the last page?

9    BY MS. JOHNSON:

10        Q    It's a November -- meeting that you had to

11   go over a SBT story.  And then the last page are

12   e-mail exchanges where she talks to you about let's

13   meet tomorrow.  And it's an e-mail dated

14   December -- is that not right?

15        A    Yeah.

16                  MS. JOHNSON:  All right.  If you could

17   pull up Exhibit 24, Court Reporter?

18                  (Exhibit 24 was marked for

19                  identification.)

20                  THE REPORTER:  Sure thing.  One moment.

21                  THE WITNESS:  And here I say that it's

22   a lot of information and she says that there is a lot

23   of information that you've provided.

24   BY MS. JOHNSON:

25        Q    All right.  So Ms. Khazanie, I'm --

1                    MS. JOHNSON:  If you could just show

2       her, Court Reporter --

3       BY MS. JOHNSON:

4            Q    -- this first page talks about your EI

5       training; do you see where you registered in this

6       first one and it says the location and time is

7       4/23/2019 from 11:00 a.m. to 12:00 p.m., correct?

8            A    Correct.

9            Q    And that's the one you went to and thought

10      was a waste of time?

11           A    I thought it was not pertinent at all to

12      what they were saying.

13           Q    Okay.  Even though it was recommended by

14      your supervisor?

15           A    My supervisor who had never -- who got it

16      from Steve Ragan and Steve Ragan had never actually

17      sent anybody to it and did not know what it was about.

18           Q    Okay.  And you said there was only one

19      session.

20                    MS. JOHNSON:  Court Reporter, if you

21      could turn to page 3?

22      BY MS. JOHNSON:

23           Q    Do you see where it says: this message

24      confirms your registration for the following training

25      program, emotional intelligence.  And it says May 9,

1    2019, from 1:00 to 2:00 p.m.?

2         A    And do you see that it says it's online web?

3         Q    Yeah.  And you -- do it; did you?  That --

4         A    I don't remember if I did, but it --

5         Q    Well, if you didn't do it -- you registered

6    for it; do you recall doing the second day?

7         A    I do not remember.

8         Q    Well, if they expected you to do it and you

9    didn't, do you have a reason for that?

10        A    I probably -- when they asked me what it was

11   about and I told them that it was about having the

12   ability to speak to people and not being shy that

13   Katie even said to me, "Well, that's the opposite of

14   what I said."

15        Q    Do you know -- did you ever tell them you

16   didn't do part two of the training even though you --

17        A    I do not remember.

18        Q    Okay.  Well, you know they can tell if you

19   did it or not?

20        A    Well, then they -- said something to me if

21   they did 'cause I do not recall this at all.

22             MS. JOHNSON:  Okay.  All right.

23   Exhibit Number 25.

24             (Exhibit 25 was marked for

25             identification.)

 1                    THE REPORTER:  One moment.

 2                    THE WITNESS:  Okay.

 3        BY MS. JOHNSON:

 4             Q    So you had testified before that Katie never

 5        encouraged diversity training; do you recall receiving

 6        this e-mail on February 15 where she's encouraging

 7        people to go to "understanding unconscious bias"?

 8             A    Okay.

 9                    MS. JOHNSON:  All right.  And then if

10        you could turn to the --

11                    THE WITNESS:  It's one thing for her to

12        tell us to take it, but then not accommodating

13        people's schedules to actually do it is different.

14        BY MS. JOHNSON:

15             Q    All right.  All right.  So do you recall

16        her --

17                    MS. JOHNSON:  If you could turn to the

18        last page, Court Reporter?

19        BY MS. JOHNSON:

20             Q    Did you attend that diversity training do

21        you know?

22             A    I don't remember.

23             Q    Okay.

24             A    Everyone went to Thinkposium.

25        That's -- that's where -- when we were in a group

1     during Thinkposium -- when I -- when we were in a

2     group at Thinkposium and everyone was talking about

3     their -- about their experiences about what it was

4     like -- about, you know, what are different things

5     you've went through.

6              And I explained the hair comment -- somebody

7     during Thinkposium and they said, "Oh, my God.  I

8     would quit that job in a heartbeat.  You should sign

9     up.  You should go to HR."  And everyone at my

10    Thinkposium group -- because it is at the Friday

11    Center -- when we were supposed to share things that

12    happened and I shared the hair comment in my safe

13    group during Thinkposium, everyone told me to go to HR

14    and leave the School of Public Health.

15         Q     So --

16         A     So yes, I attended Thinkposium, as did the

17    entire School of Public Health.

18         Q     Right.  And so --

19         A     And I don't think Katie was there.

20         Q     And you testified that she didn't encourage

21    people to go.  She starts this e-mail where:  I've

22    discussed that I want everybody participating in

23    diversity and inclusion activities, correct?  And

24    everybody on the team did go to Thinkposium, correct?

25         A     Everyone in the school went to Thinkposium;

1    that was not a specialized training.  That is

2    a -- half of the university is there; it is at the

3    Friday --

4         Q    You just said everybody went, so now

5    you're -- I'm confused.  Did everybody on your team

6    go?

7         A    Everyone on my team went and a lot of people

8    from the school went.

9                   MS. JOHNSON:  Okay.  All right.  If you

10   could pull up Exhibit 28?

11                   (Exhibit 28 was marked for

12                   identification.)

13                   THE REPORTER:  One moment.

14   BY MS. JOHNSON:

15        Q    So Ms. Khazanie, you had testified before

16   that you were upset -- and I believe you put in your

17   charges that you were upset and felt singled out when

18   Katie sent an e-mail out to everybody about you taking

19   the two-week yoga course.  And I believe I asked you

20   did she ask your permission first and you testified

21   "no."

22                   If you could take a look at these e-mails?

23   And if you start --

24        A    I do not recall this e-mail.

25        Q    Well, okay.  So she sends you an e-mail at

Page 231

1    4:39 on August 1 and says:  I'm also going to send an

2    e-mail to everyone about special requests like this so

3    everyone knows how I view these types of requests and

4    what my parameters are when I approve them.  I'm not

5    singling you out, but I do need everyone to understand

6    you're not getting special treatment.

7             And then you write her back later that night

8    and you say:  absolutely feel free to use my case as

9    an example.  I don't feel singled out at all.  And

10   then you go on to talk about the yoga program,

11   correct?

12        A    Yeah.  And I -- I don't recall this, but I

13   do feel that -- if I replied at 9 o'clock -- if I

14   replied at 9 o'clock, which it shows that I did, I

15   probably was mulling over this all day and was feeling

16   very pressured from her and felt that I had to say

17   this.

18        Q    Well, you say:  absolutely feel free to use

19   my case --

20        A    Yes, because I felt --

21        Q    -- example.  I don't feel singled out at

22   all.

23        A    Yeah.  And I sent it at 9 o'clock at night,

24   which means that I probably was just feeling so

25   pressured that I sat on it all day and then finally

1    was -- said, "okay.  Fine."  But I --

2         Q    But this is what went to Katie, though,

3    right?

4         A    What?

5         Q    That's what went to Katie?

6         A    Yes.  And it went to Katie at 9 o'clock at

7    night after me feeling -- like she straight up says:

8    I don't want -- I'm not singling you out, but she was.

9    How was I --

10        Q    But she asked you --

11        A    -- how --

12        Q    She asked you first, correct?

13        A    Yeah.  But -- but was I supposed to respond

14   to her, "Absolutely not, don't do that.  I," like,

15   she -- I already felt that she was a bully, so I kind

16   of did as she said and tried to be perky and happy

17   about things.

18             It was hard for me -- was really hard for me

19   'cause, like, when somebody puts you on the spot like

20   this -- it's really hard when your boss puts you on

21   the spot and you just -- trying to keep a smiling face

22   and keep going, which is what I did.

23             MS. JOHNSON:  All right.  And if you

24   could pull up Exhibit 26?

25   //

Page 233

1                    (Exhibit 26 was marked for

2                    identification.)

3                    THE REPORTER:  One moment.

4                    MS. JOHNSON:  Thank you.

5      BY MS. JOHNSON:

6          Q    Ms. Khazanie, just wanted to go over a

7      couple e-mails; again, more reviews from Katie and

8      comments from Katie.  Here's a comment -- do you

9      recall this July 26 e-mail where there was a concern

10     about the revenue in one of the models keeps growing?

11             And then you write her back and say:  I'll

12     look at it right now -- if I can make sense of it.

13     I'm not quite sure what is causing it to move that

14     way.

15         A    Okay.

16         Q    And then do you see on July 28 where --

17                    MS. JOHNSON:  The next page, Court

18     Reporter.

19     BY MS. JOHNSON:

20         Q    -- where it says:  the declining revenue

21     continued to bother me.  It just didn't make sense to

22     me even after we talked on Friday, so I looked at it a

23     little deeper yesterday.  You had some errors in your

24     revenue calculations?  Do you see where she's pointing

25     out errors to you?

1        A    One error.  It's not --

2                  MS. JOHNSON:  Go to the next page.

3    BY MS. JOHNSON:

4        Q    November 5.  Do you see where you say:  this

5    math doesn't pan out; we end up with a total of

6    105 percent?  And you're not supposed to have

7    105 percent, correct?

8        A    Yes.  And then I say:  if you have a second,

9    I can explain what I mean.  I'm going to try and fix

10   it and wait for your approval.

11                 MS. JOHNSON:  Okay.  All right.  Can

12   you go to the next one?

13   BY MS. JOHNSON:

14       Q    On November 12, the bottom one, e-mail from

15   you to Katie:  here is a corrected version without the

16   hard code error in the enrollment section.  And she

17   writes you back:  thank you.  It's not good that this

18   was wrong in the version you gave me and I sent to

19   chairs, correct?  Is that what she says?

20       A    Yes.

21                 MS. JOHNSON:  And then if you could

22   turn to the next page?

23   BY MS. JOHNSON:

24       Q    This is a document that's attached to your

25   grievance dated December 12.

1          A    Okay.

2          Q    -- thought I'd give you an update on some

3     things I'm working on.  And then you state on that

4     first one:  I'll have one dashboard on budget cuts,

5     one on perm budget, and will keep going with

6     comparisons to HC and other factors.  And you

7     indicate:  I definitely need to think into this one

8     more since the source of state isn't all from the

9     students like school based tuition?

10         A    Okay.

11         Q    And then do you see for the F&A story -- do

12    you recall when she assigned the F&A story to you?

13         A    I do not.

14         Q    Do you recall in that October 28 e-mail she

15    wanted you to finish the F&A project this week?

16         A    The project is different from the Tableau

17    book, but okay.

18         Q    All right.  And then you say:  I've only

19    uploaded the F&A data as a table so far.  When I

20    finish the descriptions, I'll go deeper.  And then you

21    say -- for the sources and uses story, you say:  this

22    one's still in the early stages?

23         A    Yes.  These are -- you are taking projects

24    and Tableau stories; they are two different projects.

25    It is a phase one and a phase two --

Page 236

1      Q    Okay.  That's fine.  And then on the very

2   last paragraph on the next page, you're talking about,

3   I guess, a Tableau -- and you say:  I've struggled to

4   make it work for a while now, correct?

5      A    Yes.  Because the playable version -- a

6   playable version means that somebody else can log into

7   it and manipulate the data and it plays like a video

8   game.  I could make it so that other people could use

9   it and that's what I had done so that I could present

10   it and other people could have it.

11           But a playable -- do I -- if you read the

12   e-mail, it says:  I talked -- Nick and I -- Nick was

13   on the data team -- talked through the pros and cons

14   of putting a playable version in Tableau where

15   leadership could enter headcounts and FTE.

16           That means that the data source is no longer

17   locked; the data source is now something that they can

18   mess with -- "they" meaning department chairs

19   and -- and allowing your data to no longer be locked

20   means that -- you have to put in securities all the

21   way down to make sure that nothing is being -- is

22   changed correctly and that is a very time consuming

23   thing to put into Tableau.

24           And it's -- that's why I said it almost

25   seems counterproductive to spend that much time on

1    setting it up when it's a quick and easy job in Excel.

2    'Cause in Excel you can just lock the page that has

3    the data and allow others to log into it and it's the

4    same thing as Tableau; it just doesn't have the name.

5             'Cause Tableau is --

6         Q    But she wanted you to do it in Tableau,

7    though, right?

8         A    And why I was explaining to her that -- that

9    the time was not -- was not worth putting it in

10   Tableau.  It was not worth the -- of buying licenses

11   for everybody at the school so that they could see the

12   exact same thing that's in Excel just in a expensive

13   software version.

14        Q    All right.  And then just quickly looking at

15   the last page, it's an e-mail from Katie to you on

16   Friday, January 3.  The very last sentence says:  have

17   you completed the state funds piece for FY2016 to 2019

18   (part of the Tableau assignment I gave in September)?

19   Do you see where she states that?

20        A    Mm-hmm.

21        Q    And does that indicate to you that she'd

22   been waiting for that since September?

23        A    And I had given it to her several times and

24   tried to talk to her --

25        Q    But --

1      A    -- several times.  And if you see all the

2    other e-mails, I'm -- anyway.

3                  MS. JOHNSON:  If you could pull

4    up -- I'm trying to move fast.  If you could pull up

5    Exhibit 27?

6                  (Exhibit 27 was marked for

7                  identification.)

8    BY MS. JOHNSON:

9      Q    One of your -- and while he's pulling that

10   up, one of your claims in this case is you felt too

11   self-conscious to eat outside of your office?

12     A    Mm-hmm.

13     Q    Do you see this first page?  I'm just going

14   to send you a couple of documents about lunches.

15          Do you see this first one where you and Teri

16   are thinking about eating lunch?

17     A    Okay.

18     Q    -- March?

19     A    Okay.

20     Q    So you weren't self-conscious about --

21     A    I wasn't going to stop eating.  I'm a human

22   being.

23     Q    But that's what you say in your charges,

24   that you were too self-conscious to eat in front of

25   people afterwards.  So that's why I'm just asking you.

Page 239

1          A     Yeah.  And I -- I -- being self-conscious
2     doesn't mean I can go without food.
3          Q     Do you tell Teri:  I'm hungry always?
4          A     'Cause that was the joke that Katie always
5     made about me.
6          Q     Okay.  And then the next page is a team
7     lunch that you organized, inviting Katie -- May 21; do
8     you remember organizing a team lunch on May 21?
9          A     That sounds very much like me, that I try to
10    keep up comradery.
11         Q     Do you recall -- okay.  Do you recall --
12               MS. JOHNSON:  Next page.
13    BY MS. JOHNSON:
14         Q     Do you recall organizing or asking -- team
15    lunch on June 5 because you and Katie had -- you were
16    the winning Jeopardy team and won a $25.00 gift card?
17         A     Kate and I were the winning Jeopardy team;
18    not Katie --
19         Q     Kate.  Sorry.  Kate.  Yes.  But do you
20    recall -- and then Katie agrees to pay the difference?
21         A     Yeah.  That was me trying to be a good
22    colleague.
23         Q     All right.  And then the next page, August
24    16, do you recall asking where people wanted to go for
25    the next team lunch?

1       A     Again, these are -- these are me just trying

2    to be a good colleague and -- and foster some

3    comradery.

4       Q     And then the last page, December 10, you

5    said:  I wanted to have a team lunch since we haven't

6    done anything in a few months?

7       A     Again, trying to foster -- comradery.

8       Q     All right.  So we've gone over your

9    termination letter.  And the reasons that were

10   provided in there were inability to meet expectations,

11   inability to work independently, inability to

12   recognize inaccuracies in calculations, and I think

13   we've discussed all those.

14            Regarding the low work output, I just wanted

15   to ask you a couple more questions about the low work

16   output.  Again, we already talked about that Katie had

17   received complaints that you were spending time

18   talking with others and distracting them from working;

19   do you recall us talking about that?

20      A     Yes.

21      Q     Do you also recall us talking about

22   excessive shopping online?

23      A     I recall.

24      Q     And you denied that you did any excessive

25   shopping on your work computer during work time?

1          A      Excessive.

2          Q      All right.  Ms. Khazanie, you understand

3     that people can pull up browser history?

4          A      Okay.

5          Q      And I haven't had a chance to go through all

6     of that, but let me just -- I can pull so many

7     different pages.  Do you recall on December 9 reading

8     up on Ellen DeGeneres, George Bush, and the Death of

9     Uncritical Niceness?

10         A      No.  I don't recall --

11         Q      So would that have --

12         A      -- browser history from 2019.

13         Q      Okay.  Well, I'm just asking you.  Do you

14    recall reading how bad are K-cups for the environment?

15         A      That sounds --

16         Q      -- and December 9 --

17         A      -- article.

18         Q      All right.  Do you recall shopping at

19    Athleta on December 9 for women's yoga clothing?

20         A      Possibly.

21         Q      Okay.  Do you recall looking up nail

22    polish -- this is on December 6 during work time.

23    Zoya nail lacquer?

24         A      Possibly.

25         Q      -- fall collections watches and reviews?

Page 242

1        A    I -- I don't -- any of this is, like, I

2    didn't --

3        Q    You agree that low work output is related to

4    how much time at work you're spending at work,

5    correct, on work?

6        A    Correct.

7        Q    Okay.  Do you recall on December 6

8    researching or looking up love letters to boyfriend, a

9    Google search?

10       A    I don't remember this.

11       Q    Do you remember December 6 looking

12   up -- pedal pushers?  And I'm just going to flip

13   through a bunch of different pages because I don't

14   want you to think I'm just picking on one day.

15                    THE WITNESS:  You're -- you're -- go

16   ahead, Valerie.

17                    Valerie, you're muted.

18                    MS. JOHNSON:  You're muted.

19                    MS. BATEMAN:  Are you going to produce

20   this list of documents you're asking her about?

21                    MS. JOHNSON:  Yes.  It's been asked

22   for.  We will -- I have to produce it as a link

23   because it's so big, Valerie.  I can't produce it

24   as -- document, but yeah --

25                    MS. BATEMAN:  Okay.  Yeah.  So --

Page 243

1           MS. JOHNSON:  -- I believe

2   it's -- we'll produce it.  It's been asked in

3   discovery.

4           MS. BATEMAN:  Okay.

5           MS. JOHNSON:  Because I'm -- I'd like

6   to further ask questions about --

7           MS. BATEMAN:  Okay.  Well, I'm just

8   saying we'll have to supplement that by request for

9   other people's browser's history during the same time.

10           MS. JOHNSON:  Okay.  Well, we'll object

11   to that.  But okay.  All right.  Moving on.

12   BY MS. JOHNSON:

13       Q    December 5, you recall looking up women's

14   jewelry?

15       A    I --

16           MS. BATEMAN:  I think she's already

17   said she doesn't recall her browser history from 2019.

18   So it --

19   BY MS. JOHNSON:

20       Q    All right.  Just tell me if you don't

21   recall --

22       A    I don't recall.

23       Q    -- looking up J.Crew drapery mock neck top

24   in Dutch floral?

25           MS. BATEMAN:  I think she's already

1    said she doesn't recall her browser history from all

2    of 2019.  So you can assume that the answer to every

3    question you're going to ask her from that inch and a

4    half stack of paper is going to be she doesn't recall.

5                    MS. JOHNSON:  No.  It's more

6    than -- stack.  We're talking --

7                    MS. BATEMAN:  Okay.  Well, I'm not

8    there.  I can't tell how big it is.  So --

9    BY MS. JOHNSON:

10       Q    All right.  Well, let me just ask you a

11   couple more.  Let me ask you a couple more because I

12   don't want you to think I'm just picking --

13                   MS. BATEMAN:  I mean, objection; asked

14   and answered.

15                   MS. JOHNSON:  Okay.  Well, I haven't

16   asked the same question --

17                   MS. BATEMAN:  Yeah.  You asked

18   her -- they're all from 2019 and she's already said

19   she doesn't recall.  You're going to make it an

20   exhibit?  The exhibit will speak for itself.  There's

21   no reason for you to continue to ask her questions

22   that she's already said she doesn't recall.  Let the

23   exhibit speak for itself.

24                   MS. JOHNSON:  I'm going to ask a few

25   more questions, Valerie.

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 244 of 280

1              MS. BATEMAN:  She doesn't recall, Kari.

2              MS. JOHNSON:  All right.  You can

3    object --

4              MS. BATEMAN:  She -- I'm objecting.

5    I'm saying this is asked and answered.  You've

6    got -- how big is the stack of paper you have there?

7              MS. JOHNSON:  A lot.  It's huge.

8              MS. BATEMAN:  Yeah, it's huge.

9    BY MS. JOHNSON:

10        Q    Do you remember on --

11             MS. BATEMAN:  And so this is just

12   harassing my client.  She's already said --

13             MS. JOHNSON:  No, it's not.

14             MS. BATEMAN:  -- she doesn't recall.

15   She doesn't recall her browser history from 2019.

16             MS. JOHNSON:  I don't think asking her

17   questions about how she spent her workday is

18   harassment, Valerie.  I --

19             MS. BATEMAN:  You can ask her how she

20   spent her workday.  That's not asking her how she

21   spent her workday.  You're not asking her --

22             MS. JOHNSON:  Okay.

23             MS. BATEMAN:  -- how much time did you

24   spend looking up these websites --

25             MS. JOHNSON:  Valerie, I'm going to ask

1      more --

2                    MS. BATEMAN:  Nothing --

3                    MS. JOHNSON:  I'm going to ask more

4      questions about this.  If you want --

5                    MS. BATEMAN:  Well, I'm going to --

6                    MS. JOHNSON:  -- to object --

7                    MS. BATEMAN:  If you want to ask her

8      how she spent her workday, I don't have a problem with

9      that.  But you're making the transcript unnecessarily

10     long and expensive.

11                   MS. JOHNSON:  -- and I'm going to

12     object --

13                   MS. BATEMAN:  She doesn't recall --

14                   MS. JOHNSON:  -- to the speaking --

15                   MS. BATEMAN:  -- any of the browsing

16     history --

17                   MS. JOHNSON:  But she might

18     recall -- you haven't let me ask her, Valerie.  There

19     might be a topic that jogs her memory.  There might

20     be --

21                   MS. BATEMAN:  Okay.  Have at it.  Have

22     at it, Kari.  Have at it.

23                   MS. JOHNSON:  Thank you.  Thank you.

24     BY MS. JOHNSON:

25         Q    Do you recall looking for slim stretch

1    perfect shirts and black watch tartan on December 2?

2         A    I do not recall.

3         Q    Do you recall Clark's Arlo boots on November

4    27?  And again, I'm being just very -- picking --

5         A    Yeah.  And -- and, Kari, I think what you're

6    missing is that I had three screens in my -- in my

7    computer.  And if something was up on one screen, it

8    would show -- even if I was doing work somewhere else,

9    it would show there for days or it would show there.

10            I don't know why if I did something at -- if

11   I looked up something at lunch time or during a break

12   that you would go through each of my browser history.

13   I do not remember everything I went through in 2019.

14        Q    Okay.  You're aware that browser history

15   tells the times of the day?  Is there any reason why

16   you would be shopping and checking out at 10 o'clock

17   on a workday -- work related.  Is there any work

18   related reason why you would be shopping for women's

19   clothes at 10 o'clock or 2:00 p.m. on a workday?

20        A    I do not recall what -- the circumstances.

21        Q    And you know that it also tells you when you

22   click on things if it changes?  Do you recall Black

23   Friday customer breakfast November 22; do you recall

24   that?

25        A    I do not recall.

1          Q     Do you recall looking at a Connie jersey top

2     on November 21?

3          A     I do not recall.

4          Q     Do you recall purchasing items from Bowden

5     US on November 21?

6          A     I do not recall.

7          Q     So do you recall looking up Thrillist Best

8     and Rest podcast on November 21?

9          A     I do not recall.

10         Q     Do you recall looking at J.Crew Sophie

11    sweater blazer outfit on November 20?  And I'll start

12    going faster.

13         A     I do not recall.

14         Q     Would it surprise you, Ms. "Khazanie" --

15               MS. BATEMAN:  Khazanie.  Khazanie.  Why

16    don't you just call her Supriya?  Call her Supriya if

17    that'll be easier.

18               MS. JOHNSON:  Okay.  I'm going to go

19    with Ms. Khazanie.  And I apologize.  As I think

20    you've been able to tell, I do struggle with words

21    sometimes.

22    BY MS. JOHNSON:

23         Q     Do you recall looking up Sarah Feinberg on

24    Washington Post on November 18?

25         A     No.

Page 249

1        Q    Is that the name --

2        A    I don't recall.

3        Q    Is that your supervisor at Washington Post?

4        A    It might've been her name.

5        Q    Do you recall researching gyms near downtown

6   Raleigh on November 18?

7        A    I do not recall.

8        Q    Do you recall UGGs women's gray boots on

9   November 18?

10       A    I do not recall.  Kari, I do not recall my

11   2019 browser history.

12       Q    Okay.  All right.  Okay.  All right.  So

13   finishing up just a couple of questions and I think

14   I'm really getting to the end here.

15            So you indicated that you talked to Janet

16   Scarce and you talked to her one time after

17   Thinkposium, correct?

18       A    I think that was the timeline.

19       Q    And did you make an appointment to talk to

20   her?

21       A    I don't remember.  I -- I think I might've

22   just stopped in her office.

23       Q    Okay.  And did you -- but you didn't request

24   that she file a formal complaint or anything?

25       A    Because I was afraid I would be retaliated

1    against if I did.

2         Q    Okay.  And you also talked to Charletta; is

3    that correct?

4         A    I talked to Charletta, yes.

5         Q    And you say in one of your documents that

6    you scheduled an appointment for her for December 21;

7    that was a Saturday, correct?

8         A    Yes.

9         Q    And so why would you schedule an appointment

10   with her at her house on a Saturday --

11        A    I scheduled an appointment with her.  My

12   boyfriend at the time had gotten a new car and her son

13   really wanted to -- really liked cars and wanted to

14   see one in-person.

15        Q    So when you say you scheduled an

16   appointment, it wasn't like an official appointment

17   during her work hours; was it?

18        A    No.  She -- her son really wanted to see the

19   new car and had never seen one.  And I -- she

20   said -- asked if he could see it and I said, "Sure."

21   And the only time that my boyfriend and I were both

22   free was a Saturday.  And the -- didn't ask --

23        Q    Did you know before you were terminated

24   that -- did you know in December that Katie was

25   considering terminating you?

1        A    I did not, but I did -- I wish she had let

2    me know.  It would've been fantastic for to have had a

3    mature adult conversation and just said to me, "You

4    know what?  This is not working out."  And I would

5    have gladly, gladly left.  Gladly.

6              And I would've -- I wanted to move -- I

7    was -- she knew I was moving to downtown Raleigh.  I

8    would have transferred to a different school with a

9    different boss where somebody cared about me,

10   appreciated me, and -- and we got along better.

11             She did not get along with me, she did not

12   like me, and she treated me badly and she harassed me.

13   And when -- if she had just told me, "You know what?

14   This isn't working out," I would've been perfectly

15   happy -- perfectly happy to move on with my life as

16   opposed to -- did, which is just out of the blue

17   firing me a week before -- no warning.

18        Q    Are you aware that UNC has a policy where

19   they don't terminate people in December because of the

20   holidays and people being absent from a lot of that

21   time?

22        A    I am not aware of that, but if that's the

23   truth then she should've had a conversation with me

24   and just told me.

25        Q    Okay.  So you indicate that you've talked

Page 252

1  with Steve Ragan and you said -- early November.

2  Isn't it true, Ms. Khazanie, that the reason you

3  talked with him was because of the sexual harassment

4  complaint involving a coworker; it wasn't because of

5  Katie?

6      A     He came to me -- Katie -- somebody came

7  to -- to -- I -- I think it was on Charletta's

8  colleagues or somebody went to Steve Ragan to tell him

9  about the colleague.  Steve Ragan came to me and said,

10 "Do you want to press charges or say something about

11 what he said to you?"  And I said, "I really don't

12 want to pursue that."

13         I thought it was a stupid thing he said to

14 me, but the person -- he does not make me feel

15 uncomfortable at work.  The person that really -- feel

16 uncomfortable at work is Katie.

17     Q     So do you recall in your exit

18 interview -- Steve Ragan was there, correct?

19     A     Correct.

20     Q     And was Abby McLennan there, as well?

21     A     Yes.

22     Q     And do you recall when Steve Ragan asked

23 you, "Why didn't you bring these up to me" and that

24 you indicated in front of both of them, "Because I was

25 afraid because you and Katie are so close"?  Don't you

1    recall saying that in your exit interview?

2        A    I said that to him the day he came to me

3    about the colleague.  I said, "Katie makes me more

4    uncomfortable."  And he said, "Just have a

5    conversation with her."  And I did have a conversation

6    with her and we've gone over the e-mail where I had

7    the conversation with her.  And then I was retaliated

8    against.

9        Q    So if Abby McLennan wrote up notes --

10       A    But yes, I did -- I did feel that Katie and

11   Steve were so close that Steve might not protect me.

12   And Steve didn't protect me when I went to him.

13       Q    But why would the third person in the room

14   with you and Steve during your exit interview write up

15   notes saying that he specifically asked you, "Why

16   didn't you bring up any of this to me before" and that

17   you --

18       A    But I did bring it up with him before.

19       Q    But that's not what you said then.  You

20   said, "Because I was afraid you two were so close."

21   So why did they hear that; what made two people hear

22   that?

23       A    I don't know what they wrote up.  I told

24   Steve and I told Janet and I told Charletta that Katie

25   was bullying me.  In -- exit interview as I was being

Page 254

1    walked out when -- if Steve says that he had no idea

2    that this was happening, that is -- that's not the

3    truth.  Because I did come to him and I did go to

4    Janet and I did go to Charletta.

5         Q    Did you ever go to Kauline Cipriani; did you

6    ever talk to her before you were terminated?

7         A    No.

8         Q    Okay.  Did you talk to anyone else besides

9    Janet and Steve?

10        A    Yes.  I think it was a known fact that Katie

11   was -- was bullying me.  I --

12        Q    Well, so now --

13        A    -- everyone --

14        Q    -- who else?  Who else?

15        A    I think everyone up and down that hall knew

16   that I was uncomfortable and everyone up and down that

17   hall knew that it just was not going well.  And

18   I -- I --

19        Q    Okay.  So it wasn't --

20        A    -- my hope -- my hope by talking to

21   Charletta was out of desperation -- out of just

22   absolute desperation that maybe after I am

23   a -- after -- my plan was that on January 14, the day

24   I became a full employee, I was going to work up the

25   courage to tell Katie that I want to go somewhere

1     else.

2           Q     Okay.  So your plan was only to work with

3     Katie for another week or so?

4           A     Well, she was harassing me.

5           Q     But I'm just saying was that your plan?  I'm

6     just asking you what --

7           A     My hope was that I -- she would -- she would

8     stop harassing me and I wanted to go somewhere where

9     she was not harassing me.  And I would have gladly

10    taken a transfer somewhere else.  I would've applied

11    to another job in state government.

12               I lived in downtown Raleigh; there were

13    ample opportunities somewhere else for me to go

14    somewhere else where my boss was not bullying me.

15          Q     Well, then, how come it took you -- per your

16    discovery responses -- a year to find another job?

17          A     Because when you apply for state jobs, the

18    first thing that they take are SHRA employees that

19    want to transfer within the system; that's the

20    first -- they -- there are many jobs that you can't

21    even apply for unless you are a transfer employee.

22    That was the first thing.  The second thing was it was

23    a pandemic.

24          Q     Well, but your plan -- you left in January

25    and you were saying your plan was to start looking for

1    another job in January and that it would've been easy

2    for you to get one.  But then at --

3         A    If I had been an SHRA employee, which I was

4    not.  I -- I was -- one week shy of getting

5    that -- getting that status and that protection.

6         Q    Let me try to just finish up with a couple

7    of quick questions.  And then I want to take a very

8    short break to just glance through -- because I really

9    am trying to finish.

10             Did you ever talk with anybody I the

11   "omsbud" department at UNC?

12        A    I was told to talk to somebody from

13   "omsbud," but I didn't know who to reach out to.

14        Q    Okay.  So I want to go over your damages.

15   And let me just ask you this -- we talked about how

16   long you were out of employment -- how long did you

17   get unemployment after you left UNC?

18        A    I -- whatever the North Carolina employment

19   period is.  And then --

20        Q    Did you get any other --

21        A    -- there was -- there was some

22   COVID -- COVID things, but that's it.

23        Q    Right.  Okay.  What other forms of income

24   did you have?

25        A    Nothing.

1      Q    Okay.  Were you living with your

2   fiance/boyfriend at that time?  I think you were.

3      A    Yes.  Just --

4      Q    Okay --

5      A    -- to be okay.

6      Q    So you've indicated in your answers to

7   interrogatories that you were diagnosed with anxiety,

8   but then in supplemental responses you indicate that

9   you did not seek any treatment after your termination;

10  which one is it?  And you produced no medical records.

11     A    And I will not produce medical records to

12  you.  I --

13     Q    So -- this, were you diagnosed -- did you go

14  seek any type of medical treatment after you were

15  terminated because of your termination?

16     A    I was very depressed, I was crying all the

17  time, and I talked to my primary care physician about

18  it.

19     Q    And did he diagnose you with a condition?

20     A    I was not -- he said I had situational

21  depression from being fired.

22     Q    Okay.  So you have talked to a doctor about

23  it and have received a diagnosis?

24     A    He said it was situational depression from

25  having stressful time at work and being fired.  And he

1    said, "Once you find the right job, everything will

2    fall into place and you'll be okay."  But I think --

3         Q    And you're --

4         A    -- abuse -- the abuse was what was causing

5    me to be anxious.

6         Q    So you're refusing to produce medical

7    records?

8              MS. BATEMAN:  You know what?  If you

9    want a statement from her doctor -- I don't even know

10   if he put it in her medical records --

11             MS. JOHNSON:  Valerie, we're going to

12   file a motion to compel for the records and hold this

13   deposition open because you haven't produced them.

14   You said she didn't seek treatment after saying she

15   did and --

16             MS. BATEMAN:  Well, I --

17             MS. JOHNSON:  -- and now she's

18   saying -- you said because she didn't have insurance

19   and now she's saying she did.  So we'll handle that in

20   a motion to compel, but she's indicated --

21             MS. BATEMAN:  You can do that, but I

22   think you're misstating our discovery responses.

23             MS. JOHNSON:  No, actually -- okay.

24             If you can pull up, Court Reporter --

25             THE WITNESS:  I -- I cannot be forced

1    to provide you with medical information without my

2    release.  I do not want my medical records to be

3    available to you or anybody.  It is a

4    conversation -- me and my physician.

5    BY MS. JOHNSON:

6        Q    Then are you or are you not claiming

7    emotional distress in this case?

8                MS. BATEMAN:  No.  She's claiming back

9    pay.  That's exactly what we said in our discovery

10   responses.  She's claiming back pay --

11               MS. JOHNSON:  Valerie, it's not -- you

12   state that she's claiming emotional distress and in --

13               MS. BATEMAN:  She said she was not

14   formally treated for her emotional distress; she saw

15   her GP.

16               MS. JOHNSON:  Okay.  I'm going to -- if

17   you can pull up Exhibit 3, Court Reporter?

18               Okay.  If you could pull up

19   number -- go to page 17.  All right.  And then so

20   my -- if you can actually go to the prior page?  No.

21   I -- no.  Page 17.

22   BY MS. JOHNSON:

23       Q    I'm asking you to describe the emotional

24   distress and your response is:  as a result of my

25   being bullied and my wrongful termination, I suffered

1    loss of self-esteem and was diagnosed with situational

2    depression.  I was prescribed antidepressants and

3    antianxiety medication.

4            Did you recall saying that, Ms. Khazanie?

5        A    I -- my physician said, "If you want to take

6    medicine for this, I can prescribe it to you."  And I

7    did not take the prescription.  I did not do any more

8    with it and I sought assistance from other places by

9    talking to my yoga instructor and talking to religious

10   leaders and trying to deal with it holistically.

11           MS. JOHNSON:  Court Reporter, can you

12   pull up Exhibit Number 11?

13           (Exhibit 11 was marked for

14           identification.)

15   BY MS. JOHNSON:

16       Q    I'm going to ask you this again while he's

17   pulling that up.  Are you claiming emotional distress

18   or not in this case as a damage?

19       A    Valerie has all of the --

20           MS. BATEMAN:  Kari, we've answered the

21   interrogatories the way we've answered them.  I think

22   my client's responses speak for themselves.  You

23   asked --

24           MS. JOHNSON:  Okay.  Well, actually --

25           MS. BATEMAN:  You asked if she was

1    claiming emotional distress damages; she said she
2    suffered emotional distress.  You said, "We want to
3    see the treatment records for it."  She said, "There
4    are no treatment records for it because I handled it
5    holistically."
6              I think this is a weight of the
7    evidence, not an exclusionary issue.  But if you --
8              MS. JOHNSON:  -- said --
9              MS. BATEMAN:  -- if you want to --
10             MS. JOHNSON:  Valerie --
11             MS. BATEMAN:  If you -- I'm not
12   finished talking.  If you want to do a motion to
13   compel, then go right ahead and we'll deal with that
14   on its merits.  But she can have emotional distress
15   without having sought treatment for it.
16             MS. JOHNSON:  You know, Valerie, I
17   agree.  But she says she sought treatment.  She said
18   she got diagnosed and sought treatment.  So we're
19   entitled to those records  Also then he pulled up
20   Exhibit Number 11, which are -- supplemental
21   responses.
22             If you can turn to page 7 where I ask?
23   Because I said in the deficiency we're entitled to the
24   medical information.  She says --
25             MS. BATEMAN:  That's page 11.  That's

Case 1:20-cv-01096-TDS-JEP  Document 72-9  Filed 03/24/23  Page 261 of 280

```
 1      page 11.

 2                    MS. JOHNSON:  No, page 7.  Sorry.

 3      Page 7.

 4                    MS. BATEMAN:  Yeah.  You asked about

 5      all health problems or conditions for the past 12

 6      years; that's overbroad --

 7                    MS. JOHNSON:  Valerie, can -- yes.

 8      BY MS. JOHNSON:

 9          Q    And then in your supplemental responses or

10      in response to our deficiency notice, Ms. Khazanie,

11      it's a -- additions noted in the response to

12      interrogatory number 19, plaintiff did not seek

13      treatment for emotional distress resulting from her

14      termination date due to a lack of health insurance.

15                    So we have one response where you're saying

16      you were diagnosed.  You've just testified you

17      discussed it with your primary physician.  And then we

18      have a response saying that you didn't seek treatment

19      because you didn't have insurance.  So which is it?

20                    MS. BATEMAN:  If she didn't have health

21      insurance that covered, like, a therapist or something

22      like that, then she didn't have health insurance to

23      cover that and she didn't seek the treatment.  She

24      already told you that her --

25                    MS. JOHNSON:  She testified she saw a
```

Case 1:20-cv-01096-TDS-JEP  Document 72-9  Filed 03/24/23  Page 262 of 280

1    primary.

2    BY MS. JOHNSON:

3        Q    Did you not -- Ms. Khazanie, we've got what

4    you testified to under oath --

5        A    I -- I saw -- you are allowed -- I -- I paid

6    for the limited, like, Obamacare package that allowed

7    me to see my primary care physician once.  It did not

8    cover me to go to a psychiatrist or a psychologist or

9    a therapist that would pay for regular treatments.  I

10   did not want to take --

11       Q    But you brought it up with your primary

12   physician, correct?

13       A    I did.

14       Q    Okay.  All right.  And he diagnosed you with

15   situational depression, correct?

16       A    He said this -- situational depression.  I

17   do not know what he wrote in my medical records.  But

18   as -- he told me -- you get to a place where you are

19   not abused and you have a fulfilling job, you will be

20   okay.  And I --

21       Q    And has that happened --

22       A    -- to that --

23       Q    -- now that you have a fulfilling job?

24       A    I do.

25       Q    Okay.  So your situational depression has

1    ended?

2         A    Correct.  'Cause the situation --

3         Q    Ms. Khazanie, has --

4         A    -- the situation was the abusive boss and

5    the unemployment.

6         Q    And you've had other abusive bosses before,

7    correct?

8         A    I have.

9         Q    And you've been the victim of sexual

10   harassment at Credit Suisse, correct?

11        A    Correct.

12        Q    And have you ever been treated for

13   depression before?

14        A    No.

15        Q    Who is your primary physician?

16        A    I don't have to answer this.

17                  MS. BATEMAN:  Yeah, I mean --

18                  MS. JOHNSON:  Okay.  Are you

19   saying -- Valerie, are you instructing her not to

20   answer?

21                  MS. BATEMAN:  I'm just saying she said

22   she had a conversation.  I'm happy to get a copy of

23   her medical records and see if he actually wrote

24   anything down, but she's already testified that it was

25   just a conversation with him.

1                    MS. JOHNSON:  Well, I've asked for

2         that.  I asked for that in --

3                    MS. BATEMAN:  I --

4                    MS. JOHNSON:  You --

5                    MS. BATEMAN:  -- you asked -- let's go

6         up and look at the interrogatories.  You asked for all

7         health problems or conditions for the past 12 years.

8         That was your interrogatory request.

9                    MS. JOHNSON:  I asked -- yes.  There's

10        two --

11                   MS. BATEMAN:  All health conditions --

12                   MS. JOHNSON:  -- requests and one --

13                   MS. BATEMAN:  --  or problems for the

14        past 12 years.  That's not even remotely relevant to

15        her damages in this case.

16                   MS. JOHNSON:  Valerie, we'll just look

17        at the responses and look at your answers.  But I want

18        to move this along.

19        BY MS. JOHNSON:

20             Q    Ms. Khazanie, we -- and again, I'm trying to

21        move this along.  So you've indicated that you were

22        out of work for, I guess, a year.  You have a higher

23        paying job after -- year and during that time you

24        received unemployment and I guess some sort of COVID

25        benefits.  And then you say you're looking for

Page 266

1    attorney fees; do you have a number for your attorney

2    fees yet?

3                   MS. BATEMAN:  No, she doesn't.  And

4    that's attorney-client anyway.

5                   MS. JOHNSON:  Okay.  That -- I'm just

6    asking.  I'm just asking, Valerie.

7    BY MS. JOHNSON:

8         Q    After you filed your SHRA grievance with

9    UNC, you had a mediation and we've explored this in

10   detail in discovery.

11        But you indicate that it was your

12   understanding that the mediation agreement that you

13   signed didn't cover the claims in this lawsuit because

14   you -- after you conferred with an attorney and it was

15   your understanding that you could proceed with these

16   claims, correct?

17        A    Correct.

18        Q    Who was that attorney?

19        A    Valerie.

20        Q    Okay.

21                   MS. JOHNSON:  Valerie, if you don't

22   mind, I really am trying to speed this up.  I'm going

23   to check my notes real fast.  I think I'm at the end,

24   but I just need to check my notes for like -- if you

25   can give me five minutes?

Page 267

1              MS. BATEMAN:  Yeah, that's fine.  Let's

2       go off the record.

3              MS. JOHNSON:  All right.  Thank you.

4              THE REPORTER:  The time on the monitor

5       is 5:03 p.m.; we are now off the record.

6                    (Off the record.)

7              THE REPORTER:  The time on the monitor

8       is 5:09 p.m.; we are now back on the record.

9       BY MS. JOHNSON:

10          Q    Ms. Khazanie, just one kind of topic I

11      wanted to just ask you about is when was the last time

12      you talked with anybody at UNC?

13          A    I do not remember.  I had a -- a -- Melvin

14      reached out to me on -- on some form of communication.

15      Either --

16          Q    Social media?

17          A    -- my phone.  Melvin and Joseph just both

18      asked to see how I was doing.

19          Q    And when was that?

20          A    I don't remember.  I don't recall.

21          Q    And I'm not trying to pin you down to a

22      specific time, but was it -- do you know, was it like

23      in the -- has it been in the last couple of months?

24          A    I don't think -- it's -- it -- they said --

25          Q    Was it --

Page 268

1          A     -- congratulations on getting married, so it

2     must've been in the last two years.

3          Q     Okay.  Okay.  That's right.  All right.  And

4     so how about Charletta; when was the last time you

5     talked with Charletta?

6          A     Charletta called me in June of 2020.

7          Q     Mm-hmm.

8          A     Because she called to see how I was doing

9     because I lived downtown and there were -- that was

10    during BLM protests.

11         Q     Oh.  And did y'all talk about your

12    employment or anything during those communications?

13         A     She said, "Why don't you" -- "have you found

14    anything yet?"  And I said, "No."  And she said, "Why

15    don't you just find a job remote?"  And that's all I

16    remember.

17         Q     Okay.  And prior to June of 2020, had you

18    talked -- did you talk with her any other time?

19         A     She called me -- she called me the day I was

20    fired.  And told --

21         Q     Okay. And what'd y'all talk about --

22         A     -- not -- she said she can't take -- she had

23    promised that on the 14th of January she would go with

24    me to Kauline Cipriani, the dean of diversity and -- I

25    don't remember her exact title -- and that she would

1    help me -- just tell her about my situation and help

2    me is what she told me.

3         Q    And did you ever after your termination talk

4    with Kauline Cipriani?

5         A    No.

6         Q    Okay.  And so besides Charletta and Melvin

7    and Joseph Love, have you talked with anybody at UNC

8    since you were terminated?  Or texted.  I should ask

9    that more broadly.  Have you communicated?

10        A    I do not recall who I talked to immediately

11   after being let go or fired, but I have not kept in

12   touch with anyone from the school.

13        Q    Do you recall sending e-mails out to some of

14   the chairs or business managers?

15        A    Yes.  After I left, I did.

16        Q    Okay.  All right.  And do you recall calling

17   Katie an emotional predator in those e-mails?

18        A    I'm sure I -- because she is -- to me she

19   was.

20        Q    Do you recall referencing Trump in those

21   e-mails?

22        A    I do not recall referencing Trump, but I do

23   recall saying that Katie was -- Katie was a bully.

24   And I -- I have no -- the hardest part about this

25   entire case is that I came forward about a bully and

1    you are pulling in every other thing and not going to

2    the source of what I had said and what I came forward

3    about.

4            And I don't think anyone should feel

5    protected by the State Human Rights Act and feel

6    protected by HR because what you have done is -- is

7    confirmed that speaking truth to power is a bad thing.

8        Q    When you just brought up working remotely,

9    that reminded me of one other thing I think you said

10   in your charge.  Katie let you work remotely a decent

11   amount, correct?

12       A    A handful of days.

13       Q    Are you aware that she let you work more

14   remotely than anybody else in the department in her

15   finance team at the time?

16       A    I think everyone would have loved to have

17   done it, they were just too afraid of her.  I had --

18       Q    But you weren't; you asked --

19       A    Huh?

20       Q    You weren't afraid to ask to work remotely;

21   were you?

22       A    I had come from investment banking and

23   consulting where people work from anywhere; from

24   a -- from a back of a taxi to -- hotel room -- and

25   I -- especially in 2023.

1          This sounds kind of crazy, but asking to

2     work remotely for a day -- it was not for a extended

3     period of time; it was often because I went on a trip

4     over the weekend and it was cheaper to fly back on

5     Monday night rather than Sunday night, which is --

6          Q     But that was in -- but we're talking about

7     2019 before COVID, correct?  And people at state

8     government didn't really work remotely, correct?

9          A     Correct.  And I asked -- it was when I went

10    out of town to visit my family in New Jersey or in

11    Denver or something of that nature -- I told her that

12    the flights are cheaper if I fly out on a Monday night

13    rather than flying out on a Sunday night; is it okay

14    if I work remotely on Monday.

15         Q     And so --

16         A     She was very hesitant about it.  She did not

17    let me -- and the whole time I was remotely working,

18    she harassed me with phone calls and texts and

19    messages and e-mails and my whole family watched this

20    and they all said, "My gosh, she bullies you."

21         Q     Well, you were working, though, right?  You

22    considered it a workday?

23         A     It was a workday, but she was particularly

24    harassing me more because I was remote.  All of --

25         Q     And --

1           A    -- she was --

2           Q    -- tell me --

3           A    -- she was checking on me and she would

4    message.  And when I was in Denver, Colorado, she told

5    me that she would not be able to log into a meet and I

6    would have to conduct it.  A meeting I had never

7    conducted before, but she also knew that the time

8    difference was two hours.  So I woke up at 6:00 in the

9    morning and I conducted -- meeting.

10          Q    Well, but you were at work.  You could've

11   taken it as a vacation day if you had had the time,

12   right?

13          A    I wanted to save up my time so that I could

14   take a substantial vacation to Europe and not use it

15   up for a day here and a day there.

16          Q    But it's not -- like a supervisor has a

17   right for you to -- on a day that you're saying you're

18   working to attend a meeting, correct?

19          A    It is.  But a supervisor, knowing that you

20   are two time zones away -- probably if they were kind

21   not ask you to work at 6:00 a.m.

22          Q    Okay.  And then just according to my

23   records -- tell me if this meets with your

24   recollections -- that you worked remotely

25   approximately three times in March, two times in

1    April, two times in May, one time in June, four times

2    in July, and one time in November; does that sort of

3    match up?

4         A    That does not match up.

5         Q    Okay.  So if we have documentation that

6    shows that those were remote days for you --

7         A    Four times in March?

8         Q    Three times in March.  And I think I have

9    four times in -- yeah.  I have July 5, July 8, July

10   26, July 29, November 27, March either 4 or 5, March

11   either 15 or 16, and March -- it was either 29 or

12   March 3.

13        A    I -- this -- this is far more detail than I

14   have recollection of.

15        Q    Okay.  But are you surprised to hear that

16   you were allowed to work remotely more than any other

17   person on the finance team?

18        A    I -- I had a laptop and other people wanted

19   to work remotely.

20        Q    But you got to, right?

21        A    I don't understand why this is considered --

22        Q    Well, you've mentioned that; it's in your

23   claim about not being able to work remotely.  That's

24   why I'm bringing it up.

25        A    Yeah.  And -- and a couple days here and

Page 274

1    there during the course of the year is not a huge

2    privilege in my opinion.

3                MS. JOHNSON:  Okay.  I don't think I

4    have any further questions, believe it or not.

5                MS. BATEMAN:  Well, I just have one.  I

6    have one.

7                          EXAMINATION

8    BY MS. BATEMAN:

9        Q    Ms. Khazanie, there have been a lot of

10   questions today about the rights of a supervisor to do

11   certain things like control your work, you know,

12   decide whether you can be on leave; just a variety of

13   things.  What was your understanding or did you have

14   an understanding that supervisors also had

15   obligations, as well as rights?

16               MS. JOHNSON:  Object --

17       A    I did --

18               MS. JOHNSON:  -- you can answer.

19   BY MS. BATEMAN:

20       Q    And what were those obligations?

21       A    I was under the understanding and it was

22   even written in my probationary -- that they were

23   supposed to meet with you at least quarterly and write

24   a paragraph.

25               And then we were supposed to talk about it

1      in documentation and both parties were supposed to

2      initial and confirm that we understood what was

3      happening and that if anything was the problem, we

4      would have a mature conversation and discuss it.

5              And if there were performance issues that

6      there would be conversations about performance issues

7      and a performance improvement plan or something of

8      that nature.

9              I did not think that anybody in the state

10     system -- because my mom's in the state system and my

11     father's in the state -- was in the state

12     system -- that if you were an employee, no one

13     outright fires you without warning and conversations

14     and documentation and some sort of parameters around a

15     procedure to do that.

16             You can't just blindside somebody a week

17     before they go permanent.  Never having said a single

18     thing since Q1 and then just drop it on them.

19     Q    So is it your testimony that not only did no

20     one talk to you about your performance deficiencies,

21     but you also never received anything in writing?

22     A    Correct.

23                  MS. BATEMAN:  Okay.  That's all I have.

24                  MS. JOHNSON:  All right.  I think

25     that's all I have, but I do believe the court reporter

Case 1:20-cv-01096-TDS-JEP   Document 72-9   Filed 03/24/23   Page 275 of 280

Page 276

1    asked us to stay on at the end in case he had any

2    questions.

3                    Court Reporter?  I believe that's --

4                    THE REPORTER:  Yes.  So --

5                    MS. JOHNSON:  -- what you said.

6                    THE REPORTER:  I just have a couple

7    things to do before we go off the record.  So just

8    give me one second to make sure I have all the

9    exhibits down.

10                   So if I'm not mistaken, there were 24

11   exhibits tendered today marked 1 through 8, then 10

12   through 13, and then 17 through 27, it appears.  I

13   believe that's what I have down; does that match what

14   you have, Ms. Johnson?

15                   MS. JOHNSON:  I believe through 28; was

16   that not right?

17                   THE REPORTER:  Yeah.  I do have it

18   through 28.  Sorry.  My bad.

19                   MS. JOHNSON:  Okay.  Yeah.  Yeah.

20   That's right, then.

21                   THE REPORTER:  All right.  Next on the

22   list -- this one regards you, Ms. Bateman, and

23   Ms. Khazanie.  How would -- like to handle signature;

24   we'd like to read and sign or waive?

25                   MS. BATEMAN:  Does that have to be on

1    the record?

2                     THE REPORTER:  Veritext wants me to

3    make sure I get it on the record whether it's required

4    or not saying what you --

5                     MS. BATEMAN:  Okay.  I haven't -- yeah.

6    We will read and sign.

7                     THE REPORTER:  All right.  And lastly,

8    how would we like to handle transcript orders?

9                     MS. BATEMAN:  Pardon me?

10                    THE REPORTER:  How would we like to

11   handle transcript orders?  Veritext also likes us to

12   have those on the record too so we know what --

13                    MS. BATEMAN:  Yeah.  I will confer with

14   my client and get back to you about that.

15                    THE REPORTER:  All right.

16                    MS. JOHNSON:  And, Joshua, I always

17   just say this.  I just want the regular -- whatever

18   your regular is.  I don't think it needs to be

19   expedited.

20                    THE REPORTER:  Okay.

21                    MS. JOHNSON:  So whatever your

22   regular -- which, I guess, is usually electronic.  I

23   don't know what -- whatever your regular is.  And if

24   you need more clarification than that, please just

25   contact me early next week.

1              THE REPORTER:  All right.  I don't

2    believe anyone else needs one.  Then in that case,

3    I'll double-check --

4              MS. JOHNSON:  Yeah, no one

5    else -- yeah.  No one else of the other attorneys on

6    the defendants' side needs one.

7              MS. BATEMAN:  Yeah.  And can you just

8    send me the options, please?

9              THE REPORTER:  All right.  I'll have

10   someone from Veritext send you the options,

11   Ms. Bateman.

12              MS. BATEMAN:  That'd be great.  Thank

13   you.

14              THE REPORTER:  All right.  So with this

15   in mind, the time is now 5:24 p.m.; we are now off the

16   record.

17              (Signature reserved.)

18              (Whereupon, at 5:24 p.m., the

19              proceeding was concluded.)

20

21

22

23

24

25

Page 279

1              CERTIFICATE OF DEPOSITION OFFICER

2              I, JOSHUA SEAGONDOLLAR, the officer before

3    whom the foregoing proceedings were taken, do hereby

4    certify that any witness(es) in the foregoing

5    proceedings, prior to testifying, were duly sworn;

6    that the proceedings were recorded by me and

7    thereafter reduced to typewriting by a qualified

8    transcriptionist; that said digital audio recording of

9    said proceedings are a true and accurate record to the

10   best of my knowledge, skills, and ability; that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to the action in which this was taken;

13   and, further, that I am not a relative or employee of

14   any counsel or attorney employed by the parties

15   hereto, nor financially or otherwise interested in the

16   outcome of this action.

17                        JOSHUA SEAGONDOLLAR

18                        Notary Public in and for the

19                        State of North Carolina

20

21   [X] Review of the transcript was requested.

22

23

24

25

Page 280

1                    CERTIFICATE OF TRANSCRIBER
2              I, KATLIN JENSEN, do hereby certify that
3     this transcript was prepared from the digital audio
4     recording of the foregoing proceeding, that said
5     transcript is a true and accurate record of the
6     proceedings to the best of my knowledge, skills, and
7     ability; that I am neither counsel for, related to,
8     nor employed by any of the parties to the action in
9     which this was taken; and, further, that I am not a
10    relative or employee of any counsel or attorney
11    employed by the parties hereto, nor financially or
12    otherwise interested in the outcome of this action.
13
14
15                    KATLIN JENSEN
16
17
18
19
20
21
22
23
24
25